No. 26-2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,

Defendant-Appellee

COMMON CAUSE; KATHERINE ELLENA; VIRGINIA STATE CONFERENCE OF THE NAACP; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# BRIEF FOR THE UNITED STATES AS APPELLANT

*(See inside cover for continuation of counsel)*

*(continuation of counsel)*

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
KELSEY E. MCGEE
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 251-0053

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

SUMMARY OF ARGUMENT ........ 11

STANDARD OF REVIEW ........ 13

ARGUMENT ........ 13

I. The DOJ's demand for an electronic, unredacted copy of Virginia' SVRL satisfied Title III's requirements ........ 13

A. Virginia's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand ........ 15

1. The SVRL is a record that came into Commissioner Koski's possession ........ 16

2. The district court erred in finding the SVRL falls outside Title III when the SVRL would still "come into" Commissioner Koski's possession the moment another person in his office gave it to him. ........ 31

**TABLE OF CONTENTS (continued): PAGE**


3. The district court's interpretation of Section 301 excluding internally generated documents would lead to absurd results. .......... 33

B. The DOJ stated a sufficient basis and purpose in its demand for Virginia's SVRL. .......... 36

1. The Attorney General is entitled to Virginia's SVRL without meeting the requirements for an administrative subpoena. .......... 38

2. The DOJ's demand stated an adequate basis. .......... 48

3. The DOJ's stated purpose of ascertaining Virginia's compliance with the NVRA and HAVA was sufficient. .......... 51

4. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303. .......... 55

II. The DOJ's demand for Virginia's unredacted SVRL does not violate federal or state privacy laws. .......... 57

A. Federal law preempts any contrary Virginia privacy law. .......... 58

B. The United States is complying with the Privacy Act. .......... 61

CONCLUSION .......... 64

**TABLE OF CONTENTS (continued):** **PAGE**

STATEMENT REGARDING ORAL ARGUMENT .................................. 66

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney Gen.*
285 F.2d 430 (5th Cir. 1961) .......... 18, 39

*Alphin v. United States*, 809 F.2d 236 (4th Cir. 1987) .......... 57

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .......... 63

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .......... 58

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .......... 13

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 54, 64

*Bryan v. United States*, 524 U.S. 184 (1998) .......... 31

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 59

*Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052 (2026) .......... 20

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)
(per curiam) .......... 41, 53

*Department of Com. v. New York*, 588 U.S. 752 (2019) .......... 56

*Doe v. Chao*, 540 U.S. 614 (2004) .......... 62

**CASES (continued):** **PAGE**


*Donaldson v. United States*, 400 U.S. 517 (1971),
*superseded by statute on other grounds*,
Tax Reform Act of 1976, Pub. L. No. 94-455,
90 Stat. 1520 ........ 46

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) ........ 47

*EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*,
116 F.3d 110 (4th Cir. 1997) ........ 51

*EEOC v. Maryland Cup Corp.*, 785 F.2d 471 (4th Cir. 1986) ........ 50

*Equal Emp. Opportunity Comm'n v.
South Carolina Nat'l Bank*,
562 F.2d 329 (4th Cir. 1977) ........ 46-47

*Equity Inv. Assocs., LLC v. United States*,
40 F.4th 156 (4th Cir. 2022) ........ 43-44

*Ex Parte Siebold*, 100 U.S. 371 (1879) ........ 59

*Fischer v. United States*, 603 U.S. 480 (2024) ........ 29

*Foster v. Love*, 522 U.S. 67 (1997) ........ 59

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) ........ 17

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc.
Union No. 174*, 598 U.S. 771 (2023) ........ 60

*Gray v. Main*, 309 F. Supp. 207 (M.D. Ala. 1968) ........ 60

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ........ 15

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) ........ 48, 51

**CASES (continued):** **PAGE**

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......... 41

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) .......... 41

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000) .......... 44

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) .......... 40, 41

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .......... *passim*

*Lamie v. United States Tr.*, 540 U.S. 526 (2004) .......... 25

*Link v. NLRB*, 330 F.2d 437 (4th Cir. 1964) .......... 47

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) .......... 15, 19

*Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) .......... 13

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .......... 20

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) .......... 15

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946) .......... 44

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) .......... 61

*Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) .......... 60

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) .......... 54

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) .......... 30

**CASES (continued):** **PAGE**


*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................. 54

*Ronnow v. City of Las Vegas*, 65 P.2d 133 (Nev. 1937) .......................... 17

*Russello v. United States*, 464 U.S. 16 (1983) ................................. 25, 53

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .............................. 3-4

*Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239
(4th Cir. 2009) ................................................................................. 13

*United States v. American Target Advert.*
257 F.3d 348 (4th Cir. 2001) ................................................... 48, 57

*United States v. Benson*, 819 F. Supp. 3d 753
(W.D. Mich. 2026) ........................................................... 23, 46, 53

*United States v. Benson*, 179 F.4th 470,
*reh'g en banc denied*, No. 26-1225,
2026 WL 2364306 (6th Cir. Aug. 14, 2026) ............................ *passim*

*United States v. DeMarinis*, No. 25-3934, 2026 WL 1780586
(D. Md. June 18, 2026) ................................................................ 24-25

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978) ........................................................................ 55

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ............................. 40

*United States v. Maine*, No. 1:06-cv-86-JAW,
2007 WL 1059565 (D. Me. Apr. 4, 2007) ......................................... 19

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ...................... 58

*United States v. Mississippi*, 380 U.S. 128 (1965) ........................... 15, 19

**CASES (continued):** **PAGE**

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .................... 41, 46

*United States v. Oregon*, No. 6:25-cv-1666,
2026 WL 318402 (9th Cir. Feb. 5, 2026) ........................................ 37

*United States v. Powell*, 379 U.S. 48 (1964) ............................... 43-44, 56

*United States v. Rosinsky*, 547 F.2d 249 (4th Cir. 1977) ........................ 43

*United States v. Stuart*, 489 U.S. 353 (1989) ........................................ 55

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ............................................................... 19

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ............................................... 29-30

*Webster v. Doe*, 486 U.S. 592 (1988) ....................................................... 41

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1 ............................................................ 59

U.S. Const. Art. VI, Cl. 1 ................................................................. 58

**STATUTES:**

Civil Rights Act of 1960
(Title III)
52 U.S.C. 20701 *et seq.* ............................................................ 3
52 U.S.C. 20701 ........................................................... *passim*
52 U.S.C. 20701-20706 ........................................................... 52
52 U.S.C. 20702 ........................................................... 28-29, 31
52 U.S.C. 20703 ........................................................... *passim*
52 U.S.C. 20704 ........................................................... 4, 60-61
52 U.S.C. 20705 ........................................................... *passim*

**STATUTES (continued):** **PAGE**


Pub. L. No. 86-449, § 601, 74 Stat. 90 ........................................... 52
(Title VI)
52 U.S.C. 10101 ........................................... 52

Civil Rights Act of 1964 (Title VII)
42 U.S.C. 2000e-2 ........................................... 52

Civil Rights Cold Case Records Collection Act of 2018
§ 2(3)(B), Pub. L. No. 115-426,
132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ........................................... 19

Fair Housing Act of 1968
42 U.S.C. 3604-3606 ........................................... 52
42 U.S.C. 3617 ........................................... 52

Help America Vote Act
52 U.S.C. 21083(a)(1)(A) ........................................... 6
52 U.S.C. 21083(a)(1)(A)(viii) ........................................... 6, 33
52 U.S.C. 21083(a)(2)(A) ........................................... 5-6, 28
52 U.S.C. 21083(a)(2)(A)(i)-(iii). ........................................... 6
52 U.S.C. 21083(a)(2)(B)(ii) ........................................... 28
52 U.S.C. 21083(a)(5)(A)(i)-(ii) ........................................... 6
52 U.S.C. 21083(a)(5)(A)(iii) ........................................... 6
Pub. L. No. 107-252, 116 Stat. 1666 (2002) ........................................... 54

National Voter Registration Act of 1993
52 U.S.C. 20501 *et seq.* ........................................... 9, 49
52 U.S.C. 20501(a)(3) ........................................... 53
52 U.S.C. 20501(b)(3) ........................................... 5
52 U.S.C. 20507 ........................................... 24
52 U.S.C. 20507(a)(4) ........................................... 5, 28
52 U.S.C. 20507(i)(1) ........................................... 5, 60

**STATUTES (continued):** **PAGE**

President John F. Kennedy Assassination
Records Collection Act of 1992
§ 3(2), Pub. L. No. 102-526,
106 Stat. 3444 (44 U.S.C. 2107 note) .......... 19

Privacy Act of 1974
5 U.S.C. 552a(e)(4) .......... 61-62
5 U.S.C. 552a(e)(4)(B) .......... 63
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 .......... 58, 62

Voting Rights Act of 1965
52 U.S.C. 10301-10306 .......... 52
52 U.S.C. 10309 .......... 52

8 U.S.C. 1454(a) .......... 23-24

8 U.S.C. 1445(f) .......... 24

10 U.S.C. 130c(d)(2)(C) .......... 22

13 U.S.C. 214 .......... 22

26 U.S.C. 7605(a) .......... 44

26 U.S.C. 7605(b) .......... 44

28 U.S.C. 1291 .......... 2

28 U.S.C. 1331 .......... 2

28 U.S.C. 1343(a)(4) .......... 2

30 U.S.C. 1732(b) .......... 22

44 U.S.C. 3572(f) .......... 22

**REGULATIONS:** **PAGE**

28 C.F.R. 0.50(a) ........ 63

68 Fed. Reg. 47,610 (Aug. 11, 2003) ........ 62

68 Fed. Reg. 47,611 (Aug. 11, 2003) ........ 62-64

70 Fed. Reg. 43,904 (July 29, 2005) ........ 62

82 Fed. Reg. 24,147 (May 25, 2017) ........ 62

**LEGISLATIVE HISTORY:**

*Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ........ 45

106 Cong. Rec. 7767 (1960) ........ 41

**RULES:**

Fed. R. App. P. 2 ........ 64-65

Fed. R. App. P. 40(d)(1) ........ 65

Fed. R. App. P. 41(b) ........ 64-65

Fed. R. Evid. 201(b) ........ 57

**MISCELLANEOUS:**

Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026), https://www.justice.gov/olc/media/1440346/dl ........ 18

Black's Law Dictionary (4th ed. 1968) ........ 17

**MISCELLANEOUS (continued):** **PAGE**


Black's Law Dictionary (5th ed. 1979) ............ 20-21

*New Shorter Oxford English Dictionary* (4th ed. 1993) ............ 17

Report of the United States Commission on Civil Rights (1959) ............ 26, 34-35

*The American Heritage College Dictionary* (1959) ............ 30

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury# ............ 63

U.S. Dep't of Just., Civil Right Division, Voting Section, https://www.justice.gov/crt/voting-section ............ 63

U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA*, https://tinyurl.com/2pvdk78h (last visited Sept. 8, 2026)) ............ 54

U.S. Election Assistance Comm'n, About the EAC, http://eac.gov/about (last visited Sept. 3, 2026) ............ 7

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025), https://tinyurl.com/38xb38tx ............ 7

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960) ............ 16

*Webster's Seventh New Collegiate Dictionary* (1967 ed.) ............ 17

*Webster's Third New International Dictionary* (1966 ed. Vol. I) ............ 17, 21-22, 30

## INTRODUCTION

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General sweeping authority to inspect election records. 52 U.S.C. 20703. In accordance with that authority, the United States requested Virginia's statewide voter registration list (SVRL) to enable the United States to investigate Viriginia's compliance with the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA). Virginia declined. The United States then brought this lawsuit to compel Virginia to produce the SVRL.

In dismissing the United States' Complaint and denying the United States' Motion to Compel the district court rewrote the phrase "come[s] into . . . possession" to exclude internally generated documents like Virginia's SVRL from the scope of Title III. This interpretation is irreconcilable with the plain and ordinary meaning of Title III's text. The other arguments raised below—(1) that the United States failed to provide a sufficient basis and purpose for its Title III demand, and (2) that state and federal privacy laws excuse compliance with the Attorney General's demand for Virginia's complete and unredacted SVRL—provide no alternative basis to affirm.

This Court should reverse the district court's judgment and remand with instructions for the district court to order Virginia to produce the demanded SVRL.

## STATEMENT OF JURISDICTION

This appeal stems from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343(a)(4). That court entered a final Order granting the defendant's and intervenors' Motions to Dismiss on June 18, 2026. JA1-14.[1] The United States filed a timely Notice of Appeal. JA192-194. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding Virginia's statewide voter registration list (SVRL) is not a record that "come[s] into" an election officer's "possession" within the meaning of Title III of the CRA, 52 U.S.C. 20701.

2. Whether Title III of the CRA permits a court to scrutinize the sufficiency of the Attorney General's written statement of the basis and

[1] "JA_" refers to the joint appendix filed with this brief. "Doc. __, at __" refers to the docket number and internal page numbers on the district court docket sheet, No. 3:26-cv-42-RCY (E.D. Va.).

the purpose for the demand, and if so, whether the Attorney General's statement was sufficient here.

3. Whether federal or state privacy laws prevent the United States from demanding and obtaining the full, unredacted copy of Virginia's SVRL.

## STATEMENT OF THE CASE

1.a. Congress passed the CRA to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll

tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted

additional laws that affect what "records and papers which come into [election officers'] possession," 52 U.S.C. 20701.

Relevant here are the NVRA and the HAVA, which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3). The NVRA requires each State, with exceptions, "for at least 2 years . . . [to] make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The NVRA further requires each State to conduct "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . change in the residence of the registrant." 52 U.S.C. 20507(a)(4). Similarly, HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(2)(A).

Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL which "serve[s] as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C. 21083(a)(1)(A)(viii). HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters," who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

2. The United States Election Assistance Commission (EAC) is "an independent bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process." U.S. Election Assistance Comm'n, About the EAC, http://eac.gov/about. EAC conducts a biennial Election Administration and Voting Survey (EAVS) of States. For the 2024 EAVS, States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, *Election Administration and Voting Survey 2024 Comprehensive Report* at iv (June 2025), https://tinyurl.com/38xb38tx.

Based on its review of the 2024 EAVS report, the Attorney General, acting through representatives at the Department of Justice (DOJ), sent a July 14, 2025, letter to then-Commissioner Susan Beals, the chief election officer of Virginia, regarding Virginia's compliance with Federal list maintenance requirements. JA52-54. The July 15 letter listed several anomalies in Virginia's voter registration data identified from Virginia's EAVS responses. JA53. The letter detailed that Virginia had 1,047,543 (33.2%) duplicate registrations, which was almost three times as high as the nationwide average of 12.7% and in 2022, the duplicate registrations

reached 36.3%, along with no information provided to EAVS on whether those duplicates were removed. JA53. The letter also questioned the 9.8 voter confirmation notices, which fell well below the national average of 19.5%. JA53. Virginia was also questioned by the DOJ in the letter as to why the EAVS data showed 68.4% (536,460 voters) were removed because the voter moved out of the Commonwealth, and why that number was twice as high as the national average. JA53. Finally, the letter asked why 415,181 (79.6%) of confirmation notices were unreturned and why Virginia had removed only 7.8% (61,151 voters) who failed to respond to confirmation notices and did not vote in the two most-recent federal elections, which also fell well below the national average. JA53.

The letter requested a list of the election officials responsible for implementing Virginia's general program of voter registration list maintenance for a specified time and a description of the list maintenance steps taken and when those steps were taken to assess compliance with the NVRA. JA52. The letter also requested a current electronic copy of Virginia's computerized SVRL, as required by Section 303(a) of HAVA. JA52. The letter emphasized that the request "regard[ed] Virginia's procedures for complying with the statewide voter

registration list maintenance provisions of the [NVRA], 52 U.S.C. § 20501 *et seq*." JA52.

On August 14, 2025, having received no update regarding the request, the DOJ sent a letter demanding an electronic copy of the SVRL, including registrants' full names, dates of birth, residential addresses, and driver's license numbers or last four digits of registrants' social security numbers. JA56-58. In the months that followed, DOJ had discussions with Commissioner Beals' representatives, but on January 8, 2026, they expressed that she would not be providing the SVRL as requested. Doc. 39-2, at 4.

3. The United States brought this suit for declaratory judgment on January 16, 2026, alleging that Commissioner Beals' refusal to produce Virginia's complete, unredacted SVRL violated Section 303 of Title III of the CRA, 52 U.S.C. 20703.[2] Doc 1. The district court later authorized the National Association for the Advancement of Colored People of Virginia (NAACP), the NAACP Virginia State Conference (collectively NAACP),

---

[2] After Abigail Spanberger was sworn in as the Governor of Virginia and appointed Steven Koski to serve as Commissioner of the Department of Elections, the United States amended its Complaint to name Commissioner Koski as the defendant. JA37-46.

and Common Cause and Katherine Ellena (collectively Common Cause)—to intervene as defendants. Doc. 44.

The United States subsequently moved to compel production of the SVRL (*see* JA47-50), and Commissioner Koski, the NAACP, and Common Cause (collectively defendants) each filed Motions to Dismiss the United States' Amended Complaint. *See* JA59-66. On July 14, 2026, the district court granted the Motions to Dismiss and denied the United States' Motion to Compel. JA14.

As a threshold matter, the district court rejected the United States' contention that under *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) (*Lynd II*), the Federal Rules of Civil Procedure do not apply to Title III records demands.

Then on the merits, the district court concluded that Virginia's SVRL is not a "record" available for inspection under Title III. JA6. According to the district court (JA8), the SVRL is not a record that comes into the possession of a state election official (and therefore is not a "record" available for inspection under Title III) because state officials create the SVRL rather than "acquire, obtain, or receive" it. JA9. The district court rejected the United States' argument that "an

agency record can be both created by the agency and have come into the agency's possession." JA11 (citation omitted). Finally, the district court concluded that Congress could not have contemplated that the SVRL be a record available for inspection under Title III because NVRA and HAVA's requirement that SVRLs be continuously updated is irreconcilable with Title III provisions that criminalize the alteration of records.[3] JA12.

The United States now appeals from the Order granting the defendants' Motions to Dismiss, denying the United States' Motion to Compel, and dismissing the United States' Complaint with prejudice.

## SUMMARY OF ARGUMENT

The district court erred in dismissing the United States' claim under Title III of the CRA. Under the plain language of Section 301 (52 U.S.C. 20701), Virginia's SVRL is an election record that "come[s] into [an election officer's] possession" and must be preserved and produced to

[3] The defendants also argued that the Attorney General's written demand for the SVRL lacked a sufficient basis and purpose, and that federal and state privacy laws required dismissal. Doc. 47, at 11. The district court did not reach these arguments. JA12-13.

the Attorney General for inspection upon written demand. *See* 52 U.S.C. 20703. The district court erred in adopting a strained interpretation of "come[s] into . . . possession" that arbitrarily excludes internally generated records like the SVRL from Title III's reach. This Court should reverse.

While the district court declined to reach the other arguments advanced below, none provides an alternative ground to affirm the district court. *First*, the Attorney General satisfied Section 303 (52 U.S.C. 20703) by issuing a written demand to Commissioner Beals that contained a statement of the basis and purpose of the demand. Title III does not cabin the Attorney General's demand authority to certain types of investigations. Nor does Title III authorize a court to scrutinize the sufficiency of the Attorney General's basis and purpose for its demand. But even if it did, the Attorney General's demand for Virginia's SVRL stated a sufficient basis and purpose. *Second*, no state or federal privacy laws permit Virginia to withhold the full, unredacted SVRL from the Attorney General. This Court should remand this case with instructions to order Virginia to produce the full, unredacted SVRL for inspection consistent with the United States' Title III demand.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal under Rule 12(b)(6) *de novo*." *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss under Rule 12(b)(6), courts must "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Ibid.* A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* In addition, statutory interpretation is a question of law reviewed *de novo*. *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242-243 (4th Cir. 2009).

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of Virginia' SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962)

(*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the state election officer has rejected it, the Attorney General may seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the grounds that Virginia's "SVRL is not a record subject to production under Title III of the CRA." JA8. The court reasoned that the SVRL did not "come into [Commissioner Kolski's] possession" because "Virginian election officials created a

database themselves." JA9. The court further concluded that interpreting Title III to include the SVRL is irreconcilable with HAVA and NVRA's SVRL maintenance provisions. JA9. Both conclusions are erroneous.

### A. Virginia's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Section 301 of the CRA requires an election official to "retain and preserve . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701.

This "sweeping" retention provision applies to Virginia's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-176 (2009) (citation omitted). Title III's

text confers far broader investigative power than the district court's reading allows.

Under the plain language of Title III, Virginia's SVRL is a record required to be preserved—and thus produced for inspection upon demand. The district court erred in holding that Title III excludes internally generated records based on its reading of the phrase "come into his possession."

**1. The SVRL is a record that came into Commissioner Koski's possession.**

a. The district court erred in refusing to adopt the ordinary meaning of the phrase "come[s] into . . . possession" offered by the United States. Consistent with dictionary definitions contemporaneous with the CRA's passage, an officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). None of these definitions limit the author, source, or origin of the thing acquired or possessed.

In fact, the definition of "acquire" conveys the opposite: "to come into possession of often by some *uncertain or unspecified means*." *Webster's Seventh New Collegiate Dictionary* 8 (1967 ed.) (emphasis added); *see also Webster's Third New International Dictionary* 18 (1966 ed. Vol. I) ("to come into possession, control, or power of disposal of often by some uncertain or unspecified means"); *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))). As the contemporaneous Black's Law Dictionary described, to acquire was to "receive or gain *in whatever manner*[,]" broadly "being the act of getting or obtaining something which may be already in existence, *or may be brought into existence* through means employed to acquire it." *Black's Law Dictionary* 41 (4th ed. 1968) (citing *Ronnow v. City of Las Vegas*, 65 P.2d 133, 139 (Nev. 1937) (explaining that "[a] bridge may be acquired *by construction* as well as by purchase")) (emphases added).

The defining feature of the phrase "come into possession" then, is the resulting possession—not the particular means by which that possession is secured. By limiting the phrase's meaning to one particular method of possession, *i.e.*, receipt of externally created records, the district court's interpretation does *exactly the opposite* of what the plain language of the phrase commands.

Congress's choice of the phrase "come[s] into . . . possession" appears deliberate, being selected precisely because it is broad enough to cover any document obtained by any means—both self-generated and from an outside source—during the officer's tenure. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 8-9), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960) (referring to "all records and papers which are in the possession of an election official . . . if those records and papers relate to the acts requisite to voting"), *aff'd sub nom. Dinkens v. Attorney Gen.*,

285 F.2d 430 (5th Cir. 1961).[4] Indeed, courts have recognized that Section 301 encompasses "records of voting registration[,]" *Mississippi*, 380 U.S. at 134, including voter registration lists, *see, e.g.*, *United States v. Maine*, No. 1:06-cv-86-JAW, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre*, 624 F. Supp. at 664.

The Supreme Court has likewise understood that the scope of the phrase "come into . . . possession" is broad enough to cover internally generated documents, albeit in the context of the Freedom of Information Act (FOIA). In *United States Department of Justice v. Tax Analysts*, the Court was tasked with discerning the meaning of the phrase "agency records[,]" which FOIA left undefined. 492 U.S. 136, 142 (1989). It held that the phrase encompassed two requirements: "First, an agency must either *create* or obtain the requested materials," and second, "the materials [must] have *come into the agency's possessio*n in the legitimate

[4] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, § 2(3)(B), Pub. L. No. 115-426, 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ("was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, § 3(2), Pub. L. No. 102-526, 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

conduct of its official duties" and remain in the agency's possession at the time of a records request. *Id.* at 144-145 (emphasis added; citation and internal quotation marks omitted). Thus, the Supreme Court specifically recognized that records that "come into the agency's possession" can be created by the agency—not just obtained from external sources. Here, the district court erred in concluding otherwise. *See* JA11.

The surrounding context of Section 301 confirms the United States' interpretation. The phrases "all records and papers" and "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" clearly encompass election documents like an SVRL. 52 U.S.C. 20701; *cf. United States v. Benson*, 179 F.4th 470, 478 (*Benson II*), *reh'g en banc denied*, No. 26-1225, 2026 WL 2364306 (6th Cir. Aug. 14, 2026) (*Benson III*) (observing it was undisputed that the "qualified voter file is a 'record'" and "that the term 'relating to' has a broad meaning"). The phrase "'relating to' sweeps broadly[,]" and "means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060 (2026) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law

Dictionary 1158 (5th ed. 1979))). Thus, the types of records encompassed under Section 301 extend beyond simply applications, registrations, or receipts for payments, including any record relating to one of those activities—or even relating to the catchall "other act requisite to voting." 52 U.S.C. 20701. The SVRL fits comfortably within that scope.

When Commissioner Koski or his agents, employees, or officers, aggregate individual voter records into an SVRL, they get or acquire a new document (the SVRL) and retain it within their control—thus coming into possession of the SVRL.

b. The district court viewed the United States' reading as creating "surplusage" for the words "come into," and concluded the choice of the phrase "come into possession" instead of "in the possession" supported the district court's carve-out for self-generated documents. *See* JA11. That is incorrect.

Congress used the phrase "*come* into his possession" rather than "*in* his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453

(1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"); *Benson III*, 2026 WL 2364306, at *7 (Griffin, J., dissenting) ("By 1960, 'come into' possession or custody was a familiar legal expression. . . . [I]t did not distinguish property according to its source."). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 13 U.S.C. 214 (prohibiting an employee from publishing or communicating information "which comes into his possession by reason of his being employed"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Thus, when elsewhere in federal law a legal obligation is created when one "comes into possession of such information by reason of his or her being an officer[,]" 44 U.S.C. 3572(f), or within a certain time after "information comes into the possession of the Secretary[,]" 30 U.S.C. 1732(b), no source, origin, or author of said information is required.

Following this focus on the *how* and *when* an individual gains possession of a record or paper, Section 301 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. 52 U.S.C. 20701. Thus the phrase "come into his possession" "cabins an election official's liability to documents she received during her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting).

The distinction between records "com[ing] into [one's] possession" and being "in[] [one's] possession," then, is a "temporal" one, *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting)—not a distinction between obtaining records from an outside source and through the fruits of state officer's labor. One of the statutes cited by *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*), which the district court below heavily relied on, as "draw[ing] an explicit distinction between possessing something and having something come into one's possession," *Id.* at 768 (citing 8 U.S.C. 1454), illustrates the point. JA9-10. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of

naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . may come into possession of it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a). Thus, the phrase "come into possession" implies a temporal change in circumstances. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

Even if, as other courts have done by contrasting the "come into . . . possession" formulation of Title III with the NVRA's public-inspection provision, which requires States to make available "all records concerning the implementation of [certain] programs and activities." *United States v. DeMarinis*, No. 25-3934, 2026 WL 1780586, at *5 (D. Md. June 18, 2026) (quoting 52 U.S.C. 20507), *appeal pending*, No. 26-1878 (4th Cir. docketed July 13, 2026). But unlike Title III, the NVRA's public-

inspection provision imposes no *personal* liability—only a state government's obligation—so there is less reason to cabin when and how the duty to retain and preserve attaches. In any event, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute." *Russello v. United States*, 464 U.S. 16, 25 (1983). By the district court's own cross-statute surplusage analysis, it would appear that States are obligated under the NVRA to make available even those "records" *not* in their possession—a result that makes little sense—because the NVRA does not use the word "possession" whereas the Title III does. *DeMarinis*, 2026 WL 1780586, at *2-3 (citation omitted). Even assuming that another preferred formulation would have been clearer than what Congress chose, however, that would not necessarily render the meaning of the statute any less plain. *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004).

c. Further, while the district court errantly concluded that Section 301 is limited to those *not* created by Commissioner Koski as he did not "acquire, obtain, or receive Virginia's SVRL" (JA9), Section 301 does cover "all records and papers . . . *relating to* any application, registration . . . or other act requisite to voting in such election." 52 U.S.C. 20701

(emphasis added). So, this distinction illuminates very little when looking through the temporal lens discussed, A.1.b., *supra*.

As Judge Nalbandian has explained, the historical context in which the CRA was passed makes clear that Title III was aimed at covering "at least some government-generated records":

> One practice in the Jim Crow South was the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them. *See* Rep[ort] of the U[nited] S[tates] Commission on Civil Rights 93 (1959) [(1959 CCR Report)]. And county boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant.

*Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting); *see* 1959 CCR Report at 75, 82, 87-89 (noting that the Commission had reviewed lists of registered voters); p. 35, *infra*.

Judge Nalbandian also pointed out another contextual clue. Under the reading adopted by the district court in this case, Title III does not cover "any internally or self-generated record," the Attorney General would have no authority to demand records created by a county clerk tracking voters by race. *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting). At the time of the CRA's passage, such internally generated and inculpatory documents would have been among the most pertinent

records the Attorney General could have sought to investigate rampant discriminatory practices.[5] Furthermore, five judges on the Sixth Circuit agreed with Judge Nalbandian's panel dissent, and four more judges indicated they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and expressed "doubt over the panel opinion's interpretation of the phrase 'come into his possession' in Title III." *Benson III*, 2026 WL 2364306, at *1-2 (Murphy, J., concurring).

d. The district court erred a second time by concluding that Title III must not reach SVRLs because, according to the district court, NVRA and HAVA's SVRL maintenance requirements conflicts with Title III's criminal penalties for willfully altering covered documents. JA12.

Section 302 of Title III prohibits "[a]ny person" from "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or alter[ing] any

[5] Although the Sixth Circuit denied rehearing en banc in *Benson*, five judges agreed with Judge Nalbandian's dissent, including regarding the phrase "come into his possession," *Benson III*, 2026 WL 2364306, at *13 (Thapar, J., dissenting), and four more judges joined a concurrence which indicated they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and concluded there was "room for doubt over the panel opinion's interpretation of" that phrase, *id.* at *1-2 (Murphy, J., concurring).

record or paper" covered by Section 301. 52 U.S.C. 20702. The NVRA requires States to "make[] a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[,]" 52 U.S.C. 20507(a)(4), and HAVA requires States to "perform list maintenance with respect to the [SVRL] on a regular basis[,]" including ensuring individuals "who are not eligible to vote are removed from the [SVRL]." 52 U.S.C. 21083(a)(2)(A) and (B)(ii).

Because "Virginia's SVRL is a dynamic database that state officials regularly modify to reflect the current voter registration roll," the district court concluded that the DOJ's reading of section 20701 "could render regular list maintenance . . . illegal activity to criminal penalties." JA10. That is incorrect. A majority of judges on the Sixth Circuit have determined that Title III of the CRA can be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See, e.g.*, *Benson III*, 2026 WL 2364306, at *4-5 (Murphy, J., concurring), at *9 (Griffin, J., dissenting), at *14 n.7 (Thapar, J., dissenting).

Accepting the district court's conclusion would place *all* dynamic documents, not just the SVRL, beyond the reach of Title III. Nothing in

the text of Title III suggests a dynamic record requiring continuous maintenance or updates—whether the SVRL or something else—cannot properly come within the scope of Section 301. Nothing in Title III's text indicates that Congress intended to include such a limitation when it enacted Title III decades before the NVRA and HAVA. To the contrary, the broad scope of "all records and papers" in Section 301 indicates the opposite.

Nor does the word "alter" in Section 302 encompass list maintenance under the NVRA or HAVA. The Supreme Court recently interpreted a similarly worded criminal statute in *Fischer v. United States* and explained that, under the canon of *noscitur a sociis*, each of these words must be understood as "actions that, by their nature, impair the integrity or availability of records, documents, or objects." 603 U.S. 480, 490 (2024). Performing list maintenance under the NVRA and HAVA is thus not "alter[ing]" the SVRL at all, 52 U.S.C. 20702; it is, rather, "retain[ing] and preserv[ing]" the SVRL, 52 U.S.C. 20701; *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1085 (10th Cir.

2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing").[6]

List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 302. *See Benson III*, 2026 WL 2364306, at *9 (Griffin, J., dissenting) ("'[A]lters' likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list."). There is no obligation to create a new, static version of the database with every single edit.[7]

But even if the two statutes did conflict, the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Title III. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). There is no

---

[6] *See The American Heritage College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

[7] The CRA does, however, require election officials to preserve the official voter registration list used for a specific federal election. *See Benson III*, 2026 WL 2364306, at *14 n.7 (Thapar, J., dissenting).

basis for resorting to an "implied repeal" of Section 301 as applied to SVRLs. *Benson II*, 179 F.4th at 485-486 (Nalbandian, J., dissenting).

Moreover, Section 302's willful *mens rea*—overlooked by the district court—places the type of ordinary list maintenance and updates required under the NVRA and HAVA well beyond the scope of criminal penalties. 52 U.S.C. 20702; *see Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

**2. The district court erred in finding the SVRL falls outside Title III when the SVRL would still "come into" Commissioner Koski's possession the moment another person in his office gave it to him.**

Even assuming that the phrase "come into his possession" could be read to exclude self-generated records, the SVRL still came into Commissioner Koski's possession. Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. *See* 52 U.S.C. 20701; *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring), at *9 (Griffin, J., dissenting), at *14 (Thapar, J., dissenting). Section 301 "imposes a specific duty on an

individual (each officer of election), not a general duty on the entire State." *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring). The fines and penalties follow the individual state official with possession of those records. *See* 52 U.S.C. 20701. And nothing in the phrase "comes into possession," or in Section 301 generally, mandates that the records come from voters, as opposed to other third parties—including other election officials. So even if every single election officer collectively generated the SVRL at one time after HAVA's passage (which the district court never found), every new election officer who has since gained control over the SVRL has come into possession thereof at a later time. *See Benson II*, 179 F.4th at 486-487 & n.8 (Nalbandian, J., dissenting).

Commissioner Koski came into possession of the SVRL when he received it from someone else in his office, or when he assumed office. *See Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting); *Benson III*, 2026 WL 2364306, at *2 (Murphy, J., concurring), at *9 (Griffin, J., dissenting), at *14 (Thapar, J., dissenting). "As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if *some*

state officials created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—Commissioner Koski "nonetheless 'c[a]me into . . . possession' of the [SVRL]" when he received it from other election officers. *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701).

### 3. The district court's interpretation of Section 301 as excluding internally generated documents would lead to absurd results.

Excluding internally generated documents from Title III's coverage would lead to absurd results. One of these results is that the SVRL is, since the passage of HAVA, an archetypal record of acts requisite to voting in an election kept by election officials. After all, the SVRL is not just any "record" of an "act requisite to voting," 52 U.S.C. 20701; it is a federally mandated record that "serve[s] as the official voter registration list for the conduct of *all* elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii) (emphasis added).

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, the Uniformed and Overseas Citizens Absentee Voting Act, the NVRA, HAVA, or the Voting Rights Act of 1965, for example, the Attorney General needs to examine both applications to

register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Benson III*, 2026 WL 2364306, at *15-16 (Thapar, J., dissenting); *Lynd II*, 306 F.2d at 228.

The district court's perceived conflict between Section 302 and required list maintenance is therefore not only illusory, but also harmful. It would effectively carve out vast numbers of federal election records, including SVRLs, from the United States' inspection authority under Title III, which was plainly not Congress's intent in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226. Historical context—alluded to above (p. 26)—further demonstrates that Congress would not have created such a distinction between documents received from voters and those generated by state officers. To repeat, Title III was enacted in light of "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing 1959 CCR Report at 93); *see also id.* at 479 (majority opinion) (relying on the same report). These voucher indices were critical to the Commission because

the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138.

The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. 1959 CCR Report at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88. Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic state voter registration list as required by HAVA.

The district court's interpretation would also exclude from Title III all of the most blatant evidence of discrimination—such as internal

memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting) (highlighting that under that interpretation, "if a county clerk were to keep track of anyone, by race, who paid a poll tax or was given a literacy test or otherwise tried to register to vote, that record could not be obtained by the DOJ"). Title III's text does not indicate that Congress intended such a strained limitation.

### B. The DOJ stated a sufficient basis and purpose in its demand for Virginia's SVRL.

The Attorney General's demand for election records under Section 303 must "contain a statement of the basis and the purpose therefor." 52 U.S.C. 20703. While the district court did not reach the issue, the defendants argued below that the Attorney General did not include a sufficient basis and purpose in the demand for Virginia's SVRL. *See, e.g.*, Doc. 47, at 11-12; Doc. 49, at 14-15; Doc. 51, at 15-16. These arguments fail and do not provide an alternative basis to affirm.

Commissioner Koski argued that the July 2025 letter was inadequate as it did not make any purpose or reference to Title III of the Civil Rights Act. Doc. 47, at 17. As the August 2025 letter and the July

2025 letter provided both basis and purpose for the demand, the letters can—and should be—discussed and viewed as one.

Defendants argued that both the stated basis and purpose were inadequate because the August 2025 letter did not contain the requisite basis and purpose under Title III. *See* Doc. 47, at 11-12; Doc. 49, at 14; Doc. 51, at 17. Commissioner Koski argued that the DOJ's "written demand provide[d] no legally sufficient purpose to support" a Title III demand as it "lacks 'any reference or relation to the purposes for which Title III was enacted.'" Doc. 47, at 17 (quoting *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *10 (9th Cir. Feb. 5, 2026), *appeal pending*, No. 26-1231 (9th Cir. oral argument held on May 19, 2026)). The intervening defendants made similar arguments. *See* Doc. 49, at 12-14; Doc. 51, at 15-20.

Defendants also argued that the demand was "pretextual" or "contrived" based on suppositions and speculation. Doc. 47, at 18-19; Doc. 51, at 20. While the district court declined to reach these arguments, they nonetheless fail to provide an alternative basis to affirm the district court.

**1. The Attorney General is entitled to Virginia's SVRL without meeting the requirements for an administrative subpoena.**

Section 303 of Title III provides the Attorney General with a comprehensive power to demand in writing that "the person having custody, possession, or control of" records or paper falling within the scope of Section 301 make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. Nothing in that text authorizes *post hoc* scrutiny into the sufficiency of the Attorney General's statement. The United States easily satisfied the plain text of Section 303 by providing a written statement of the basis and purpose for its records demand. Nothing in the language of Title III restricts the Attorney General's purpose to investigating racially discriminatory practices affecting the right to vote. And defendants' speculation about an ulterior motive does not provide a legal basis to resist the Title III demand.

Defendants below repeatedly criticized the United States for the August 2025 "demand provide[d] no legally sufficient basis" (Doc. 47, at 17), stated "no reason" why the full unredacted version is necessary (Doc. 49, at 17), as the purported "purpose [is] so disconnected from the [CRA]

purportedly authorizing it" (Doc. 49, at 17). Defendants' arguments are largely underpinned by quotes from other district courts' decisions not before this court. As an initial matter, accepting defendants' invitation to scrutinize the Attorney General's demand statement requires overlooking the limited role that courts play in evaluating a demand under 52 U.S.C. 20703. Title III does not allow scrutiny into the sufficiency of the Attorney General's demand statement.

After the Attorney General's written demand has been made, and the state election officer has rejected it, either affirmatively or by inaction, Title III authorizes the Attorney General to seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705. This proceeding to compel production of federal election records under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings," but rather "comparable to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Lynd II*, 306 F.2d at 225. The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion*, 187 F. Supp. at 854, and the "investigative process could be completely disrupted if

investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 301, the United States initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. The special statutory proceeding contemplated in Title III's text limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226 (quoting 52 U.S.C. 20703). Nor is "the factual foundation for, or the sufficiency of" the statement of basis and purpose "open to judicial review or ascertainment." *Id.* at 226; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*).

Nothing in the language of Title III provides a meaningful standard against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. *Benson III*, 2026 WL 2364306, at *15

(Thapar, J., dissenting); *cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate in writing "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

Instead, the Attorney General need only "identify in a general way the reasons for his demand" for federal election records. *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible* violations of a Federal statute." *Ibid.* (emphasis added); *see, e.g.*, *Bruce*, 298 F.2d at 861 ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962) (verbatim), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); *cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950) (concluding that an administrative body to which a statute delegates

investigative and accusatory duties may take steps to inform itself as to whether there is probable violation of the law).

Accordingly, the only "matters open for determination" by the court when a recipient of the Attorney General's demand challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

Intervenors attempt to evade the special statutory proceeding contemplated in Title III by analogizing this proceeding to an administrative subpoena enforcement. *See, e.g.*, Doc. 51, at 16-17 (analogizing CRA demands to similar administrative subpoena processes). But the distinctions between a Title III demand and an administrative subpoena are pervasive and dispositive.

To start, the text of Title III is markedly different from the text of statutes relating to administrative subpoenas. The Attorney General's authority to demand records and papers under Title III extends only to a specific, though broad, set of documents: those "relating to any application, registration, payment of poll tax, or other act requisite to

voting in [a federal] election." 52 U.S.C. 20701.

The authorization for administrative subpoenas is quite the opposite: the government to demand a wide variety of records and testimony from any person but, because there is no other limit on the person affected or the type of information, the information must be relevant or material to one of the agency's authorized purposes. *See United States v. Powell*, 379 U.S. 48, 53 n.12 (1964) (noting that information can be obtained if it "may be relevant or material" (quoting 26 U.S.C. 7602 (1954 ed.))); *see also Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156 (4th Cir. 2022); *United States v. Rosinsky*, 547 F.2d 249, 252 (4th Cir. 1977).

Consider the statute at issue in *Powell*. That statute authorizes the Internal Revenue Service (IRS) to issue an administrative summons to a taxpayer to appear and provide testimony and records that "may be relevant or material" to its inquiry into the taxpayer's liability due to a possibly fraudulent return. *Powell*, 379 U.S. at 53 n.12 (quoting 26 U.S.C. 7602). The statute limited the IRS's authority to summon for:

> the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of

> any person in respect of any internal revenue tax, or collecting any such liability.

26 U.S.C. 7602(a). The statute also required the time and place of examination to be "reasonable under the circumstances." 26 U.S.C. 7605(a). Importantly, it also provided that "[n]o taxpayer shall be subjected to unnecessary examination or investigations." 26 U.S.C. 7605(b). So under that statute, courts have held that the issuer "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed." *Powell*, 379 U.S. at 57-58; *Equity Inv. Assocs., LLC*, 40 F.4th at 161-162 (same).

The requirements that courts have imposed on enforcement of administrative subpoenas also have roots in the Fourth Amendment. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (explaining four factors must be met for "an investigative subpoena . . . to be reasonable under the Fourth Amendment"); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-209 (1946) (discussing how the requirements of relevance, a congressionally-authorized purpose within

Congress's power, and adequate specification of the documents satisfy the Fourth Amendment). But those Fourth Amendment concerns are not implicated in the context of Title III, where the federal government merely requests state documents from state officials—not an individual's private papers.

Title III already imposes the constraints that Congress deemed necessary by limiting the set of records and papers which he can demand. *See* 52 U.S.C. 20701, 20703. Title III already prescribes what method of production is reasonable under the circumstances. 52 U.S.C. 20703. And unlike administrative-subpoena statutes, Section 303 does not limit the purpose of any demand; a statement of purpose must simply be provided in the demand. 52 U.S.C. 20703. There is thus no need and no statutory authorization for a relevance inquiry. Indeed, the CRA was enacted after Congress saw that the mere power of subpoena had not proven sufficiently effective in investigating discriminatory voting practices. *See Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . . rather than for the

issuance of a subp[o]ena").

But even under more generally applicable standards for enforcing administrative subpoenas, *see Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"), judicial review is limited. *See Equal Emp. Opportunity Comm'n v. South Carolina Nat'l Bank*, 562 F.2d 329, 332 (4th Cir. 1977) ("Settled authority holds that the role of the district court in an enforcement proceeding is sharply limited."); *see also Donaldson v. United States*, 400 U.S. 517, 529 (1971) (explaining that "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available"), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. Ordinarily, the government "need not show that the exercise of its jurisdiction is supported by reasonable cause unless the person to whom the subpoena is directed raises a substantial question that the court's process will be abused by enforcement." *Ibid.*; *Morton Salt*, 338 U.S. at 652 ("[I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.").

Importantly, a dispute as to whether the records sought by the agency will ultimately prove a legal violation is not a basis for resisting the subpoena. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *see also South Carolina Nat'l Bank*, 562 F.2d at 332 ("The administrative agency, not the court, is responsible for determining in the first instance through its preliminary investigations the coverage of the statutes the agency must administer."). Put differently, "[i]t is unreasonable to the extreme to insist that the result shall be in hand before an investigation may begin." *Link v. NLRB*, 330 F.2d 437, 440 (4th Cir. 1964). The possibility that "the investigation ultimately uncovers no wrongdoing" cannot override the "public interest in ensuring 'the expeditious investigation of possible unlawful activity.'" *United States v. American Target Advert., Inc.*, 257 F.3d 348, 353-354 (4th Cir. 2001) (citation omitted).

In sum, nothing in the text of Title III allows election officials like Commissioner Koski to resist compliance with the Attorney General's Title III demand because the demand did not provide the official's desired "purpose . . . to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." JA57.

Nothing in the plain text of Title III could be read to impose upon the Attorney General the burden to prove the DOJ "Virginia has employed any practices that violate the NVRA" or "reference any complaints" about Virginia's list maintenance procedures. Doc. 47, at 16. The Attorney General, when presenting a legal basis and purpose for his claims need not use the "magic words" such as "purpose" as defendants content. Doc. 47, at 17. Citing legal precedent underpinning the request is sufficient. *See Hannah P. v. Coats*, 916 F.3d 327, 345 (4th Cir. 2019) (citation omitted) ("Proper notice does not require 'any magic words.'")

**2. The DOJ's demand stated an adequate basis.**

Regardless of the level of scrutiny that applies, the Attorney General stated a sufficient basis for the demand. The two letters sent by the DOJ both individually and together provided ample "basis" for the demand. The July 15 letter disclosed concern over the sufficiency of Virginia's efforts "to remove those ineligible voters from the registration list[,]" citing several examples of irregularities from "[a] review of the most recent EAVS report." JA52-53. For example, the letter described that Virginia reported nearly as many active registered voters as the citizen voting age population in Virginia, with a registration rate in 2024

of 92.2% of the citizen voting age population and a similar unusually high ratio of registered voters to citizens for several prior years. JA53. As another example, the letter highlighted that Virginia reported almost three times the national average of duplicate registrations in 2022. JA53. In addition, the letter described that Virginia had a significantly low rate of removal for those who failed to respond to confirmation notices sent. JA53.

The August 14 letter, for its part, referenced that Virginia had failed to respond to the July 15 letter by the deadline set in the July letter, which was 14 days past receipt of the letter. The letter reiterated that the DOJ sought to "assess the State's compliance with the statewide VRL maintenance provisions of the NVRA, 52 U.S.C. § 20501, *et seq*." JA56. The August 15 letter also expanded upon the *legal* basis for the request, reciting in detail the relevant provisions of the CRA and clarifying the SVRL demand was made not only under the Attorney General's NVRA authority but pursuant to the Section 303 of the CRA and the Attorney General's responsibility "to enforce HAVA's computerized statewide voter registration list requirements." JA57.

The two letters also both individually and together provided ample "purpose" for the demand. The July 15 letter disclosed the DOJ sought "to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. JA52. It also stated that the NVRA's purpose was "ensuring the accuracy and currency of official list of eligible voters" (JA52), and that "the purpose of [the Department's] request [for the unredacted SVRL] is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." JA57.

Under any reasonable reading, the basis and purpose for the DOJ's demand was clear and put Commissioner Koski on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. That was all that Commissioner Koski was owed. The demand provided sufficient notice of the basis for the demand, including the Attorney General's authority and reasons for desiring to inspect the SVRL, as well as the purpose. Defendants do not claim that producing the SVRL would be "unduly burdensome," *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 476 (4th Cir. 1986), and the record sought, the SVRL, is directly relevant to and "might cast light on" the DOJ's investigation into Maryland's

compliance with the NVRA and HAVA. *EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) (citation omitted). Finally, Title III does not require the United States to ritualistically use the word "basis," "based upon," or any other magic words or phrases when communicating its demand to a State. *Compare Hannah P.*, 916 F.3d at 345 ("Proper notice does not require 'any magic words.'") (citation omitted) *with* Doc. 47, at 17 (criticizing the DOJ because "[the July 2025 request] does not use the word 'purpose'"). Dissatisfaction with the sufficiency of the DOJ's demand fails to provide an alternative ground to affirm the district court's order.

**3. The DOJ's stated purpose of ascertaining Virginia's compliance with the NVRA and HAVA was sufficient.**

According to defendants, investigating Virginia's compliance with the NVRA and HAVA "is not a permissible purpose for the CRA's inspection provision" (Doc. 49, at 14), (emphasis omitted). While defendants acknowledge that the CRA is a statute aimed at preserving "the right of all qualified citizens to vote without discrimination on account of race" (*id.* at 15), and that the Attorney General has the right to investigate and bring suit when Title III is violated (Doc. 49, at 15-16),

defendants deny that obtaining voter files to investigate NVRA and HAVA violations are encompassed in that broad authority under Title III (Doc. 49, at 16). Defendants strain credulity in stating that Congress, in its absence of stating something means that somehow, the inverse is now true that the DOJ is limited. Doc. 49, at 16. But no such limitation on the scope of the basis or purpose for the demand appears in the text of Title III. *See* 52 U.S.C. 20701-20706; *Benson III*, 2026 WL 2364306, at *4 (Murphy, J., concurring) ("I see nothing in the statute's text that limits the purposes for which the DOJ may request the records.").

By contrast, Congress limits the application of rights and remedies when it wants to, including elsewhere in the CRA where it constrained the Attorney General's authority to address racially discriminatory practices. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101); 42 U.S.C. 2000e-2 (prohibiting employment practices "because of such individual's race, color, . . . or national origin" in Title VII of the Civil Rights Act of 1964); 52 U.S.C. 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language in the Voting Rights Act of 1965); 42 U.S.C. 3604-3606, 3617 (prohibiting

discrimination in renting "because of race, color, . . . or national origin" in the Fair Housing Act of 1968). The lack of a similar limitation in Title III is significant, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23 (brackets in original; citation omitted).

Honoring the plain text of Title III, it is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868. The Title III demand here plainly relates to investigating possible violations of federal statutes—and statutes that share Title III's purpose of protecting the constitutional right to vote. *See* p. 38, *supra*; *Benson I*, 819 F. Supp. 3d at 767. Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3).

HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration

standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[8]

By mandating list maintenance, the NVRA and HAVA also protect against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). The CRA, at the very least, empowers the Attorney General to investigate and assess compliance with other elections statutes, like the NVRA and HAVA.

[8] U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://tinyurl.com/mwsvsjfv (last visited Sept. 8, 2026).

### 4. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303.

Defendants also argued that the DOJ's demand was improper because it was "pretextual" or "contrived." Doc. 47, at 18-19; Doc. 51, at 24. They contended that the court could "reject the United States' purported purpose if the complaint and judicially noticeable facts make clear it is contrived." Doc. 47, at 18 (citation omitted). As already explained (pp. 25, 39-40, 46, *supra*), this Court's review of the DOJ's demand is limited to assessing whether the Attorney General in fact stated a "basis and purpose," 52 U.S.C. 20703, not whether that basis and purpose is subjectively sufficient.

Setting that aside, even under precedents involving administrative subpoenas, the burden on a party resisting a subpoena based on claims the government is abusing the court's process and acting in "bad faith" "is a heavy one." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978). The United States generally "need only demonstrate good faith in issuing the summons." *United States v. Stuart*, 489 U.S. 353, 359 (1989). The types of improper purposes that justify court intervention are narrow "such as to harass the [recipient] or to put pressure on him to settle a

collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

Defendants here cannot overcome their heavy burden of disproving the good faith basis of the demand and proving the demand was issued out of malice, intent to harass, to pressure to settle a collateral dispute, or the like. *Compare* Doc. 47, at 19-20 (stating the "[DOJ] 'intends to' send states' voter registration lists to the U.S. Department of Homeland Security") (citation omitted), *with* Doc. 51, at 21 (declaring the United States "has not disclosed the actual purpose for its requests"). First, it is doubtful that the mere existence of a secondary motive related to identifying ineligible voters could constitute bad faith or improper motive. *See generally* Doc. 51, at 21-24; *see also Powell*, 379 U.S. at 58.[9]

---

[9] Defendants cite *Department of Commerce v. New York*, 588 U.S. 752, 784 (2019), to suggest courts can reject "contrived" agency rationale Doc. 47, at 18-19, but that case involved an inapposite Administrative Procedure Act challenge and "[a] rare" extensive administrative record that presented "unusual circumstances[.]" *New York*, 588 U.S. at 785. In any event, it supports the United States' position, including by confirming that a "strong showing of bad faith or improper behavior" is required to venture beyond the record and "inquir[e] into 'the mental process[] of administrative decisionmakers'" and "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.* at 780-781 (citation omitted).

Second, because "[m]ere allegations of bad faith will not suffice[,]" defendants' speculation based on "public reporting" falls well short of "specific facts in its responsive pleadings, supported by affidavits, from which the court can infer a possibility of some wrongful conduct." *Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987) (citation omitted); *see also* Doc. 49, at 4; Doc. 51, at 3-11.[10] Inquiring into the "actual purpose" of the DOJ's request would improperly intrude upon the investigative functions of the DOJ. *See, e.g.*, *American Target Advert., Inc.*, 257 F.3d at 354 ("Congress has duly weighed the competing policy interests, and it has chosen in favor of the effective administration and enforcement of its laws. It is not the role of the courts to second-guess that choice.").

## II. The DOJ's demand for Virginia's unredacted SVRL does not implicate or violate federal or state privacy laws.

The district court also did not reach the defendants' argument regarding state and federal privacy laws, but these arguments are likewise meritless. *See, e.g.*, Doc. 47, at 22-23. State privacy or anti-disclosure laws do not permit Virginia to defy Title III, and Virginia's

[10] Intervenors' cited news articles, which rely on speculation and inadmissible hearsay, do not satisfy the requirements for judicial notice. Fed. R. Evid. 201(b).

duty to comply with Title III is independent of any duty the United States has to comply with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896; *see United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS summons"). Regardless, though, the United States is complying with federal privacy laws.

### A. Federal law preempts any contrary Virginia privacy law.

Defendants argued below that "DOJ's demand for Virginia's unredacted voter list would violate protections for voters' sensitive information under Virginia law." Doc. 49, at 18; *see also* Doc. 47, at 20 ("Virginia law does not authorize disclosure of the most sensitive information."). Put simply, state law does not allow Virginia to defy federal law. To the extent that state law purports to prohibit Virginia from complying with the United States' demands, state law must yield. *See* U.S. Const. Art. VI, Cl. 1; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to

federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

Notwithstanding a State's broad constitutional authority over the conduct of federal elections, including voters' privacy rights, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ibid.* (brackets in original) (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)).

Congress enacted broad regulations over the conduct of federal elections. Title III imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*). Title III authorizes the Attorney General to compel records

under Title III but imposes its own privacy protections for records and papers demanded under Section 303. *See* 52 U.S.C. 20704. If Virginia's laws impose even greater privacy protections, they conflict with and thwart the enforcement of federal law and therefore are preempted. *See, e.g.*, *Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) ("It is a bedrock rule, of course, that federal law preempts state law when the two conflict.").

Nor does the text or history of Title III support the defendants' position. Indeed, even in the 1960s, voter-registration applications—unquestionably records covered by the CRA, *see* 52 U.S.C. 20701—sometimes contained significant personal information that the Intervenors seek to shield here, such as birthdates. *See, e.g.*, *Gray v. Main*, 309 F. Supp. 207, 219 (M.D. Ala. 1968) (birthdate).

Defendants rely predominantly on cases interpreting provisions of the NVRA to support their belief redactions are required here. *See* Doc. 47, at 22 (citing *Public Int. Legal Found., Inc. v. Bellows*, 92 F. 4th 36, 56 (1st Cir. 2024)). But the NVRA requires *public* inspection, allowing inspection by *any* party. *See* 52 U.S.C. 20507(i)(1); Doc. 49, at 18-19. Because the CRA requires disclosure to the Attorney General, not the

public, these authorities are inapposite. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (allowing redactions in the NVRA context to cure "an intolerable burden on [the constitutional right to vote]" for a "statute that conditions voting on *public release*").

Congress anticipated that covered records would contain sensitive information when it prohibited the "disclos[ure of] any record or paper produced pursuant to [Title III]." 52 U.S.C. 20704. The purpose of the CRA—to allow the Attorney General access to the information necessary to determine whether there is a violation of federal law—would be entirely thwarted by allowing States to redact identifying information from voting records. *See generally Benson III*, 2026 WL 2364306, at *14, *16 (Thapar, J., dissenting). Virginia must produce the unredacted SVRL.

### B. The United States is complying with the Privacy Act.

Intervenors also argued below that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. Doc. 49, at 22-23. That is incorrect.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). It requires federal agencies to "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4).

The DOJ did so here. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to

elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[11]

No more persuasive is the intervenor's argument that this SORN identification of "the categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), cannot be read to include all registered voters in Virginia and other States. *See* Doc. 49, at 23. The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual §9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at

[11] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Sept. 8, 2026).

47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. Moreover, because votes case by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611. The Privacy Act therefore provides no alternative basis to affirm the district court.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order granting the defendants' Motions to Dismiss and denying the United States' Motion to Compel Production, and remand with instructions to order Commissioner Koski to immediately produce the requested unredacted SVRL.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). A decision in September would still allow the United States to work with Virginia to take real steps to clean

up its SVRL, if necessary, prior to the upcoming November 3, 2026, general election.

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. 2, 40(d)(1).

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that it is in all parties' interest to obtain a decision from this Court quickly given the upcoming November 3, 2026, general election. Accordingly, the United States is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument, if the Court believes that the benefit of oral argument would outweigh the time concerns and would request that argument take place in September 2026.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ Kelsey E. McGee
ANDREW G. BRANIFF
KELSEY E. MCGEE
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 251-0053

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of 13,000 words according to Federal Rule of Appellate Procedure 32(a)(7)(B)(i); and 4th Circuit Rule 32(b) because it contains 13,135 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Kelsey E. McGee
KELSEY E. MCGEE
Attorney

Date: September 8, 2026