No. 26-2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

Steven Koski, in his Official Capacity as Commissioner of the Virginia Department of Elections,

Defendant-Appellee

COMMON CAUSE; KATHERINE ELLENA; VIRGINIA STATE CONFERENCE OF THE NAACP; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

# JOINT APPENDIX
(VOLUME 1 OF 1)

*(See inside cover for continuation of Counsel)*

*(continuation of Counsel)*

JAY C. JONES
Attorney General of Virginia

MEGAN C. KEENAN
MIKAELA A. PHILLIPS
Assistant Attorneys General
Office of the Attorney General
of Virginia
202 N. 9th St.
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us
mphillips@oag.state.va.us

*Counsel for Defendant-Appellee Steven Koski*

DAVIN M. ROSBOROUGH
ARI J. SAVITZKY
American Civil Liberties Union
Foundation
125 Broad St.
18th Floor
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
asavitzky@aclu.org

*Counsel for Defendant-Intervenor Common Cause*
*Counsel for Katherine Ellena*

HARMEET K. DHILLON
Assistant Attorney General

ANDREW G. BRANIFF
GRETA A. GIESEKE
KELSEY E. MCGEE
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 251-0053
kelsey.mcgee@usdoj.gov

*Counsel for Plaintiff-Appellant United States of America*

*(continuation of Counsel on next page)*

*(continuation of Counsel)*

ARIA C. BRANCH
KEVIN R. KOWALEWSKI
UZOMA N. NKWONTA
JACOB D. SHELLY
Elias Law Group LLP
250 Massachusetts Avenue, NW
Suite 400
Washington, D.C. 20001
(202) 948-1135
abranch@elias.law
kkowalewski@elias.law
unkwonta@elias.law
jshelly@elias.law

WALKER R. MCKUSICK
Elias Law Group LLP
1700 7th Avenue
Suite 2100
Seattle, WA 98101
(202) 968-4659
wmckusick@elias.law

*Counsel for Intervenor-Appellee Virginia State Conference of the NAACP*
*Counsel for Intervenor-Appellee National Association for the Advancement of Colored People*

# TABLE OF CONTENTS

PAGE

Memorandum Opinion,
filed July 14, 2026
(Doc. 76) .......... 1

Order Appealed,
filed July 14, 2026
(Doc. 77) .......... 14

District Court Docket .......... 15

Declaration of Suzanne Almeida,
filed January 30, 2026
(Doc. 15-1, Exh. A) .......... 27

Declaration of Katherine Ellena,
filed January 30, 2026
(Doc. 15-2, Exh. B) .......... 33

Complaint,
filed March 19, 2026
(Doc. 28) .......... 37

Motion for Order to Compel Records Demanded Pursuant to
the Civil Rights Act of 1960,
filed April 29, 2026
(Doc. 39) .......... 47

Letter from the DOJ to Commissioner Beals,
dated July 15, 2025
(Doc. 39-3, Exh. 2) .......... 51

Letter from the DOJ to Commissioner Beals,
dated August 14, 2025
(Doc. 39-4, Exh. 3) .......... 55

**TABLE OF CONTENTS (continued):** **PAGE**

Defendant's Motion to Dismiss,
filed May 19, 2026
(Doc. 46) .................................................. 59

National Association for the Advancement of Colored
People and NAACP Virginia State Conference's
Motion to Dismiss,
filed May 19, 2026
(Doc. 48) .................................................. 62

Motion of Intervenor[s]-Defendants Common Cause and
Katherine Ellena to Dismiss the Complaint,
filed May 19, 2026
(Doc. 50) .................................................. 65

Confidential Memorandum of Understanding (Texas),
filed May 19, 2026
(Doc. 51-1, Exh. A) .................................................. 67

Hearing on Motion to Compel and Motions to Dismiss in
*U.S. v. Amore*, No. 25-cv-639 (D.R.I.), held Mar. 26, 2026,
filed May 19, 2026
(Doc. 51-2, Exh. B) .................................................. 77

Notice of Appeal,
filed July 24, 2026
(Doc. 80) .................................................. 192

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, *in his official capacity as Commissioner of the Virginia Department of Elections*, *et al.*,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:26CV42 (RCY) |

**MEMORANDUM OPINION**

This action arises from the United States Attorney General's investigation into Virginia's compliance with federal election law. It is one of dozens of parallel suits filed against state election officials across the country. The case is before the Court on three Motions to Dismiss advanced by Virginia Department of Elections Commissioner Steven Koski ("Defendant Koski" or "Commissioner Koski") and two groups of intervening Defendants[1], respectively. Plaintiff, the United States, has also moved to compel production of Virginia's statewide voter registration list (SVRL).

The motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court such that oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons described herein, the Court will grant the Motions to Dismiss and deny the United States's Motion to Compel. These rulings will be fatal to the United States's suit.

[1] The Court previously authorized the National Association for the Advancement of Colored People (NAACP), the NAACP Virginia State Conference, Common Cause, and Ms. Katherine Ellena to permissively intervene as Defendants in this matter. *See* Mem. Order, ECF No. 44.

## I. STANDARD OF REVIEW[2]

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). By advancing a 12(b)(6) motion, a defendant asserts that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[2] The United States argues that the Federal Rules of Civil Procedure do not apply to this action because the Attorney General's filing of an application for an order under Title III of the Civil Rights Act (CRA) is a special statutory proceeding rather than an ordinary, traditional civil action. Resp. Opp'n Mots. Dismiss 3, ECF No. 58; *see also* Am. Compl. ¶¶ 3–4, ECF No. 28 (characterizing the instant action as a special statutory or summary proceeding). The Court disagrees and accordingly applies the Federal Rules of Civil Procedure.

The text of the CRA, in granting jurisdiction to federal district courts where a demand to compel production of records is made, confers jurisdiction "by appropriate process." 52 U.S.C.A. § 20705. Congress could have further defined appropriate process, but did not do so, strongly suggesting that the default procedural rules of federal courts apply. Turning to those rules, Federal Rule of Civil Procedure 1 instructs: "These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." The CRA is not listed or otherwise contemplated at Rule 81.

The Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), provides further assurance that the Federal Rules of Civil Procedure ought to apply to this action. In *Powell*, the Supreme Court determined that identical language ("by appropriate process") in the context of different statutes concerning administrative summonses renders the Federal Rules of Civil Procedure applicable when there is no other provision specifying a substitute procedure to be followed. *Id.* at 51 n.10, 58 n.18. This mandatory authority binds the Court—not the Fifth Circuit's decision two years earlier to treat a CRA Title III proceeding by the United States Attorney General as something other than "an ordinary, traditional civil action." *Kennedy v. Lynd,* 306 F.2d 222, 225 (5th Cir. 1962). Further, in *Lynd,* it appears the Attorney General filed an "application" to compel production, *id.* at 225, whereas here, the United States affirmatively embraced the process of ordinary litigation by filing a Complaint and Amended Complaint. *See United States v. Oregon*, 2026 WL 318402, at *8, n.1 (D. Or. Feb 5, 2026).

This Court thus joins the majority of other federal district courts that have recently considered this question in analogous suits by concluding that the Federal Rules of Civil Procedure apply in this CRA Title III action advanced by the United States Attorney General. *See, e.g.*, *United States v. Oregon*, 2026 WL 318402, at *8; *United States v. Demarinis*, 2026 WL 1780586, at *3 (D. Md. June 18, 2026); *United States v. Fontes*, 2026 WL 1177244, at *1 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 2026 WL 1040637, at *3–4 (D.R.I. Apr. 17, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. Jan. 15, 2026); *United States v. Bellows*, 2026 WL 1430481, at *5, n.8 (D. Me. May 21, 2026); *United States v. Warner*, No. 2:26-CV-156, at 3–4 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of the State of N.Y.*, 2026 WL 1999921, at *6–7 (N.D.N.Y July 10, 2026). *But see United States v. Benson*, 819 F. Supp. 3d 753, 765–66 (W.D. Mich. 2026) (applying Federal Rule of Civil Procedure 12(b)(6) because CRA records request was brought alongside other federal law claims).

misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When deciding a motion to dismiss under Rule 12(b)(6), the Court "views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions. *Id.* Likewise, if the complaint "lacks a cognizable legal theory" as a matter of law, then dismissal is proper. *Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 749 (E.D. Va. 2001).

Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required to satisfy Federal Rule 8(a)(2). *Id.* (citations omitted).

At the motion to dismiss stage, a court may consider the face of the complaint, documents attached to the complaint, documents attached to a motion to dismiss that are integral to the complaint and whose authenticity is unchallenged, and matters of public record subject to judicial notice. *Philips*, 572 F.3d at 180 (citation omitted). Applying these standards, the Court construes the facts in the Amended Complaint, including any attached documents[3], as follows.

## II. BACKGROUND

On July 15, 2025, the United States Attorney General sent a letter ("July 15 Letter") to then-Commissioner of the Virginia Department of Elections Susan Beals ("Commissioner Beals"),

[3] Although filed by the United States as exhibits to the Motion to Compel, two letters ought to have been attached to the Amended Complaint as they are referenced throughout and integral to that document. Their authenticity has not been challenged. The Court therefore considers the letters, for the essential context they provide, as discussed herein. *See Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023).

seeking information regarding Virginia's compliance with federal election law, specifically the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA). Am. Compl. ¶¶ 21–22. Citing various statistics from a 2024 Election Administration and Voting Survey report, the July 15 Letter asked Commissioner Beals to explain certain data and requested additional information on behalf of the Attorney General, including the "current electronic copy of Virginia's computerized statewide voter registration list" and "all fields contained within the list." *See id.*; Mot. Compel Ex. 2 at 2, ECF No. 39-3.

When Commissioner Beals did not respond within 14 days as requested, the Assistant Attorney General sent an additional letter ("August 14 Letter"), clarifying that the provided SVRL should include each registrant's "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Mot. Compel Ex. 3 at 2, ECF No. 39-4. Citing the NVRA, HAVA, and Title III of the CRA as the authorities underlying its request, the August 14 Letter "demand[ed] an electronic copy of Virginia's complete and current [SVRL]" for the purpose of "ascertain[ing] Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3; *see also* Am. Compl. ¶ 26.

The United States represents that it had discussions with representatives of Commissioner Beals in the months following the July 15 and August 14 Letters; however, on January 8, 2026, "representatives for Commissioner Beals expressed in person that she would not be providing the SVRL." Am. Compl. ¶ 27. On January 16, 2026, the United States initiated this action, alleging that Commissioner Beals's refusal to provide election records pursuant to the Attorney General's written demands constituted a violation of the CRA. *See generally* Compl., ECF No. 1.

On January 17, 2026, Abigail Spanberger was sworn in as Governor of the Commonwealth of Virginia, and she appointed Defendant Koski to serve as Commissioner of the Virginia Department of Elections. Am. Compl. ¶ 28. The United States amended its Complaint on March 19, 2026. The one-count Amended Complaint against Commissioner Koski asks this Court to (1) declare that Defendant's refusal to provide the election records upon demand by the Attorney General violates Title III of the CRA, specifically 52 U.S.C. § 20703, and (2) order Defendant to provide the Attorney General with all fields of Virginia's current, electronic SVRL within five days of the Court's ruling. *See id.* ¶¶ 29–31.

To date, Virginia officials "have not provided any documents responsive to the . . . outstanding demand for records." *Id.* at ¶ 28. On April 29, 2026, the United States separately moved to compel Commissioner Koski to produce the same SVRL at issue in the Amended Complaint as well as "such other federal records demanded by the Attorney General to ascertain Virginia's compliance with the NVRA and HAVA."[4] Mot. Compel 2.

On May 6, 2026, the Court authorized two groups of Defendants to permissively intervene in this action: (1) the NAACP and the NAACP Virginia State Conference (together, "NAACP Intervenors"); and (2) Common Cause and Ms. Katherine Ellena (together, "Common Cause Intervenors"). Mem. Order, ECF No. 44. On May 19, 2026, all Defendants filed Motions to Dismiss for Failure to State a Claim. *See* ECF Nos. 46, 48, 50. The Court authorized the Democratic National Committee to file an *amicus curiae* brief in support of Commissioner Koski's

[4] The United States does not specify exactly what "other federal records" it seeks as part of its Motion to Compel, *see generally* Mot. Compel 2, and all briefing by the Parties is focused on Virginia's SVRL. This Opinion is thus necessarily circumscribed to the lawfulness of the United States's demand for Virginia's SVRL. To the extent the United States invites the Court to presuppose the existence—and order production—of additional election records that Defendant Koski may or may not possess, the Court declines that invitation. *See Philips N. Am. LLC v. Probo Med. LLC*, 2022 WL 17793491, at *3 (S.D.W. Va. Dec. 19, 2022) (describing as improper "fishing expeditions" that "exceed the boundaries of the complaint and are based purely on unsupported speculation."); *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009) ("Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing.").

Motion to Dismiss. *See* ECF Nos. 52-1, 67. The Court further permitted the NAACP Intervenors to file two notices of supplemental authority, ECF Nos. 69, 70, 71, 72, and reviewed responses to both submitted by the United States, ECF Nos. 73, 74.

## III. ANALYSIS

Commissioner Koski argues that the United States's Amended Complaint fails to state a claim for at least three reasons: (1) Virginia's SVRL is not the type of "record" relating to a federal election that State election officials must make available for inspection under Title III; (2) the Attorney General failed to state the factual basis for demanding Virginia's SVRL; and (3) the purpose contained in the Attorney General's written demand was contrived and insufficient to require Virginia to make the records available under Title III. Koski Mem. Supp. Mot. Dismiss ("Koski Mem. Supp.") 1, ECF No. 47. The first ground has been briefed by Defendant Koski, the NAACP Intervenors, and the Common Cause Intervenors alike. *See* Koski Mem. Supp. 8–11; NAACP Mem. Supp. Mot. Dismiss 7–9, ECF No. 49; Common Cause Mem. Supp. Mot. Dismiss 13–15, ECF No. 51. The Court finds this ground persuasive and dispositive such that the Motion to Compel must be denied and the suit dismissed. Virginia's SVRL is outside the scope of Title III of the CRA. Thus, the United States fails to state a claim in its Amended Complaint.

### A. Legal Landscape

The Court will briefly review the requisite statutory background. Congress passed the Civil Rights Act of 1957 in response to de jure discrimination against Black voters in the American south. *United States v. Benson*, __ F.4th __, 2026 WL 1815425, at *2 (6th Cir. June 24, 2026) (citing Pub. L. No. 85-315, 71 Stat. 634); *see also Weber*, 816 F. Supp. 3d at 1175 (describing "persistent voter suppression . . . preventing Black Americans from voting" during the Jim Crow era including destruction of records of those who had registered to vote). The 1957 Act

"empowered the Attorney General to 'seek injunctions against public and private interference with the right to vote on racial grounds.'" *See Benson,* 2026 WL 1815425, at *2 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966)). It did not, however, arm the Attorney General with the tools necessary to investigate allegations of voting discrimination because, although the federal government could institute proceedings, "it lacked the power pre-suit to compel the production of documents and records from States to build a discrimination case." *Id.* To address this issue, the Civil Rights Act of 1960 requires states to keep—and gives the Attorney General access to—certain voting records. *See id.* (first citing *Katzenbach*, 383 U.S. at 313; and then citing *United States v. Mississippi*, 380 U.S. 128, 134 (1965)). Title 52 U.S.C. § 20701 provides in pertinent part:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .

Section 20702 provides penalties for any person "who willfully steals, destroys, conceals, mutilates, or alters any record or paper" that § 20701 requires be retained and preserved. The following section—and basis of the instant suit—provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. § 20703.

The Amended Complaint advances a single count against Commissioner Koski for violation of § 20703 and thus makes no claims pursuant to the NVRA and HAVA. *See* Am.

Compl. ¶¶ 29–31. As pertinent background, however, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[,]" such as persons who have passed or moved away. 52 U.S.C. §20507(a)(4). And the HAVA requires that States maintain and administer "a single, uniform, official, centralized, interactive computerized [SVRL] . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter." 52 U.S.C. § 21083(a)(1)(A). State election officials retain discretion under the HAVA to determine the appropriate method for creating, storing, and maintaining the voter registration list. 52 U.S.C. § 21085 (instructing that the "specific choices on the methods of complying with the requirements of [the] subchapter shall be left to the discretion of the State."). *See also United States v. Wis. Elections Comm'n*, 2026 WL 1430354, at *1 (W.D. Wis. May 21, 2026).

**B. CRA Claim**

In line with the positions of Commissioner Koski and Intervening Defendants, and corresponding with a growing group of federal courts in analogous suits, this Court holds that Virginia's SVRL is not a record subject to production under Title III of the CRA. Beginning with the statutory text, the CRA does not further define what it means for records or papers to "come into [the] possession" of an officer of election. *See* 52 U.S.C. §§ 20701, *et seq.* The Court therefore must assign the phrase its ordinary meaning. *See EPA v. Calumet Shreveport Refin., LLC*, 605 U.S. 627, 638 (2025); *see also Sebelius v. Cloer*, 569 U.S. 369 (2013) ("[W]e start, of course, with the statutory text, and proceed from the understanding that, unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." (cleaned up, citation omitted)). At this point, multiple federal courts, including the United States Court of

Appeals for the Sixth Circuit, have now engaged in the same statutory interpretation exercise for § 20701. *See Benson,* 819 F. Supp. 3d at 768–70; *Benson*, 2026 WL 1815425, at *4–6; *Demarinis*, 2026 WL 1780586, at *4–5; *Wis. Elections Comm'n*, 2026 WL 1430354, at *3; *Bellows*, 2026 WL 1430481, at *6; *Bd. of Elections of the State of N.Y.*, 2026 WL 1999921, at *8–11; *United States v. Scanlan*, 2026 WL 1864054, at *4–6 (D.N.H. June 29, 2026).

Around the time that Congress enacted Title III, the phrase "come into . . . possession" meant to "acquire," "obtain," or "receive." *Benson*, 2026 WL 1815425, at *4 (collecting mid-twentieth-century dictionary definitions). Commissioner Koski did not acquire, obtain, or receive Virginia's SVRL. Rather—and as mandated by the HAVA—Virginia election officials created the database themselves. Koski Mem. Supp. 7. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 2026 WL 1815425, at *5. This is because "[c]oming into possession of something most naturally implies receipt from an external source." *Bellows*, 2026 WL 1430481, at *6, n.10. Hence, Virginia's SVRL did not "come into [Koski's] possession" as that phrase is ordinarily understood. *See id.*

This interpretation of "come into his possession" is bolstered by the statutory language that immediately follows: "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. "Each of these terms refers to something that the voter submits or does as part of the registration process" and indicates that the sort of records covered by the statute are those that election officials *receive* as opposed to those they *create*. *Benson*, 819 F. Supp. 3d at 768–69. This, of course, makes perfect sense "given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Id.*

(citing *Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB). The CRA responded to that problem by requiring States to preserve records that voters submitted to them—not records that the States had created themselves. *Id.*

The Court is further obliged to "read [a statute's] words 'in their context and with a view to their place in the overall statutory scheme.'" *Benson*, 2026 WL 1815425, at *4 (quoting *Calumet Shreveport Refin., LLC*, 605 U.S. at 643). Recall that § 20702 criminalizes alteration of any record or paper that must be retained and preserved under § 20701. Virginia's SVRL is a dynamic database that state election officials regularly modify to reflect the current voter registration roll. Koski Mem. Supp. 9. Adopting the United States's reading of § 20701 could render regular list maintenance (for example, removing deceased individuals or updating residential addresses) illegal activity subject to criminal penalties. Even worse, construing § 20701 in a manner that subjects Virginia's SVRL to Title III "would place Title III on a collision course with [the] NVRA and HAVA." *Benson*, 2026 WL 1815425, at *6. Title III requires election officials to retain and preserve records and papers that come into their possession, while the NVRA and HAVA direct election officials to remove ineligible voters from voter registration lists. *Id.* Plaintiff's proposed interpretation would untenably "place election officials in violation of one federal law for trying to comply with the others." *See id.* The harmonious-reading canon of statutory interpretation thus also cuts against the position advanced by the United States. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, at 502 (2018) (describing the Court's "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another"); *see also Demarinis*, 2026 WL 1780586, at *5 (declining to read § 20701 to produce this "absurd result"); *Fontes*, 2026 WL 1177244, at *4.

The United States makes several arguments in support of its preferred interpretation of §§20701, *et seq*. None are persuasive. First, Plaintiff insists that "all records" in § 20701 means *all* records, including Virginia's SVRL. Resp. Opp'n Mots. Dismiss 7–9. This reading, however, would require the Court to ignore that Congress was more specific in writing "all records and papers *which come into [the officer of election's] possession*." The surplusage canon of construction cautions against assuming that statutory terms chosen by Congress are void of significance. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024). If Congress did intend to say "all records," full stop, it had the proper punctuation available. This point is buttressed by the fact that Congress chose "all records" without a qualifier in the context of the NVRA. *See* 52 U.S.C. § 20507(i)(1); *see also Benson*, 819 F. Supp. 3d at 768. This Court agrees with the District of Arizona that, based on the plain meaning of the statutory text, the "broad swath of documents" covered by § 20701 "is not limitless." *Fontes*, 2026 WL 1177244, at *5–7.

Next, invoking a Freedom of Information Act (FOIA) case, the United States argues that "an agency record can be both created by the agency and have come into the agency's possession" because "coming into possession of material refers to *when*, not how, the possession began." Resp. Opp'n Mots. Dismiss 9 (citing *DOJ v. Tax Analysts*, 492 U.S. 136, 144–45 (1989)). The Court is not persuaded, however, that the Supreme Court's broad interpretation of "agency records" in the context of a FOIA provision is particularly instructive when "records" as used there is not modified with the "come into . . . possession" language employed in the relevant CRA provision here. *See Tax Analysts*, 492 U.S. at 142. The Court agrees with the Sixth Circuit that the United States's reliance on *Tax Analysts* is "misplaced." *See Benson*, 2026 WL 1815425, at *7. Further, § 20701 already has an explicit temporal component—a period of twenty-two months from the date of certain enumerated elections—so there is no reason to believe "come into his possession" is

imbued with a hidden meaning about additional time restraints. *See Wisc. Elections Comm'n*, 2026 WL 1430354, at *4.

Third and finally, the United States rejects the idea that its understanding of the CRA creates conflicts with the NVRA and HAVA because § 20702 criminalizes the *willful* alteration of records. So, reasons Plaintiff, the statute does not create liability for SVRL maintenance undertaken without ill intent. Resp. Opp'n Mots. Dismiss 9–10. One can certainly imagine a world in which the NVRA and HAVA demand "good" SVRL alterations, while the CRA punishes "bad" SVRL alterations. However, a more natural understanding, especially considering that the existence of a computerized voter list would not have been foreseeable to Congress in the 1960s, is that the NVRA and HAVA promote SVRL maintenance, and the CRA simply does not contemplate that kind of record. *See* Benson, 819 F. Supp. 3d at 770. As the Western District of Wisconsin pointed out, even if the criminal penalties of § 20702 can "conceivably be reconciled" with the United States's interpretation of Title III, "there is still tension in a statutory construction that applies Title III's requirements to non-permanent records like voter registration lists." *Wisc. Elections Comm'n*, 2026 WL 1430354, at *5. For example, what would it mean to "retain" and "preserve" a database like Virgina's SVRL, which is continuously updated? *See* 52 U.S.C. §20701. For this and the other reasons described herein, the Court finds that the Amended Complaint fails to state a claim because Virginia's SVRL is outside the scope of the CRA by the plain meaning of the statutory text.

## IV. CONCLUSION

Because the Court finds Virginia's SVRL to be outside the scope of Title III of the CRA, the Motions to Dismiss will be granted. Likewise, because the United States's Motion to Compel seeks the same relief as the Amended Complaint for essentially the same reasons, that Motion will

be denied. The Court need not and does not reach Defendants' arguments with respect to the sufficiency of the Attorney General's written demand nor the privacy and preemption issues that may or may not accompany SVRL disclosure.

Given this Court's holding that the CRA does not require production of Virginia's SVRL, no further amendment of the Amended Complaint could cure the defects in Plaintiff's one-count CRA suit. *Demarinis,* 2026 WL 1780586, at *5; *see also Dominio Sugar Corp. v. Sugar Workers Loc. Union 392,* 10 F.3d 1064, 1066–67 (4th Cir. 1993). Dismissal will therefore be with prejudice. An appropriate Order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Date: July 14, 2026
Richmond, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, *in his official capacity as Commissioner of the Virginia Department of Elections*, *et al.*,<br>Defendants. | ) | Civil Action No. 3:26CV42 (RCY) |

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, Defendant Steven Koski and the Intervenor Defendants' Motions to Dismiss (ECF Nos. 46, 48, 50) are hereby GRANTED and the United States's Motion to Compel (ECF No. 39) is DENIED. The Court DISMISSES the single count of the Amended Complaint WITH PREJUDICE. Accordingly, the Clerk is DIRECTED to CLOSE this case.

Let the Clerk send a copy of this Order and the accompanying Memorandum Opinion to all counsel of record.

It is so ORDERED.

/s/ RCY
Roderick C. Young
United States District Judge

Date: July 14, 2026
Richmond, Virginia

# *3:26cv42, United States Of America V. Koski*

US District Court Docket

United States District Court, Virginia Eastern

(Richmond)

**This case was retrieved on 09/03/2026**

## Header

**Case Number:** 3:26cv42
**Date Filed:** 01/16/2026
**Assigned To:** District Judge Roderick C. Young
**Nature of Suit:** Voting (441)
**Cause:** Civil Rights
**Lead Docket:** None
**Other Docket:** A. Walker, 26-02002
**Jurisdiction:** U.S. Government Plaintiff

**Class Code:** Closed
**Closed:** 07/14/2026
**Statute:** 42:1981
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

### Litigants

United States of America
**Plaintiff**

### Attorneys

Eric Neff
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Crt
Civil Rights Division 150 M St. Ne Ste 8-142
Washington, DC 20002
USA
202-532-3628 Email:Eric.Neff@usdoj.Gov

James Thomas Tucker
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Crt
U.S. Department Of Justice, Civil Rights Division, Vot 4
Constitution Square 150 M Street, N.E., Room 8.193
Washington, DC 20530
USA
202-307-2767 Email:James.T.Tucker@usdoj.Gov

Harmeet Dhillon
PRO HAC VICE
[Terminated: 04/21/2026]
Dhillon Law Group, Inc.
Ca 177 Post St. Ste #700
San Francisco, CA 94108
USA
415-433-1700 Email:Harmeet@dhillonlaw.Com

James T. Catania
ATTORNEY TO BE NOTICED
DOJ-Crt
150 M Street, Nw 8th Floor Ste 1126
Washington, DC 20001

| Litigants | Attorneys |
| --- | --- |
| | USA<br>202-322-0312 Email:James.Catania@usdoj.Gov |
| | John Casali<br>ATTORNEY TO BE NOTICED<br>DOJ-Crt<br>150 M Street Ne<br>Washington Dc, DC 20003<br>USA<br>202-316-8087 Email:John.Casali@usdoj.Gov |
| | Jonathan Holland Hambrick<br>ATTORNEY TO BE NOTICED<br>Office of the U.S. Attorney<br>Suntrust Building 919 East Main Street Suite 1900<br>Richmond, VA 23219<br>USA<br>(804) 819-5400 Email:Jay.H.Hambrick@usdoj.Gov |
| | Lindsey Halligan<br><br>[Terminated: 04/21/2026]<br>DOJ-USAO<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>USA<br>703-299-3700 Email:Lindsey.Halligan@usdoj.Gov |
| | Raymond Yang<br>ATTORNEY TO BE NOTICED<br>DOJ-Crt<br>150 M Street Ne<br>Washington, DC 20002<br>USA<br>202-316-3962 Email:Raymond.Yang@usdoj.Gov |
| Democratic National Committee<br>**Amicus** | John Frederick Preis<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br><br>7719 Rock Creek Rd<br>Henrico, VA 23229<br>USA<br>(804) 289-8682 Email:Jpreis@richmond.Edu |
| | Daniel J. Freeman<br>ATTORNEY TO BE NOTICED<br>Democratic National Committee<br>430 South Capitol St Se #3 20003<br>Washington, DC 20003<br>USA<br>202-923-6429 Email:Freemand@dnc.Org |
| Steven Koski<br>in his Official Capacity as Commissioner of the Virginia Department of Elections \|<br>**Defendant** | Tillman James Breckenridge<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>202 North 9th Street<br>Richmond, VA 23219<br>USA<br>804-786-7704 Email:Tbreckenridge@oag.State.Va.Us |

| Litigants | Attorneys |
|---|---|
| | Daniel Honold<br>ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>202 N 9th St.<br>Richmond, VA 23219<br>USA<br>440-539-4048 Email:Dhonold@oag.State.Va.Us<br><br>Triston Chase O'Savio<br>ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>202 North 9th Street<br>Richmond, VA 23219<br>USA<br>804-845-4898 Email:Tosavio@oag.State.Va.Us |
| Common Cause<br>**Intervenor** | Davin McKay Rosborough<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 10004<br>New York, NY 10004<br>USA<br>703-380-0804 Email:Drosborough@aclu.Org<br><br>Ari Joseph Savitzky<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY 10004<br>USA<br>212-549-2500 Fax: 332-234-9285 Email:Asavitzky@aclu.Org<br><br>Patricia Jia Yan<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-457-0800 Fax: 332-234-9285 Email:Pyan@aclu.Org<br><br>Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa Jeane Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| Katherine Ellena<br>**Intervenor** | Davin McKay Rosborough<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 10004<br>New York, NY 10004 |

| Litigants | Attorneys |
|---|---|
| | USA<br>703-380-0804 Email:Drosborough@aclu.Org |
| | Ari Joseph Savitzky<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY 10004<br>USA<br>212-549-2500 Fax: 332-234-9285 Email:Asavitzky@aclu.Org |
| | Patricia Jia Yan<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-457-0800 Fax: 332-234-9285 Email:Pyan@aclu.Org |
| | Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa Jeane Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2500 Email:Tlee@aclu.Org |
| NAACP Virginia State Conference<br>**Intervenor** | Aria Christine Branch<br>ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4518 Email:Abranch@elias.Law |
| | Kevin Ronald Kowalewski<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (DC-NA)<br>250 Massachusetts Avenue Nw Suite 400 **na**<br>Washington, DC 20001<br>USA<br>(202) 968-4498 Email:Kkowalewski@elias.Law |
| | Richard Alexander Medina<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (DC-NA)<br>250 Massachusetts Avenue Nw Suite 400 **na**<br>Washington, DC 20001<br>USA<br>(202) 968-4498 Email:Rmedina@elias.Law |

| Litigants | Attorneys |
|---|---|
| | Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (WA-NA)<br>1700 Seventh Avenue Suite 2100 *** Na ***<br>Seattle, WA 98101<br>USA<br>(202) 968-4498 Email:Wmckusick@elias.Law |
| National Association for the Advancement of Colored People<br>**Intervenor** | Aria Christine Branch<br>ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC 20001<br>USA<br>202-968-4518 Email:Abranch@elias.Law<br><br>Kevin Ronald Kowalewski<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (DC-NA)<br>250 Massachusetts Avenue Nw Suite 400 **na**<br>Washington, DC 20001<br>USA<br>(202) 968-4498 Email:Kkowalewski@elias.Law<br><br>Richard Alexander Medina<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (DC-NA)<br>250 Massachusetts Avenue Nw Suite 400 **na**<br>Washington, DC 20001<br>USA<br>(202) 968-4498 Email:Rmedina@elias.Law<br><br>Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP (WA-NA)<br>1700 Seventh Avenue Suite 2100 *** Na ***<br>Seattle, WA 98101<br>USA<br>(202) 968-4498 Email:Wmckusick@elias.Law |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 01/16/2026 | Complaint under Civil Rights Act of 1960, filed by UNITED STATES. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Neff, Eric) (Entered: 01/16/2026) | |
| 2 | 01/16/2026 | Proposed Summons re 1 Complaint by United States of America. (Neff, Eric) (Entered: 01/16/2026) | |
| | 01/16/2026 | Initial Case Assignment to District Judge Roderick C. Young. (adun, ) (Entered: 01/20/2026) | |
| 3 | 01/20/2026 | Summons Issued as to Susan Beals. NOTICE TO ATTORNEY: Please remove the headers and print two duplex copies of the Electronically issued summons for Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention. Electronically file the summons return using the filing events Summons Returned Executed or Summons Returned | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Unexecuted. Please ensure that the original summons page signed by the clerk is the first document to appear when filing the return of service. (adun, ) (Entered: 01/20/2026) | |
| 4 | 01/20/2026 | LOCAL CIVIL RULE 7(E) STANDING ORDER. Signed by District Judge Roderick C. Young on 7/16/2024. (adun, ) (Entered: 01/20/2026) | |
| 5 | 01/20/2026 | STANDING ORDER IN RE COURTROOM ELECTRONICS. Signed by District Judge Roderick C. Young on 1/15/2025. (adun, ) (Entered: 01/20/2026) | |
| 6 | 01/26/2026 | MOTION to Intervene by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NAACP Virginia State Conference. (Branch, Aria) (Entered: 01/26/2026) | |
| 7 | 01/26/2026 | Memorandum in Support re 6 MOTION to Intervene filed by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Exhibit A - Proposed Answer, # 2 Exhibit B - Declaration of Rev. Cozy E. Bailey, Sr., # 3 Exhibit C - Declaration of Anthony P. Ashton, # 4 Exhibit D - Order, U.S. v. Scanlan (D.N.H.))(Branch, Aria) (Entered: 01/26/2026) | |
| 8 | 01/26/2026 | Corporate Disclosure Statement by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 01/26/2026) | |
| 9 | 01/27/2026 | Motion to appear Pro Hac Vice by Richard A. Medina and Certification of Local Counsel Aria C. Branch Filing fee $ 75, receipt number AVAEDC-10738700. by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 01/27/2026) | |
| 10 | 01/27/2026 | Motion to appear Pro Hac Vice by Walker McKusick and Certification of Local Counsel Aria C. Branch Filing fee $ 75, receipt number AVAEDC-10738737. by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 01/27/2026) | |
| 11 | 01/27/2026 | Motion to appear Pro Hac Vice by Kevin R. Kowalewski and Certification of Local Counsel Aria C. Branch Filing fee $ 75, receipt number AVAEDC-10738765. by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 01/27/2026) | |
| 12 | 01/30/2026 | ORDER granting 9 Motion for Pro hac vice Richard Alexander Medina for NAACP Virginia State Conference and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. Signed by District Judge Roderick C. Young on 1/30/2026. (adun, ) (Entered: 01/30/2026) | |
| 13 | 01/30/2026 | ORDER granting 10 Motion for Pro hac vice Walker Roy McKusick for NAACP Virginia State Conference and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. Signed by District Judge Roderick C. Young on 1/30/2026. (adun, ) (Entered: 01/30/2026) | |
| 14 | 01/30/2026 | ORDER granting 11 Motion for Pro hac vice Kevin Ronald Kowalewski for NAACP Virginia State Conference and NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. Signed by District Judge Roderick C. Young on 1/30/2026. (adun, ) (Entered: 01/30/2026) | |
| 15 | 01/30/2026 | MOTION to Intervene (Unopposed) by Common Cause, Katherine Ellena. (Attachments: # 1 Exhibit A - Almeida Declaration, # 2 Exhibit B - Ellena Declaration, # 3 Proposed Order)(Rosborough, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Davin) (Entered: 01/30/2026) | |
| 16 | 01/30/2026 | Memorandum in Support re 15 MOTION to Intervene (Unopposed) filed by Common Cause, Katherine Ellena. (Attachments: # 1 Exhibit 1 - Motion to Dismiss, # 2 Exhibit 2 - Memorandum In Support of Motion to Dismiss, # 3 Exhibit A (to MTD Brief) - July 15 Letter, # 4 Exhibit B (to MTD Brief) - Dhillon Letters, # 5 Exhibit C (to MTD Brief) - Memorandum of Understanding, # 6 Exhibit D (to MTD Brief) - Weber Transcript)(Rosborough, Davin) (Entered: 01/30/2026) | |
| 17 | 01/30/2026 | Corporate Disclosure Statement by Common Cause, Katherine Ellena. (Rosborough, Davin) (Entered: 01/30/2026) | |
| 18 | 02/04/2026 | Motion to appear Pro Hac Vice by Ari Joseph Savitzky and Certification of Local Counsel Davin Rosborough Filing fee $ 75, receipt number AVAEDC-10758412. by Common Cause, Katherine Ellena. (Rosborough, Davin) (Main Document 18 replaced on 2/5/2026) (jenjones, ). (Entered: 02/04/2026) | |
| 19 | 02/04/2026 | Motion to appear Pro Hac Vice by Patricia Yan and Certification of Local Counsel Davin Rosborough Filing fee $ 75, receipt number AVAEDC-10758511. by Common Cause, Katherine Ellena. (Rosborough, Davin) (Main Document 19 replaced on 2/5/2026) (jenjones, ). (Entered: 02/04/2026) | |
| 20 | 02/04/2026 | Motion to appear Pro Hac Vice by Sophia Lin Lakin and Certification of Local Counsel Davin Rosborough Filing fee $ 75, receipt number AVAEDC-10758526. by Common Cause, Katherine Ellena. (Rosborough, Davin) (Main Document 20 replaced on 2/5/2026) (jenjones, ). (Entered: 02/04/2026) | |
| 21 | 02/04/2026 | Motion to appear Pro Hac Vice by Theresa Jeane Lee and Certification of Local Counsel Davin Rosborough Filing fee $ 75, receipt number AVAEDC-10758548. by Common Cause, Katherine Ellena. (Rosborough, Davin) (Entered: 02/04/2026) | |
| | 02/05/2026 | Notice of Correction re 18 , 19 , 20 : Documents filed as PDF fillable forms. Filing attorney reminded to only upload standard PDFs. Clerk has corrected. No further action needed. (jenjones, ) (Entered: 02/05/2026) | |
| 22 | 02/12/2026 | ORDER granting 18 Motion for Ari Joseph Savitzky to appear as Pro Hac Vice for Common Cause and for Katherine Ellena. Signed by District Judge Roderick C. Young on 2/12/2026. (sbea) (Entered: 02/12/2026) | |
| 23 | 02/12/2026 | ORDER granting 19 Motion for Patricia Yan to appear as Pro Hac Vice for Common Cause and Katherine Ellena. Signed by District Judge Roderick C. Young on 2/12/2026. (sbea) (Entered: 02/12/2026) | |
| 24 | 02/12/2026 | ORDER granting 20 Motion for Sophia Lin Lakin to appear as Pro Hac Vice for Common Cause and Katherine Ellena. Signed by District Judge Roderick C. Young on 2/12/2026. (sbea) (Entered: 02/12/2026) | |
| 25 | 02/12/2026 | ORDER granting 21 Motion for Theresa Jeane Lee to appear as Pro Hac Vice for Common Cause and Katherine Ellena. Signed by District Judge Roderick C. Young on 2/12/2026. (sbea) (Entered: 02/12/2026) | |
| 26 | 03/18/2026 | NOTICE of Appearance by John Casali on behalf of United States Of America (Casali, John) (Entered: 03/18/2026) | |
| 27 | 03/19/2026 | MOTION to Withdraw as Attorney by United States Of America. (Casali, John) (Entered: 03/19/2026) | |
| 28 | 03/19/2026 | AMENDED COMPLAINT against All Parties, filed by United States Of America.(Casali, John) (Entered: 03/19/2026) | |
| 29 | 03/19/2026 | Proposed Summons by United States Of America (Casali, John) (Entered: 03/19/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 31 | 03/19/2026 | Summons Issued as to Steven Koski. NOTICE TO ATTORNEY: Please remove the headers and print two duplex copies of the Electronically issued summons for Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention. Electronically file the summons return using the filing events Summons Returned Executed or Summons Returned Unexecuted. Please ensure that the original summons page signed by the clerk is the first document to appear when filing the return of service. (adun, ) (Entered: 03/19/2026) | |
| 30 | 03/19/2026 | NOTICE of Appearance by Raymond Yang on behalf of United States Of America (Yang, Raymond) (Entered: 03/19/2026) | |
| 32 | 04/14/2026 | NOTICE of Appearance by Jonathan Holland Hambrick on behalf of United States Of America (Hambrick, Jonathan) (Entered: 04/14/2026) | |
| 33 | 04/14/2026 | SUMMONS Returned Executed by United States Of America Steven Koski served on 4/13/2026, answer due 5/4/2026 (Casali, John) (Entered: 04/14/2026) | |
| 34 | 04/15/2026 | ORDER - The Court DIRECTS Defendant to enter an appearance and file a notice of its position on the pending Motions to Intervene on or before April 22, 2026. The Clerk is DIRECTED to send a copy of this Order to counsel of record for the United States and proposed intervenors. The United States Marshals Service SHALL serve a copy of this Order on Defendant at the following address as soon as is practicable. Copy of Order placed in USMS box for service. Signed by District Judge Roderick C. Young on 4/15/26. (mful, ) (Additional attachment(s) added on 4/15/2026: # 1 USM 285) (mful, ). (Entered: 04/15/2026) | |
| 35 | 04/21/2026 | ORDER- For good cause shown, it is hereby ORDERED that (1) the Motion to Withdraw (ECF No. 27 ) is GRANTED; and (2) Harmeet Dhillon and Lindsay Halligan shall be REMOVED as counsel of record for Plaintiff in this matter. Eric Neff and John Casali shall remain counsel of record for the same. Signed by District Judge Roderick C. Young on 4/21/2026.(adun, ) (Entered: 04/21/2026) | |
| 36 | 04/21/2026 | Marshal's Return in re 34 (adun, ) (Entered: 04/21/2026) | |
| 37 | 04/22/2026 | NOTICE of Appearance by Triston Chase O'Savio on behalf of Steven Koski (O'Savio, Triston) (Entered: 04/22/2026) | |
| 38 | 04/22/2026 | NOTICE by Steven Koski re 34 Order,, (O'Savio, Triston) (Entered: 04/22/2026) | |
| 39 | 04/29/2026 | MOTION to Compel Production of Records by United States Of America. (Attachments: # 1 Supplement Memorandum of Law in Support of Motion to Compel, # 2 Exhibit Declaration of Eric Neff, # 3 Exhibit July 15 Letter, # 4 Exhibit August 14 Letter, # 5 Exhibit North Carolina 2025 Consent Order, # 6 Exhibit Texas 2008 Memorandum of Understanding, # 7 Exhibit Georgia 2006 Complaint, # 8 Exhibit Georgia 2006 Consent Decree, # 9 Exhibit Virginia 2026 Executive Order)(Casali, John) (Entered: 04/29/2026) | |
| 40 | 04/30/2026 | First MOTION for Extension of Time to File Answer by Steven Koski. (Attachments: # 1 Proposed Order)(O'Savio, Triston) (Entered: 04/30/2026) | |
| 41 | 04/30/2026 | RESPONSE to Motion re 40 First MOTION for Extension of Time to File Answer filed by United States Of America. (Casali, John) (Entered: 04/30/2026) | |
| 42 | 05/04/2026 | MOTION for Leave to File Motion to Dismiss by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Exhibit 1 - Proposed Motion to Dismiss, # 2 Exhibit 2 - Memorandum in Support of Proposed Motion to Dismiss)(Branch, Aria) (Entered: 05/04/2026) | |
| 43 | 05/05/2026 | ORDER- The Court is committed to the prompt and efficient litigation of the above-styled dispute but finds that Plaintiff will not suffer undue prejudice if subject to modest extensions. Accordingly, and for good cause shown, the Court hereby GRANTS IN PART the Motion for Extension (ECF No. 40 ). Defendant SHALL answer or otherwise respond to the Amended Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure on or before May 19, 2026. Defendant SHALL subsequently file its Response to Plaintiffs Motion to Compel on or before May 26, 2026. The United States' Reply in Support of its Motion to Compel, if any, SHALL be due six days thereafter on June 1, 2026. SEE ORDER FOR DETAILS. Signed by District Judge Roderick C. Young on 5/5/2026. (adun, ) (Entered: 05/05/2026) | |
| 44 | 05/06/2026 | ORDER- Accordingly, and for the reasons stated herein, the Motions to Intervene (ECF Nos. 6 , 15 ) are hereby GRANTED pursuant to Federal Rule of Civil Procedure 24(b). The intervening parties authorized herein SHALL file responsive pleading(s) that answer or otherwise respond to Plaintiffs Amended Complaint on or before May 19, 2026. Responses by any Defendant to Plaintiffs Motion to Compel Production of Records, ECF No. 39 , SHALL be due on or before June 1, 2026. Because this Order directs the NAACP Proposed Intervenors to file a responsive pleading, their separately filed Motion for Leave to File Motion to Dismiss (ECF No. 42 ) is DENIED AS MOOT. The NAACP Proposed Intervenors should amend their proposed Motion to Dismiss to reflect their authorized role as party Defendants and re-file the motion in the time for filing a responsive pleading authorized herein. SEE ORDER FOR DETAILS. Signed by District Judge Roderick C. Young on 5/6/2026. (adun, ) (Entered: 05/06/2026) | |
| 45 | 05/19/2026 | NOTICE of Appearance by Tillman James Breckenridge on behalf of Steven Koski (Breckenridge, Tillman) (Entered: 05/19/2026) | |
| 46 | 05/19/2026 | MOTION to Dismiss for Failure to State a Claim by Steven Koski. (Attachments: # 1 Proposed Order Defendant's Proposed Order)(Breckenridge, Tillman) (Entered: 05/19/2026) | |
| 47 | 05/19/2026 | Brief in Support to 46 MOTION to Dismiss for Failure to State a Claim filed by Steven Koski. (Breckenridge, Tillman) (Entered: 05/19/2026) | |
| 48 | 05/19/2026 | MOTION to Dismiss for Failure to State a Claim by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Proposed Order)(Branch, Aria) (Entered: 05/19/2026) | |
| 49 | 05/19/2026 | Memorandum in Support re 48 MOTION to Dismiss for Failure to State a Claim filed by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 05/19/2026) | |
| 50 | 05/19/2026 | MOTION to Dismiss for Failure to State a Claim by Common Cause, Katherine Ellena. (Attachments: # 1 Proposed Order)(Rosborough, Davin) (Entered: 05/19/2026) | |
| 51 | 05/19/2026 | Memorandum in Support re 50 MOTION to Dismiss for Failure to State a Claim filed by Common Cause, Katherine Ellena. (Attachments: # 1 Exhibit A - MOU, # 2 Exhibit B - U.S. v. Amore Transcript)(Rosborough, Davin) (Entered: 05/19/2026) | |
| 52 | 05/20/2026 | MOTION for Leave to File a Brief as Amicus Curiae by Democratic National Committee. (Attachments: # 1 Democratic National Committee's Brief as Amicus Brief (Received on 5/20/2026), # 2 | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Application for Pro Hac Vice as to Daniel J. Freeman (Received on 5/20/2026))(Kski, ) (Entered: 05/20/2026) | |
| 53 | 05/20/2026 | Memorandum in Support re 52 MOTION for Leave to File filed by Democratic National Committee. (Kski, ) (Entered: 05/20/2026) | |
| 54 | 05/20/2026 | Corporate Disclosure Statement by Democratic National Committee. (Kski, ) (Entered: 05/20/2026) | |
| 55 | 05/26/2026 | NOTICE by Steven Koski Supplemental Authority (Breckenridge, Tillman) (Entered: 05/26/2026) | |
| 56 | 05/26/2026 | RESPONSE in Opposition re 39 MOTION to Compel Production of Records filed by Steven Koski. (Breckenridge, Tillman) (Entered: 05/26/2026) | |
| 57 | 06/01/2026 | Memorandum in Opposition re 39 MOTION to Compel Production of Records filed by Common Cause, Katherine Ellena. (Rosborough, Davin) (Entered: 06/01/2026) | |
| 58 | 06/01/2026 | Memorandum in Opposition re 48 MOTION to Dismiss for Failure to State a Claim , 46 MOTION to Dismiss for Failure to State a Claim , 50 MOTION to Dismiss for Failure to State a Claim filed by United States Of America. (Attachments: # 1 Affidavit Neff Second Dec., # 2 Exhibit Defs 2d Status Report, # 3 Exhibit North Carolina Order, # 4 Exhibit Maine Consent Decree, # 5 Exhibit New Jersey Consent Decree, # 6 Exhibit Indiana Consent Decree, # 7 Exhibit Indiana Motion to Amend Consent Decree, # 8 Exhibit Indiana Amended Consent Decree, # 9 Exhibit Alabama Complaint, # 10 Exhibit Shelby County Documents, # 11 Exhibit Vermont Complaint, # 12 Exhibit Georgia Letter, # 13 Exhibit Ford Carter Excerpt Reports, # 14 Exhibit District Court Order re Kennedy v. Lynd)(Catania, James) (Entered: 06/01/2026) | |
| 59 | 06/01/2026 | REPLY to Response to Motion re 39 MOTION to Compel Production of Records filed by United States Of America. (Catania, James) (Entered: 06/01/2026) | |
| 60 | 06/01/2026 | RESPONSE in Opposition re 39 MOTION to Compel Production of Records filed by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 06/01/2026) | |
| 61 | 06/02/2026 | NOTICE of Appearance by James Thomas Catania on behalf of United States Of America (Catania, James) (Entered: 06/02/2026) | |
| 62 | 06/08/2026 | Reply to Motion re 46 MOTION to Dismiss for Failure to State a Claim Reply in Support filed by Steven Koski. (Breckenridge, Tillman) (Entered: 06/08/2026) | |
| 63 | 06/08/2026 | NOTICE of Appearance by Daniel Honold on behalf of Steven Koski (Honold, Daniel) (Entered: 06/08/2026) | |
| 64 | 06/08/2026 | RESPONSE in Support re 50 MOTION to Dismiss for Failure to State a Claim filed by Common Cause, Katherine Ellena. (Attachments: # 1 Exhibit A - Scanlan Protective Order, # 2 Exhibit B - Schedule A to Scanlan Protective Order)(Rosborough, Davin) (Entered: 06/08/2026) | |
| 65 | 06/08/2026 | REPLY to Response to Motion re 48 MOTION to Dismiss for Failure to State a Claim filed by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Branch, Aria) (Entered: 06/08/2026) | |
| 66 | 06/15/2026 | Motion to appear Pro Hac Vice by Daniel J. Freeman and Certification of Local Counsel John F. Preis by Democratic National Committee (FEE NOT PAID). (mful, ) (Entered: 06/15/2026) | |
| | 06/16/2026 | Electronic Fee Payment - Pro Hac Vice by Democratic National Committee. Filing fee $ 75, receipt number AVAEDC-11075521.. (Preis, John) (Entered: 06/16/2026) | |

3:26cv42, United States Of America V. Koski

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 67 | 06/16/2026 | ORDER- The Court finds it appropriate to exercise its discretion to GRANT the motion (ECF No. 52 ). Accordingly, the DNC's proposed amicus curiae brief (ECF No. 52 -1) is hereby deemed FILED and will be considered by the Court in its forthcoming adjudication of the Motion to Compel and Motion(s) to Dismiss currently pending in this action. SEE ORDER FOR DETAILS. Signed by District Judge Roderick C. Young on 06/16/2026. (Kski, ) (Entered: 06/16/2026) | |
| 68 | 06/16/2026 | ORDER granting 66 Motion for Pro hac vice Daniel J. Freeman for Democratic National Committee. Signed by District Judge Roderick C. Young on 6/16/2026. (adun, ) (Entered: 06/16/2026) | |
| 69 | 06/23/2026 | MOTION for Leave to File Notice of Supplemental Authority by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Exhibit 1 - United States v. DeMarinis)(Branch, Aria) (Entered: 06/23/2026) | |
| 70 | 06/25/2026 | ORDER- Upon review, the Court finds it appropriate to exercise its discretion to GRANT the Motion (ECF No. 69 ). Accordingly, the supplemental authority in support of the NAACP Intervenors pending Motion to Dismiss is hereby ACCEPTED as FILED and will be considered by the Court in its forthcoming adjudication of the Motion(s) to Dismiss currently pending in this action. Signed by District Judge Roderick C. Young on 6/25/2026. (adun, ) (Entered: 06/25/2026) | |
| 71 | 06/26/2026 | MOTION for Leave to File Second Notice of Supplemental Authority by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Exhibit 1 - United States v. Benson)(Branch, Aria) (Entered: 06/26/2026) | |
| 72 | 06/30/2026 | ORDER - The Court finds it appropriate to exercise its discretion to GRANT the Motion (ECF No. 71 ). Accordingly, the supplemental authority in support of the NAACP Intervenors' pending Motion to Dismiss is hereby ACCEPTED as FILED and will be considered by the Court in its forthcoming adjudication of the Motion(s) to Dismiss currently pending in this action. It is so ORDERED. Signed by District Judge Roderick C. Young on 6/30/2026. (jenjones, ) (Entered: 06/30/2026) | |
| 73 | 07/01/2026 | Response to NAACP Notice of Supplemental Authority filed by United States Of America. (Catania, James) (Entered: 07/01/2026) | |
| 74 | 07/01/2026 | Response to NAACP Second Notice of Supplemental Authority filed by United States Of America. (Catania, James) (Entered: 07/01/2026) | |
| 75 | 07/14/2026 | MOTION for Leave to File Third Notice of Supplemental Authority by NAACP Virginia State Conference, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Exhibit 1 - United States v. Warner, # 2 Exhibit 2 - United States v. Schmidt, # 3 Exhibit 3 - United States v. Scanlan, # 4 Exhibit 4 - United States v. Bd. of Elections of N.Y.)(Branch, Aria) (Entered: 07/14/2026) | |
| 76 | 07/14/2026 | MEMORANDUM OPINION. SEE ORDER FOR DETAILS. Signed by District Judge Roderick C. Young on 7/14/2026. (jenjones, ) (Entered: 07/14/2026) | |
| 77 | 07/14/2026 | ORDER - For the reasons stated in the accompanying Memorandum Opinion, Defendant Steven Koski and the Intervenor Defendants' Motions to Dismiss (ECF Nos. 46 , 48 , 50 ) are hereby GRANTED and the United States's Motion to Compel (ECF No. 39 ) is DENIED. The Court DISMISSES the single count of the Amended Complaint WITH PREJUDICE. Accordingly, the | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Clerk is DIRECTED to CLOSE this case. It is so ORDERED. Signed by District Judge Roderick C. Young on 7/14/2026. (jenjones, ) (Entered: 07/14/2026) | |
| 78 | 07/15/2026 | ORDER - This matter is before the Court on a Motion for Leave to File Third Notice of Supplemental Authority (ECF No. 75 ) filed by Defendant-Intervenors NAACP and NAACP Virginia State Conference. The above-styled case is now closed. In light of the Court's ruling yesterday on the Motions to Dismiss and Motion to Compel in this matter, the Motion for Leave to File Third Notice of Supplemental Authority (ECF No. 75 ) is DENIED AS MOOT. It is so ORDERED. Signed by District Judge Roderick C. Young on 7/15/2026. (jenjones, ) (Entered: 07/15/2026) | |
| 79 | 07/24/2026 | NOTICE of Appearance by James Thomas Tucker on behalf of United States Of America (Tucker, James) (Entered: 07/24/2026) | |
| 80 | 07/24/2026 | NOTICE OF APPEAL re: 76 Memorandum Opinion, 77 Order by United States Of America (Tucker, James). Modified on 7/27/2026. (sbea) (Entered: 07/24/2026) | |
| | 07/27/2026 | Notice of Correction re: 79 Notice of Appearance; Please update address in PACER, we have a different address in our system than what you have submitted on your document. (sbea) (Entered: 07/27/2026) | |
| 81 | 07/27/2026 | Transmission of Notice of Appeal to US Court of Appeals re 80 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Lgar, ) (Entered: 07/27/2026) | |
| 82 | 07/29/2026 | USCA Case Number 26-2002, 4CCA Case Manager A. Walker, for 80 Notice of Appeal filed by United States Of America. (mful, ) (Entered: 07/30/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

# EXHIBIT A

**DECLARATION OF SUZANNE ALMEIDA**

Pursuant to 28 U.S.C. § 1746, I, Suzanne Almeida, declare as follows:

1. I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.

2. I am a member of Common Cause. As a full-time member of Common Cause's staff, I currently serve as a Vice President, States. I have served in this role and a substantially similar role since May 2022 and have been a member of Common Cause's staff since July 2018.

3. I directly oversee a number of states and support Common Cause work across the country, including in the Commonwealth of Virginia, to protect voting rights, promote ethical government, and hold power accountable. In my role as Vice President, States, I also engage with Common Cause's policy, organizing, and external affairs staff to advance pro-voter, pro-democracy policy. I work with multiple coalitions to advance pro-voter reforms and increase civic engagement, including the national Election Protection Coalition.

4. Common Cause is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia and registered to do business in Virginia. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and intervenes in this action on behalf of itself and in a representative capacity on behalf of its members.

5. Pursuant to its bylaws, Common Cause has defined who qualifies as a member. Under its definition, a "member" of Common Cause is any individual who, within the past two years, (a) made a financial contribution to the organization; or (b) has taken meaningful action in support of Common Cause's advocacy work. Such meaningful action includes, but is not limited to, signing petitions directed to government officials; participating in letter-writing or phone-banking campaigns;

attending town halls, workshops, or rallies organized by Common Cause; or otherwise engaging in activities designed to advance the organization's mission. As of this writing, there are approximately 20,678 members of Common Cause in the Commonwealth of Virginia. These members also likely include voters who are more likely to be mistakenly caught up in the federal government's efforts to remove voters from the rolls, including voters with felony convictions, voters who have moved within Virginia or left the state and then returned, voters who are naturalized citizens, voters who vote by mail, and other voters whose identifying information is particularly important to keep private due to some other heightened need for privacy.

6. Common Cause's mission is to uphold the core values of American democracy by creating an open, honest, and accountable government that serves the public interest, promotes equal rights, opportunity, and representation for all, and empowers people to make their voices heard in the political process.

7. In the Commonwealth of Virginia, Common Cause ensures that voters' voices are heard in the political process. Our members reside throughout the Commonwealth and include registered voters whose personal information is maintained in the Commonwealth of Virginia Department of Elections voter registration database. If the Commonwealth of Virginia discloses the unredacted voter registration file to the U.S. Department of Justice, these members' sensitive personal information—including driver's license numbers and portions of social security numbers—would be unlawfully released, causing an invasion of privacy, chilling participation in the electoral process, and undermining confidence in the integrity of the Commonwealths' elections.

8. Common Cause believes the right to vote is the cornerstone of a functioning democracy. We are committed to ensuring that every Virginia voter can register and cast their ballot with a focus on communities who experience additional barriers to participation including Black people, Indigenous Peoples, Latina/o people,

Asian/Pacific Islanders, other people of color, young people, and people with disabilities. Part of that work is to counter anything that could chill participation in the election process, including attempts to gather personal voter data by individuals not authorized to access it.

9. Through our legislative advocacy, Common Cause has ensured that voting in the Commonwealth has remained as secure as possible, while expanding access to the ballot. For example, in 2023-2024, we lobbied and mobilized our membership in support of bills in both chambers to guarantee voting rights for returning citizens, including the right to register to vote.

10. Common Cause works to ensure that once registered, all voters can cast a ballot. Through our Election Protection program, for example, we have provided training to organizations and volunteers to equip them to support voters on Election Day and assisted voters through the Election Protection hotline, including answering questions on registering to vote in Virginia.

11. As a nonpartisan democracy reform and good government organization, Common Cause assists eligible Virginia voters in registering to vote, verifying, and/or updating their voter registration through outreach to our members in the Commonwealth. For example, on National Voter Registration Day, Common Cause members in Virginia received notices from us urging them to register to vote and/or to verify their registration status, and many did. As a result, voters we assist are added to the official Virginia Department of Elections voter file, and we consider it our duty to safeguard the trust they place in us and in the democratic process. We have a vested interest in protecting the integrity and privacy of that data. Any threat to the security of the voter file, especially one that could result in the misuse of personal information, directly undermines our work, damages public trust, and risks chilling voter participation.

12. We also run targeted communications campaigns, including through social media, to keep our members in Virginia informed about key election deadlines and updates. These efforts amplify official messages from the Virginia Department of Elections helping ensure voters have accurate, timely information to participate confidently in our democracy.

13. Disclosure of the entire, unredacted Virginia Department of Elections voter file would undermine Common Cause's work and risk harm to our members. We rely on public confidence in the security and integrity of voter data to encourage participation. If voters fear their personal information, like a partial Social Security number or driver's license number, could be misused or exposed, they may avoid registering to vote, decline to update their current voter registration record, or withdraw from civic engagement activities altogether. Such results undermine Common Cause's mission to expand access and participation, especially among historically marginalized communities. Knowing that their personal data could be used to challenge their eligibility to vote would chill participation in the democratic process. This is especially true for voters in marginalized communities who already face systemic barriers and distrust government surveillance.

14. Additionally, disclosure of the complete Virginia Department of Elections voter file would facilitate unsubstantiated voter challenges, a concern especially for vulnerable communities. Improper and flawed mass-challenge programs disproportionately target voters who lack stable housing or traditional addresses. Mass challenges, often filed in bulk by activists, can overwhelm local election officials, divert resources from voter outreach and education, delay or obstruct legitimate registrations and ballot processing. This undermines the infrastructure that Common Cause and our partners rely upon to ensure smooth, inclusive elections. Diverting resources to address these improper activities weakens our capacity to run voter registration drives, educate voters, and mobilize

communities. These sorts of challenges also work to revive historical tactics of voter suppression. Private voter challenges have roots in post-Reconstruction laws used to disenfranchise Black voters. Today, they are increasingly used to target voters of color, Indigenous Peoples, young voters, and those who are unhoused or in transient living situations; all of whom Common Cause prioritizes in our voter registration work and lobbying/advocacy supporting the inclusion of their voting rights. If voters' sensitive data is disclosed to the federal government and used to promote mass disenfranchisement, Common Cause will be forced to redirect resources to mitigate disenfranchisement among existing voters and away from its core activities of voter registration and voter engagement in the democratic process.

15. If the Commonwealth of Virginia discloses the unredacted voter file, this will work to normalize federal overreach into state-run elections, weakening local control and opening the door to future demands for even more intrusive data. It poses a grave threat to voter privacy and public confidence. This threatens the decentralized structure of U.S. elections, which Common Cause defends as a safeguard against authoritarianism.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 29th day of January 2026, in Philadelphia, Pennsylvania.

Suzanne Almeida

Suzanne Almeida
Vice President, States of Common Cause

# EXHIBIT B

## DECLARATION OF KATHERINE ELLENA

Pursuant to 28 U.S.C. § 1746, I, Katherine Ellena, hereby declare as follows:

1. I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.
2. I currently reside in Great Falls, Virginia, and I am an eligible, registered voter in Virginia.
3. I am originally from New Zealand, and previously worked as a diplomat with the New Zealand Ministry of Foreign Affairs and Trade. Through my work overseas, I met a United States citizen in 2009, and after marrying him in 2011, we moved to the United States in July 2011, first to California, and then to Virginia in April 2013, where I have resided since that time.
4. When I first came to the United States, I was a legal permanent resident. In March 2015, I became a naturalized citizen of the United States. The most important part of becoming a naturalized citizen for me was the right (and responsibility) of participating in the democratic process in the United States, and I have been voting in elections in Virginia since I naturalized.
5. I have spent the majority of my career supporting democratic governance and electoral integrity globally, based on the established human right to universal and equal suffrage. I have experience working on a neutral and non-partisan basis with election commissions, oversight bodies, tribunals, and courts in over 30 countries, and have helped design election dispute

resolution systems, refine elections laws and administrative rules, and deliver training on election litigation. I have supported peer exchange visits of election officials and judges from around the world to learn about election processes in the United States and am a special advisor to the bi-partisan Standing Committee on Election Law at the American Bar Association.

6. When I learned that the federal government had requested Virginia's complete statewide voter registration file, including sensitive personal information, I became deeply concerned about how this data might be used. I am particularly worried that naturalized citizens like myself could be particularly vulnerable to unfounded allegations of illegal voting, wrongly removed from the voter rolls, or subject to discriminatory barriers to registration.

7. I care deeply about the privacy of my personal data. Government collection and use of personal information is subject to strict legal limits and voter registration systems must protect eligible voters from erroneous removal, even as they maintain accurate lists. I also believe in the integrity of the electoral system as a whole and the importance of ensuring that process is implemented in a way that is as inclusive and accessible as possible for every eligible voter. This means that the process of registration and voting must be free from intimidation or chilling effects, and that no qualified voter should be unjustly removed from registration lists or otherwise prevented from exercising their political rights.

8. Naturalized citizens have deliberately chosen to make the United States their home, and for us the right to cast a ballot carries profound legal and personal significance—especially for those who have not been able to meaningfully exercise fundamental political rights in their country of birth, which I have witnessed firsthand in my work. Federal law in the United States guarantees that once naturalized, we enjoy the same right to vote as any other citizen. Many naturalized citizens place great trust in the integrity and transparency of the American electoral system. We deserve firm assurance that our participation—and our personal information—will be protected.

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 29, 2026 in Great Falls, Virginia.

Katherine Ellena

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

JOHN R. CASALI
RAYMOND YANG
Trial Attorneys, Voting Section
Civil Rights Division

*Attorneys for the United States*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>Defendant. | Civil Case No.: 3:26-cv-00042-RCY<br><br>**FIRST AMENDED COMPLAINT** |

## COMPLAINT

1. Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain

and preserve … *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701 (emphasis added).

2. Title III likewise grants the Attorney General the sweeping power to obtain these records: "Any record or paper required by [section 301] of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

3. If the custodian to whom the written demand is made refuses to comply, the CRA requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the officer of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

4. In this "summary" proceeding, *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963), the Attorney General need only show that she made a "written demand" for records covered by Section 301 of the CRA and that "the person against whom an order for production is sought . . . has failed or refused to make such papers 'available for inspection, reproduction, and copying,'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not adjudicate "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand" or "the scope of the

order to produce." *Id.*

## I. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); and 52 U.S.C. § 20705.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendants are located in and conducts election administration activities in this District.

## II. PARTIES

7. Plaintiff is the United States. The Attorney General has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20510(a); and Title III of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21111.

8. Defendant Steven Koski, an appointee of Governor Abigail Spanberger, is sued in his official capacity as Commissioner of the Virginia Department of Elections[1], the chief State election official responsible for complying with Virginia's responsibilities under federal election law. *See* 52 U.S.C. § 20706; 52 U.S.C. § 20509; Va. Stat. § 24.2-102(B).

## III. BACKGROUND

9. This proceeding arises from the Attorney General's investigation into Virginia's

[1] Defendant Koski replaces Defendant Susan Beals in her Official Capacity as Commissioner of the Virginia Department of Elections.

compliance with federal election law, particularly the CRA, NVRA, and HAVA.

10. Both the NVRA and HAVA require States to maintain and preserve certain records and papers that fall within the scope of Section 301 of Title III of the CRA.

**The National Voter Registration Act**

11. The NVRA requires each state to "designate a state officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509. The NVRA includes as a definition that the term "'State' means a State of the United States and the District of Columbia." 52 U.S.C. § 20502(4).

12. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4).

13. The NVRA also requires States to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

**The Help America Vote Act**

14. HAVA requires all States to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

15. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits States from processing voter-

registration applications without obtaining and verifying certain identifying information from the applicants, namely, a driver's license number for those who possess a valid one, the last four digits of a social security number for those who do not possess a valid drivers' license, and for those who have neither, a unique identifier, 52 U.S.C. § 21083(a)(5)(A).

**The Civil Rights Act**

16. Congress empowered the Attorney General to request records pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701, *et seq.*

17. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special, or primary election. *See* 52 U.S.C. § 20701, *et seq.*

18. Section 303 of the CRA provides, in pertinent part, "[a]ny record or paper required by [52 U.S.C. § 20701] of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703.

## IV. FACTUAL ALLEGATIONS

19. The United States Election Assistance Commission ("EAC") – "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help American participate in the election process" – conducts a biennial Election Administration and Voting Survey ("EAVS"). EAC, *About the EAC*, http://eac.gov/about (last visited March 13, 2026).

20. For the EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, 2024 EAVS Report at 7.[2]

21. Based on a review of the 2024 EAVS Report, the Attorney General sent a letter to Commissioner Beals—Defendant Koski's predecessor—on July 15, 2025, seeking information regarding Virginia's compliance with federal election law. *See* Letter from Attorney General to Commissioner Beals ("July 15 Letter").

22. The July 15 Letter stated that the purpose of the request is to ascertain compliance with the list maintenance requirements of the NVRA and HAVA. The letter requested a copy of Virginia's statewide voter registration list ("SVRL") within fourteen days of the date of the letter. The July 15 Letter also requested that the SVRL contain "all fields" required under Section 3030 of HAVA.

23. The July 15 Letter further stated that the SVRL and all other federal election records that were produced would be maintained according to all applicable federal laws, including Section 304 of the CRA and the Privacy Act. The August 14 Letter also explained to Defendants that "HAVA specifies that the 'last [four] digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974.'" 5 U.S.C. § 552a note; 52 U.S.C. § 21083(c). In addition, any prohibition of

[2] https://eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (last visited March 19, 2026).

disclosure of a motor vehicle record contained in the Driver's Privacy Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Department is now doing.

24. The July 15 Letter identified data Virginia reported to the EAC, published in the 2024 EAVS report, that the United States desired explanations for. This Virginia data included: registration rate (*i.e.* percentage of citizens voting age population registered to vote) of 92.2 percent, confirmation notice rate of 8.8 percent (versus 19.5 percent national average), and duplicate registration rate of 33.2 percent (versus 12.7 percent national average).

25. On August 14, 2025, the United States sent another letter requesting that, pursuant to the CRA, Virginia needed to provide an SVRL with all fields ("August 14 Letter").

26. The August 14 Letter stated that the purpose of the request was to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA."

27. The United States and representatives for Commissioner Beals had discussions in the months subsequent to the July 15 and August 14 Letters. On January 8, 2026, representatives for Commissioner Beals expressed in person that she would not be providing the SVRL. Despite representations and commitments by members of the Youngkin administration to produce Virginia's SVRL, the SVRL has not been provided to the United States as of this date.

28. On January 17, 2026, Abigail Spanberger was sworn in as Governor of the Commonwealth of Virginia, and appointed Defendant Koski to be the Commissioner of the Virginia Department of Elections. This litigation has been pending since. To date, the

Spanberger administration has not provided any documents responsive to the United States' outstanding demand for records.

**COUNT ONE**

**VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703**

29. On August 14, 2025, the Attorney General sent a written demand to Defendant Commissioner of the Virginia Department of Elections for the production of specific election records pursuant to 52 U.S.C. § 20703.

30. The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

31. Defendants have refused to provide the records requested.

Wherefore, the United States respectfully requests this Court:

A. Declare that Defendants' refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

B. Order Defendants to provide to the Attorney General the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083 within 5 days of a Court order.

DATED: March 19, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ John R. Casali
JOHN R. CASALI
RAYMOND YANG
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
john.casali@usdoj.gov
Tel. (202) 316-8087

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *John R. Casali*
JOHN R. CASALI
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
john.casali@usdoj.gov
Tel. (202) 316-8087

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| United States of America<br><br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>Defendant. | CASE NO: 3:26-cv-00042-RCY |

**MOTION FOR ORDER TO COMPEL RECORDS DEMANDED PURSUANT TO THE CIVIL RIGHTS ACT OF 1960**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq.*, hereby moves this Honorable Court for an Order to Show Cause requiring Defendant, STEVEN KOSKI, Commissioner of the Virginia Department of Elections, to show why he should not be compelled to produce the documents requested by the United States. The United States offers the attached Memorandum of Law, Declaration of Eric Neff, and Exhibits, in Support of its Motion to Show Cause.

**WHEREFORE,** Plaintiff requests that this Court enter an Order directing Defendant to show cause why he has failed to produce the demanded records. Plaintiff further requests this Court:

A. Declare that Commissioner Koski's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

B. Order Commissioner Koski to provide to the Attorney General the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083 within five (5) days of a Court order.

C. Order Commissioner Koski to produce such other federal records demanded by the Attorney General to ascertain Virginia's compliance with the NVRA and HAVA.

D. Order such relief as the interests of justice may require.

DATED: April 29, 2026 Respectfully submitted,

TODD W. BLANCHE
ACTING ATTORNEY GENERAL

By: /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK
VSB No. 37590
*Local Attorney for the United States*
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ *John R. Casali*
JOHN R. CASALI
RAYMOND YANG
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.135
Washington, D.C. 20002
Telephone: (202) 316-8087
Email: john.casali@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ John Casali
John R. Casali
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.135
Washington, D.C. 20002
Telephone: (202) 316-8087
Email: john.casali@usdoj.gov

# EXHIBIT 2

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 15, 2025

Via Mail and Email

The Honorable Susan Beals
Commissioner, Virginia Department of Elections
1100 Bank Street, First Floor
Richmond, Virginia 23219
susan.beals@elections.virginia.gov

Dear Commissioner Beals:

We write to you as the chief election official for the Commonwealth of Virginia to request information regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Virginia's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

> The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent report from EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Virginia, with a registration rate in 2024 of 92.2 percent of the citizen voting age population. Please explain what actions Virginia is taking to ensure that voters who should not be on the voter roll are being removed.

2. In the EAVS data for Question A3d, Virginia had 1,074,543 voters (33.2 percent) with duplicate registrations, almost three times as high as the nationwide average of 12.7 percent. In response to the same question for the 2022 EAVS Report, Virginia had 1,226,754 duplicate registrations (36.3 percent). Please explain why duplicate registrations are such a high percentage of the total registration applications received. Please explain what actions Virginia is taking to identify duplicate registrations and to remove those duplicates from the voter registration list.

3. In the EAVS data for Question A10a, Virginia sent 521,339 confirmation notices, which is 8.8 percent of all active registered voters and well below the national average of 19.5 percent. Please explain why Virginia sent confirmation notices to so few registered voters.

4. In the EAVS data for Question A12b, Virginia had 536,460 voters (68.4 percent) removed because they moved out of the commonwealth, which was twice as high as the national average. Please explain how Virginia identifies voters who have moved out of the commonwealth and determines their removal from the voter registration list.

5. In the EAVS data for Question A12e, Virginia had 61,151 voters (7.8 percent) removed due to failure to respond to confirmation notices and did not vote in the two most recent federal elections, which was well below the national average. Based on the responses to Question A10f, 415,181 (79.6 percent) of the confirmation notices were unreturned. Please explain why so few voters are being removed in Question A12e. Please provide a list of all registrations that were cancelled because of failure to respond to confirmation notices and did not vote in the two most recent federal election cycles.

6. No data was listed in the EAVS survey for Question A12h for Virginia regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list. If they were merged or linked with another record, please provide that information.

Please provide a description of the steps that Virginia has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the commonwealth used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen
2. Adjudicated incompetent
3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

# EXHIBIT 3

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

August 14, 2025

Via Mail and Email

The Honorable Susan Beals
Commissioner, Virginia Department of Elections
1100 Bank Street, First Floor
Richmond, Virginia 23219
susan.beals@elections.virginia.gov

Re: **Complete Virginia's Voter Registration List with All Fields**

Commissioner Beals:

We understand that the time the Justice Department has provided your state to respond to the request for a statewide voter registration list ("VRL") and other information has not reached its deadline.

Given responses from other states thus far, we want to clarify that the Justice Department's request to provide an electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Virginia's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Virginia's complete and current VRL. The purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Virginia must ensure that it contains *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to

[2] In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department by the date set for your delivery by our original letter, or by August 21, 2025, whichever is later.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections,<br><br>*Defendant*. | No. 3:26-cv-42 |

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Steven Koski, in his official capacity as Commissioner of the Virginia Department of Elections, moves to dismiss the United States' amended complaint for failure to state a claim. Consistent with the briefing of undersigned counsel in support of this motion to dismiss, the United States' amended complaint fails to state a claim for at least three reasons: (1) Virginia's statewide voter registration list is not the type of "record" relating to a federal election that state elections officials must preserve, retain, and make available for inspection under Title III; (2) the U.S. Attorney General's written demand failed to state the factual basis for demanding Virginia's statewide voter registration list; and (3) the purpose contained in the U.S. Attorney General's written demand was both contrived and insufficient to require Virginia to make records available under Title III. The United States' claim also independently fails because the U.S. Attorney General's demand for Virginia voters' sensitive, non-public data violates both state and federal law.

For the reasons set forth in the accompanying brief in support, Defendant respectfully requests that the Court grant this motion to dismiss the United States' amended complaint.

Date: May 19, 2026

Respectfully submitted,

STEVEN KOSKI, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE VIRGINIA DEPARTMENT OF ELECTIONS

By: *<u>/s/ Tillman J. Breckenridge</u>*

Jay Jones
*Attorney General*

Travis G. Hill
*Chief Deputy Attorney General*

Tillman J. Breckenridge (#85647)*
*Solicitor General*

Triston Chase O'Savio (#100111)*
*Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

**Counsel of Record for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May, 2026, I filed the foregoing using the Court's CM/ECF filing system, which sends an electronic notification of the same to counsel of record.

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#85647)*
*Solicitor General*

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,

Defendant.

No. 3:26-cv-00042-RCY

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND NAACP VIRGINIA STATE CONFERENCE'S MOTION TO DISMISS**

NOW COME Intervenor-Defendants NAACP and the NAACP Virginia State Conference ("NAACP Intervenors"), by and through counsel, and move to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

WHEREFORE, for the reasons stated in their Memorandum of Law in Support of Motion to Dismiss, which is incorporated herein by reference, NAACP Intervenors respectfully request that this Court GRANT their Motion to Dismiss.

Dated: May 19, 2026

Respectfully submitted,

*/s/ Aria C. Branch*

Aria C. Branch, VSB #83682
Richard A. Medina, DC Bar No. 90003752*
Kevin R. Kowalewski, NY Bar No. 5946645*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498

abranch@elias.law
rmedina@elias.law
kkowalewski@elias.law

Walker R. McKusick, WA Bar No. 63205*
**ELIAS LAW GROUP LLP**
T: (206) 656-0177
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
wmckusick@elias.law

* Admitted *Pro Hac Vice*

*Counsel for NAACP Intervenors*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 19th day of May, 2026, with a copy of this document via the Court's CM/ECF system.

*/s/ Aria C. Branch*
Aria C. Branch, VSB #83682
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
abranch@elias.law

*Counsel for NAACP Intervenors*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>Defendant. | No. 3:26-cv-00042<br>(Hon. Roderick C. Young) |

**MOTION OF INTERVENOR-DEFENDANTS COMMON CAUSE AND KATHERINE ELLENA TO DISMISS THE COMPLAINT**

Common Cause and Katherine Ellena (collectively, "Intervenor-Defendants") move to dismiss the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim for which relief may be granted. A memorandum setting forth the facts and legal argument necessary to support their motion, with exhibits attached, is being filed concurrently herewith. *See* L.R. 7(F)(1).

The requests propounded by the U.S. Department of Justice ("DOJ") on the State of Virginia, as set forth in the First Amended Complaint, do not satisfy the core statutory requirement that any federal demand for information under the Civil Rights Act of 1960 include a statement of "the basis and the purpose" for the federal data request. 52 U.S.C. § 20703. Even if they did, production would still be inappropriate, because the requested documents fall outside the scope of

the United States' investigative authority and because the United States's request for this data without any redaction or protections for voters' privacy is unlawful.

The Court should dismiss this action.

## CONCLUSION

The Court should dismiss the First Amended Complaint.

Dated: May 19, 2026

Respectfully submitted,

/s/ Davin Rosborough
Ari J. Savitzky*
Davin Rosborough (Va. Bar No. 85935)
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Facsimile: (212) 549-2539
asavitzky@aclu.org
drosborough@aclu.org
slakin@aclu.org

Patricia J. Yan*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
pyan@aclu.org

*Counsel for Intervenor-Defendants Common Cause and Katherine Ellena*

* Admitted *pro hac vice*

# EXHIBIT A

**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I. PARTIES & POINTS OF CONTACT.

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice
VRL/Data User: Eric Neff
Title: Acting Chief, Voting Section
Address: 150 M St. NE, Ste. 8-139, Washington DC 20002
Phone: (202) 704-5430

VRL/Data Provider
State Agency Name: Office of the Texas Secretary of State
Custodian: Adam Bitter
Title: General Counsel
Address: P.O. Box 12697, Austin, Texas 78711-2697
Phone: (512) 475-2813

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Texas ("Texas").

### II. AUTHORITY.

By this Agreement, Texas has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department"). The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social

security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.
- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).
- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*
- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.
- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III. PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states. The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact of the issues to assist your state with curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV. TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you. Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V. TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI. METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"). A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk. JEFS implements strict access controls to ensure that each user can only access their own files. All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

**VII. LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.**

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII. NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX. CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

**X. LOSS OR BREACH OF DATA.**

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

**XI. DESTRUCTION OF DATA.**

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);
2. Archive and store electronic data containing confidential information offline in a secure location; and

3. All other data will be erased or maintained in a secured area.

**XII. OTHER PROVISIONS.**

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq*., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name: Office of the Texas Secretary of State
Signature: [signature] Date of Execution: 12/5/25

Authorized Signatory Name Printed: Adam Bitter

Title: General Counsel

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: [signature] Date of Execution: 12/9/2025

Authorized Signatory Name Printed: Eric Neff

Title: Acting Chief, Voting Section, Civil Rights Division

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *25-CV-639-MSM
*
UNITED STATES OF AMERICA, *
*
Plaintiff, *
*
vs. *MARCH 26, 2026
*
GREGG M. AMORE, in his official *
capacity as Secretary of State *
for the State of Rhode Island, *
*
Defendant. *Courtroom 2
*PROVIDENCE, RI
* * * * * * * * * * * * * * * * *

BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(Motion to Compel)
(Motions to Dismiss)

**APPEARANCES:**

FOR THE PLAINTIFF: ERIC NEFF
DOJ-Crt
Civil Rights Division
150 M St. NE, Ste 8-1807
Washington, DC 20002

FOR THE DEFENDANT: JAMES J. ARGUIN
Gregg Amore RI Department of Attorney
General
150 South Main Street
Providence, RI 02903

FOR INTERVENOR DEFENDANTS:

| | |
|---|---|
| Common Cause<br>Catherine Saunders<br>Stuart Waldman<br>Julia Sanches | ARI J. SAVITZKY<br>American Civil Liberties Union Foundation<br>125 Broad Street<br>New York, NY 10004 |

FOR INTERVENOR DEFENDANTS:

| | |
|---|---|
| SEIU District 1199NE<br>Rhode Island Alliance for Retired Americans<br>Carolyn Betensky<br>Michael Zack Mezera | ROBERT GOLAN-VILELLA, ESQ.<br>Elias Law Group LLP<br>250 Massachusetts Ave NW<br>Ste 400<br>Washington, DC 20001 |

| | |
|---|---|
| Court Reporter: | Denise P. Veitch, RPR<br>One Exchange Terrace<br>Providence, RI 02903 |

26 MARCH 2026 -- 10:00 A.M.

THE COURT: We are on the record in Civil Action 25-639, and it is entitled United States of America v. Gregg Amore; it's a civil action. Can counsel who are going to argue identify themselves for the record and identify who else is at counsel table, please.

MR. ARGUIN: Good morning, your Honor. Special Assistant Agent Attorney on behalf of the Secretary of State for the State of Rhode Island Gregg M. Amore, and with me at counsel table is Special Assistant Attorney General Kyla Duffy.

THE COURT: Okay. You didn't give us your name.

MR. ARGUIN: James Arguin.

THE COURT: Thank you.

MR. ARGUIN: Sorry, your Honor.

THE COURT: That's okay. All right.

MR. SAVITZKY: Good morning, your Honor. Ari Savitzky on behalf of Intervenor Defendants Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches; and with me at counsel table is my colleague, Will Hughes.

THE COURT: Okay. Thank you.

MR. GOLAN-VILELLA: Robert Golan-Vilella on behalf of the SEIU Intervenors. With me at counsel

table is David Fox, and in the gallery is Miriam Weizenbaum.

THE COURT: Thank you.

For the Government.

MR. NEFF: Good morning, your Honor. My name is Eric Neff. I'm here on behalf of the United States, with my co-counsel, Christopher Gardner.

THE COURT: All right. I apologize if I get anybody's name wrong in this.

Let's just set some ground rules so we can make this a little easier for everyone. Our stenographer is valiantly trying to keep up with us so we have to make an effort not to speak quickly. I don't know if anybody here is naturally a quick talker; try to slow it down. Because it's a dialogue I will have to break in and ask questions that results in some necessary overtalk, but if we can just stop and try not to speak over each other more than necessary, I would appreciate that.

I had a request from my Clerk for an order of argument. I believe the Motions to Dismiss, that the Defendants wish to proceed first. Am I wrong about that?

MR. ARGUIN: Your Honor, we're happy with whatever order is convenient to the Court, but

certainly that would make the most sense to us, given the overlapping nature of the arguments.

THE COURT: Right. My original intent was to have the government argue its Motion to Compel, have you respond; then have you argue your Motion to Dismiss and have them respond. But rather than do a back and forth -- is that all right with you, Mr. Neff?

MR. NEFF: Yes, your Honor, and that's consistent with how most other courts have been proceeding, so I think that makes sense.

THE COURT: Okay. We don't like to do things the way -- no, I'm just kidding. That is fine.

So on behalf of the State of Rhode Island, Gregg Amore, I'll hear from you on your Motion to Dismiss, and can you also address the government's Motion to Compel which is at ECF 2 in this case.

MR. ARGUIN: Thank you, your Honor.

The Department of Justice seeks to use civil rights legislation that was enacted for an entirely different purpose to compel the production of Rhode Island's complete Voter Registration List without redaction of confidential data on nearly 750,000 active registered voters in the State. This effort goes far beyond what Congress intended when it passed the Civil Rights Act of 1960. It also is fundamentally at odds

with the very statutes DOJ claims it seeks to enforce, which are, specifically, the National Voter Rights Act, which I'll refer to as NVRA, and the Help America Vote Act, or HAVA. The object and purpose of those statutes is to make it easier, not harder, for eligible voters to register and exercise their right to vote. And you can find that in the statement of Findings and Purpose in Section 20501 of the NVRA. Those statutes also have their own enforcement provisions that can be found in 52 U.S.C. Section 21111 of the HAVA and Section 20510(a) of the NVRA. They also, pursuant to court interpretations including from the First Circuit, allow for the redaction of confidential information relating to voters, including individual voter's Social Security numbers and driver's license numbers.

Now, DOJ tries to bypass these records by plucking a records demand provision from the Civil Rights Act, a law enacted more than 30 years before the NVRA and HAVA, to obtain the very confidential information the First Circuit and other courts have held should be redacted.

It further contends, and this is at its reply brief, ECF 33, pages eight to nine, that its authority affording to demand records under the Civil Rights Act is nonreviewable.

THE COURT: Well, let's address that, because they're saying they're entitled to a special process here. Address the issue of the special process, if any, that they're entitled to and how the Court is supposed to look at the fact that they filed a civil complaint in determining whether there's a special process or I should follow the basic Rules of Civil Procedure with respect to their Complaint.

MR. ARGUIN: Certainly. Let me start with the very fundamentals. This action was filed as a civil action. The Federal Rules of Civil Procedure, (1) make expressly clear that the Federal Rules of Civil Procedure apply to all civil actions except as specified in Rule 81; and Rule 81, of course, makes no mention of an action for a records demand under the Civil Rights Act. It also, according to the Complaint, seeks relief under the Declaratory Judgment Act, Section 28 U.S.C. Section 2201, which Rule 57 of the Civil Rules makes expressly clear it's subject to the Rules of Federal Civil Procedure. And it served the summons in this action on Secretary Amore under Rule 4 of the Federal Rules of Civil Procedure; and the form under Rule 4 specifically advised the Secretary that he could answer or file a Motion to Dismiss pursuant to Rule 12 of the Rules of Civil Procedure.

All of that indicates that the -- this case is no different than any other civil action. And that's also confirmed when one looks at the language of the Civil Rights Act of 1960. The provision of the statute, it makes clear that this court is not a rubber stamp to simply follow a ministerial process to approve any records demand DOJ may submit under the Civil Rights Act. In fact, Section 20703 of the Civil Rights Act imposes specific obligations on DOJ to provide a written statement of the basis and purpose for any records demand.

THE COURT: And so doesn't that get into what do you mean by basis and purpose. Are we talking factual or legal basis and factual or legal purpose; correct?

MR. ARGUIN: Both. The basis is the factual basis why, what is the reasonable suspicion, what is the factual allegation that gives rise to what they claim is a civil rights violation; and I'll come back to that in greater detail later. But the purpose is also what are you looking to achieve? And that's also a problem here, which I'll explain shortly.

But getting back to the court's jurisdiction in the summary process, Section 20705 specifically says an action for enforcement of a demand that is served under the Civil Rights Act must be -- is within this

court's jurisdiction and must be exercised pursuant to appropriate process.

So in terms of the summary proceedings that they're talking about, the appropriate process is what's the determinant factor. And your Honor has guidance from the United States Supreme Court in its *Powell* decision on exactly what that phrase means. And, in fact, the Supreme Court in *Powell* interpreted an IRS statute that had substantively similar language to the CRA record demand provision, including the use of the phrase "by appropriate process". And like the Civil Rights Act, it also did not say anything about it was limited to a subpoena or anything else. It was an action by the federal agency to enforce a records demand or demand for inspection to get access to records that the person who was served with those records opposed.

And the Supreme Court of the United States interpreted the phrase "appropriate process" to refer to the Rules of Federal Civil Procedure. And that, of course, is consistent with the Rules I was just reviewing. But, more importantly, it also said that that appropriate process is used to ensure that the court's process is not being invoked or abused by the person seeking to compel, by the agency seeking to

compel the production of records. And it also made clear that part of that appropriate process inquiry is to inquire into the underlying reasons of the demand.

And that brings us full circle back to the statutory language of the CRA which highlights, you know, which raises several different points of why that framework simply does not apply in this context. And let me quickly point out some reasons by that.

What DOJ is trying to do is pluck one provision from the Civil Rights Act enacted 30 years ago and read it to the exclusion of all other statutes that are applicable to the very issues in this case, including, specifically, the NVRA and the HAVA, which are the very statutes it claims it wants to enforce.

The NVRA and HAVA have specific protections for confidential information. And I already mentioned the Supreme Court's decision in *Bellows* that, that are applicable to any demand for records or any requests for production of the states' registered voter list. And what's more, in the years since the Civil Rights Act of 1960 was enacted, Congress has also recognized the need for additional protections for the privacy of data revealing personally identifiable information of citizens and Americans; and that's both in the E-Government Act and the Privacy Act.

THE COURT: So how do I read -- the government is going to argue that the Fifth Circuit case from 1960, *Lynd,* is controlling. Obviously it's not precedent, binding precedent on this circuit or this district; but how do I read *Lynd* and *Powell* together? Are you saying *Powell*, for the purposes of the inquiry that the Court can make, kind of overrules or tacitly overrules *Lynd*?

MR. ARGUIN: To the extent that *Lynd* stands for the proposition that there is no testing of the basis or the purpose of a demand under the Civil Rights Act, *Lynd* is overruled. But *Lynd* also recognizes, and its discussion is consistent with all of the Fifth Circuit 1960-era cases the DOJ relies upon invoking the Civil Rights Act. All of those cases dealt with a situation that was within the scope of the Civil Rights Act. It was specifically dealing with instances where there were efforts to intimidate or interfere with the right to vote, most commonly through racial profiling or exclusionary practices to preclude people from voting because of their race.

THE COURT: So my background is in criminal law, so I look at this as if we look at it like a search warrant, so to speak, which it's not and I understand it's completely not a good analogy. But the government

can't say we want to search every house on this block because drugs are coming from this block. They have to have some reasonable basis for suspecting that the individual establishment or house they're going to search has a nexus to drug distribution. Is that sort of -- a very wonky analogy, but is that sort of what you're saying, like they can't just come in here and say we're going to look at the voting records of every state to see if the states are doing what they're statutorily required to do, without some evidence the states are not doing what they're required to do?

MR. ARGUIN: I think your Honor is right on the right track. The purpose of the statute, the CRA has its own statutory provisions for how you obtain these records, right, and those provisions specifically say you must state the basis and the purpose, and then they also add it also must be pursuant to appropriate process; and neither of those conditions are met here.

THE COURT: The government is going to say our basis is HAVA and the National NAVA (verbatim) and our purpose is to make sure that the State of Rhode Island is complying with HAVA and NAVA.

MR. ARGUIN: But all of the cases on which they rely, again going back to *Lynd* and the other Fifth Circuit cases as examples of this, they all

included a statement of the basis and the purpose that was far beyond the boilerplate statement that's been presented to the Secretary of State here. They actually stated that they had suspicions of racial practices in the registration process or in voting, and they narrowed that in most of those cases to circumstances that were in a particular county; not a statewide request for an entire voter registration list. They were looking at practices that interfered with the right to vote, and they specified those reasons in their decisions. There's simply nothing comparable here.

And the other, turning to the purpose that, yeah, all -- what they cite is we want to assess whether the State is complying with the list maintenance requirements imposed by the NVRA and HAVA, two entirely different statutes that have their own enforcement provisions. NVRA and HAVA give the Attorney General the right to bring a civil action -- again, not a summary process -- for if there is any suspected violation of a state of its compliance with NVRA and, with the NVRA and HAVA. And those provisions are in 52 U.S.C. 2111 and 52 U.S.C. 20510(a). The first one is HAVA; the second one is the NVRA.

There's no explanation here for why DOJ did not

invoke those provisions, except for the fact that even in the statement of purpose and the basis that they've provided in their September 8th demand letter to the Secretary of State, that they don't have one. They just want to see what is there. They don't have and they are not alleging any violation of the State's or the Secretary of State's list maintenance responsibilities; and so they're searching for one. That kind of fishing expedition is not allowed under the ordinary Rules of Civil Procedure, and certainly it should not be allowed with respect to highly-sensitive confidential information on 750,000 active registered voters in Rhode Island. There's simply no basis for it.

And one other thing I would point out. The NVRA and HAVA, which are the listed maintenance statutes that require the Secretary of State to set up a general program for list maintenance and undertake reasonable efforts to ensure that the names of deceased voters or voters who are moved are timely removed from the active list. Those statutes expressly place that responsibility squarely on the State, and they make clear in the statutory language that that enforcement of those provisions, the reasonable efforts, the general programs are specifically within the discretion

of the State. And that, I think, is another key point here, and that's because what DOJ is attempting to do is interfere with the State's responsibility to carry out tasks that Congress has assigned to it; and the fact that Congress assigned it to the State, not the federal government, is also consistent with Article I -- Article I, Section 4 of the Constitution which recognizes the primary role of the States in election and registration processes.

THE COURT: How do you respond to what I think the government is saying, which is how can we -- that we accept the Elections Clause does what the Elections Clause does, but it also allows Congress to sort of set some rules into place and how are we, the DOJ, supposed to enforce the Rules if we're just supposed to take it on faith that the States are doing what they're supposed to do.

MR. ARGUIN: Two things. Again, the primary responsibility, the balance that Congress struck, the balance that the Framers of the Constitution struck was to preserve local control over elections unless Congress specified otherwise. That's the preemption issue.

But here, as I've already said, the NVRA and the HAVA, which are the two statutes that deal specifically

with list maintenance responsibilities, specifically give that discretion, raw discretion to the States. There's no mention of the Department of Justice or the federal government unless and until those penalty provisions that we were just speaking of came in, where they can bring a civil action if there is a violation. But there's no violation here.

THE COURT: So looking at sort of the original intent of the Framers and the intent of Congress and the sort of the text of the statutes, it would seem that adhering closely to what's there, that the Department of Justice wouldn't have the role that it's seeking to have here. Is that correct?

MR. ARGUIN: I think that that's absolutely correct. The Department of Justice's role has to be conferred by Congress. And this gets back to one of the points I made earlier. What they're doing is cherry-picking a records demand provision from now 65 years ago and using that, to the exclusion of the very statutes they're seeking to enforce that deal specifically with the issue of voter list maintenance, and that also completely ignore the privacy protections that Congress enacted in the Privacy Act and in the E-Government Act to specifically protect the right of individual citizens to not have their personally

identifiable information swept up in some omnibus request, which your Honor well knows is not just here in Rhode Island; it's across the country.

And we still -- and going back to the statutory purpose, there is absolutely no way the Court could read, as they say, look at just the language on the page. Well, that's not true. I mean a basic rule of statutory construction is you have to understand the context in which a statute is enacted. The Civil Rights Act of 1960 was enacted for a different purpose, as we talked about, dealing with the interference with the right to vote, preventing people from voting.

The HAVA and the NVRA have a fundamentally different purpose. It's to encourage the right to vote. That's in the findings that Congress itself made. They tried to make it easier to vote, and they afford multiple protections that require the Secretary of State to proceed with caution and follow specific procedures before any person is removed from the active list. And as I've already said, they also provide protections consistent with the Privacy Act, the E-Government Act, and state law on what information can and cannot be shared with the public or in response to a request. They protect confidentiality.

THE COURT: There is anything in the Civil

Rights Act or Title III that precludes the State from redacting personally-identifying information or sensitive information?

MR. ARGUIN: There is absolutely no language in the Civil Rights Act of 1960 that would preclude it.

And the other point to keep in mind when we talk about context, and I think they cite this in support of their plain language argument, that it's only the words on the page that matter. But that case, I think it's *Buckman*, the Supreme Court decision in *Buckman* is very clear what they're talking about there is you have to interpret words according to the usage at the time. You look at the words used through the lens of what Congress intended when it enacted the law.

Now in 1960 when the Civil Rights Act was enacted, they were dealing with a very different issue. This was Jim Crow South where they were excluding people based on race. That was the purpose. And the Civil Rights Act of 1960 was intended to fill a gap in the predecessor statute of the Civil Rights Act of 1957 where records relating to these discriminatory practices and other records relevant to intimidation connected with the right to vote were being destroyed.

This 1960 Act was passed specifically to make sure those records were preserved so they would be

available in the event there were suspicions of any kind of discriminatory or other prohibited practices that interfered with the right to vote.

THE COURT: Let's say we were in an environment that was similar to the 1960s and the Department of Justice had a belief that, you know, women were being precluded from voting in Rhode Island and they had some basis for that. Could they then utilize the Civil Rights Act to come here and ask for those documents in order to enforce the amendment allowing women to vote, for example?

MR. ARGUIN: If they had a proper purpose and stated a proper basis and that was presented, then I think that would comply with the Civil Rights Act. That, of course, is not the situation here.

And one other thing to note. When we look at the statutes through the eyes of the Congress that enacted it, which is the 1960s Congress, you know, the statute, the CRA specifically says, okay, if you state a proper -- the basis and the purpose, and you follow the appropriate process, those records can be produced. But they also said what they allowed for in the statute in 2073 -- 21073 was that be allows onsite inspection and reproduction. And why is that? Because they didn't have electronic data being amassed by states or

private parties or the federal government. It didn't exist. That's exactly why it's wrong to just cherry-pick one statute and say it trumps from the 1960s, say it trumps all these later enactments. That's not the rule how statutes are interpreted. Statutes have to be interpreted as a whole in the context, and the court has to balance the congressional expressions in various statutes that deal with the same subject matter.

And here, we're talking about voting records, specifically registered lists, voter registration lists, but also the privacy interests that are implicated by that kind of collection of data. And it's an entirely different thing to say you can come and inspect the registered voter lists and make a copy of it than saying here is, what they want is an unredacted database with all the fields unredacted, with all of that information put out there for a purpose that is not yet clear. And let me get to the purpose issue.

THE COURT: Can I ask one more question before you do.

MR. ARGUIN: Sure.

THE COURT: Do we know in 1960 what data was contained within voting rolls?

MR. ARGUIN: Well, what we know is the obligations imposed by the HAVA and NVRA didn't exist. They didn't come until many years later.

So the records that we're talking about here could not have been in the minds of Congress when it enacted the Civil Rights Act of 1960; and, in fact, that's exactly how two other district courts in the Central District of California and the District of Oregon have interpreted this.

But getting back to the purpose, your Honor asked, well, don't they need some of this information to do whatever, whatever kind of assessment they want to do with respect to the State's list maintenance responsibility. The answer has to be categorically no. The Secretary has already offered to provide them with the publicly-available list, which includes a host of information about relative, you know, about voter, registered voters in Rhode Island, including their names, their full names, their full dates of birth, residential addresses, mailing addresses, party affiliation if they elect to provide it and, I'm sorry, there's others if I find my list. But all of that information is available. The only information --

THE COURT: When they vote; right?

MR. ARGUIN: And where they vote, how they

registered. And it also includes, as required by HAVA, a unique identifier, voter identifier number for every active voter in Rhode Island. Unlike some states, it's not only assigned if you don't have a Social Security number or a driver's license; Rhode Island assigns a unique HAVA identifier to all registered voters. All of that information is in the public record, I mean is publicly available pursuant to Rhode Island law and also, is also made available under the NVRA through its public inspection provisions.

The only information that the Secretary of State has withheld are the last four digits of the Social Security number and individual state driver's licenses, and he did that because of the requirements of State law that say that information cannot be disclosed; and also is consistent with First Circuit's decision in *Bellows*, which other circuits, including the Fourth Circuit and other district courts have also endorsed that view, that redaction of that personally identifiable information on individual voters is absolutely appropriate.

So the other point I'll make on this is if they were to say, I think the only answer to that is they say, well, we don't know if it's the same person. But you have all this information available to you through

the publicly-available list to do a very comprehensive comparison, if that's needed; and assuming, again, it's even proper for DOJ to engage in that sort of list maintenance responsibility, when Congress has assigned that task to the discretion of the States.

The last point I make is what we are talking about here are general programs and reasonable efforts to maintain a list. They're seeking line-by-line assessment or analysis of the registered voter lists at one point in time. That does not have anything to do with reasonable efforts or general programs.

THE COURT: So if they had come here and asked for an explanation or information about the procedure that the Secretary of State has used, and I think it's four times a year -- is that quarterly that they cull, or is it monthly?

MR. ARGUIN: It's daily, your Honor.

THE COURT: Daily.

MR. ARGUIN: Anytime -- it's hourly, actually. Any time a person walks into an office, the DMV to register to vote, the voter maintenance, the voter registration list is updated.

THE COURT: Okay. I apologize. So if they'd come in and said we want to know what procedures, are you using the ERIC system, are you using voter,

Motor Voter, I think we used to call it, system, and they had gotten about information how that system, if they had sought information about that system was implemented would they be closer to their directive under the National Voting Rights Act and the...

MR. ARGUIN: If was reason to suppose there was a violation of federal law, then perhaps. But as we put in our Motion to Dismiss, your Honor, we catalog a whole host of the reasonable efforts that the Secretary of State's Office and the Department of State are pursuing to comply with NVRA. And I think that it's very telling that in all that publicly-available information and statutory provisions, there's no response from DOJ suggesting that we're not doing what we're supposed to be doing.

THE COURT: Right.

MR. ARGUIN: And so we get back to the fishing expedition. What is the point of this and how is it consistent with the way Congress has delegated responsibility for list maintenance, and how is it possible to read a statute from now 65 years ago to the exclusion of all the protections that are afforded in these very specific laws that are far more current and far more specific to the issues of this case.

THE COURT: And a moment-in-time snapshot of the

voting lists sort of is necessarily misleading; is that not correct? If I were to die tomorrow or move to another state, preferably -- you know, to die, not to living here but to dying -- then the records of today would be inaccurate, correct, if I registered to vote, you know, in Hawaii tomorrow?

MR. ARGUIN: Absolutely, your Honor. This is the critical point. This is why the list maintenance responsibilities under HAVA and NVRA are far different from the Civil Rights Act of 1960.

These statutes are intended to promote the right to vote, and they have very specific safeguards. The Secretary of State, the Department of State cannot remove an active voter without following a notice and process to confirm that, in fact, the person is dead and that, in fact, the person has moved. That doesn't happen in a day because there's a mailing process and there's response mailings and deadlines set for how much time you have to allow for a person to say hey, I'm still here. That can't happen with a snapshot. So all you're going to get is one picture in time that, following your example, you may have already moved but maybe you're coming back and -- or maybe you have moved and you haven't yet registered.

But we need to make sure that, in fact, the

Secretary of State has to make sure that, in fact, the move actually happened before you're removed from the voter registration, from the active list of voter registration. What often happens is that there's notice of suspicion that someone has died or moved before the confirmation process, the confirmation process puts a hold, they're moved to an inactive list. But then there's a confirmation process, and if it's confirmed that they moved, then they're removed. But if it's not confirmed and they're still here, then they go back on the active list. All of that is to make sure there is no infringement to the right of vote. And without some allegation that the Secretary is applying some sort of practice or procedure that infringes the right to vote or that discriminates against voters because of race or another category, then there's absolutely no basis for relying on the CRA and certainly no basis to read it in isolation from all the other statutes that we've been discussing.

THE COURT: And don't I have to read it in conjunction with *Powell*, --

MR. ARGUIN: Absolutely.

THE COURT: -- which says that information can be redacted; correct?

MR. ARGUIN: Well, the First Circuit said --

THE COURT: I'm sorry.

MR. ARGUIN: -- in *Bellows* says it can be redacted. And certainly all the other courts that have been confronted with this, which to date is the Central District of California, the District of Oregon, and the District of Michigan, have all dismissed DOJ's complaints for many of the same reasons we've been discussing; that they are not within the CRA, that the statement of purpose and demand is not here, and that redaction is perfectly appropriate.

And so for all those same reasons, consistent with the other courts' decisions, the Secretary of State would urge this Court to dismiss DOJ's complaint and deny the parallel Motion to Compel.

THE COURT: Okay. Thank you.

Hang on. Are we going to hear from the Intervenors first, I believe?

MR. NEFF: That makes sense, your Honor.

THE COURT: That way you don't have to argue more than once, unless you want to.

But don't -- let's not tread over ground that's already been covered. You have not been objected to as Intervenors but, you know, so your separate issues are the question here.

MR. SAVITZKY: Understood, your Honor, and may

it please the Court, Ari Savitzky from ACLU for the Common Cause Intervenors. I'll address the two issues before the Court, the two motions before the Court. Before I do I want to acknowledge Ms. Saunders, Cathy Saunders, one of the Intervenors in the courtroom today; Stuart Waldman, one of the Intervenors in the courtroom today; John Marion, the Rhode Island Director of Common Cause, the organizational Intervenors in the courtroom today.

And the reason these voters have intervened and the reason they're here today is because they're intensely concerned that the federal government is making an improper and unprecedented grab for their sensitive personal information. And they're right to be concerned because they have eyes to see and they can see when the Attorney General sends a letter to the Governor of Minnesota demanding the state's voter rolls as a condition for pulling back immigration enforcement. They can see when the Department of Justice admits that DOGE has mishandled voters' sensitive personal information with respect to the Social Security Administration and entered into agreements with outside election-related groups. They can see when former attorneys from the Civil Rights Division tell the New York Times that they were tasked

by the front office, the Department of Justice, with obtaining state voter rolls so that DOGE can look at them. And they can see the Memorandum of Understanding that has been sent to states in conjunction with these data requests that purports to allow the federal government to take charge over who gets to stay on the states' voter laws; contrary to federal law, contrary to the Constitutional order. And so the outcome here is incredibly important to the voter Intervenors and to their fellow Rhode Islanders and to our democracy.

The Court has our papers. You heard from one of the Defendants already. The most important thing I could do I think is to answer and address the questions the Court's raised. I think there are two basic questions for the Court to answer at this point: (1) What are the rules that apply here, what type of proceeding is it. That goes to the Motion to Compel. (2) Is the Complaint that was filed by the United States legally deficient such that this action should be dismissed. I'm going to address this point briefly without being repetitive of what we've going over already and while addressing the Court that the point, the points that the Court has brought up. Excuse me.

Question (1), what are the rules that apply here. The United States initiated this proceeding by

filing a civil action or this Federal Rules of Civil Procedure. Rules 1 and 81 state the Rules apply. The *United States v. Powell*, binding Supreme Court precedent, says that the Rules apply. And the CRA by using the term "appropriate process" says that the Rules apply.

What *Powell* says, and this is Footnote 18 of *Powell*, extremely clear, When a statute grants the court jurisdiction to enforce some government demand for information by appropriate process, but "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." That's the end of it.

Now, how fast an action moves, how much discovery might be needed, where -- whether the case can be resolved on summary judgment; those are all questions that are addressed under the Rules. There's flexibility under the Rules. That's what this Court does. But the bottom line is we apply the Rules and we apply Rule 12. That's the first step. We look at the Complaint, is it legally sufficient.

*Lynd*, if I can address the question the Court asked for, was not to the contrary. *Lynd* is a case where there's two years of litigation, endless motions and attempts by the state defendants to not address the

government's demand. That's not what is happening here.

The Motion to Compel says give us these documents, give us the State's voter rolls with all the confidential personal information of Rhode Island voters, without even consideration of whether or not the demand is legally valid or whether there's an improper purpose. And just one other point on the Motion to Compel piece. Even -- and your Honor raised the analogy to the criminal context. How about the analogy to the administrative subpoena context; right?

This is a full-on civil action. They filed a Complaint. But sometimes there'll be an administrative subpoena in another context and someone will run to federal court, the person who received the subpoena, and they'll move to quash; right? That's also a scenario that happens. And even in those circumstances courts apply the teaching of *Powell*. The First Circuit does this. One of the cases cited in the briefing is an administrative subpoena case about gender-affirming care I think at Mass General Hospital in Massachusetts, from the District of Mass last year.

Even when you go to court on a motion to quash, not a full-blown federal action filed under by Complaint, the court considers is there an improper

purpose, is there a proper legal basis for the demand; right? And in that administrative subpoena case I referred to, 800 F.Supp. 3d, it's at page 237, the relevant discussion, (Reading) When there's not an iota of suspicion of --

THE COURT: Can you slow down just a smidge; I'm sorry.

MR. SAVITZKY: When there's not an iota of suspicion of any specific or particularized wrongdoing, the court quashes. Now, again, that's in the administrative subpoena context.

And again, here we have a Complaint filed under the Rules. So there's no possible way and there's no precedent and there's no analogy when you grant a Motion to Compel without considering these questions, considering whether there's a legal basis to grant the demand. And then also considering is there improper purpose; there's plenty of evidence of that here as well.

So just to address the other question here, right, so now we're at Rule 12. We have a Complaint. Is it legally deficient? It is. We have to dismiss. Statute requires a written demand for the information that states the basis and the purpose for the request.

And it's in the briefing already so I will

address only very briefly the numerous different ways in which this demand, encapsulated by the September 8th letter sent to the Secretary, is legally deficient. First of all, did the Attorney General state the basis for the request? No. It's an easy one, there's just zero statement of the basis; and that's the ground in which the California and Oregon courts dismissed. It's not in writing, which is what's required. You state the basis in writing.

And by the way, look at that *Lynd* case; right? What did the Department of Justice under RFK think you were supposed to do when this statute was actually in use? Footnote 6, page 229 of *Lynd* --

(Court Reporter requests clarification)

MR. SAVITZKY: -- it quotes what the written demand said. (Reading) This demand is based upon information in the possession of the Attorney General tending to show the distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.

That's the basis. That's the factual basis. That was the original understanding of the basis that was required.

There's nothing like that here. Pure fishing expedition. That is all you need to hold to say that

the demand is legally deficient under the CRA.

Another independent ground, do they state the purpose. There's a conclusory sort of general statement, Oh, the purpose is to ascertain compliance with HAVA and the NVRA. There's no discussion, no pleadings, no meat on the bones.

What do HAVA and the NVRA actually require? HAVA requires states to collect a person's voter -- driver's license number, Social Security number. Rhode Island is doing that. They didn't ask, well, what do you do? Do you collect that? Did you look at the voter registration form? I brought copies. They asked for it. So if the United States simply wanted --

(Court Reporter requests clarification)

MR. SAVITZKY: If the United States wanted to simply ascertain whether that information is being collected, it doesn't need Rhode Islanders' confidential personal information to do that.

And same with the NVRA. The NVRA, and I won't repeat it because Mr. Arguin has mentioned, it tasked the states with voter list maintenance. It doesn't task the federal government with doing that. And it certainly doesn't say that the federal government should replicate the thing that the State does, let alone do it with a snapshot. So there's no purpose

that's stated as plausible and there are no pleadings to sort of flesh out what would be the plausible purpose.

And then you get to pretext. Because even if a purpose, a sort of general conclusory purpose is stated, is it the purpose. We know from the Supreme Court's decision *in Niz-Chavez* against *Garland,* which we cite in the papers, the use of the definite article matters. You need to state the purpose; not any purpose, not a purpose, not some purpose.

And here, there's plenty of evidence, massive evidence that the purpose has not been stated. I mean just look at the MOU that DOJ has offered to the states that aggrandizes for the federal government for first time ever, in violation of federal law, the role a voter list maintenance to the federal government to say the federal government can look at individual voters and demand that they be removed from the voter rolls within 45 days, which is a violation of the NVRA. And we have an extensive roundup of all this in our brief; I won't repeat it here. And I think what the Court may hear today in response are answers like we've heard in some of the other proceedings in some of the other states; and what we haven't heard in those proceedings is an unequivocal disavowal of this ulterior purpose.

In Minnesota an attorney at the Department of Justice said, I don't know the answer, to whether the Attorney General could use state voter files to look at every person who voted in the country. In Connecticut last week an attorney said, I simply can't state what the Attorney General's purpose may be at some other time.

So I would just say if you ask about that, your Honor, I would suggest listening very carefully to whether there's a true and unequivocal disavowal of that purpose, contrary to all the evidence that we see, that voters can see. And I don't think you'll hear that. I don't think you can hear that, given the representations that have been made and given the evidence that's out there. And that is also an independent ground to dismiss the Complaint, because if you don't state the purpose, you haven't complied with the statute.

On the last ground, which is the privacy, I won't address again the issues around the Privacy Act. They're in the briefing. I'll only say there are also constitutional privacy issues at stake that have to do with the chilling effects of releasing voters' confidential personal information without adequate safeguards and making that the price of the franchise:

If you want to be on the voter rolls, then you have to be okay with your personal identifying information going to DOJ and to whatever other federal agencies they share it with for whatever purposes.

That is exactly what the voter Intervenors here and what so many Rhode Islanders who care about a vibrant democracy are concerned about.

And your Honor, if the Court has no further questions, I'm happy to address any further issues. But I think there are multiple grounds to dismiss, and I think that's the right course here.

THE COURT: Thank you.

(Pause)

MR. GOLAN-VILELLE: Good morning, your Honor.

THE COURT: Good morning.

MR GOLAN-VILELLE: My name is Robert Golan-Vilelle on behalf of Intervenors SEIU District 1199NE, the Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Zack Mezera. These Intervenors are membership organizations and Rhode Island registered voters who are deeply concerned with DOJ's unprecedented efforts to obtain their and their members sensitive personal information in this lawsuit.

We, of course, agree with the State and the Common Cause Intervenors that this action must be

dismissed. I won't repeat all the points that they've made, but I'd like to add points on three specific issues that reinforce why they are correct that dismissal is required here. Those are the issue of basis, the issue of purpose, and the fact that Rhode Island is entitled to redact the sensitive information at issue here, which is the entirety of the case, given that it has already offered to disclose the public list.

First, on the issue of basis, this is the simplest and most straightforward ground on which this case can be resolved. I won't repeat everything the State has said, but the statute has two requirements: basis and purpose. They each must have independent meaning. DOJ has understood it to -- each of them to have separate meanings in all of the 1960s cases that they rely on; and all three courts to have addressed this issue today have understood "basis" to mean factual basis. And that makes sense because it is the only meaning that makes sense in the statutory scheme.

So DOJ's actual position in its briefing that is put forward here is that the Civil Rights Act itself is the basis for its Civil Rights Act demand. That simply cannot be right as a matter of law because it would automatically be satisfied in every single case and,

you know, that would render the provision meaningless; well understood that Congress does not enact meaningless statutes and that we don't read statutory language to be superfluous.

And as the State and the other Intervenors have said, the DOJ's September 8th letter simply provided no basis at all. It doesn't use the word "basis." It doesn't provide anything that could be understood as a factual basis, and this straightforwardly requires dismissal here. And the most important thing is that it requires dismissal under any level of review. You know, no matter -- even leaving aside the issue of what type of proceeding is this, are we under *Lynd* or *Powell*, even, even under the most hands off, you know, even under the most hands-off level of review, at a bedrock minimum this Court needs to assess whether a basis was provided at all; and it plainly was not here, and that is enough to dismiss this case on its own.

On the issue of purpose, I won't rehash all the ground that the State went over. We agree with them that a proper purpose under the Civil Rights Act has to deal with an individual's ability to register to vote and cast a vote freely. That is, again, what all of the 1960 cases actually involved. That is what the entire subject matter of the statute deals with. And

I'd just like to add -- I'd just like to point the Court to one additional authority that reinforces not just why this interpretation of the statute is correct; but specifically why the purpose that DOJ has put forward here is not an appropriate one, and that case is *Kennedy v. Bruce*. The cite for that is 298 F.2d 860. This is one of the Fifth Circuit 1960s cases that DOJ relies on. And there's an extended discussion in this case about a particular county in Alabama where there are two particularly notable facts.

First, in this county, of the roughly 6,000 Black citizens of voting age, not a single one was registered to vote. And then there was also for the white citizens, there was a number that was greater than 100 percent of the white citizens who were registered to vote. And the court actually goes on to say, I'm quoting, "Obviously such a figure indicates that there have been failures to purge voters who have moved away or had died, a matter which does not bear any particular importance to the present inquiry."

And this is particularly striking because it means at that point in time, even when a court had its, had in front of its face facts that would suggest what today we would call list maintenance issues, it simply did not think that this bore any relevance to

Title III. The court was not concerned with the more than 100 percent of white citizens who were registered to vote. It was extremely concerned with the zero Black citizens who were registered to vote and the overwhelming societal problem in (indecipherable).

THE COURT: But isn't the Department of Justice saying, well, since then HAVA and the National Voting Rights Act, NVRA, have sort of modified the landscape. Isn't that what they're saying?

MR. GOLAN-VILELLA: That is what they are saying. We don't think it's correct and because it's basically assuming their premise. It's assuming that the Civil Rights Act was meant to be a sort of all-encompassing such that any time, you know, Congress enacted a subsequent law that had anything to do with the voting, that would sort of automatically be a proper purpose under the law. But there's nothing in the Civil Rights Act that suggests that.

We agree that with, you know, what the State has said in terms of, you know, the better reading is that it should have some tether to the purposes for which the Civil Rights Act was enacted. And, you know, the *Bruce* opinion we think matters because, you know, it's the best indication of when you have the actual facts at issue that, you know, today we would call list

maintenance issues. You know, the court went out of its way to say that this has no particular relevance.

So we think all of this collectively, you know, the text and context of the law, the actual case law and past practice of how it's been used, ordinary principles of statutory interpretation, we think all of that points in favor of the State's position and in favor of the proposition that this simply was not a proper purpose here.

And then, finally, I'll move on to the issue of whether Rhode Island can redact the sensitive information at issue here. So as your Honor asked in a previous question, there is nothing in the Civil Rights Act at all that prevents redactions. Rhode Island law prohibits the disclosure of the sensitive information at issue here. I don't believe DOJ has contested that; and DOJ has the burden of showing that that law has been preempted and simply has not met that burden.

There is simply no reason to conclude that the Civil Rights Act preempts these privacy protections, for a few reasons. There's no express preemption provision. As the State I believe noted, this information was not even required to be on applications at the time; and there's an overwhelming consensus of courts that you can redact under the NVRA, including

here in the Fifth Circuit under the *Bellows* decision.

DOJ's only argument here that the Civil Rights Act contemplates the production of sensitive material is to point to 52 U.S.C. 20704, which puts limits on the further disclosure of information received under a Title III demand.

But there's simple no reason to conclude that that means Congress at that time must have contemplated that that includes sensitive information. And the best way to look at this is to look at the Privacy Act. The Privacy Act prohibits disclosures under various circumstances even when the information is public and not particularly sensitive. It just has to be contained in a system of records and be identifiably about specific people. And that's linked to the purposes of Privacy Act, which is that we think there ought to be, you know, some limits on controls on when the government and when specific arms of the government have possession of specific information.

So there is simply no reason to conclude that the Civil Rights Act preempts the Rhode Island law here, as the Oregon court also concluded as an alternative reason for dismissal in that case. And that is why, you know, even if DOJ were entitled to the list, you know, at all, Rhode Island would be able to

redact the sensitive information which, again, is the entirety of the dispute here.

So for all of these reasons and all the others in our briefing, we'd ask that you dismiss this case.

THE COURT: Thank you.

We're going to take a 15-minute break so that we can get through the government's argument without interruption, and we'll about back in 15 minutes to hear from you, Mr. Neff.

(Recess)

THE COURT: Whenever you're ready.

MR. NEFF: Good morning, your Honor. May it please the Court, Eric Neff, on behalf of the United States.

This case ask about transparency, transparency in our elections enforced with the CRA. The CRA is a sweeping bill because it is about transparency.

THE COURT: But is it? Is that what it's for? I mean isn't there transparency when the State offers you their publicly-available information? Why does the government need driver's license numbers and Social Security cards and the Social Security numbers, and what is the purpose that the federal government sees that it has? Is it in maintaining the voter list? Because that's certainly not what HAVA and the National

Voting Rights Act say, is it?

MR. NEFF: Thank you, your Honor. I would direct your Honor's attention to the Ford-Carter Report, the bipartisan report that was done in the wake of the 2000 election and is the Blue Ribbon Report that led to the passage of HAVA. The Ford-Carter Report said, and I quote from Section 3, "An added identifier, an added numerical identifier is desirable, given various spellings and clerical errors that frustrate reliance only on a given name and address." Further down, "We suggest that States obtain the last four digits of this number as an added identifier." The Federal Election Commission has made the same recommendation.

The Help America Vote Act went further, knowing that the Social Security number implicated concerns that people might have. It wrote directly in the statute that the SSN-4 is not a Social Security number for purposes of the Privacy Act.

THE COURT: When you say the SSN-4, what do you mean?

MR. NEFF: Thank you, your Honor. The last four digits of a Social Security number.

THE COURT: So, but back up a little bit, okay, because this report, the Carter, the Ford-Carter Report

isn't before the Court. It's the government asking through the use of Title III to get records under HAVA and the National Voting Rights Act. So tell me how -- forget about purpose, forget about transparency. For a minute just tell me what your basis is for getting this information from each individual state, and do you have a factual basis?

MR. NEFF: Our basis is the CRA. The United States' position --

THE COURT: You can't say the CRA requires me to give a basis and so our basis is the CRA. That's circular logic; right?

MR. NEFF: I would posit the United States would say no, that we're only required to state a legal basis. However, if your Honor was inclined to require a more specific basis, it would be what the United States reviewed before it pursued the voter rolls here, and that would be the EAVS data published by the EAC, which is reviewed extensively by the Voting Section, and the EAVS report was cited in our Complaint.

For example, in the case of Rhode Island, Rhode Island self-reports to the Election Assistance Commission that they do not do eligibility audits. That's a concern of the Voting Section. We want to make --

THE COURT: Explain what you mean by that, because my understanding of Rhode Island's procedure as they've outlined it in their Motion to Dismiss is that they take information from the prison I think daily and cull the rolls for people who are incarcerated; that they provide the information to that ERIC system that 25 states put together that has masked identifiers for individual voters; that they received daily reports of voting. And the ERIC system compares the data with other states to make sure that somebody is not registered to vote in two jurisdictions, that they -- what's the word I'm looking for -- that they also get information from each individual Board of Canvassers in the 39 cities and towns here.

So what do you mean that they don't, they don't cull ineligible voters? What are you trying to say here? Because if they're collecting a Social Security number and a driver's, or a Rhode Island ID number, and then they're required, then those things are -- if they're required for registration then by definition the registration is an open eligible voter, isn't it?

MR. NEFF: Your Honor, the United States is not saying that Rhode Island does not cull ineligible voters.

THE COURT: What are you saying?

MR. NEFF: What we are saying is that we don't need to allege that. We -- as the *Lynd* court said, the Attorney General's, quote, right to records does not require that the A.G. show that the A.G. could win without them. We do not need to allege a violation of a specific statute.

I was only raising the lack of a particular audit and, again, this was self-reported by Rhode Island as a concern that the Voting Section had.

There are also certain numbers that raise concerns with the Voting Section, as Rhode Island self-reported having 60,000 inactive registrations. They reported having 60,000 duplicate registrations. This is out of about 800,000 registered voters. That's also a 90 percent registration rate of the adult age voting population.

THE COURT: I believe it's 700-and something thousand voters; but your point is taken.

But I guess what's the DOJ's, what horse do you have in this race? Is it that you're trying to double-check the work of all of the states, or is it that you're trying to assert an outsized role for the federal government in the running of elections?

MR. NEFF: Certainly not outsized role, your Honor.

THE COURT: It seems that way from your filings in all of these states. So what's your purpose?

MR. NEFF: The United States is in a trust but verify mode as it relates to voter list maintenance countrywide. It is --

THE COURT: So let me ask a question then because I think 11 -- well, originally three jurisdictions just provided the list to DOJ: Texas; I don't know, North or South Carolina; somebody else. What did you do with those lists?

MR. NEFF: So we kept all the lists that we received -- at this point it's been 17 states have been kept in separate compartmentalized files that only very limited people have any access to.

THE COURT: And what did you do to verify those lists?

MR. NEFF: We've not done anything yet because we've not --

THE COURT: Why not? If you need to verify those lists, if you have an oversight role why haven't you taken -- some states have said here, here's all our data. And you've gotten it, and by my understanding you got some of it back in the summer of last year. Why haven't you done anything with those states' data?

MR. NEFF: Well, we're talking as to the

non-public lists; correct?

THE COURT: Right.

MR. NEFF: Okay. The United States is taking extra concern to make sure that we're complying with the Privacy Act in every conceivable way, and there are still a couple steps we have to go through before the United States is comfortable proceeding and comfortable representing to this Court that we're in full compliance with the Privacy Act.

THE COURT: What steps have you taken and what steps need to be taken with those states that have complied? Because to me, the states that have complied are traditionally more conservative states. Texas just gave you their list, let's say. Why not go through Texas's list to make sure that only eligible voters are on their list?

MR. NEFF: I can only go into the United States delivery of process so much, you Honor, but what I can say is that the United States is evaluating, for one, an opinion out of the D.C. Circuit that analyzed DHS's SORN, and also the United States is -- we are certainly going to be proceeding with running this, our intention is to run this against DHS's SAVE database.

THE COURT: Which database?

MR. NEFF: The SAVE database that runs, that

essentially is a, it's called like a fetching system that seeks information from other databases to cross-check whether the data set on a roll is either a deceased person or a noncitizen.

THE COURT: And what's the accuracy rate of data that you've run against that system?

MR. NEFF: The accuracy rate we've been told --

THE COURT: By whom?

MR. NEFF: -- by DHS, and it's particularly the SAVE personnel that run the system is that it is in effect 100 percent accurate.

THE COURT: That's not the reporting; right? I mean isn't the reporting that people have been run through that SAVE Act and not for voting but for other things have been kicked out as noncitizens when they were, in fact, citizens?

MR. NEFF: There's an important note that the SAVE database has been around, the SAVE Act, essentially states have been able to submit their information to SAVE for about 30 years. But SAVE has also changed drastically in the last few months. It's been I would call upgraded and the process they go through, we can go into that if your Honor wants to, but essentially when any flagged voter comes back, it's then run through a very comprehensive confirmation

process to make sure that the, quote, like problematic registration is, in fact, not just --

THE COURT: What's the process?

MR. NEFF: DHS has about 200-odd employees who are trained for a minimum of six months each and know various databases that are accessible to the federal government through use and shared agreements to be able to essentially access important naturalization files and other data that can establish whether the person is a citizen, because there are holes in the process.

THE COURT: What are the holes?

MR. NEFF: The holes, the most common hole would be when someone is -- someone who came to the United States is a parent and has children who are U.S. citizens and then naturalized; like the most common hole of that is that it's actually rather expensive to go through the full, quote, documentation process. A common, cheaper shortcut that people will just do is just go get a passport.

THE COURT: By "people," do you mean the children or the parent?

MR. NEFF: The parents, your Honor.

THE COURT: Because the children are derivative citizens under that scenario, so even if the children are born outside of the United States; correct?

MR. NEFF: Correct. And I'm talking about the parent in this scenario as the most common problematic scenario; that the child is not a problem. That would not come up as any issue. It's the parent that potentially would and --

THE COURT: If they're naturalized they can't vote?

MR. NEFF: Explaining to your Honor when an immigrant is naturalized, sometimes that's not immediately available in naturalization documentation databases. So what these 200 people are doing is they're going to other ways to verify that that person a citizen. One common way is going to the Department of State and confirming that they have a passport.

THE COURT: Gotcha. So what you're saying, what you're asserting here is the federal government's role in that process. That's not what the Framers envisioned, is it? The Framers gave in the Elections Clause the responsibility for maintaining elections to the individual states, with some congressional oversight or some congressional barriers or, what do you call them, check points.

But it's not a federal government role to maintain -- to run elections. It never has been. I mean we're supposed to look at what the original intent

of our Founders was when they wrote these documents, and they were pretty clear that states have the responsibility of running elections. And actually the HAVA and National Voting Rights Act sort of reiterates that; right.

MR. NEFF: In their own sphere, yes. But when Congress intervenes it has preemption and, in fact, they have a stronger right to preemption than they would in any other sphere. The Electors Clause broadens Congress's power in elections.

THE COURT: Understood. I understand the preemption difference with the Elections Clause. But tell me where you get from that to this request for all this personally-identifying information that goes beyond what's publicly available for the voting lists in 50 states, when you have some of them for eight or nine months and you've done nothing with them.

MR. NEFF: It would be right in the Help America Vote Act that says that this is the data that the states need to maintain for each registrant, --

THE COURT: Right.

MR. NEFF: -- and that the Attorney General is charged with enforcing that the statute.

THE COURT: What have you done to find out whether the State of Rhode Island is maintaining or not

maintaining that, besides asking for a list of all of the voters?

MR. NEFF: That's how we are going to ensure that they have the proper identification as to each and every voter.

THE COURT: So every state is under suspicion of not doing it unless and until you verify that they've done it.

MR. NEFF: That's the Attorney General's designated role under the Help America Vote Act.

THE COURT: It's not really though. Their role is to enforce the Help America Vote Act, but the states have a role in that Act. The outsize role belongs to the states; right?

MR. NEFF: The role for executing the Rules belongs to the states, yes. The job of oversight falls on the Attorney General.

THE COURT: And what is it about -- I'm going to let you make your argument, go ahead, without asking you more questions about that.

But I want to go back to what the basis and the purpose is because I don't know that, in fact, I don't think that you've provided anything that says there's a basis individually for Rhode Island that we need these for this reason. And frankly saying, you know, we're

going to get it from every state and hold onto it and we're going to decide whether you're in compliance or not based on putting data that is personally identifying information through yet another database that we don't know anything about, that apparently is only a couple months old, to me it says that you are asserting the role that HAVA gave to the states.

MR. NEFF: The United States respectfully disagrees, your Honor.

THE COURT: Well, tell me how I'm wrong.

MR. NEFF: The statute of HAVA itself gives the United States, the United States and the Attorney General specifically the authority to enforce the statute.

THE COURT: And how is the publicly-available information not enough for you to ascertain whether states are complying with the statute?

MR. NEFF: Going further into the problem that was identified in the Ford-Carter Report, the HAVA identifier actually protects voters because what they found was happening was that with someone with a common name was very often falling off of the rolls because he was being wrongly identified as someone that -- maybe someone reported, a John Smith reports himself to have moved out of specifically Florida where this became an

issue, --

THE COURT: Uh'huh.

MR. NEFF: -- and Florida then dropped a John Smith off the rolls that was not the John Smith. And so that's why Ford-Carter Commission recommended have a HAVA, what I'm calling a HAVA number; but last four of SSN or driver's license in the first order.

THE COURT: But the HAVA number, well, now I'm thinking of the ERIC number, which is a different number that's assigned to each individual voting record; right?

MR. NEFF: We are not involved in ERIC. I don't know specifically what numbers they generate or don't. That's a private organization that the states are choosing to give the states' private voter registration info too.

THE COURT: Actually it's a nonprofit that the states together have put together, right, so it's a closed loop with the other states.

MR. NEFF: Well, it is a nongovernmental organization --

THE COURT: Correct.

MR. NEFF: -- that does also I believe self-admittedly distribute it to third parties so, I mean --.

THE COURT: So, well, so you're saying trust the government, but go ahead, and not the private industry, but all right.

MR. NEFF: Well, I would say that ERIC is not mentioned in HAVA. ERIC is not mentioned in the CRA. The Attorney General is.

THE COURT: But the CRA doesn't mention HAVA because it didn't exist, and it doesn't mention databases because they didn't exist. It says go copy them at the Secretary of State's Office. Why can't you do that?

MR. NEFF: It's important to read our election statutes as in harmony, not at war with each other. That's not what was intended by them. It's right there in the National Voter Registration Act, 52 U.S.C. 20510(d)(1) says that this law is meant to be read in addition to all other rights. The NVRA expands rights; so does HAVA. HAVA merely imposes certain minimum requirements on states such that their rolls are clean. That's all the United States is interested in here. That's why we stated that as our basis and purpose. We're interested in clean rolls. We're interested in HAVA-compliant voter rolls.

THE COURT: Right. But it seems like you've jumped a bunch of interim steps, but go ahead.

MR. NEFF: What the *Lynd* court said at pincite 226, that all that's required is a simple statement from the Attorney General to the court satisfying the elements above; and it's just have we stated a written demand, have we stated a basis and purpose, was that to an officer of election, and did the state refuse.

THE COURT: So what's the basis?

MR. NEFF: The basis is the Civil Rights Act.

THE COURT: So that circular thing again. What's the purpose?

MR. NEFF: The purpose is to ensure that Rhode Island is complying with all provisions of the NVRA and the HAVA.

THE COURT: So you're saying that the Department of Justice doesn't need any more indication than that. So if another president comes in and says, you know what, I lost this state and this state in the last election; I'm going to look at their voting rolls. You would have no objection to that.

MR. NEFF: No, your Honor; it is true that the CRA is a sweeping authority. It's a very short statute. It provides broad authority within a limited scope. And it's important for your Honor to make sure that the requests are within that scope and that they

are appropriate under the statute, however, as the *Lynd* court explained.

THE COURT: I know, but you're talking about a Fifth Circuit case from before I was born, and I think I might be one of the oldest people in this courtroom so let's just remember that.

MR. NEFF: I'm not trying to push upon your Honor that it is anything more than persuasive here.

THE COURT: But I have to look at it with respect to what has happened since 1960; right?

MR. NEFF: Yes. And I appreciated your Honor's discussion that got right into *Powell* which followed, --

THE COURT: Right.

MR. NEFF: -- and *Powell* happened since and where the -- your Honor correctly characterized the Defense's argument that *Powell* tacitly overrules *Lynd*. That couldn't be further from the case.

THE COURT: Okay.

MR. NEFF: The only question in *Powell* was what type of review does a particular statute call for.

THE COURT: Right. And it uses that statute in question in that case, and I understand that it's a separate statute, but it uses the exact same language. And *Powell* says you have to have some basis that's not

just the law says I can do it so therefore I'm doing it; right? Isn't that essentially *Powell*?

MR. NEFF: No, your Honor, it doesn't use the same language. And that's the sleight of hand the Defense does as well as they're committing the same error that the Oregon court did by just calling the statutes the IRS statute and the CRA substantially similar. It's not true. 26 U.S.C. Section 7605(b) prohibits the U.S. from subjecting a taxpayer to "unnecessary examination and investigations." Those are the words that are being examined. Those are the words that are not -- that are in that fashion are not in the CRA.

THE COURT: But doesn't it say that you have to have a purpose, a basis and purpose for seeking the information?

MR. NEFF: Yes, and that is appropriate for your Honor to review.

THE COURT: And you're saying basis and purpose not appropriate in this case?

MR. NEFF: No, we are saying we stated -- it appears we have a difference with your Honor that we've stated a sufficient basis and purpose, but we would say that and we've specifically alleged in both our letter and the Complaint that we have stated a basis and

purpose.

THE COURT: Okay. And why have you -- why did you choose to file a Complaint in federal court? Why not an administrative subpoena?

MR. NEFF: Thank you, your Honor. That was as part of the U.S.'s efforts towards transparency in this case. We understand the many concerns that many parties may have and we -- what I would humbly submit is that the Defense can't have it both ways. They can't both say you shouldn't have filed a Complaint, you surrender your right to an expedited proceeding; but then also say you can't exclude the Federal Rules of Civil Procedure in cases where it's inappropriate in this action because you're denying us procedural protections. The *Lynd* court made clear that the Federal Rules of Civil Procedure do not apply to CRA proceedings. That doesn't mean your Honor can't reference the Federal Rules of Civil Procedure when appropriate.

THE COURT: I think though that if the courts had no role in reviewing anything and we're just to rubber stamp anything the Department of Justice does for any reason that they state, for any basis, for any purpose, that would render, that would read out the language of the court's, you know, reviewing or

enforcing those requests.

So what I'm wondering is where was your basis stated? Is it in the Complaint or was it in the letter, and what specific language did you use?

MR. NEFF: It was stated in the letter, your Honor. I could reference, well, I can quote the letter to which we said this is pursuant to the CRA, the purpose of this request is to -- and this would be the purpose -- ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and the HAVA. That is in the record, our Motion to Compel, declaration doc 2-2 at page 41. It's also cited in the Complaint doc 1 at page 5.

THE COURT: So your argument is you don't need a factual basis; you can just go on what the Defense is calling a fishing expedition and get everybody's list to check their work, so to speak.

MR. NEFF: Consistent with the various Fifth Circuit case law. While we understand your Honor's --

THE COURT: This isn't the Fifth Circuit. So let's talk First Circuit, because doesn't *Bellows* in the First Circuit allow for redaction?

MR. NEFF: *Bellows* was a case that involved a private party bringing an action under the NVRA.

This is a much different procedural scenario.

We have the Attorney General bringing a CRA action. It was appropriate under the NVRA for there to be redactions giving a list to a private party. That is not applicable to the analysis here.

THE COURT: So Department of Justice can give this list to anybody else, or no?

MR. NEFF: No.

THE COURT: No other department of the federal government? So you can't give it to HHS, Homeland Security, whatever they call themselves.

MR. NEFF: Your Honor, I meant -- to be clear, I meant to deny that it is true that we can just give the list to anybody. That's certainly not the case.

THE COURT: What can you do?

MR. NEFF: We can give it for, as pursuant to uses that we've published in our systems records notices, which generally folds into law enforcement and governmental purposes. There are routine uses that are statutory purposes given to us by Congress.

THE COURT: But not under Title III and not under HAVA or the National Voting Rights Act; right?

MR. NEFF: Incorrect, your Honor, because specifically the HAVA, NVRA, and CRA are mentioned in the systems of records notices as routine uses for the Voting Section to use these lists for.

THE COURT: What I'm saying is can you take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens.

MR. NEFF: In compliance with all federal laws, yes, and we intend to do so.

THE COURT: How?

MR. NEFF: We intend to first off enter a use agreement with them, which we've already done, an appropriate use agreement. Second, we intend to make sure that our SORNs are fully applicable to --

THE COURT: How? How are you going to control what they do?

MR. NEFF: Thank you, your Honor, that's a good question. In the Department of Justice we have a little-known agency, the Office of Civil Liberties and Privacy. We've had -- we've been working with them every step of the way. In fact, the head of that office, Mr. Winn, is a longtime AUSA and practiced in this field, has extended an open invitation to all the courts to even come and testify or be at counsel table if needed to explain all of Privacy Act actions that the United States is taking in preparation for properly sharing this data with DHS or SAVE, making sure that it's only being used in the proper manner and that

everyone's privacy protections are protected.

THE COURT: So what can it be used for?

MR. NEFF: For list maintenance; for our routine uses that are described in the SORNs, which is essentially the statutes that Civil Rights Division enforces, which are listed in the CFRs, specifically Section 0.50 and 0.51.

THE COURT: So not for ICE going to people's homes and arresting them; right?

MR. NEFF: No.

THE COURT: Are you sure?

MR. NEFF: Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do. However --

THE COURT: Isn't that why Rhode Island doesn't want to give you the driver's license and Social Security numbers, because you can't promise what other people are going to do?

MR. NEFF: If that were the case, your Honor could fashion an order that would order that the data be given and be shared only in the manner that we are properly allowed to use it for.

THE COURT: What if I said you can't share it at all.

MR. NEFF: Can't share it even to run through --

THE COURT: Even within any other department of the federal government or any state or local government.

MR. NEFF: One thing I can promise for sure --

THE COURT: Or any political campaign or political entity --

MR. NEFF: One thing I can promise for sure, the Civil Rights Division is going to comply with every order this court gives, no questions asked.

THE COURT: I kind of doubt that, but okay. So -- but that's sort of the cart before the horse.

Let's go back to the basis. So even if I were to follow *Lynd* in the Fifth Circuit case, wouldn't the Defendants be able to redact the information that's personally identifying individual people before it gives you the list? Doesn't *Bellows* allow that and doesn't it require it on some level? Rhode Island law requires it.

MR. NEFF: No, on both counts, your Honor. First off, again, it's necessary to read the election statutes in harmony with each other, not as at war with each other. The HAVA specifically mentions that this is data we need to properly do our job, and furthermore that's true just as a practical matter.

As to Rhode Island law, my friends on the other

side gloss over in the law that they cite, Rhode Island statute 20-00-19.5(i), that under voter registration form and confidentiality to the extent permitted by law, this says the SSN-4 is confidential. It falls right back into the supremacy argument.

To the extent that federal law has specified that we get this, which it has, the Rhode Island law allows for us. And, in fact, further later down in the law in a law not -- again, not cited by Defendant, Rhode Island law 20-00-19 which states the purpose of these laws, it says that the purpose of these laws is "implementing the voter registration requirements of both federal and state laws".

THE COURT: All right. Let's back up. Your basis is the CRA.

MR. NEFF: Yes.

THE COURT: Is there a factual basis?

MR. NEFF: As I've explained with the EAVS data there is, your Honor. However, we're not required to state it and it's not appropriate for this Court to review it, consistent with the same letters that --

THE COURT: Don't I have to determine whether you have a basis or not?

MR. NEFF: You have to determine whether we have a basis, that's correct.

THE COURT: Whether it's a lawful basis. If your basis is I don't want women voting in Rhode Island, then that's okay, I still have to give you the list; they have to give you the list?

MR. NEFF: No, your Honor. You do, you are able to review it in a facial sense. Is it facially compliant with the purposes of the CRA. Remember, the CRA is culled Federal Elections Records. The point here is falling right under Federal Elections Records is the Attorney General's duty to conduct oversight, to trust but verify as to whether these states are doing what they need to be doing, to doing things like removing 60,000 inactive registrations, like removing --

THE COURT: But Rhode Island removed 105,000 registrations or some odd number like that in the last whatever period of time that they cited in their briefing.

Why is your oversight role satisfied by a snapshot in time of the voter records?

MR. NEFF: So this is an ongoing obligation, and the United States is entering this in good faith, absolutely just wanting clean voter rolls and free and fair elections. I would agree as to the snapshot issue that the most important voter role is the one that is

the snapshot right in time that is used for an actual election.

THE COURT: But isn't your role more effectively -- and I'm not going to pretend to tell the Department of Justice how to do their job. But why would you not be looking at the processes that states are using, as opposed to the list? The list gives you nothing except a snapshot in time. The process tells you whether or not they're complying with HAVA and the National Voting Rights Act.

MR. NEFF: We look at both, your Honor, and --

THE COURT: Why does the list help?

MR. NEFF: Because the United States has the capability to run these lists against other databases to be able to tell if there are bad registrations on their rolls.

THE COURT: So if I -- I'm registered to vote in Rhode Island. If I move to Oregon and register, and you get the list where I'm still in Rhode Island, then that somehow says Rhode Island's list is inaccurate, even if I never voted here after I moved.

MR. NEFF: No, your Honor. It just leads to a scenario where we can check with Rhode Island, do our constitutional and statutory duty to verify with Rhode Island they have removed you from the rolls.

THE COURT: But how do you know that I need to be removed from the rolls? What is your role in this?

MR. NEFF: Our role is oversight and so if we knew -- in your hypothetical, if we knew that you had moved to Oregon and we also knew that Rhode Island had not removed you from the rolls --

THE COURT: But you wouldn't know that based on this list because you're getting a snapshot. You're getting the day before I moved.

MR. NEFF: I understand, your Honor, and there may be, like there can be holes in list maintenance, but that's why there's oversight.

THE COURT: But that's why we have ongoing list maintenance; right? So if you don't check it every day, all 50 states, all Boards of Canvassers, every single -- and the District of Columbia every single day, then, you know, if your oversight is inaccurate; right?

MR. NEFF: No, I wouldn't concede that. It's the Attorney General's prerogative as to how she's going to go about her oversight role and how often and in what manner.

THE COURT: But then doesn't -- okay. Go ahead.

MR. NEFF: Going into the, essentially the details of Rhode Island's election process, and what

they've done is exactly what the Fifth Circuit has warned against saying that Title III properly is purely investigative. That's *Alabama ex relatione Gallion v. Rogers*, 187 F.Supp. 848 at 854; *Coleman v. Kennedy*, 313.F.2d 867 at 868. The purpose of Title III is only looking into possible violations of a federal statute, and that that language is clear and unambiguous.

THE COURT: So what are the possible violations that you're alleging here?

MR. NEFF: The possible violations would be in noncompliance with the NVRA and HAVA, and we're back to what the letter --

(Indecipherable crosstalk)

THE COURT: -- logic then; right? We're asking because we don't have any information but we want the information so that we can figure out whether there is evidence; right?

MR. NEFF: Which is exactly what the court warned against. The Attorney General's right to records does not require that she know that she could win without them. That's why this is an investigatory tool. The whole point is for us to be able to check, and if something is wrong we need not prove that something is wrong; we need not even allege that something is wrong.

THE COURT: But I think you do. That's where you have a basis, a factual basis. We come into court all the time and you're required to have a factual basis under the Federal Rules of Civil Procedure so that you're not going on a fishing expedition. And you chose the forum here; you chose to file a civil complaint as opposed to a request for an administrative subpoena.

MR. NEFF: I'd refer your Honor, if you want more current analysis, it would be the *Benson* court's analysis in the Michigan case where --

THE COURT: You're talking about the Sixth Circuit.

MR. NEFF: Correct, where that court's analysis was that such a basis and purpose was sufficient for the purposes of the statute.

THE COURT: Also not mandatory authority; right?

MR. NEFF: Correct.

THE COURT: Okay. Go ahead.

MR. NEFF: And less persuasive than the Fifth Circuit, we would posit to you, because it is a district court, not a court of appeal.

THE COURT: Correct. But more recent.

MR. NEFF: That's true.

THE COURT: As is Oregon and the Central

District of California; correct?

MR. NEFF: Correct. And the Central District of California and Oregon rely heavily on that misreading of *Powell*, where even in *Powell* reaffirms what we're talking about here where it said that even with the language of the Internal Revenue Code that had the statute that has the, that gives the U.S. the ability to send these subpoenas or these requests for investigation; the U.S. does not depend on a case or controversy for this. It can send them even just because it wants assurances that it is not true, that a crime did not happen, that a violation did not happen.

In other words *Powell* doesn't overrule *Lynd*, doesn't even cast out on it; it reaffirms it.

*Powell* further explained that the judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine, "If the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation," which relates directly back to the language that is present in Section 7605(b) and not in the CRA, and that is preventing subjecting a taxpayer to "unnecessary examination or investigations."

Clearly if that language was in the CRA we would be in a completely different scenario.

THE COURT: But *Benson* construed the demand as an administrative subpoena and dismissed it anyway.

MR. NEFF: That's correct.

THE COURT: And so if we follow *Benson,* why is this case different?

MR. NEFF: Because the reason for the *Benson* court's dismissal was, as the court stated itself, overly pedantic and it just doesn't, it doesn't pass muster as far as the textual interpretation of the statute. The *Benson* --

THE COURT: So now we get back to textualism and the Elections Clause; right?

MR. NEFF: I would more say it's just a simple issue of statutory interpretation: What do the words mean? What does "comes into possession" mean? It's a pretty -- it's actually just a basic concept. There's nothing in the text that suggests that it matters whether the document was generated externally or internally.

THE COURT: I guess what I'm lost on here is what the government's argument seems to be is that Title III of the Civil Rights Act, as well as the HAVA Act and the National Voting Rights Act sort of empower

the federal government through rhe Department of Justice to take a second crack at maintaining voter lists for individual states; and it's sort of like why wouldn't Congress have said that in those Acts, and I think it was Justice Scalia who said Congress doesn't hide elephants in mouse holes.

Aren't you arguing that they sort of have this elephant hidden in the mouse hole and you actually have the ability to double-check not just the process, that they're complying with the process, but check their work?

MR. NEFF: No. The NVRA and HAVA are quite explicit that the Attorney General is charged with enforcing what the, the limited purpose it was attempting to accomplish.

THE COURT: Which is?

MR. NEFF: In the NVRA's case there are multiple purposes of the NVRA, but if we're going to sum it up in a few words it would be ensuring access to voter registration.

THE COURT: Okay. And how does this ensure access to voter registration?

MR. NEFF: As stated previously, when you don't have a HAVA identifier it actually poses a great risk that people will be inaccurately removed from the

rolls.

THE COURT: But so you're saying you think Rhode Island is removing too many people from the rolls.

MR. NEFF: Again your Honor is going into breaking down whether it's actually true or not. We can't know until we have the list to be able to do our check --

THE COURT: And the elephant is in the mouse hole again. Okay. Go ahead.

MR. NEFF: And so if I were then going to give a five-word explanation of the HAVA, it would be imposing certain list maintenance requirements on the states and, again, the Attorney General is posed with enforcing that. That's -- to what extent it's been done in the past is not of concern to this court. What matters is what the law says and what it says our duty is, and is what we're doing consistent with that. And providing the HAVA number is just very clearly right there in the statute.

THE COURT: It says the Department of Justice is entitled to the HAVA number?

MR. NEFF: No. It says the State is required to maintain it and that the Attorney General is charged with enforcing the statute.

THE COURT: The State is in charge of the

numbers and the rolls, and the government is in charge of making sure that the states are doing their job.

MR. NEFF: Yes.

THE COURT: Not checking their work.

MR. NEFF: Well, I think that might be a distinction without a difference. We are making sure that they're doing the work that they're required to be doing.

THE COURT: No, you're not, because the voting rolls that you're asking for are a snapshot in time. If you were making sure that they were doing what they're supposed to do under HAVA, you'd be looking at the systems and the processes and you'd be auditing whether or not they're applying those systems and processes consistently across time.

MR. NEFF: Judge --

THE COURT: You're looking for the voting records. You want a list of all -- is the purpose to get a national voting database?

MR. NEFF: No.

THE COURT: Really? You're destroying these after you've giving them a look-over?

MR. NEFF: Again, we have a number of laws we have to comply with. One of them is the Federal Retention Records Act, so we have certain mandatory

requirements. We can't just destroy them immediately. But we are going to be complying with all applicable federal laws, including privacy laws, and your Honor will be well within her authority to issue an order consistent with both the CRA and its concerns as to the protection of the data.

THE COURT: Okay.

MR. NEFF: I want to just make one note as far as the, my friends' briefing that says that a racially discriminatory purpose is required under the CRA; when -- first off, not only is that not in the text, but it's abundantly clear from text around it that it was purposely excluded.

First off, the title of the law is Federal Election Records. Most importantly, one needs only look in other titles of the Civil Rights Act to see that when Congress intended to put in racial discrimination as an element, it knew how to, it knew how to use those words. It's right there in Section 601, which is codified as amended Section 52 U.S.C. Section 10101 where it used "on account of race or color".

Furthermore, in multiple acts passed in the similar time, Title VII of the Civil Rights Act of 1964; Section 2 of the Voting Rights Act; the Fair

Housing Act, which was then part of the Civil Rights Act of 1968, all language including race and color were used as qualifiers.

It is not in Title III. That's because of what Title III is.

THE COURT: But Title III talks about poll taxes, so we have to read Title III in the time context, don't we?

MR. NEFF: Yes. But what -- it is using terms that is all acts requisite to voting, which a voter roll and maintenance of a voter roll is clearly an act requisite to voting.

THE COURT: Can't we construe the HAVA and the National Voting Rights Act as modifying to some degree --

MR. NEFF: Well...

THE COURT: -- the Title III?

MR. NEFF: Yes, but the question is in which direction. And the National Voting Registration Act specifically tells you again, Section 20510(d)(1), this is in addition to other rights. The National Voter Registration Act and the Help America Vote Act are working in congruence with each other to have a coherent scheme where the states will have clean voter rolls and have fair and accurate elections. To read

them as in conflict with each other and preventing anyone from looking at what the states do is just not consistent with the text or fair reading of the statutory scheme.

I want to emphasize again that *Lynd* specifically talked about the pleadings issue in which it said that pleadings are -- that when they're not filed the whole procedure does not have to satisfy usual notions under the Federal Rules of Civil Procedure, and that that was then was upheld by *Powell,* which even followup with Supreme Court jurisprudence to *Powell* made clear that *Powell* was not meant to impair summary enforcement proceedings because summary enforcement proceedings are different than actual action. They're -- this is purely an investigative tool that needs, and it needs to be done in short order; it's just, it follows from elections. Elections have some of the shortest time frames.

We need to get started as soon as we can to make sure that the voter rolls are accurate and maintained properly in advance of each coming election.

THE COURT: But does this get you there?

MR. NEFF: It's one step towards it, and essentially to say, well, we could be -- you could also be doing this, you could also be doing that, is to

outside what's in this case.

THE COURT: Yeah, but I'm not -- but you have to have a purpose that is met by your demand.

MR. NEFF: That's true.

THE COURT: Okay. So you're saying your purpose is to make sure that the voting rolls are accurate for the next election.

MR. NEFF: Largely, yes. And that's consistent with the list -- I want to stick to the text that we put on the letter, but your Honor is accurately describing what that entails.

THE COURT: Okay. How is that served by asking for a voter list for more than a year before the next election?

MR. NEFF: Fair question. If we can flag some now, flag some registrations now that are very distinctly problematic, we can get started now with the State to get those removed in time.

As we get closer to the election there are other limitations that come into play. You've got, first off, the election offices get more busy; second, we have Purcell issues. So there's all kinds of reasons why we have to start earlier.

THE COURT: But -- okay. All right. I understand what you're saying; I just don't think that

your request gets you there.

So what is the limit to the purpose that can support the records demand? Does it have to be related to voting records?

MR. NEFF: Yes, it would have to be related to federal election records. That's the most signification limitation that there -- the second most limitation would be the 22 months provision.

THE COURT: So fair for the State to say I'm culling everybody who's never voted in a federal election before I give you my list.

MR. NEFF: I'm sorry, I didn't hear.

THE COURT: They're pulling off everybody from the list to somebody -- people who've only voted in state elections or who have never actually voted, they don't have to give you that information.

MR. NEFF: Not if they're registered to vote in this coming election because the record is the voter registration list; it is not who, when they registered. There is a list that exists right now that Rhode Island will be using as an act requisite to vote.

THE COURT: Hasn't Rhode Island offered to give you, but for the last four of the Social Security number or the driver's license number, and you refused that; correct?.

MR. NEFF: No, we don't refuse that. They're free to upload it if they like, but we would still be here because we can't do our job without that.

THE COURT: Now, if I don't follow *Lynd*, okay, and I evaluate the basis and purpose advanced in the A.G.'s demand, and if the Court determines that the stated purpose is pretextual, shouldn't the Court dismiss the case?

MR. NEFF: No.

THE COURT: So you can have a pretext.

MR. NEFF: It would be inappropriate for your Honor to analyze whether it was a pretextual motive or not.

THE COURT: But I have to determine whether there's a basis and a purpose, and you're saying if you come here and you give me a clearly phony basis or purpose, I still have no ability to deny your request.

MR. NEFF: While that's true, I'd also say that's not -- that doesn't need to be a concern of your Honor because that's not the case here. There's not basis for it. The closest thing to a basis is the *Weber* court bringing in anonymously-sourced media articles into a judicial opinion.

There is no record here to support that the Civil Rights Division would be doing anything other

than what it states it will be doing.

THE COURT: Hasn't the Department of Justice and the President issued all kinds of statements about a national vote, you know, one of them was the Republican Party should take over the voting; but putting that aside, that the federal government should take over voting management, that all of these things that are clearly unconstitutional, and am I supposed to just ignore those and say trust me?

MR. NEFF: There have been a number of statements that have been made --

THE COURT: Correct.

MR. NEFF: -- extraneously. What I would impress on the Court is that once you look first and foremost at what the Civil Rights Division said --

THE COURT: And what are you saying? We're going to take these, we're going to look at them, and we're going to flag people we don't think should be voters in Rhode Island.

MR. NEFF: And we will then approach the states with that data.

THE COURT: Okay. And then the State is going to say to say to say to you I know, but that was a moment in time and we've culled our data 30 times since then. And then you're going to say?

MR. NEFF: And we've all done our jobs.

THE COURT: Have you?

MR. NEFF: Yes.

THE COURT: Because they could still have false information on there. You haven't done your job.

MR. NEFF: It's definitely trust but verify. But if they're able to show us the list that doesn't have that inaccurate registration on it, then it's good.

THE COURT: Why don't they show you the process?

MR. NEFF: Because we have to confirm that they're actually following their own processes.

Also, I want to be clear here, based on their self-reported information to EAVS, we don't believe they have been following best practices. As we -- the EAC lists five categories of audits that Rhode Island could be doing, and Rhode Island self-reports they only do two of them. I commend them for doing logic and accuracy testing and risk-limiting audits, but there are several more that can be done.

THE COURT: Such as?

MR. NEFF: Such as specifically eligibility audits, legal audits, and post-election tabulation audits.

THE COURT: Tell me what you mean by those.

MR. NEFF: For example, I mean it varies state by state, but the most -- eligibility might be, for example, submitting the data to SAVE. There's nothing stopping these states from doing it themselves, in fact, they're invited to; and SAVE will run it for them, will give it back to them and will give them the data --

THE COURT: And this is the new and improved SAVE database, not the one that was wildly inaccurate --

MR. NEFF: Correct.

THE COURT: -- six months ago.

And we're supposed to just take Department of Justice or Department of Homeland Security's word that now we're accurate?

MR. NEFF: No, your Honor. Everyone has their own role in this. And the federal -- the Civil Rights Division's role is to ensure that the lists are clean and that the states are doing what processes they should be doing to make sure that they are clean.

THE COURT: So if you find states that are making it difficult for certain classes of people to register to vote, then you're going to go right down to that state and say you have to enable people, give people the opportunity to vote.

MR. NEFF: That would be a appropriate concern for the Civil Rights Division Voting Section, yes.

THE COURT: How would you find that in this mechanism?

MR. NEFF: We have an open, a decade-long process for complaint sifting. Every complaint that's sent to us goes through a various -- goes through a review process that is then elevated. This is what we do, your Honor.

THE COURT: Okay. All right. Is there anything further?

(Pause)

MR. NEFF: No, your Honor, absent further questions, we submit.

THE COURT: Okay.

Any rebuttal?

MR. ARGUIN: If I could briefly, your Honor.

THE COURT: Sure.

MR. ARGUIN: Thank you. Special Assistant Attorney General James Arguin on behalf of the Rhode Island Secretary of State.

Just a few points in response to what we heard this morning. First of all, for the first time we've heard reference to alleged discrepancies in what's called the EAVS report submitted by the State. The

last one was done in 2024 following the last election.

THE COURT: And just -- I don't want to interrupt you, but that wasn't cited in their demand --

MR. ARGUIN: Absolutely, and that was my point. Absolutely not. The September 8th, 2025 demand letter at ECF 2-2 made absolutely no mention of this.

Now, as my brother mentioned, the Complaint does make a reference to it. It says they looked at it, and that's in some of the earlier paragraphs of their Complaint they've said they had reviewed the EAVS reports. But they provided no conclusions that they drew from the EAVS report that could ever come close to stating a proper basis or purpose, as required by the CRA. They just made reference to the report.

THE COURT: So the first time that you're finding out what they think you should have done under the EAVS report is today.

MR. ARGUIN: Is this morning. And I think also the other point I would make about the EAVS report is what matters is not a passing reference in the Complaint. Under the CRA what matters is the statement of the basis and purpose in the written letter; and there is absolutely nothing in the demand letter to the Secretary of State, no references at all.

And furthermore, even if that passing reference

in the Complaint were somehow sufficient, it doesn't state what they said today. And as we're (indecipherable), what we're looking at when you look at voter registration lists, which as we established during our first conversation, those are updated by the minute and there are safeguards in place specifically to make sure no one is falsely removed. So there are sometimes things captured in those reports that are subject to corrective action or are in process of being corrected pursuant to the State's obligations under the NVRA.

THE COURT: So that gets to the purpose, I think, which is the moment-in-time issue. It's a moment in time. It doesn't, my -- if the purpose is to make sure the State is complying with HAVA and the National Voting Rights Act, then I'm not sure how we get there with a moment-in-time snapshot, unless they're calling it like a minute audit; but they would have to do it every day, every minute, every hour in order to really determine, and for all 50 states.

MR. ARGUIN: Exactly. Or set up their own shadow (indecipherable).

THE COURT: Which is not permitted, which is not what the federal Elections Clause or the Elections Clause of the Constitution says. It says states -- not

the Department of Justice -- shall maintain and process.

MR. ARGUIN: That's precisely right. And I think even the Fifth Circuit cases that they referenced as support under the CRA -- and my colleague mentioned one of them. The *Bruce* case is instructive because in *Bruce* that was exactly what the court was examining, whether there was a violation of the CRA, whether, you know, that was actionable or that required the records to be (indecipherable). And it specifically distinguished the alleged violation of the CRA from the state's alleged failure to purge voters who had --

(Court Reporter requests clarification)

MR. ARGUIN: Specifically distinguished it from the list maintenance activities of purging voters who had moved away or died. It said it wasn't relevant to the CRA.

The other point that's also I think --

THE COURT: And that's a contemporaneous Fifth Circuit case, correct, the *Kennedy v. Bruce*?

MR. ARGUIN: Yeah, that was contemporaneous, you know, a year or two after the Civil Rights Act was --

THE COURT: And *Lynd*, contemporaneous --

(Indecipherable crosstalk)

MR. ARGUIN: -- the *Lynd* line of cases, and it's

cited in our materials.

The reason why I think the argument as just presented highlights the need for an accurate statement of the basis and the purpose is the assertion today -- which, again, comes as a surprise -- that DOJ does plan, in fact, to share this data with the Department of Health -- Department of Homeland Security to run it through the SAVE database for immigration checks. Again, while we heard that this is all about transparency, that was never disclosed. And what's more, it certainly is not provided in the notice provided to the Secretary of State.

And it also conflicts with their representation to this Court in their reply at EC-33, that they said there was an affirmative duty on them not to disclose this information beyond the purposes they were requesting. Now, the statute on which they're relying allows them to share with other agencies; but, nevertheless, this is sort of a moving target. So what are we -- why do we need these lists, and how is this purpose of putting them through the SAVE database relevant to whether or not Rhode Island is complying with its list maintenance responsibilities? And clearly it is not, it is a different purpose, and it's another purpose that is not within the Civil Rights

Act, which is another reason why it should be denied.

One other point that was made is this repeatedly emphasis that all we need to do is state the legal basis and not the factual basis. But again, the very cases on which they rely under the Fifth Circuit line of cases specifically rejected that. Take, for instance, *In Re: Gordon*, 218 F.Supp. 826, a 1963 case from the Southern District of Mississippi. It specifically said that the CRA is not an unlimited discovery device which may be employed and used without restraint. Then also another case from that era, *In Re: Coleman,* similarly said that requests under CRA are not made based on speculation or idle curiosity.

And let's get back to *Lynd,* the principal case on which they rely. It specifically noted that the records it was talking about were public records, and it said nothing here is confidential -- which is why they proceeded to make that express distinction that they were not talking about confidential or private information. So clearly they did not anticipate the release of Social Security numbers or state driver's license numbers.

The other point that was made is that the Ford-Carter Commission that led to the HAVA required states to provide these unique HAVA identifiers. Well,

as we have already discussed, that is in the publicly-available information that Rhode Island has offered to provide. Those HAVA identifiers are part of the public access provision provided by state law, and they're available.

THE COURT: I want to clarify this because I think that it got a little conflated in the Department of Justice's argument.

I understood them to be arguing the last four of the Social Security number and the HAVA number were the same thing. Perhaps I misunderstood. But what the HAVA number is, is that sort of computer-generated unique identifier.

MR. ARGUIN: It's a unique identifier generated as part of the registration process. It is not the Social Security number. It is not a driver's license. It's a unique identifier that HAVA requires the states to do. Many states do it only if the other numbers aren't available; if there's no Social Security number or if there's no driver's license.

But Rhode Island assigns a HAVA, a unique HAVA identifier to every voter. But, you know, that doesn't raise the same confidentiality and privacy issues as a Social Security number, I would point out, given all the financial and other records that are associated

with Social Security numbers and driver's license numbers. HAVA is unique to voting.

THE COURT: And I think that since HAVA is unique to voting, it more closely aligns with the purpose that the Department of Justice is seeking. Does the court --. So those numbers are different numbers. They're not -- the HAVA number might be generated as a result of the Social Security number, the driver's license number, the address, the date of birth, all of those things, which are publicly available -- well, not the Social Security number and driver's license. But all of those records create or cause the creation of the HAVA number. Is that accurate?

MR. ARGUIN: Well, as I understand it, your Honor, as part of the -- once the registration is submitted and the application is submitted, a unique identifier is assigned to that voter.

THE COURT: Okay. And then Rhode Island goes through a process too where it verifies voting information periodically.

MR. ARGUIN: Absolutely. Yes.

THE COURT: Tell me about that because --

MR. ARGUIN: Not only at the time -- it's detailed in our Motion to Dismiss, but it's certainly

at the time one registers proof of citizenship, you know, they have to swear an attestation of citizenship, they present their residence application, proof of identification, all the material is submitted.

Periodically there are other updates done through mailings. In fact, just in 2025 the Department of State sent out a mass mailing to the active voter registration list to confirm addresses. And of course daily, you know, they're reviewing and comparing the Social Security death index, whether or not persons have died. And there's reporting also from the State Office, the Medical Board or the corner, whoever is in charge of statistics or vital statistics, the Office of Vital Statistics to confirm, to compare death records with the database, and all that information is subject to verification and processing.

And as you mentioned, the State also participates in a multi-state effort, ERIC, which is shared information with other states to reconcile discrepancies with voters who have moved to another state. So all of that information is compiled to maintain the most accurate listing.

THE COURT: But let me just ask a question. When the Secretary of State is verifying, say, vital statistics, people who have died, they don't give the

voting list to Vital Statistics; is that correct? They get the death records from Vital Statistics --

MR. ARGUIN: Exactly.

THE COURT: -- so that the integrity of the voting list is maintained by the Secretary of State.

MR. ARGUIN: Absolutely correct. They're receiving information to enter into the database. So someone who died, someone who becomes incarcerated, that information is shared by other state agencies, compared to other available information, for instance the Social Security Death Index, and the system is updated with that information on a regular basis.

The other point that's somewhat concerning is also even though we say that the Department of Justice said that they're going to run this through the SAVE Act and use it for immigration purposes; but even more problematic was the concession that the Civil Rights Division can not really promise what it's going to do with the information. Now, that is really troublesome when talking about 750,000 eligible voters in Rhode Island who all have their own concerns about privacy and informational data security. And that's --

THE COURT: I'm sorry. And Rhode Island law as well as federal law requires certain protections of that data because of the increase in online kind of

scams and financial fraud and all of those things.

MR. ARGUIN: The court's own electronic filing rules are clear, don't put that in a publicly filed document; and it's exactly the same reason. These kinds of concerns about data security didn't exist in 1960s; it wasn't that prevalent. But now data security is a fact of life, and someone gets your Social Security number or your driver's license number that's used for multiple programs and services and identification needs, it's problematic, and that's why both state and federal law protect it.

There was a passing reference that DOJ says they've complied with the Privacy Act because they've issued a bunch of SORNs. There is a couple SORNs our there; they've cited three or four in their Complaint. None of them serves the fundamental purpose of giving any citizen adequate notice that the data that they've supplied to vote and to exercise their First Amendment rights is somehow going to now be shared with the Department of Homeland Security to run immigration checks; and perhaps who knows what else because we won't specify what it is. That's really concerning. And I think that's exactly why there was some discussion of, well, just put a protective order in place and we'll abide by that. That in no way

addresses the State's concerns. The Attorney General of Rhode Island and the Secretary of State of Rhode Island have a duty to uphold public interest, which is to protect the rights of the citizens to their confidential -- to make sure their confidential and private information that is shared with the government to register to vote is not distributed without a valid and clear legal purpose.

And what's more, that right -- although it's the Secretary of State and the Attorney General who enforce it -- belongs to the citizens of Rhode Island, the 750,000 people who are going to have their personal, private information shared for what unknown or unlimited list of reasons.

And it's not speculation to say that this type of immigration check that they've only confirmed today is exactly what they're planning to do, or for some other purposes. The Executive Order that President Trump issued, 14248 just last year, specifically says we want to obtain the voter registration list from all of the states so we can run it through the Department of Homeland Security to run immigration checks.

It's exactly consistent with what we heard today. And what's more, that order, which has been enjoined by the District of Massachusetts, is still a

public statement from the head of the Executive Branch disclosing that they intend to use the data not for any purpose related to the CRA and even not for any purpose related to the HAVA or the NVRA.

THE COURT: So you're saying that notwithstanding the assurances that Mr. Neff gives the Court that the Civil Rights Division of the Department of Justice is planning to use it for the limited purpose contained within the statutes; you're saying he has no control over that and the evidence is to the contrary from above his pay grade.

MR. ARGUIN: Well, with all deference to Mr. Neff, I take him at his word, but his word was equivocal: I don't know; I don't know what's planned; I don't know what will happen. And this was the point one of my colleagues made.

So I think all of that reinforces the Secretary of State's concerns relating to DOJ's failure to provide a clear and accurate statement of the basis and the purpose for its demand for an unredacted version of the State's voter registration list.

And just one more point. If your Honor reviews all of the Fifth Circuit cases, and I'm talking about *Lynd*, *Bruce*, *Coleman* that's been cited, they all had the statement of the basis and purpose. I'm not saying

it was used in detail, but it at least related to the statutory purpose, and it wasn't something like.

THE COURT: And it didn't say my basis is the law. It gave a factual basis.

MR. ARGUIN: Absolutely correct. Absolutely correct.

And so with that, your Honor, for all those additional reasons, we request the Complaint be dismissed and the Motion to Compel be denied.

THE COURT: Is there anything further?

MR. SAVITZKY: Your Honor, if I could be heard extremely briefly, although very slowly and articulating.

THE COURT: Yes.

(Laughter in courtroom)

MR. SAVITZKY: Just again, not very much to add at all, but just on a couple of points that were raised. First of all with respect to *Powell*, there was an argument made that I don't think was in the briefing that actually *Powell* is about Section 7605 of the IRS statute and therefore it's distinguishable. That's not right. And the section of *Powell* that really controls is III, it's on page 255 of 379, United States Reports, and that's really the section that talks about what do we do where the United States District Court is given

jurisdiction by any appropriate process. And the court answers the question and says, well, when there's -- when the procedures isn't specified, you use the federal rules. And above the line that's in Footnote 18, (indecipherable) the line that says there will be a hearing and you can challenge the demand on any appropriate ground, any appropriate ground.

The idea that you could ever demand -- use government power to demand this sensitive information and there would be no substantive consideration of whether it is lawful and whether the purpose is improper is foreign to the law and inconsistent with the cases not just from the IRS. I mean the case we talked about, about the hospital in Boston last year, that's HHS. So we know that's not true.

On the merits, I want to point the Court to 52 U.S.C. 21085. This is from HAVA, it's part of HAVA. And there was a lot of discussion with counsel from the Department of Justice about the federal government's role, the designated role.

What that section of the provision says as part of HAVA is the specific choices on the methods of complying with HAVA are left to the discretion of the states. Congress -- end quote.

Congress could not have been clearer about the

discretion given to the states and the limited role of the federal government vis-a-vis the states and their process.

One other point, and I won't get into the basis and the purpose that's been discussed at length on the SAVE database specifically, and just to this point of there's been basically no disavowal this data could be shared, no attempt to cabin what other federal agencies might do.

But as I read the specific SORN, or System of Records Notice, that governs the SAVE Act and data that's put into that -- not the SAVE Act, excuse me -- the SAVE database, which is different. As I read it, it's 90 Federal Register page 48954 into 55; I believe that's the cite. But as I read that, it's contemplated when you put information into that SAVE database it is then retained for up to 10 years. So the idea that there are any real limits on what other federal agencies are going to do with this data once the Civil Rights Division gets it, I think is belied by what you've heard today.

The Department of Justice may think it's a good policy or good idea to run the data in this way, even though it could jeopardized naturalized citizens' right to vote like Ms. Sanches, who is an Intervenor here.

Texas may think it's a good idea. But nothing in federal law requires that; nothing about ascertaining compliance with federal law means that must happen, and therefore there's no basis or purpose for this request. The Complaint should be dismissed.

THE COURT: Anything else?

MR. GOLAN-VILELLA: Nothing further from us, your Honor.

THE COURT: Mr. Neff.

MR. NEFF: Briefly, your Honor.

THE COURT: Very briefly.

MR. NEFF: Keeping my comments to what was mentioned in rebuttal, I specifically heard my friend say that there was no exclusion that this could be used for immigration purposes or check. I want to correct the record. To the extent that I gave that impression, I did not mean to. This is not being used for immigration purposes.

THE COURT: By you.

MR. NEFF: Correct. And I think this is something that is getting lost here in this rebuttal discussion. The question that is being posed by my friends -- and it's not a fair question -- is why can't you give us 100 percent assurances as to what other federal agencies will do in the future regardless of

what steps you take now. That's never a fair question. It's not an appropriate question for this Court. The question is --

THE COURT: But isn't it when you're asking for such extraordinary information and they're offering you most information redacted down just slightly. Why isn't that sufficient? It seems that in -- Rhode Island gives everyone a HAVA number. Why doesn't that satisfy your...

MR. NEFF: I would dispute your characterization, your Honor. The redaction of the last four of the Social Security is what we need to do effective list maintenance. And furthermore, no one has taken a step back here --

THE COURT: You don't need to do list maintenance. You need to verify that they're doing list maintenance.

MR. NEFF: Correct.

THE COURT: So you don't need to do list maintenance, and that's not the Department of Justice's role. In fact, Congress specifically gave that, assigned that role to the individual states. So that's not your role.

MR. NEFF: Noted correction, your Honor. That's right. We need the SNN in order to conduct our list

maintenance oversight.

THE COURT: Why can't you use the HAVA number?

MR. NEFF: That's a good question. I think the terms are getting conflated and unhelpful here.

It's important to note that HAVA is, does not put those -- when it lists the numbers that the State is required to keep, it doesn't list it in the disjunctive; it lists them actually in an order. First the State is required to identify the voter with the driver's license number. Only if a driver's license number does not exist or is somehow not available is the State then allowed to move to the SSN-4, and, in an emergency case, issuing a HAVA-specific identification.

THE COURT: But Rhode Island specifically gives everybody a HAVA-specific ID, so why isn't that enough?

MR. NEFF: It would not be enough under the HAVA statute.

THE COURT: Why?

MR. NEFF: It would be a facial violation of the statute actually because they would not be -- if they're not attaching the driver's license to every voter.

THE COURT: They're attaching the driver's license number, but they're saying what's publicly available, what's available to you, Department of

Justice, which should serve your purpose is the HAVA number.

And unlike other states, we don't just collect the last four of the Social Security number or the driver's license number; we give everybody a HAVA number, and you can have that. Why isn't that enough?

MR. NEFF: In that case the federal government would be charged with ensuring that they are keeping the driver's license number, and so therefore it would be appropriate for the United States to ask to see the list with the driver's license number.

THE COURT: Do you have any evidence that the State of Rhode Island is not doing what it says it's doing?

MR. NEFF: We can't know what they are or aren't until we've seen the list.

THE COURT: So the answer is no.

MR. NEFF: That's correct.

THE COURT: Okay.

MR. NEFF: And I would, going back to what my question -- what I think the question needs to be, it's have we taken all necessary and prudent steps and are those steps consistent with federal law. Here, there is an MO -- let's not lose sight of the fact there is an MOU in place. I signed it myself on January 20th

with DHS that limits the use of the data to votes-specific purposes --

(Indecipherable crosstalk)

MR. NEFF: -- maintenance.

THE COURT: Okay. Let's say fast-forward five years, you're not in your job anymore. Are they bound by that MOU?

MR. NEFF: Yes, pursuant to this data, yes. And furthermore your Honor can bolster that.

THE COURT: But that's not my role here. My role is to say are you entitled to what you're seeking, which is sort of a broad swarth of personally identifying information that frankly is a lot different now than it was in 1960. I don't know how many spam calls you get a day, but I can tell you that I get lots of them and they're, you know, all kinds of fraudulent types of calls even to my government cell phone, which I find funny.

And so, you know, it's a different landscape. You have to acknowledge that. Not acknowledging that is burying your head in the sand, so your purpose needs to include some understanding of that.

When you're just saying the HAVA number is not enough, I need the driver's license and Social Security number, then they're saying why, and your answer is I

don't have to tell you why, essentially.

MR. NEFF: Far from acknowledging the new era we're in, we're embracing it. This is just a first step to sifting down to where there are problematic registrations. I think it would fair for someone to state that in today's day and age it's extremely hard to comply with all the provisions at the HAVA at the scale the Secretaries of the State are being asked to do right now. We can work as a partner with them. This is only a first step to seeing where some of the problems may be; and so because of such a large number as Rhode Island themselves has said, we need to be able to do our initial check so that we can start whittling down where maybe some of the problems are. We're not saying there are problems. That's not what we're talking about at this phase. We're just talking about doing the initial screening that is necessary, given the scale of a voter registration list.

THE COURT: But the Department of Justice kind of came in hot and asked for all the information. They didn't say, hey, let's partner, how can we help you, what are you doing? They came in and said give us all your information because we need to verify that you're doing what you're supposed to be doing, so offering a partnership now seems a little hollow.

MR. NEFF: If they're willing to come forward -- and I would strongly suspect they're not, that's why with here -- with exactly what they've offered plus just, and I say "just" the last four digits of the Social Security number which are not --

THE COURT: But that's the issue.

MR. NEFF: -- not the Social Security number --

THE COURT: They are --

MR. NEFF: -- giving it to the federal government, then there wouldn't be an issue.

THE COURT: Ane if you were to come forward and say those records will be destroyed the day after we get them and run them through, they probably would have less of a problem with it. So we can't live -- you know, my mother-in-law used to say, If "if" were a skiff, we'd all go for a boat ride. So it's kind of a silly analogy, like to say if they were to give us this, then we wouldn't have a problem. You're asking for what they don't want to give you and that they are arguing they're not required to give you.

MR. NEFF: That goes to exactly what we're asking for your Honor to do, is to issue the order, the Motion to Compel, and then you can appropriately set a next hearing in order to fashion how that order is going to look.

THE COURT: Why do you need the last four of the Social Security number? Why is it four?

MR. NEFF: Because it's all that's -- thankfully it's all that's needed in order for database management analysts to be able to get accurate information.

THE COURT: And can they get that information -- can somebody hack in your computer system, get that information and use it for some nefarious purpose? They don't need any more than the last four; right?

MR. NEFF: If you're talking about the Civil Rights Division, I can say Civil Rights Division goes above and beyond to ensure the security of the data that it has. We have yet to have a data breach in our history.

THE COURT: In your history of the Civil Rights Division since 1960.

MR. NEFF: That we're aware of, that's correct. I did run, I did make best efforts to where I can represent to the Court we're not aware of one and we believe we would be.

And our MOUs reflect, deal with people -- institutions are dealing with privacy issues all the time, and that includes clauses what to do if something happened. These can all fashioned, again, like consistent with we have an entire office devoted to

making sure not just that we're complying with federal law; that's not the Attorney General's only interest. The Attorney General's other interest is to make sure people's privacy are protected.

THE COURT: But if somebody has your Social Security, the last four of your Social, don't the first three and the middle two tell you date and place of birth to some degree or at least within a range?

MR. NEFF: Well, we don't -- that's why the HAVA statute specifically defined it as not a Social Security number. It's only the last four is the identifier, and that's all we need to get to essentially accuracy that makes it possible for us to do our oversight.

THE COURT: Okay. But first we have to accept the premise that you need this list to do your oversight.

MR. NEFF: Correct. Yes.

THE COURT: Okay. Is there anything else?

MR. NEFF: Thank you, your Honor. On that I would submit, unless your Honor has further questions.

THE COURT: No, no further questions.

We are in recess, and I will issue an order shortly, probably not today or tomorrow but hopefully next week.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch_
Denise P. Veitch, RPR
Federal Official Court Reporter

March 20, 2026
Date

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections,<br><br>Defendant. | Case No. 3:26-cv-42-RCY |

**NOTICE OF APPEAL**

Plaintiff United States of America, by and through the Acting Attorney General, appeals to the United States Court of Appeals for the Fourth Circuit from this Court's Memorandum Opinion (ECF 76) and Order granting the Defendant and Intervenor-Defendants' Motions to Dismiss and denying the United States' Motion to Compel (ECF 77) entered in this action on July 14, 2026.

Dated: July 24, 2026

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

*/s/ James Thomas Tucker*
JAMES THOMAS TUCKER
JAMES T. CATANIA
JOHN CASALI
RAYMOND YANG
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

Respectfully submitted,

*/s/ James Thomas Tucker*
James Thomas Tucker