No. 26-2002

IN THE

# United States Court of Appeals for the Fourth Circuit

United States of America,

*Plaintiff-Appellant*,

v.

STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections,

*Defendant-Appellee*.

**On Appeal from the United States District Court For the Eastern District of Virginia**

## RESPONSE BRIEF OF APPELLEE


JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

MEGAN C. KEENAN
*Deputy Solicitor General*

MIKAELA A. PHILLIPS
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us


October 8, 2026

*Counsel for Defendant-Appellee*

## TABLE OF CONTENTS

Introduction ........................................................................ 1

Issues Presented ........................................................................ 2

Statement ........................................................................ 3

A. The federal government seeks Virginia's full, current, unredacted statewide voter registration list ........................................................................ 3

B. The federal government invokes three federal laws in its outreach about Virginia's voter registration list ........................................................................ 5

C. The federal government brings this action, alleging a violation of Title III of the Civil Rights Act ........................................................................ 6

D. Contemporaneously, the federal government brings actions seeking the voter registration lists of at least 30 other states ........................................................................ 8

E. The district court dismisses the federal government's complaint and denies the motion to compel ........................................................................ 13

Standard of Review ........................................................................ 15

Summary of Argument ........................................................................ 15

Argument ........................................................................ 19

I. The statewide voter registration list that the U.S. Attorney General demands is not a "record" within the meaning of Title III of the Civil Rights Act ........................................................................ 19

A. The statutory text covers only records that "came into [the] possession" of state election officials,

not records generated and maintained by state election officials ........ 19

B. The broader statutory context confirms that Title III does not cover the statewide voter registration list ........ 22

C. The U.S. Attorney General's demand separately flunks Title III's requirement that the record is related to a particular federal election ........ 27

D. The federal government's counterarguments are unpersuasive ........ 29

II. The U.S. Attorney General's written demand lacks a sufficient basis and purpose under Title III of the Civil Rights Act ........ 38

A. Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding a state's records ........ 38

B. This Court can adjudicate the legal sufficiency of the basis and the purpose provided in the U.S. Attorney General's written demand for records ........ 41

C. The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted ........ 44

D. The U.S. Attorney General's written demand provides no factual basis for demanding Virginia's complete and unredacted statewide voter registration list ........ 46

E. The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient under Title III ........ 49

III. The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state and federal law ........ 56

A. Virginia law prohibits sharing much of the sensitive information that the U.S. Attorney General demands ........ 56

B. Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information ........ 59

C. The U.S. Attorney General's demand further fails to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002 ........ 61

Conclusion ........ 64

Certificate of Compliance ........ 65

Certificate of Service ........ 66

# TABLE OF AUTHORITIES

## Cases

*Anand v. Commonwealth*,
No. 1:23-cv-87, 2023 WL 7301995 (E.D. Va. Nov. 3, 2023) .................63

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .........................................................53

*Benjamin v. Sparks*,
986 F.3d 332 (4th Cir. 2021) .............................................................15

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ..........................................................................37

*Crooks v. Harrelson*,
282 U.S. 55 (1930) ............................................................................39

*Davis v. Michigan Department of Treasury*,
489 U.S. 803 (1989) ..........................................................................24

*Department of Agriculture Rural Development Housing Service v. Kirtz*,
601 U.S. 42 (2024) ............................................................................29

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ..........................................................................53

*Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ..........................................................................30

*GenBioPro, Inc. v. Raynes*,
144 F.4th 258 (4th Cir. 2025) ....................................................59, 60

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ...................................................40

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) ........................................................40, 51

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .................................................. 40, 41, 61

*Loughrin v. United States*,
573 U.S. 351 (2014) .................................................................. 20

*Obduskey v. McCarthy & Holthus LLP*,
586 U.S. 466 (2019) .................................................................. 42

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ...................................................... 61

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .................................................................. 20

*United States v. Adams*,
837 F. Supp. 3d 881 (E.D. Ky. 2026) .................................................. 9, 21

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......................... 10, 39, 40, 41, 43, 50

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) .................................... 10, 22, 26, 52

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ............................. 9, 10, 20, 21, 23, 26, 33

*United States v. Benson*,
187 F.4th 462 (6th Cir. 2026) .................................................. 9, 36, 37

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ................... 9, 21, 25, 26, 33, 48

*United States v. Board of Elections of New York*,
No. 1:25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ....... 9, 22

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ........ 9, 21, 29

*United States v. DeMarinis*,
No. 1:25-cv-2934, 2026 WL 1780586 (D. Md. June 18, 2026)........ 10, 22

*United States v. Evans*,
No. 25-cv-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026)................................................. 9, 21, 33, 34, 51

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026)................................ 10, 21, 25, 26

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) ................. 5, 10, 39, 44, 46, 47, 53

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026) .............9, 22

*United States v. Hanzas*,
No. 2:25-cv-00903, 2026 WL 2754349
(D. Vt. Sep. 17, 2026)..........................................................9, 22, 25

*United States v. Hobbs*,
No. 3:25-cv-6078, 2026 WL 2833713
(W.D. Wash. Sep. 22, 2026).................................................9, 22, 52

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026)............9, 22

*United States v. Oliver*,
1:25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026) ..........9, 39, 48

*United States v. Oregon*,
828 F. Supp. 3d 1092
(D. Or. 2026) ......................6, 9, 12, 39, 41, 43, 45, 46, 49, 50, 52, 54, 55

*United States v. Powell*,
379 U.S. 48 (1964) ......................................................... 42, 43, 44, 53

*United States v. Raffensperger*,
No. 1:26-cv-485, 2026 WL 3002013 (N.D. Ga. Sep. 30, 2026) .........9, 60

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026) .......... 9, 22, 31

*United States v. Schmidt*,
No. 2:25-cv-1481, 2026 WL 1850016 (W.D. Pa. June 27, 2026) .... 10, 22

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) .......... 9

*United States v. Thomas*,
No. 3:26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026) .......... 9, 22

*United States v. Warner*,
No. 2:25-cv-156, 2026 WL 2018877
(S.D.W. Va. July 13, 2026) .......... 9, 46, 52

*United States v. Weber*,
816 F. Supp. 3d 1168
(C.D. Cal. 2026) .......... 9, 10, 13, 39, 40, 43, 46, 52, 53, 54, 55, 61

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) .......... 9, 22, 25, 26, 38

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) .......... 60

**Constitutional Provisions**

U.S. Const. Art. I, § 4, Cl. 1 .......... 59

**Statutes**

10 U.S.C. § 130c .......... 31, 32

26 U.S.C. § 7602 .......... 43

26 U.S.C. § 7604 .......... 42

26 U.S.C. § 7605 .......... 43

44 U.S.C. § 3301 .......... 30

44 U.S.C. § 3572 .......... 32, 33

5 U.S.C. § 208(b) .......... 18

5 U.S.C. § 552a .......... 18, 62

52 U.S.C. § 20501 .......... 5

52 U.S.C. § 20501(b)(4) .......... 5

52 U.S.C. § 20507 .......... 3, 5, 21, 23, 28, 52

52 U.S.C. § 20701 .......... 6

52 U.S.C. § 20701 .......... 4, 13, 19, 20, 21, 22, 23, 25, 27, 33, 34, 35, 36

52 U.S.C. § 20702 .......... 6, 24, 25

52 U.S.C. § 20703 .......... 6, 7, 29, 39, 45

52 U.S.C. § 20705 .......... 41, 42

52 U.S.C. § 21083 .......... 5

52 U.S.C. § 21085 .......... 5

Pub. L. No. 107-347 .......... 18, 62

Va. Code § 2.2-515.2 .......... 57

Va. Code § 24.2-404 .......... 21, 28, 57, 58

Va. Code § 24.2-404.1 .......... 21

Va. Code § 24.2-405 .......... 57

Va. Code § 24.2-406 .......... 27, 57, 58

Va. Code § 24.2-407.1 .......... 58

Va. Code § 24.2-418 .......... 57

Va. Code § 24.2-444 .......... 27, 38, 57

Va. Code § 24-1002.1 .......... 58

**Other Authorities**

@AAGDhillon, X.com (Dec. 15, 2025, 1:02 p.m.), https://x.com/AAGDhillon/status/1997003629442519114 .......... 11

ERIC, *What is ERIC?*, https://perma.cc/NY8B-6JDY .......... 58

Letter from Attorney General Pamela Bondi to Minnesota Governor Tim Walz (Jan. 24, 2026), https://perma.cc/84VH-ZK5Z .......... 11

Oxford English Dictionary (1933) .......... 20

U.S. Commission on Civil Rights, Report of the United States Commission on Civil Rights (Sep. 9, 1959) .......... 23, 25, 50

U.S. Court of Appeals for the Sixth Circuit, *Judges*, https://perma.cc/J7LZ-E9AE .......... 36

Webster's Third New International Dictionary (1961) .......... 20

## INTRODUCTION

Between September 2025 and April 2026, the U.S. Department of Justice ("DOJ") has sued at least 30 states and the District of Columbia for refusing to provide their complete and unredacted statewide voter registration lists to the U.S. Attorney General. All 27 courts that have decided the issue have ruled against the federal government. This is DOJ's 28th bite at the apple. In each case, DOJ has argued that the defendant states and election officials violated Title III of the Civil Rights Act by failing to disclose this sensitive data. That is wrong for several reasons, and the federal government presents no compelling reason why this Court should be the first to reach a contrary result.

The district court correctly dismissed the federal government's complaint after concluding Virginia's statewide voter registration list is not the type of "record" relating to a federal election that state election officials must preserve, retain, and make available for inspection under Title III. This Court can and should stop there, as the district court did.

To the extent this Court reaches the remaining issues presented on appeal, they provide only further independent bases to affirm, because the federal government must win each one of them to justify its

unprecedented attempt at intrusion on states' election functions. The federal government is not entitled to the complete, unredacted, statewide voter registration list that it seeks for at least two additional reasons. First, the federal government did not sufficiently state the basis or the purpose of the demand in writing—a prerequisite to states making any record available for inspection. The U.S. Attorney General's demand letter failed to state any factual basis for demanding Virginia's statewide voter registration list, and the stated purpose was both contrived and insufficient to require Virginia to make records available under Title III. Second, granting the federal government's requested relief would violate both state and federal law. For any of these reasons, this Court should affirm the district court's decision.

## ISSUES PRESENTED

1. Whether the demanded statewide voter registration list, which Virginia state election officials internally generate and must routinely update pursuant to their obligations under state and federal law, is a record that "come[s] into" an election officer's "possession" and is subject to preservation and retention obligations under Title III of the Civil Rights Act, 52 U.S.C. § 20701.

2. Whether the Attorney General's written demand for Virginia's statewide voter registration list contained a sufficient "statement of the basis and the purpose" for demanding Virginia's statewide voter registration list, as Title III of the Civil Rights Act requires.

3. Whether state or federal privacy laws prevent the federal government from demanding and obtaining the full, unredacted copy of Virginia's statewide voter registration list.

## STATEMENT

### A. The federal government seeks Virginia's full, current, unredacted statewide voter registration list

In July 2025, DOJ sent a letter to then-Commissioner of the Virginia Department of Elections Susan Beals. JA52–54 (the "July 2025 Request"). In the July 2025 Request, the U.S. Attorney General asks that the Virginia Department of Elections "produce for inspection the following records" pursuant to "Section 20507(i) of the [National Voter Registration Act ('NVRA')]":

> The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.

> Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

JA52. The July 2025 Request makes no reference to Title III of the Civil Rights Act and does not use the word "demand," nor does it state the basis or the purpose of the U.S. Attorney General's request for the statewide voter registration list. JA52–54.

In August 2025, DOJ sent a second letter to then-Commissioner Beals. JA56–58 (the "August 2025 Demand"). This time, in addition to invoking the NVRA and the Help America Vote Act ("HAVA"), the letter states that "the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ('CRA'), codified at 52 U.S.C. § 20701, et seq.," and that "the Attorney General is demanding an electronic copy of Virginia's complete and current [voter registration list]." JA56–57. The August 2025 Demand reiterates that the U.S. Attorney General requests a copy of the list that contains "*all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." JA57. The

August 2025 Demand includes no factual basis for the U.S. Attorney General's demand, and it asserts that "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." JA57.

The federal government alleges that, on January 8, 2026, "representatives for Commissioner Beals expressed in person that she would not be providing" the statewide voter registration list, and that, to date, the list "has not been provided to the United States." JA43.

### B. The federal government invokes three federal laws in its outreach about Virginia's voter registration list

DOJ's letters invoke three federal laws: the NVRA, HAVA, and Title III of the Civil Rights Act. The NVRA was enacted "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Similarly, HAVA regulates and requires states to maintain a "computerized statewide voter registration list." *Id.* § 21083 (a)(1)(A). Together, the NVRA and HAVA require states "to undertake an ongoing program of voter-list maintenance, though federal law largely leaves the finer details of list maintenance to the states' discretion." *United States v. Galvin*, 830 F. Supp. 3d 122, 125 (D. Mass. 2026) (citing 52 U.S.C. §§ 20507, 21083, 21085).

Title III of the Civil Rights Act provides the federal government with certain tools to root out racial discrimination in voting in federal elections and imposes a process by which the federal government can use those tools to investigate the infringement of voters' rights. *See United States v. Oregon*, 828 F. Supp. 3d 1092, 1097–98 (D. Or. 2026). First, Title III requires state election officers to retain certain records related to voting in a federal election for 22 months following the date of the federal election. 52 U.S.C. § 20701. Such "records" include, for instance, the registration application that a voter submits to state election officials. *Id.* Second, Title III imposes penalties for theft, destruction, or alteration of those covered records. *Id.* § 20702. Third, Title III requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "a statement of the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." *Id.* § 20703.

### C. The federal government brings this action, alleging a violation of Title III of the Civil Rights Act

DOJ filed its initial complaint against then-Commissioner Susan Beals on January 16, 2026. JA19. On March 19, 2026, DOJ filed an

amended complaint, which named current Commissioner of the Virginia Department of Elections Steven Koski as the defendant in former Commissioner Beals' stead. JA37–45.

The amended complaint alleges one cause of action: a violation of the Civil Rights Act, 52 U.S.C. §§ 20703. JA44. The complaint seeks the following relief: a declaration that Commissioner Koski violated the Civil Rights Act by refusing to provide the requested records, and an order requiring Commissioner Koski "to provide to the Attorney General the current electronic copy of Virginia's computerized voter registration list, with all fields," including the "full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier" for each registered voter. JA44.

Shortly after filing the amended complaint, DOJ filed a motion to compel the production of the statewide voter registration list. JA47–50. This motion sought all of the relief requested in the complaint: a declaration that "Commissioner Koski's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703," and an order requiring

Commissioner Koski to produce "the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." JA48.

### D. Contemporaneously, the federal government brings actions seeking the voter registration lists of at least 30 other states

This action is one of at least 30 that DOJ has filed against states and the District of Columbia in recent months.[1] Each of the 26 district

---

[1] *United States v. Bellows*, No. 25-cv-468 (D. Me.); *United States v. Oregon*, No. 25-cv-1666 (D. Or.) (filed Sep. 16, 2025); *United States v. Benson*, No. 25-cv-1148 (W.D. Mich.); *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338 (N.D.N.Y.); *United States v. Pennsylvania*, No. 25-cv-1481 (W.D. Pa.); *United States v. N.H. Secretary of State*, No. 25-cv-371 (D.N.H); *United States v. Simon*, No. 25-cv-3761 (D. Minn.); *United States v. Weber*, No. 25-cv-9149 (C.D. Cal.); *United States v. DeMarinis*, No. 25-cv-3934 (D. Md.); *United States v. Hanzas*, No. 25-cv-903 (D. Vt.); *United States v. Albence*, No. 25-cv-1453 (D. Del.); *United States v. Amore*, No. 25-cv-639 (D.R.I.); *United States v. Hobbs*, No. 25-cv-6078 (W.D. Wash.); *United States v. Oliver*, No. 25-cv-1193 (D.N.M.); *United States v. Galvin*, No. 25-cv-13816 (D. Mass.); *United States v. Griswold*, No. 25-cv-3967 (D. Colo.); *United States v. Nago*, No. 25-cv-522 (D. Haw.); *United States v. Evans*, No. 25-cv-4403 (D.D.C.); *United States v. Matthews*, No. 25-cv-3398 (C.D. Ill.); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036 (W.D. Wis.); *United States v. Fontes*, No. 26-cv-66 (D. Ariz.); *United States v. Thomas*, No. 26-cv-21 (D. Conn.); *United States v. Beals*, No. 26-

courts that has considered and addressed whether the federal government failed to state a claim under Title III of the Civil Rights Act has dismissed the federal government's claim.[2] And the only federal

cv-42 (E.D. Va.); *United States v. Raffensperger*, No. 26-cv-485 (N.D. Ga.); *United States v. Adams*, No. 26-cv-19 (E.D. Ky.); *United States v. Caldwell*, No. 26-cv-2025 (D.N.J.); *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla.); *United States v. Henderson*, No. 26-cv-166 (D. Utah); *United States v. Warner*, No. 26-cv-156 (D.W.V.); *United States v. McGrane*, 26-cv-197 (D. Idaho).

[2] JA1–13; *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) ("*Benson I*"), *aff'd*, 179 F.4th 470 (6th Cir. 2026) ("*Benson II*"), *reh'g denied*, 187 F.4th 462 (6th Cir. 2026) ("*Benson III*"); *United States v. Raffensperger*, No. 1:26-cv-485, 2026 WL 3002013 (N.D. Ga. Sept. 30, 2026); *United States v. Hobbs*, No. 3:25-cv-6078, 2026 WL 2833713 (W.D. Wash. Sep. 22, 2026); *United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Hanzas*, No. 2:25-cv-00903, 2026 WL 2754349 (D. Vt. Sep. 17, 2026); *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 3:25-cv-00728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. 25-cv-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, 837 F. Supp. 3d 881 (E.D. Ky. 2026); *United States v. Thomas*, No. 3:26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, No. 1:25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Warner*, No. 2:25-cv-156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.,* No. 1:25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, 838 F. Supp. 3d 150 (D.N.H. 2026); *United States v. Schmidt*, No. 2:25-cv-1481, 2026 WL

court of appeals to have considered the issue has affirmed. *Benson II*, 179 F.4th 470 (6th Cir.), *reh'g denied*, 187 F.4th 462 (6th Cir. 2026).

As one federal court considering a parallel action has judicially noticed: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *United States v. Weber*, 816 F. Supp. 3d 1168, 1185 (C.D. Cal. 2026) (collecting citations).

Recorded, public statements by the federal government's counsel in this litigation further indicate that DOJ seeks to collect and aggregate states' voter rolls. *Compare* Br. 80[3] (counsel signature block), *with* @AAGDhillon, X.com (Dec. 15, 2025, 1:02 p.m.), https://x.com/

---

1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, No. 1:25-cv-2934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026).

[3] All citations to the opening brief use the ECF-generated page numbers.

AAGDhillon/status/1997003629442519114. Assistant Attorney General Dhillon's post admitted that federal government had "reached out to all 50 states" demanding their voter rolls. *Id.* at 00:15. It then described the 15 lawsuits pending at the time of the post and assured that the federal government would "get to the rest of the states." *Id.* at 01:14. It noted that the federal government had received voluntary disclosures from several states and checked over 40 million voter records. *Id.* at 01:20. Then, tellingly, it proceeded to *aggregate the data* it had amassed from the voluntary disclosure states. *See id.* at 01:25 (asserting more than 20,000 "dead people" and "several thousand non-citizens" across those states' voter rolls). The post concluded by promising that federal government "will not rest" until it completes "this project." *Id.* at 02:04.

In January 2026, then-U.S. Attorney General Bondi tied her demands for state voter rolls directly to immigration enforcement in a letter to Minnesota Governor Tim Walz. Ltr. from U.S. Attorney General Pamela Bondi to Minn. Governor Tim Walz (Jan. 24, 2026), https://perma.cc/84VH-ZK5Z ("Bondi Minn. Ltr."). "The letter details the Attorney General's views about the state of 'lawlessness' regarding immigration enforcement in Minnesota and concludes with a list of

demands to 'restore the rule of law' through 'common sense solutions,'" including "a demand for Minnesota to 'allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960.'" *Oregon*, 828 F. Supp. 3d at 1106–07 (noticing same letter from U.S. Attorney General Bondi).

The federal government's counsel has also admitted this additional purpose of immigration enforcement in the context of parallel litigation. At a hearing involving the federal government's lawsuit seeking Rhode Island's voter registration list, the district court asked whether DOJ can "take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens,'" and counsel for the federal government responded: "In compliance with all federal laws, yes, *and we intend to do so*." ECF No. 47 at 65, *United States v. Amore*, No. 25-cv-00639 (D.R.I. Mar. 30, 2026) (emphasis added).

DOJ's representations of a broader purpose for collecting states' voter rolls are consistent with judicially noticeable reports from other federal agencies that "point to the federal government laying the groundwork to amass the personal information of millions of Americans

in a centralized database," including by enlisting technology company Palantir to "build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services," and by pressuring states to disclose to the federal government other "sensitive information from programs like the Supplemental Nutritional Assistance Program (SNAP), as well as data from Medicaid." *Weber*, 816 F. Supp. 3d at 1185.

### E. The district court dismisses the federal government's complaint and denies the motion to compel

The district court concluded that Virginia's statewide voter registration list "is not the type of 'record' relating to a federal election that State election officials must make available for inspection under Title III of the Civil Rights Act. JA6, JA8.

Because the Civil Rights Act does not define what it means for records or papers to "come into [the] possession" of an officer of election, *see* 52 U.S.C. §§ 20701, *et seq.*, the Court "assign[ed] the phrase its ordinary meaning." JA8. "Around the time that Congress enacted Title III, the phrase 'come into . . . possession' meant to 'acquire,' 'obtain,' or 'receive.'" JA9. But Virginia's election officials did not acquire, obtain,

or receive Virginia's statewide voter registration list: rather, "as mandated by the HAVA," "Virginia election officials created the database themselves." JA9. Like other courts that have considered the issue, the district court explained that an "ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained," because "[c]oming into possession of something most naturally implies receipt from an external source." JA9 (citations and quotation marks omitted). The district court recognized that this ordinary meaning also comported with other aspects of the statutory text and overall statutory scheme. JA9–10. And it rejected the federal government's contrary reading, which conflicted with the statutory text and core canons of construction. JA10–11.

Having concluded that Virginia's statewide voter registration list is not a record subject to production under Title III, the district court determined that holding was "dispositive" as to both the motion to dismiss and motion to compel, and it did not reach the remaining arguments raised by the parties. JA6, JA12–13. The district court granted the motion to dismiss with prejudice, and it denied the motion to compel. JA14.

## STANDARD OF REVIEW

In appeals from orders granting motions to dismiss for failure to state a claim, this Court applies a *de novo* standard of review. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021).

## SUMMARY OF ARGUMENT

This Court should affirm on the straightforward ground that the district court addressed: that the demanded statewide voter registration list is not a "record" within the meaning of Title III of the Civil Rights Act. Title III requires state election officials to retain and preserve only records that "come into [the] possession" of state election officials. Both dictionary definitions and the broader statutory context and structure confirm that Title III covers records that election officials acquire from an external source, not records like the statewide voter registration list that are internally generated and routinely updated by state election officials. And the other federal statutes that the federal government invokes as guidance here only strengthen the conclusion that Congress knows how to attach obligations to a broader set of documents that are received *or made* by an agency, and that Congress's choice to instead use

the "come into . . . possession" language most naturally refers to the acquisition of documents from an external source.

Even setting aside the "come into . . . possession" limitation, the federal government's demand separately flunked Title III's requirement that the record must be related to a federal election that took place in the preceding 22 months. Rather than requesting the underlying voter registration records submitted in advance of the 2024 election, or even an aggregated list of voters who participated in that election, the federal government sought the "current" snapshot of the voter registration list as of July or August 2025. That "current" list necessarily reflects a set of registrants that has changed since the most recent federal election, consistent with state election officials' obligations under other state and federal elections statutes. This defect alone knocks down nearly all of the federal government's counterarguments, none of which should persuade this Court to be the first of nearly thirty courts to permit the federal government's demand for the current, complete, and unredacted statewide voter registration list.

To the extent this Court reaches the remaining issues presented on appeal—though it need not—it should affirm on either or both grounds.

First, the U.S. Attorney General's written demand lacks a sufficient basis and purpose. Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding a state's records. This Court can adjudicate the legal sufficiency of the basis and the purpose provided in the U.S. Attorney General's written demand for records, and both are lacking here.

The August 2025 Demand—the only "written demand" that the U.S. Attorney General submitted—provided no factual basis whatsoever for demanding Virginia's complete and unredacted statewide voter registration list, and the only factual basis described in the July 2025 Request bears no relationship to the information contained in the current version of the statewide voter registration list that the federal government sought. And neither the July 2025 Request nor the August 2025 Demand indicated that the federal government's purpose was to address any of the purposes underlying Title III, such as investigating discrimination or violations of individuals' voting rights. Worse yet, the federal government's public representations make clear that the U.S. Attorney General's written demand does not state "the" purpose for the requests, as the correspondence in the record omits the federal

government's since-repeated public acknowledgements that states' voter rolls are being sought to compile a national database with millions of voters' private information.

Second, the U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates both state and federal law. Virginia law prohibits state election officials from sharing much of the sensitive information that the U.S. Attorney General has demanded, including voters' social security numbers and driver's license numbers, and nothing in Title III preempts the privacy protections embedded in Virginia law. The U.S. Attorney General's demand also failed to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002, which respectively prohibit federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" in most circumstances, 5 U.S.C. § 552a(e)(7), and require the federal government to conduct a privacy-impact assessment before collecting certain types of identifiable information en masse, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921–23 (2002).

This Court should affirm.

# ARGUMENT

## I. The statewide voter registration list that the U.S. Attorney General demands is not a "record" within the meaning of Title III of the Civil Rights Act

### A. The statutory text covers only records that "came into [the] possession" of state election officials, not records generated and maintained by state election officials

The information that DOJ seeks from Virginia is not the type of "record" that Title III requires preserving or making available for inspection by the U.S. Attorney General. It is undisputed that the U.S. Attorney General may demand only the records described in 52 U.S.C. § 20701. That provision requires state officers of elections to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election for a period of 22 months following the date of the federal election. 52 U.S.C. § 20701.

The text of 52 U.S.C. § 20701 does not cover the statewide voter registration list that the federal government seeks. Statutory interpretation begins with the text, read in light of "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S.

337, 340–41 (1997). The statutory text, its context, and the broader statutory scheme all confirm the district court's interpretation.

Starting with the language itself, Virginia's statewide voter registration list would not naturally be understood to have "come into [the] possession" of Virginia's elections officials. 52 U.S.C. § 20701. "[C]ourts 'must give effect, if possible, to every clause and word of a statute,'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted), including the words "come into . . . possession" in 52 U.S.C. § 20701. And because Title III does not define the term "come into . . . possession," this Court should look to that phrase's ordinary meaning: to "acquire," "obtain," or "receive." *Benson II*, 179 F.4th at 478 (citing *Honeycutt v. United States*, 581 U.S 443, 449 (2017)); *see* "Acquire," Webster's Third New International Dictionary 18 (1961) ("to come into possession, control, or power of disposal of"); "Obtain," 7 Oxford English Dictionary 37 (1933) ("to come into the possession or enjoyment of (something)"); "Receive," Webster's Third New International Dictionary 1894 (1961) ("to come into possession of: acquire"). These definitions confirm that the phrase "come into . . . possession" naturally refers to the acquisition of an item from "an outside source." *Benson II*, 179 F.4th at

479; *see also Benson I*, 819 F. Supp. 3d at 768 (the phrase "come into . . . possession" "naturally refers to a process by which someone *acquires* an item from an external source").

Properly understood, then, the statewide voter registration list that the federal government seeks did not "come into" Virginia state election officials' possession. No "third party" or "outside source" submits the list to Virginia's election officials, *id.* at 478–79; rather, Virginia's election officials themselves create and maintain the list, pursuant to their obligations under both state and federal law. *See* Va. Code §§ 24.2-404, 24.2-404.1; 52 U.S.C. §§ 20507, 21083, 21085. The "come into . . . possession" limitation therefore places the statewide voter registration list outside the scope of the records that the U.S. Attorney General can demand.

The district court therefore correctly interpreted 52 U.S.C. § 20701 to exclude records that were created by state election officials, as have other federal courts considering the federal government's parallel lawsuits. JA6, JA8–11; *see also Benson I*, 819 F. Supp. 3d at 768–70; *Fontes*, 832 F. Supp. 3d 944, 949–54; *Adams*, 837 F. Supp. 3d at 886–87; *Caldwell*, 2026 WL 2186515, at *6–8; *Evans*, 2026 WL 2267774, at *6–8;

*DeMarinis*, 2026 WL 1780586, at *4–5; *Hanzas*, 2026 WL 2754349, at *4; *Hobbs*, 2026 WL 2833713, at *4; *Matthews*, 2026 WL 2212877, at *3–4; *Thomas*, 2026 WL 2070437, at *4–7; *Scanlan*, 838 F. Supp. 3d at 155–59; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 953–55; *Bellows*, 834 F. Supp. 3d at 122–23; *Griswold*, 2026 WL 2235374, at *12; *Bd. of Elections of the State of N.Y.*, 2026 WL 1999921, at *9; *Schmidt*, 2026 WL 1850016, at *2.

### B. The broader statutory context confirms that Title III does not cover the statewide voter registration list

Both the context immediately surrounding the "come into . . . possession" language and the broader statutory scheme support interpreting Title III to exclude the statewide voter registration list that the U.S. Attorney General demanded here, for at least three independent reasons.

First, the words in the statute immediately following "all records and papers which come into his possession" are "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Consistent with the statute's use of "come into . . . possession," each of the examples provided within the statute refers to records that election officials "obtain . . . from third

parties—generally voters or prospective voters." *Benson II*, 179 F.4th at 479. For example, the Sixth Circuit noted in *Benson II* that, in the years leading up to Title III's passage, voters in Virginia and other states were required to provide election officials with a receipt reflecting their payment of the poll tax before they could vote. 179 F.4th at 479 (citing U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights (Sep. 9, 1959), at 32, 34, 36–38, 59–60). "After the passage of Title III, election officers would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

Second, the statewide voter registration list is not a static record that election officials can "retain and preserve." 52 U.S.C. § 20701. Rather, federal law obligates state election officials to make regular modifications to the list. For instance, the NVRA requires states to "protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll." 52 U.S.C. § 20507(b) (emphasis added). And HAVA requires states to "implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name

and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State," 52 U.S.C. § 21083(a)(1)(A), and to "perform list maintenance with respect to the computerized list on a regular basis," 52 U.S.C. § 21083(a)(2)(B) (emphasis added). It does not make sense to read Section 20701 to require state election officials to "retain and preserve . . . for a period of twenty-two months" a list that undergoes such regular changes.

Third, the broader statutory scheme confirms the district court's interpretation, particularly when considering the interaction between Title III and other federal elections statutes. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The very next section of Title III criminalizes "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or alter[ing] any record or paper required by section 20701 of this title to be retained and preserved." 52 U.S.C. § 20702. If the statewide voter registration list is such a record, then Title III would forbid state election officials from altering it. *See*

52 U.S.C. §§ 20701, 20702. But, as discussed above, both the NVRA and HAVA "affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Fontes*, 832 F. Supp. 3d at 951. As a result, interpreting Section 20701 to require retention and preservation of statewide voter registration lists would place Section 20701's preservation and retention requirement in direct conflict with the NVRA and HAVA and with "the very purpose" of maintaining voter registration lists. *Id.* at 950; *see also Wis. Elections Comm'n*, 833 F. Supp. 3d at 954–55; *Hanzas*, 2026 WL 2754349, at *5.

Finally, an understanding of Section 20701 that captures records submitted by voters, rather than created by election officials, comports with the backdrop against which Title III was enacted. "[W]hen the [Civil Rights Act] was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Benson I*, 819 F. Supp. 3d at 769; *see* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights at 93 (Sep. 9, 1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the

records impossible."). Requiring states to preserve records that voters submitted to them would directly respond to that frustration of the federal government's effort to enforce voting rights. *See also Benson I*, 819 F. Supp. 3d at 769 ("Given this understanding, the distinction between applications and a voter list is perfectly logical: a voter application can be examined to determine whether it was unlawfully rejected, whereas a list of those who successfully registered to vote would be little help in such an investigation.").

Against this backdrop, the district court and other courts have concluded that Section 20701's focus on records that "come into [the] possession" of state election officials refers "only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Id.* at 768; *Benson II,* 179 F.4th at 479 ("the qualified voter file did not 'come into [the official's] possession' as that term is ordinarily understood"); *Fontes*, 832 F. Supp. 3d at 949-50, 953; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 953–54; *Bellows*, 834 F. Supp. 3d at 123. This Court should affirm.

### C. The U.S. Attorney General's demand separately flunks Title III's requirement that the record is related to a particular federal election

Even if a statewide voter registration list could ever be considered a covered record, the U.S. Attorney General's effort to obtain Virginia's "current" statewide voter registration list as of July or August 2025 falls outside of Title III's ambit. Section 20701 requires state election officials to retain and preserve covered records "relating to any application, registration, payment of poll tax, or other act requisite to voting in" in a *specific set of* elections in the preceding 22 months: i.e., "any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for." 52 U.S.C. § 20701.

The statewide voter registration list that the federal government seeks is untethered from the only federal election conducted in the 22 months before the demand. The written demand does not seek the underlying voter registration records submitted in advance of the 2024 election, *see* Va. Code § 24.2-444, or even an aggregated list of voters who participated in that election, *see id.* § 24.2-406. Instead, both DOJ letters

seek the "current" statewide voter registration list as of July or August 2025. *See* JA52, JA57.

Pursuant to state election officials' obligations under both state and federal law, the statewide voter registration list undergoes regular changes. *See supra* Argument 1.B; *see also, e.g.*, Va. Code § 24.2-404 (requiring election officials "to change or correct registration records as necessary" within the central recordkeeping system, including to add newly registered voters and remove voters who are no longer qualified to vote); 52 U.S.C. § 20507(b) (requiring state election officials to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters); 52 U.S.C. § 21083(a)(2)(B) (requiring state election officials to perform list maintenance with respect to the computerized statewide voter registration list on a regular basis). Because of these changes, the statewide voter registration list as of July or August 2025 will necessarily reflect a compilation of registrants that is different from the set that registered for or participated in the November 2024 election. As a result, the "current" list that the federal government seeks is not a "record or

paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" in the 2024 election. *See* 52 U.S.C. § 20703.

### D. The federal government's counterarguments are unpersuasive

Most of the federal government's counterarguments run into the same problem: they would require this Court to ignore the statutory limitation imposed by the "come into . . . possession" language. "This is almost never a path to a proper statutory construction." *Caldwell*, 2026 WL 2186515, at *7.

For instance, the federal government argues that the surrounding phrases—"all records" and "relating to" certain voting acts—are broad. Br. 34–35. The breadth of those phrases is irrelevant to the independent statutory requirement that only records that "come into [an official's] possession" count. "Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are superfluous or void of significance." *Dep't of Agric. Rural Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Adopting a construction that subjects all voting records and papers in the election officers' possession to Title III's requirements would render "come into" superfluous.

Congress knows how to broaden the scope of demandable records, but it did not do so here.

In its continuing effort to avoid Title III's text, the federal government tries to misdirect this Court's attention to courts' interpretation of different statutes that do not contain the "come into his possession" language at issue in this case. For example, in a case on which the federal government relies (at 33), the Supreme Court interpreted a definition of "agency records" in FOIA that included "documentary materials, regardless of physical form or characteristics, *made or received* by an agency . . ." *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 145 (1989) (quoting 44 U.S.C. § 3301) (emphasis added). That drafting distinction only strengthens the district court's conclusion here. Congress could have drafted Title III to permit the Attorney General to demand "all records made or received by" an election official. Instead, it chose language that authorized only the latter category. If the federal government wants authorization to compel production of a document that Virginia election officials *made*, it should ask Congress, not this Court, to amend the statute.

The federal government also cites a smattering of other federal statutes that use the phrase "come into . . . possession" of certain information. Br. 36. Curiously, it asserts that those statutes impose no limitation on the "source, origin, or author" of the information. Br. 36. It cites no case law or other authority, however, explaining why "come into . . . possession" should not be read to include such a limitation in those statutes. And as with Title III, the text of those statutes, too, indicates that the "come into . . . possession" phrase refers to information acquired from an external source. *See Scanlan*, 838 F. Supp. 3d at 158 (collecting statutes in which Congress "employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source").

For example, the federal government invokes 10 U.S.C. § 130c, which addresses the circumstances in which a national security official can "withhold from public disclosure otherwise required by law sensitive information of foreign governments," and discusses obligations when such information "came into the possession" of the U.S. government by a date certain. That statute defines "sensitive information of a foreign

government" to include only information that meets the following criteria:

- The information "was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization";
- "the foreign government or international organization is withholding" from public disclosure; *and*
- the foreign government or international organization either "requests, in writing, that the information be withheld" or "provided or made available" the information "to the United States Government on the condition that it not be released to the public," or the release of the information "would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future."

*Id.* § 130c(b). The statute therefore clearly contemplates that the information that "came into the possession" of the national security officer was from an external source.

The federal government also invokes 44 U.S.C. § 3572, which imposes fines and penalties when an "employee, or agent of an agency acquiring information for exclusively statistical purposes . . . comes into possession of such information" and improperly discloses such information. *Id.* § 3572(f). Again, the statute repeatedly describes the information at issue as exclusively information that the agency receives from an external source. *See id.* § 3572(a) ("information supplied by

individuals or organizations to an agency for statistical purposes under a pledge of confidentiality . . . exclusively for statistical purposes."); *see also id.* ("Data or information acquired by an agency under a pledge of confidentiality and for exclusively statistical purposes"). These statutes, too, bolster the district court's conclusion rather than undermine it.

Next, the federal government tries to construe the words "come into his possession" as a "temporal" distinction, citing Judge Nalbandian's dissent from the Sixth Circuit's *Benson II* decision. Br. 35–39. But as the *Benson II* majority and other courts have recognized, "that argument doesn't square with the plain language of the statute." *Wis. Elections Comm'n*, 833 F. Supp. 3d at 954; *see also Benson II*, 179 F.4th at 481; *Evans*, 2026 WL 2267774, at *7. Title III already has a separate, express temporal requirement: "for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for." 52 U.S.C. § 20701. Per the statute's text, the "time limit runs from the date of the election, not the date that the records came into election

officers' possession." *Wis. Elections Comm'n*, 833 F. Supp. 3d at 954. By contrast, "the phrase 'records and papers which come into his possession' says nothing about when or how the Board acquires the records and papers." *Evans*, 2026 WL 2267774, at *7.

Moreover, even *accepting* the federal government's "temporal" construction (though it is wrong) would require affirming the dismissal of its complaint. The federal government argues that Title III "places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only 'for a period of twenty-two months from the date' of that same election." Br. 37 (citing 52 U.S.C. § 20701). That construction is fatal to its claim. As explained above, *supra* Argument I.C, the federal government's complaint does not and cannot allege that Virginia's elections officials came into the possession of a voter registration list that is "current" as of July or August 2025 in the course of administering the 2024 election.

The federal government's attempt to argue that the statewide voter registration list came into Commissioner Koski's possession "when he received it from someone else in his office, or when he assumed office"

runs into the same problem. Br. 46. To start, these are factual assertions, which are nowhere pleaded in the federal government's amended complaint. The amended complaint does, however, allege that Commissioner Koski did not assume office until 2026, JA39, JA43, rendering it impossible that he came into possession of the list "in the course of administering" the 2024 election. *Cf.* Br. 37.

For similar reasons, the federal government's arguments that "[p]erforming list maintenance under the NVRA and HAVA" amounts to "retain[ing] and preserv[ing]," rather than "alter[ing]," the statewide voter registration list cannot be squared with the statutory text. Br. 43–44. Title III requires election officials to retain certain records relating to a particular federal election. 52 U.S.C. § 20701. If state election officials had an obligation to retain or preserve a statewide voter registration list that relates to an election that has already been carried out, then adding, removing, and revising information about voters whose registration status changes *after* that election does not retain or preserve the list relating to the federal election; it alters the list.

Nor can the federal government's claim that a "majority of judges on the Sixth Circuit have determined that Title III of the CRA can be

harmonized with the list maintenance requirements of the NVRA and HAVA to capture the [statewide voter registration list] in some form or another" support its argument here. Br. 42. As an initial matter, the Sixth Circuit denied the federal government's petition to rehear the appeal of the dismissal of its parallel complaint in Michigan, because "[l]ess than a majority of the judges" on the full court "voted in favor of rehearing en banc." *Benson III*, 187 F.4th at 463. And of the 17 Sixth Circuit judges considering the en banc petition—the fifteen active judges,[4] then-Chief Judge Sutton, and Senior Judge Cole—five judges authored or joined decisions dissenting from the order denying rehearing en banc. In contrast, the three judges who concurred in the denial of rehearing expressed their view that "neither the majority nor the dissent [in the panel opinion] treated the item that the DOJ requested—the 'current snapshot of eligible voters' as of July 21, 2025—as subject to preservation under § 20701," and that the U.S. Attorney General should send a new letter demanding the "*underlying* individual records" to avoid the "problem" created by treating "the entire statewide list . . . as a record

[4] U.S. Court of Appeals for the Sixth Circuit, *Judges*, https://perma.cc/J7LZ-E9AE.

that election officers must preserve." *Benson III*, 187 F.4th 462, 466 (6th Cir. 2026) (Murphy, J., concurring); *see also id.* at 468 (Murphy, J., concurring) ("Between [November 2024 and July 2025], however, officials likely would have updated this list countless times in preparation for the next election. Voters who moved out of state or who died since November 2024 would have been removed. And voters who moved in or registered for the first time would have been added. So if the entire statewide list qualifies as one 'record,' the list from July 2025 may well not 'relat[e] to' the prior election."). Because the U.S. Attorney General made the same, plainly defective demand here, this Court should affirm, just as the Sixth Circuit did.

Finally, the federal government resorts to parade-of-horribles arguments about the consequences of giving the statutory text its natural meaning. *E.g.*, Br. 40, 42–43, 47–50. Even if its predictions were accurate, such consequences could not override the text Congress chose. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest."). But the federal government has the added problem of lacking support for its conclusions. For instance, the

federal government asserts, without any support, that reading the statute to exempt voter registration lists from production would have dire consequences, because "county voter registration lists have been replaced by the self-generated electronic state voter registration list as required by HAVA." Br. 49. But Virginia law requires general registrars to keep and preserve registration records, separate and apart from the Department of Election's obligations with respect to the voter registration list. *See* Va. Code § 24.2-444. Other courts have declined the federal government's invitation to distort the statutory text based on unsupported consequentialist arguments. *See Wis. Elections Comm'n*, 833 F. Supp. 3d at 954–55.

## II. The U.S. Attorney General's written demand lacks a sufficient basis and purpose under Title III of the Civil Rights Act

### A. Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding a state's records

Title III requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such

custodian by the Attorney General or his representative." 52 U.S.C. § 20703. "The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 816 F. Supp. 3d at 1184. "Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand." *Id.*

Title III's "statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 830 F. Supp. 3d at 128. "The text repeats the definite article 'the' before 'basis' and 'purpose,' and it uses the conjunctive 'and' to join them." *Id.*; *see also Oliver*, 2026 WL 2031479, at *9. When "'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'" *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930). Accordingly, the U.S. Attorney General "is required to offer a written statement of *both* the purpose and basis for its demands." *Weber*, 816 F. Supp. 3d at 1182 (emphasis in original); *Oregon*, 828 F. Supp. 3d at 1103–05; *Galvin*, 830 F. Supp. 3d at 128–29; *Amore*, 831 F. Supp. 3d at 156–57.

This reading of the independent "basis" and "purpose" requirements is "consistent with the line of Fifth Circuit cases, most notably [*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)], upon which the United States presses the Court to rely here." *Amore*, 831 F. Supp. 3d at 157; *Weber*, 816 F. Supp. 3d at 1182–83; *see also* JA37–39 (amended complaint, invoking *Lynd*). The U.S. Attorney General's demand letter in *Lynd* provided the factual basis for his demand, stating: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 226 n.6. And it provided the legal purpose of his demand, stating: "The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Id.* *See also Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (stating same basis and purpose); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (stating same basis and purpose), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

### B. This Court can adjudicate the legal sufficiency of the basis and the purpose provided in the U.S. Attorney General's written demand for records

The federal government's briefing devotes significant space to the assertion in its complaint that, despite its invocation of a federal court's jurisdiction, a court cannot "adjudicate 'the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand' or 'the scope of the order to produce.'" JA38–39 (quoting *Lynd*, 306 F.2d at 226); Br. 52–62. Supreme Court precedent post-dating the handful of non-binding cases that the federal government cites establishes that a court's role "is not so limited." *Oregon*, 828 F. Supp. 3d at 1102; *see also Amore*, 831 F. Supp. 3d at 155.

Title III provides that the "United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Title III's use of the phrase "by appropriate process" makes plain that some measure of judicial scrutiny is required to test the sufficiency of the "statement of the basis and the purpose" that the U.S. Attorney General submits in the

written demand. *See Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (courts "generally presum[e] that statutes do not contain surplusage") (citation and quotation marks omitted)).

Although Title III does not define "appropriate process," the Supreme Court has interpreted identical language in the Internal Revenue Code, 26 U.S.C. § 7604(a). *United States v. Powell*, 379 U.S. 48, 58 & n.18 (1964); *compare* 52 U.S.C. § 20705, *with* 26 U.S.C. § 7604(a) ("If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)). And in *Powell*, the Supreme Court concluded that, "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," and courts may "inquire into the underlying reasons for the examination [of records]." 379 U.S. at 58 & n.18.

As a result, several other district courts adjudicating the federal government's parallel lawsuits have concluded that "[n]othing in the text

of Title III requires a special statutory proceeding or any abbreviated procedures," *Weber*, 816 F. Supp. 3d at 1182 & n.15, and have accordingly "applie[d] the Federal Rules of Civil Procedure as in any other case." *Oregon*, 828 F. Supp. 3d at 1102–03; *see also Amore*, 831 F. Supp. 3d at 155. The federal government's contrary argument is especially unpersuasive in light of its "affirmative choice to file a complaint and proceed through ordinary litigation" under the very process contemplated by the Federal Rules of Civil Procedure. *Oregon*, 828 F. Supp. 3d at 1103 n.1.

The federal government's attempt on appeal to distinguish the Supreme Court's discussion in *Powell* of the "appropriate process" available is misguided. It focuses on the fact that a different statute in the Internal Revenue Code provides the Secretary with authority to "examine any books, papers, records, or other data which may be relevant or material to such inquiry," Br. 57 (quoting *Powell*, 379 U.S. at 53 n.12, which was quoting 26 U.S.C. § 7602), and a third statute in the Internal Revenue Code "required the time and place of examination to be 'reasonable under the circumstances,'" Br. 58 (quoting 26 U.S.C. § 7605(a))—whereas Title III contains a more specific "set of records and

papers" that the Attorney General can demand and does not invite an assessment of relevance, materiality, or reasonableness, Br. 56–57.

But the Supreme Court's determination that courts can "inquire into the underlying reasons for the examination" did not stem from the scope of the records that the government could request under the Internal Revenue Code. *Powell*, 379 U.S. at 58. Rather, the Supreme Court reasoned that "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused"—a maxim that holds true across both sets of statutes. *Id.* This Court therefore can affirm on the alternative ground that the federal government has failed as a matter of law to provide the statement of the basis and the purpose of the demand that Section 20703 requires.

### C. The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted

To ascertain whether the written demand contained the requisite basis and purpose, the Court must first identify the written demand. Title III's text makes clear that "the 'demand in writing' must 'contain a statement of the basis and the purpose.'" *Galvin*, 830 F. Supp. 3d at 128. "The statute therefore "directs the Court to the Attorney General's written demand," *id.*, to determine whether that demand "contain[ed] a

statement of the basis and the purpose" for the demand, 52 U.S.C. § 20703. *See also Oregon*, 828 F. Supp. 3d at 1103–05 (rejecting United States' "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'").

The written demand appears only in the August 2025 Demand. *See* JA57 ("Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Virginia's complete and current VRL."). The July 2025 Request, in contrast, contains no demand, nor does it even invoke Title III of the Civil Rights Act. *See* JA52 ("We write to you as the chief election official for the Commonwealth of Virginia to request information . . ."); *id.* ("the Attorney General requests that you produce for inspection . . ."). As a result, only the August 2025 Demand can fairly be construed as a written demand for records pursuant to Title III, and this Court should look to only that document to assess whether the U.S. Attorney General's written demand complied with 52 U.S.C. § 20703.

### D. The U.S. Attorney General's written demand provides no factual basis for demanding Virginia's complete and unredacted statewide voter registration list

The requisite "basis" to support a demand for records under Title III is "a factual basis for investigating a violation of a federal statute." *Oregon*, 828 F. Supp. 3d at 1104; *see also Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Galvin*, 830 F. Supp. 3d at 127 (collecting definitions of "basis"); *Warner*, 2026 WL 2018877, at *4–5 (similar). "Put simply, the statute requires a statement of *why* the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 830 F. Supp. 3d at 127 (emphasis in original).

The August 2025 Demand contains "nothing that could fairly be characterized as the factual basis for the demand." *Galvin*, 830 F. Supp. 3d at 129 (finding the same of a virtually identical letter to Massachusetts state election official). Indeed, the federal government's only effort to pin down a factual basis in the August 2025 Demand—*i.e.*,

its assertion that the August 2025 Demand "referenced that Virginia had failed to respond to the July 15 letter by the deadline set in the July letter," Br. 63—directly conflicts with the text of the August 2025 Demand, which states: "We understand that the time the Justice Department has provided your state to respond to the request for a statewide voter registration list ('VRL') and other information has *not* reached its deadline." JA56 (emphasis added). The absence of a factual basis in the written demand is sufficient reason to affirm.

To the extent that this Court considers whether the facts recited in the July 2025 Request could form the requisite basis, those facts remain inadequate. That letter, too, contains neither "the word 'basis' or any equivalent phrase (e.g., 'based upon')." *Galvin*, 830 F. Supp. 3d at 129; *compare Lynd*, 306 F.2d at 229 n.6, *with* JA52–54. And the only facts that the July 2025 Request discusses relate to the responses that Virginia itself provided in response to the Election Assistance Commission's Election Administration and Voting Survey, based on records from the "close of registration for the November 2022 general election through the close of registration for the November 2024 general election." JA53. After reciting those facts, the July 2025 Request asks the Commissioner

to explain Virginia's practices with respect to removing people from its voter rolls and to provide information "regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act." JA52–53. But it does not assert that Virginia has employed any practices that violate the NVRA—much less connect the facts it recites to the racially discriminatory voting practices and infringement of voters' rights that Title III prohibits. Nor does either letter reference any complaints that DOJ had received about Virginia's list maintenance efforts. *See Oliver*, 2026 WL 2031479, at *10; *cf. Benson I*, 819 F. Supp. 3d at 766 (letter indicated that the DOJ had received a complaint regarding Michigan's compliance with HAVA's requirements relating to the provision of unique voter identifiers). Thus, the July 2025 Request provided no basis for the U.S. Attorney General's written demand that would satisfy 52 U.S.C. § 20703's requirements.

Critically, even if those facts provided a sufficient basis to demand *some* records, the federal government's interest in obtaining more information about survey responses covering a period of November 2022 to November 2024 provide no basis for demanding the "current"

statewide voter registration list as of July 15, 2025. *See* JA52–54. The federal government has never explained the fundamental disconnect between inquiries into election officials' past conduct—which, if anything, would form the basis for demanding records responsive to those time periods—and demanding current voter rolls, which will have changed significantly in the interim. The most straightforward explanation for the disconnect is that the federal government is not interested in investigating discrete allegations about past conduct; rather, it wants to create a national voter database under a pretense.

### E. The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient under Title III

#### 1. The written demand lacks any reference or relation to the purposes for which Title III was enacted

The requisite "purpose" to support a demand for records under Title III must relate to the purposes underlying Title III. *See Oregon*, 828 F. Supp. 3d at 1104–05. "If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Id.* (declining to "read 'purpose' so broadly" as to grant the U.S. Attorney General

"unfettered authority to demand voting records for *any* purpose"); *see also Amore*, 831 F. Supp. 3d at 156–57.

Because the "larger framework of Title III and the historical context in which it was enacted" demonstrates that the law was "intended to protect against the infringement of voting rights," the "purpose" required in a demand for records under Title III "must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1097–98, 1105; *see also* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights (Sep. 9, 1959), https://perma.cc/2PDF-GZHB. Where a written demand's purpose lacks "any reference or relation to the purposes for which Title III was enacted," the "demand for records is deficient and cannot trigger any duty to produce such records." *Oregon*, 828 F. Supp. 3d at 1105.

The U.S. Attorney General's written demand provides no legally sufficient purpose to support its claim under Title III. To be sure, the August 2025 Demand invokes Title III. JA57. But it lacks "any reference or relation to the purposes for which Title III was enacted," *Oregon*, 828 F. Supp. 3d at 1105, including any connection to purported violations of individuals' voting rights. To the extent this Court considers the July

2025 Request, it fares even worse, as it does not use the word "purpose" or make any reference to Title III of the Civil Rights Act, let alone the underlying purposes of the Civil Rights Act.

### 2. Investigating NVRA and HAVA compliance is an insufficient purpose to invoke Title III

The federal government's claim that it was investigating NVRA or HAVA compliance cannot support the U.S. Attorney General's request for information under Title III, much less the sweeping request for Virginia's complete and unredacted voter registration list.

The precedent on which the federal government relies confirms that, absent some basis to assert that state election officials are conducting list maintenance in a discriminatory manner, investigating list-maintenance practices does not fall within Title III's scope. *See Bruce*, 298 F.2d at 863 & n.2 (noting that statistical evidence indicating that election officials failed to remove "voters who have moved away or have died" does "not bear any particular importance" to demonstrating illegal discrimination in a Title III proceeding). Nothing in the NVRA or HAVA suggests that the Attorney General has or needs "special access to state voter registration lists," *Evans*, 2026 WL 2267774, at *10, and nothing in Title III supports the federal government's "supposition that

Congress intended Title III to be a freewheeling source of authority for the Attorney General to investigate any violation of federal election law," *id.* at *8; *see also Weber*, 816 F. Supp. 3d at 1183; *Bellows*, 834 F. Supp. 3d at 124–26; *Hobbs*, 2026 WL 2833713, at *5; *Oregon*, 828 F. Supp. 3d at 1105.

Even if NVRA or HAVA compliance could ever be a valid purpose for a Title III demand, obtaining the complete, current, and unredacted version of Virginia's statewide voter registration list would not confirm whether the Commonwealth is complying with the NVRA or HAVA. *See Warner*, 2026 WL 2018877, at *6. The NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from official lists" for reasons like the death or change of address of voters. 52 U.S.C. § 20507(a)(4). HAVA sets standards for "maintenance" of a state's voter lists, *id.* § 21083, and leaves the "specific choices on the methods of complying with the requirements of this subchapter . . . to the discretion of the State," *id.* § 21085. These statutes mandate ongoing processes conducted using the state's discretion, not a particular result at a particular point in time. Accordingly, a current voter registration list would not answer the question of what reasonable efforts Virginia is

undertaking to comply with federal requirements or what efforts it undertook in advance of a previous election. *See Weber*, 816 F. Supp. 3d at 1192 (citing *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019)).

**3. This Court can reject a contrived purpose**

Finally, the federal government's public representations make clear that the U.S. Attorney General's written demand does not state "the" purpose for the requests. The statute's use of the definite article conveys that the stated purpose must be the *actual* purpose, "not just a conceivable or possible" purpose. *Galvin*, 830 F. Supp. 3d at 127. Thus, this Court can affirm on the alternative ground that the federal government's purported purpose is contrived. *See Dep't of Com. v. New York*, 588 U.S. 752, 784–85 (2019) (courts need not "ignore the disconnect between the decision made and the explanation given" or defer to a "contrived" rationale).

The Supreme Court's *Powell* decision makes clear that, when a court's process is invoked, "a court may not permit its process to be abused," including when the government's demand is "issued for an improper purpose," or "for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. In keeping with that

obligation, multiple courts have taken note of the federal government's public representations that conflict with the purpose it states in the complaint and August 2025 Demand. *Weber*, 816 F. Supp. 3d at 1184 ("representations made by the DOJ elsewhere paint a starkly different picture that this Court cannot ignore"); *see also Oregon*, 828 F. Supp. 3d at 1106–07, 1108–09.

As one federal court has explained: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *Weber*, 816 F. Supp. 3d at 1185 (collecting citations). The volume and timing of similar demands across the country for states' full, unredacted voter rolls—at least 30 similar lawsuits since September 2025, *see supra* Statement.D (collecting cases)—only confirms this. So do the public statements of Assistant Attorney General Dhillon and former Attorney General Bondi, including the U.S. Attorney General's demand for state voter rolls in a letter to Minnesota Governor Tim Walz about immigration enforcement.

*See supra* Statement.D; *Oregon*, 828 F. Supp. 3d at 1106–07 (noticing same letter from U.S. Attorney General Bondi). "The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon*, 828 F. Supp. 3d at 1107.

The federal government's statements that it intends to use Title III to further its efforts to "create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling," *Oregon*, 828 F. Supp. 3d at 1108, and is nowhere disclosed in the U.S. Attorney General's written demand for Virginia's statewide voter registration list. This Court should not permit the federal government to leverage Title III toward this end "under the guise of a pretextual investigative purpose." *Weber*, 816 F. Supp. 3d at 1186.

## III. The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state and federal law

### A. Virginia law prohibits sharing much of the sensitive information that the U.S. Attorney General demands

The federal government's motion independently fails because the relief it requests is illegal. Virginia law does not authorize disclosure of the most sensitive information that the U.S. Attorney General seeks. The U.S. Attorney General's written demand included "*all fields*" of the statewide voter registration list, to include "either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." JA57. Likewise, the federal government's motion to compel sought disclosure of "the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." JA48. But disclosure of registrants' full date of birth, driver's license number, full or partial social security number, and certain residential addresses is forbidden under state law.

Virginia law requires the Virginia Department of Elections to maintain a list of registered voters, Va. Code § 24.2-404, and imposes restrictions on the Department's ability to share the voter information it retains, *e.g.*, *id.* §§ 24.2-444(C), 24.2-405(C), 24.2-406(C), 24.2-407.1, 24-1002.1, 2.2-3808.1. No list that the Department makes available for public inspection shall contain "an individual's social security number, or any part thereof" or "the day and month of birth of an individual." *Id.* § 24.2-444(C). And "it is unlawful for any agency to disclose the social security number or other identification numbers appearing on a driver's license . . ." *Id.* § 2.2-3808.1.

Virginia law also permits certain voters to provide post office box addresses that must be "included in lieu of [their] street address on the lists of registered voters and persons who voted" that are made available for private or public inspection. Va. Code § 24.2-418(B). The protected voters include active and retired law-enforcement officers, active and retired judges, victims of domestic violence, foster parents, and election officials. *Id.* §§ 24.2-418(B), 2.2-515.2.

Indeed, Virginia law criminalizes disclosing some of the information that the federal government seeks. Virginia statutes provide

authorization to disclose social security numbers under only three enumerated circumstances: (1) to "a court" for use in "jury selection"; (2) to "a commissioner of the revenue or a treasurer" for use in "tax assessment, collection, and enforcement"; or (3) to "the Chief Election Officer of another state" for "maintenance of voter registration systems." Va. Code §§ 24.2-405(C), 24.2-406(C), 24.2-407.1. For instance, the third carveout explains Virginia's disclosure of the information to the Electronic Registration Information Center ("ERIC"), a nonpartisan membership organization "comprised of state election officials from around the United States" and created "to help election officials maintain more accurate voter rolls and detect possible illegal voting." ERIC, *What is ERIC?*, https://perma.cc/NY8B-6JDY (last accessed Oct. 8, 2026).

None of these carveouts, however, authorizes the Virginia Department of Elections to provide all or part of voters' social security numbers to DOJ. And "disclos[ing] or mak[ing] any use of the social security number, or any part thereof, of any applicant for voter registration, except as authorized by law for official use" is a felony offense. Va. Code § 24-1002.1. Thus, the U.S. Attorney General has

effectively demanded that Commissioner Koski violate Virginia law, further underscoring the demand's unlawfulness.

### B. Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information

The federal government recognizes that states have "broad constitutional authority over the conduct of federal elections, including voters' privacy rights." Br. 73. But it wrongly treats *Congress's* ability to override those state choices, U.S. Const. art. I, § 4, cl. 1, as a blank check for *DOJ* to assert the authority to override state laws. That is not how preemption analysis proceeds.

Because "the ability to override the historic police powers of the states 'is an extraordinary power in a federalist system,'" Congress must be "clear when it wants to wield" its preemption authority. *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 271 (4th Cir. 2025). "Unless a statute reveals a clear and manifest intent to the contrary, we must presume Congress does not intend to upend the historic relationship of the federal and state governments." *Id.* And "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or

conflicts with state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).

Though the familiar preemption tests and all of the specifics of Virginia law are absent from the federal government's brief, Br. 71–75, its argument that "federal law preempts state law when the two conflict" sounds in the doctrine of conflict preemption. Br. 74. Conflict preemption arises when "it is impossible for a private party to comply with both state and federal requirements," or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *GenBioPro*, 144 F.4th at 275 (citations and quotation marks omitted).

Neither circumstance is present in this case, because Title III does not require Virginia to share the information that state law specifically prohibits disclosing. *See Raffensperger*, 2026 WL 3002013, at *6–8 (holding federal law does not preempt Georgia's voter privacy law). Instead, Title III has long been understood to "deal[] with public records which ought ordinarily to be open to legitimate reasonable inspection," and not the "confidential, private papers and effects" that Virginia law

protects. *Lynd*, 306 F.2d at 231.[5] And the federal government presents no persuasive argument or even any illustrative examples to support its claim that "[t]he purpose of the CRA—to allow the Attorney General access to the information necessary to determine whether there is a violation of federal law—would be entirely thwarted by allowing States to redact identifying information from voting records." Br. 75.

Virginia's privacy protections do "not obstruct" Title III's purposes and objectives, and they can "coexist" with Title III's requirements. *Weber*, 816 F. Supp. 3d at 1189. That means Title III does not preempt Virginia's laws that criminalize the provision of information that the U.S. Attorney General has demanded.

### C. The U.S. Attorney General's demand further fails to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002

The U.S. Attorney General's demand for Virginia's complete and unredacted voter registration list also violates the requirements of two

[5] The same is true of the NVRA, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (redaction is appropriate under the NVRA as "necessary to protect sensitive information"), and HAVA "does not contain any disclosure provisions in its statutory text," *Weber*, 816 F. Supp. 3d at 1190.

federal statutes. First, the Privacy Act of 1974 requires that agencies comply with procedural requirements before maintaining, collecting, or using a group of records searchable by individual, and prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" in most circumstances. 5 U.S.C. § 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). Second, the E-Government Act of 2002 requires the federal government to conduct a privacy-impact assessment before collecting information about 10 or more people that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual." Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921–23 (2002).

Despite describing the question of "whether federal or state privacy laws prevent the United States from demanding and obtaining the full, unredacted copy of Virginia's SVRL" as among the issues presented on appeal, the federal government makes no attempt to argue that its collection of sensitive voter data complies with 5 U.S.C. § 552a(e)(7), or that it complied with the E-Government Act of 2002's requirement to conduct a privacy-impact assessment.

Nor can the federal government's argumentation on reply supplement these gaps. Below, for example, the federal government's briefing attempted to add facts to the complaint. *See, e.g.*, ECF No. 58 at 25–26 ("the voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online"); *see also id.* at 27 n.20 (implying that it will store state voter rolls on a particular cloud-storage service and alleging that it already "prepared a Privacy Act Assessment" for that service). But a plaintiff cannot amend its pleadings through motions practice. *E.g.*, *Anand v. Commonwealth*, No. 1:23-cv-87, 2023 WL 7301995, at *8 (E.D. Va. Nov. 3, 2023) (noting that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint" (citation omitted)). Any effort to rely on unpleaded facts in the United States' reply brief only underscores the inadequacy of the amended complaint in these areas, which provides a further basis to affirm the dismissal of the United States' complaint.

## CONCLUSION

This Court should affirm.

Respectfully Submitted,

STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections

/s/ *Megan C. Keenan*
MEGAN C. KEENAN
*Deputy Solicitor General*

JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

MEGAN C. KEENAN
*Deputy Solicitor General*

MIKAELA A. PHILLIPS
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

October 8, 2026

*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I certify that this Brief of Appellee is proportionately spaced and contains 12,988 words excluding parts of the document exempted by Rule 32(f).

/s/ *Megan C. Keenan*
MEGAN C. KEENAN
*Deputy Solicitor General*

## CERTIFICATE OF SERVICE

I certify that on October 8, 2026, the Brief of Appellee was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Megan C. Keenan*
MEGAN C. KEENAN
*Deputy Solicitor General*