No. 26-2002

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections,

*Defendant-Appellee*,

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; NAACP VIRGINIA STATE CONFERENCE; COMMON CAUSE; KATHERINE ELLENA,

*Intervenors-Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

# RESPONSE BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND NAACP VIRGINIA STATE CONFERENCE

Walker R. McKusick
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Ste. 2100
Seattle, WA 98101
Telephone: (202) 948-1135

Uzoma N. Nkwonta
Jacob D. Shelly
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
Telephone: (202) 948-1135

*Counsel for Intervenors-Defendants-Appellees National Association for the Advancement of Colored People and NAACP Virginia State Conference*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-2002 Caption: United States v. Koski

Pursuant to FRAP 26.1 and Local Rule 26.1,

National Association for the Advancement of Colored People; NAACP Virginia State Conference
(name of party/amicus)

who is Appellee-Intervenor-Defendant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Aria C. Branch Date: 8/3/2026

Counsel for: Appellee-Intervenor-Defendants

# TABLE OF CONTENTS


TABLE OF CONTENTS .................... i

TABLE OF AUTHORITIES .................... iii

INTRODUCTION .................... 1

JURISDICTIONAL STATEMENT .................... 2

STATEMENT OF THE ISSUES .................... 2

STATEMENT OF THE CASE .................... 3

I. The Constitution and federal law assign States primary responsibility for voter registration. .................... 3

A. The Civil Rights Act of 1960 .................... 3

B. The National Voter Registration Act .................... 7

C. The Help America Vote Act .................... 8

II. DOJ embarked on a nationwide campaign to collect the private voter data of millions of Americans. .................... 10

III. DOJ sued Virginia to compel disclosure of its protected voter data. .................... 11

IV. The district court dismissed DOJ's complaint. .................... 12

SUMMARY OF THE ARGUMENT .................... 13

STANDARD OF REVIEW .................... 15

ARGUMENT .................... 16

I. The district court correctly held that the CRA does not cover state-created, dynamic records like Virginia's SVRL. .................... 16

A. Virginia's SVRL was created by election officials and therefore did not "come into" their possession. ....16

B. Applying the CRA to Virginia's SVRL would require it to be preserved without alteration, but federal law requires constant updates. ....20

C. DOJ's interpretation of the CRA should be rejected. ....22

II. The Court should also affirm because of other flaws in DOJ's claim. ....31

A. DOJ's CRA demand is subject to meaningful judicial review. ....32

B. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis. ....35

C. DOJ's claimed purpose of investigating Virginia's list maintenance program is not a proper purpose for a CRA demand. ....40

D. The CRA does not preempt Virginia's privacy protections. ....43

E. DOJ has not complied with the Privacy Act. ....45

III. If the Court reverses, it should remand for additional proceedings. ....50

CONCLUSION ....51

STATEMENT REGARDING ORAL ARGUMENT ....52

CERTIFICATE OF COMPLIANCE ....53

TEXT OF RELEVANT STATUTORY PROVISIONS ....54

# TABLE OF AUTHORITIES

## CASES

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 853 (M.D. Ala. 1960) .................................................. 23, 42

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937)..................................................................................20

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)........................................................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................15

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ..............................................................10

*Biden v. Nebraska*,
600 U.S. 477 (2023)..................................................................................41

*Blaustein & Reich, Inc. v. Buckles*,
365 F.3d 281 (4th Cir. 2004)....................................................................30

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) ................................................................35

*City and Cnty. of S.F. v. EPA*,
604 U.S. 334 (2025)..................................................................................27

*Coleman v. Kennedy*,
208 F. Supp. 199 (5th Cir. 1963) ............................................................39

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997)..................................................................................43

*Dep't of Homeland Sec. v. League of Women Voters,*
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) ................................45

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................21

*Fischer v. United States*,
603 U.S. 480 (2024)....................27

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016)....................7

*Foster v. Love*,
522 U.S. 67 (1997)....................3

*GenBioPro, Inc. v. Raynes*,
144 F.4th 258 (4th Cir. 2025)....................38

*Honeycutt v. United States*,
581 U.S. 443 (2017)....................17

*Huddleston v. United States*,
415 U.S. 814 (1974)....................17

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982)....................49

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)....................42

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962).................... 5, 6, 34, 39, 45

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026).................... 41, 43

*Leichling v. Honeywell Int'l, Inc.*,
842 F.3d 848 (4th Cir. 2016)....................46

*Lozano v. Montoya Alvarez*,
572 U.S. 1 (2014)....................18

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ..........47

*MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*,
303 F.3d 523 (4th Cir. 2002)..........16

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)..........19

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021).......... 37-38

*NLRB v. Interbake Foods, LLC*,
637 F.3d 492 (4th Cir. 2011) ..........34

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946)..........34

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024)..........5

*Patel v. Garland*,
596 U.S. 328 (2022)..........31

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019)..........16

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ..........8

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021)..........8, 44

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026)..........8

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)..........8

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005) ........................................................46

*South Carolina v. United States*,
243 F. Supp. 3d 673 (D.S.C. 2017)............................................................49

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)......................................................................................49

*U.S. Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989)................................................................................ 23-24

*United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
745 F.3d 131 (4th Cir. 2014).........................................................................15

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)......................................................................................32

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ..............................................................40

*United States v. Caldwell,*
No. 26-CV-2025, 2026 WL 2186515 (D.N.J. July 29, 2026)........................25

*United States v. Evans,*
No. 25-CV-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026) ................. 30-31

*United States v. Matthews,*
No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026).....................40

*United States v. Thomas,*
No. 3:26-CV-21, 2026 WL 2070437 (D. Conn. July 17, 2026) ....................21

*United States v. Warner*,
No. 2:26-CV-156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026)......... 40-41

*United States v. Bd. of Elections of the State of N.Y.,*
No. 1:25-CV-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ...............40

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ................................ 12, 19, 24, 31, 40, 43

*United States v. Benson*,
187 F.4th 462 (6th Cir. 2026)..................................................................28

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)...............................................11, 18, 20, 33, 36

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026).............................................. 20, 25

*United States v. Clarke*,
573 U.S. 248 (2014)...................................................................................50

*United States v. DeMarinis*,
No. 1:25-CV-3934, 2026 WL 1780586 (D. Md. June 18, 2026)............ 21, 23

*United States v. Fugit*,
703 F.3d 248 (4th Cir. 2012)......................................................................16

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) ..................................................... 37, 39

*United States v. Gentner*,
177 F.4th 519 (4th Cir. 2026)......................................................................28

*United States v. Hobbs*,
No. 1:25-CV-6078, 2026 WL 2833713 (W.D. Wash. Sep. 22, 2026) .....11, 16

*United States v. McAnlis*,
721 F.2d 334 (11th Cir. 1983).....................................................................50

*United States v. Oliver,*
No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July
14, 2026) ......................................................................................................36

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ..........................33, 36, 38, 40-40, 45, 50

*United States v. Powell*,
379 U.S. 48 (1964)........................................................................ 14, 33

*United States v. Raffensperger*,
No. 1:26-CV-0485, 2026 WL 3002013 (N.D. Ga. Sep. 30, 2026)....11, 43, 45

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026)......................................... 19, 20, 25, 29

*United States v. Umeti*,
167 F.4th 687 (4th Cir. 2026)..................................................................39

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ...........................36, 40, 44-46, 49, 50

*United States v. Young*,
989 F.3d 253 (4th Cir. 2021)....................................................................41

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).................................................................................42

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)...........................................................8, 27

*Watson v. Republican Nat'l Comm.*,
146 S. Ct. 2165 (2026)..............................................................................21

*Willner v. Dimon*,
849 F.3d 93 (4th Cir. 2017)......................................................................45

*Wyeth v. Levine*,
555 U.S. 555 (2009).................................................................................43

*Yates v. United States*,
574 U.S. 528 (2015).................................................................................19

**STATUTES**

Pub. L. No. 85-315, 71 Stat. 634 (1957)...............................................................3

5 U.S.C. § 552a ........ 46-50

6 U.S.C. § 1502 ........ 19

7 U.S.C. § 12 ........ 19

8 U.S.C. § 1454 ........ 25

10 U.S.C. § 130c ........ 25

13 U.S.C. § 214 ........ 25

18 U.S.C. § 3500 ........ 19

28 U.S.C. § 1291 ........ 2

28 U.S.C. § 1331 ........ 2

28 U.S.C. § 1345 ........ 2

30 U.S.C. § 1732 ........ 19, 25

42 U.S.C. § 1971 ........ 6

44 U.S.C. § 3572 ........ 25

49 U.S.C. § 47124a ........ 19

52 U.S.C. § 10101 ........ 6, 41

52 U.S.C. § 20501 ........ 7, 27

52 U.S.C. § 20507 ........ 7, 18, 21, 31, 38

52 U.S.C. § 20510 ........ 8

52 U.S.C. § 20701 ........ 1, 6, 13, 16-17, 19-20, 22, 27, 29, 41

52 U.S.C. § 20702 ........ 6, 21

52 U.S.C. § 20703 .......... 1, 2, 6, 14, 17, 35-37, 40

52 U.S.C. § 20704 .......... 44

52 U.S.C. § 20705 .......... 2, 7, 32

52 U.S.C. § 21083 .......... 8, 9, 10, 21, 29, 31

52 U.S.C. § 21085 .......... 9

52 U.S.C. § 21111 .......... 9

Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 .......... 49

Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003) .......... 48

Va. Code Ann. 2.2-3815 .......... 43

Va. Code Ann. 24.2-405 .......... 43

Va. Code Ann. 24.2-444. .......... 43

**FEDERAL RULES**

Fed. R. Civ. P. 1 .......... 32

Fed. R. Civ. P. 12 .......... 12, 15, 33

Fed. R. Civ. P. 81 .......... 32

**LEGISLATIVE MATERIALS**

*An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. (1960) .......... 5, 30

*H.R. Rep. No. 86-956* (1959) .......... 4

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ....................4

*Rep. of the U.S. Comm'n on C.R.* (1959) ....................4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (4th ed. 1968) .................... 36, 39

*Black's Law Dictionary* (12th ed. 2024) ....................17

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 2, 2026), https://perma.cc/SW3Z-2Y6G ....................10

*Oxford English Dictionary* (1933) ....................17

*Oxford English Dictionary* (2d ed. 1989) ....................27

*Webster's Third New International Dictionary* (1961) ....................17

*Webster's Third New International Dictionary* (1966) .................... 17, 26

## INTRODUCTION

Last year, the U.S. Department of Justice ("DOJ") sent letters to election officials across the nation demanding their States' full, unredacted voter registration lists ("SVRL"). Many refused, prompting DOJ to sue 30 States and the District of Columbia to obtain these lists. DOJ has now lost every single one of these cases so far: 27 courts (including one court of appeals and the district court below) have rebuffed DOJ's demands.

DOJ claims it is entitled to Virginia's SVRL under Title III of the Civil Rights Act of 1960 ("CRA"), but, as district courts all across the country and the Sixth Circuit have recognized, SVRLs are not covered by the CRA because they are not voter-provided records that "come into [election officials'] possession," which must be preserved unaltered under the CRA, 52 U.S.C. §20701; rather, SVRLs are state-created databases that federal law requires election officials to continuously update and revise. DOJ also failed to comply with the CRA's clear textual requirement that its pre-suit demand "contain a statement of the basis and the purpose therefor." *Id.* §20703. DOJ failed to provide *any* factual basis for its demand for Virginia's SVRL, and its stated purpose—to assess compliance with the National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA")—is improper. The CRA was enacted so that DOJ could investigate individual voting rights violations, not to superintend State list maintenance pursuant to statutes passed decades later. Finally,

DOJ failed to show either that the CRA preempts Virginia's voter privacy laws or that DOJ has complied with its obligations under the Privacy Act. Each of these issues provides independent reason to affirm.

## JURISDICTIONAL STATEMENT

DOJ's jurisdictional statement is incomplete. The district court had federal question jurisdiction under 28 U.S.C. §§1331, 1345, and 52 U.S.C. §20705, because DOJ alleges a violation of the CRA, 52 U.S.C. §20703. JA44.[1] The district court dismissed DOJ's complaint in a memorandum opinion and an order on July 14, 2026. JA1-14. DOJ filed a timely Notice of Appeal on July 24, 2026. JA192-94. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether Virginia's SVRL, a state-created database that is continually updated as required by federal law, is a "record" that must be preserved unaltered and produced to DOJ under the CRA.

2. Whether DOJ made a valid demand for Virginia's SVRL under the CRA, even though DOJ provided no "statement of the basis" for the demand.

3. Whether DOJ made a valid demand when it sought the SVRL for the purported purpose of investigating Virginia's voter-list maintenance processes, rather than for a purpose connected to protecting an individual's right to vote.

---

[1] "JA_" refers to the joint appendix.

4. Whether DOJ's demand for Virginia's complete, unredacted SVRL violates Virginia's voter privacy laws or the federal Privacy Act.

## STATEMENT OF THE CASE

### I. The Constitution and federal law assign States primary responsibility for voter registration.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). Although Congress may preempt state regulations of federal elections, such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case.

#### A. The Civil Rights Act of 1960

Congress enacted Title III of the CRA to address problems that emerged from Southern resistance to the Civil Rights Act of 1957. In particular, the U.S. Commission on Civil Rights (created by the Civil Rights Act of 1957) was charged with "investigat[ing] allegations … that certain citizens of the United States [were] being deprived of their right to vote." Pub. L. No. 85-315, §104(a)-(b), 71 Stat. 634, 635 (1957). As part of its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission revealed that election officials in Southern States often imposed tests on Black

applicants from which White applicants were exempt, *see Rep. of the U.S. Comm'n on C.R.*, 87-88 (1959) ("*Comm'n Rep*."), and denied registration to Black applicants "because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[2] The Commission thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

Yet the Commission found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, Alabama enacted legislation in response to the 1957 Act requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. 212 (1959) ("*Hearings*") (statement of U.S. Att'y Gen. Rogers).[3] Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring election officials to retain applications to vote and allow DOJ to inspect them. *Comm'n Rep*. 137-38.

---

[2] The Commission Report is available at https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

[3] Available at https://perma.cc/ET26-FKD9.

In testimony before Congress, DOJ agreed that comparing the voter applications of individual Black and White voters was essential to its civil rights work, explaining that, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *An Act to Enforce Constitutional Rights, and for Other Purposes: Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. 6 (1960) (statement of U.S. Att'y Gen. Rogers).[4] "Congress responded by passing the Civil Rights Act of 1960." *Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Shwartz, J., dissenting).

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence necessary to investigate voting rights violations. As explained by a principal drafter of the CRA, "[t]he purpose of [T]itle III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *Hearings* at 700 (statement of Rep. William M. McCulloch). The CRA thus "enable[s] the Attorney General to determine whether §1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir.

[4] Available at https://perma.cc/46G6-GQZB.

1962).[5] To that end, the CRA contains several interlocking provisions that collectively permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The core provision of the CRA requires officials to "retain and preserve" the records most critical to a voting rights investigation:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. And it allows DOJ to inspect covered records only after it makes a compliant pre-suit demand that "contain[s] a statement of the basis and the purpose therefor." *Id.* §20703.

Finally, the CRA imposes criminal penalties for "willfully fail[ing]" to comply with the statute's command, *id.* §20701, and threatens "imprison[ment]" for "[a]ny person … who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* §20702. The statute also provides that the federal district court for the district in which a CRA demand is made or in which a demanded record is located "shall have

---

[5] The section that was then 42 U.S.C. §1971, now codified at 52 U.S.C. §10101, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. §10101(a)(1).

jurisdiction by appropriate process to compel the production of such record or paper." *Id.* §20705.

### B. The National Voter Registration Act

Three decades after the CRA, Congress passed the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b). The NVRA is aimed at ensuring "simple means are available to register for federal elections and [that] those means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). The NVRA also requires covered States to take steps to keep their voter rolls reasonably updated. *See* 52 U.S.C. §20507(a)(4). In doing so, the NVRA reaffirms the principal role of States in managing registration lists, requiring only that States "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either (1) "the death of the registrant" or (2) "a change in the residence of the registrant." *Id.* The NVRA tempers this modest obligation with safeguards to prevent erroneous or rushed cancellations of registrations. *Id.* §20507(a)(3), (b)-(e).

The NVRA also addresses disclosure of records related to state compliance. It requires States to "make available for public inspection … all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* §20507(i)(1). Courts

have held either that this inspection provision does not reach States' SVRLs, *e.g.*, *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 678-83 (9th Cir. 2026), or as this Court has held, that it permits States to redact sensitive personal information regarding voters before disclosing SVRLs, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 265 (4th Cir. 2021) (citing *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (holding same); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025) (same). DOJ may initiate civil actions to address substantive violations of the NVRA, and the NVRA also authorizes private enforcement actions. *See* 52 U.S.C. §20510.

### C. The Help America Vote Act

A decade after the NVRA, and more than four decades after the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. §21083(a)(1)(A).

The list is dynamic by design. For instance, HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the

information is provided to the local official." *Id.* §21083(a)(1)(A)(vi). Likewise, the list "shall be coordinated with other agency databases within the State." *Id.* §21083(a)(1)(A)(iv). HAVA also requires that "voter registration records" are "accurate and are updated regularly." *Id.* §21083(a)(4). In other words, HAVA charges States with continually changing their single, centralized SVRLs.

HAVA gives DOJ authority to sue to address violations of the statute, *see id.* §21111, but does not empower it to demand or inspect SVRLs or otherwise audit States' voter list-maintenance practices. HAVA instead reaffirms the preeminent role of States in managing voter lists, instructing that each State's list be "defined, maintained, and administered at the State level," *id.* §21083(a)(1)(A), and that "[t]he specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State," *id.* §21085. HAVA's careful assignment of responsibilities reflects Congress's view that state authority over voter registration is central to preserving our democratic system:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Rather, HAVA ports over the NVRA's requirements, charging most States with "perform[ing] list maintenance" of their computerized SVRLs "on a regular basis" consistent with the NVRA. 52 U.S.C. §21083(a)(2)(A).

## II. DOJ embarked on a nationwide campaign to collect the private voter data of millions of Americans.

Last year, DOJ launched an unprecedented campaign to collect States' unredacted SVRLs, which include sensitive information about each registered voter. DOJ sent demands to at least 48 States, but most refused.[6] DOJ has sued 30 States and the District of Columbia to compel disclosure.

DOJ's legal theories have shifted over the course of these lawsuits. Initially, DOJ brought claims under the CRA, HAVA, and the NVRA. *See* Complaint, *United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sep. 16, 2025), ECF No. 1. In its later-filed actions, DOJ abandoned its HAVA and NVRA claims and focused solely on the CRA. *See, e.g.*, JA37-44; Complaint, *United States v. Amore*, No. 25-CV-639 (D.R.I. Dec. 2, 2025), ECF No. 1. Regardless of the vehicle, every district court that has

---

[6] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 2, 2026), https://perma.cc/SW3Z-2Y6G.

addressed DOJ's claims to date in these cases has dismissed them, and the Sixth Circuit affirmed a dismissal.[7]

### III. DOJ sued Virginia to compel disclosure of its protected voter data.

On July 15, 2025, DOJ sent a letter to then-Commissioner of the Virginia Department of Elections Susan Beals. JA52-54. Citing the NVRA's voter list maintenance provisions and expressing concern over the sufficiency of Virginia's efforts "to remove … ineligible voters from the registration list," the letter requested that the Commissioner provide a list of officials responsible for list maintenance, records concerning implementation of list maintenance efforts, and a "current electronic copy of Virginia's computerized statewide voter registration list" including "all fields contained within the list." JA52-53. Nowhere did this letter mention or cite the CRA.

On August 14, DOJ sent another letter to the Commissioner, this one demanding Virginia's statewide voter registration list under Title III of the CRA. JA56-58. DOJ insisted it receive the list with "all fields," including "the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." JA57; *see also* JA58

---

[7] *See United States v. Hobbs*, No. 1:25-CV-6078, 2026 WL 2833713, at *1 n.3 (W.D. Wash. Sep. 22, 2026) (collecting 24 district court cases); *see also United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *petition for reh'g en banc denied*, 187 F.4th 462 (6th Cir. 2026); *United States v. Raffensperger*, No. 1:26-CV-0485, 2026 WL 3002013 (N.D. Ga. Sep. 30, 2026).

n.3 (same). The purported purpose of the demand, as stated by DOJ, was to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." JA57. The Commissioner declined to produce the unredacted SVRL.

More than five months later, DOJ sued, bringing a single claim under the CRA to demand production of Virginia's unredacted SVRL. *See* JA4. Shortly after the complaint was filed, Commissioner Beals was succeeded in office by Commissioner Steven Koski, who maintained his predecessor's view on DOJ's demand. DOJ later amended its complaint, JA37-46, and moved to compel production of the unredacted SVRL. JA47-49.

## IV. The district court dismissed DOJ's complaint.

On July 14, 2026, the district court granted Commissioner Koski's and Intervenors' motions to dismiss. JA12-13. The court first rejected DOJ's argument that this action is a special proceeding exempt from Rule 12(b)(6). JA2 n.2. It then dismissed DOJ's CRA claim on the grounds that "Virginia's SVRL is outside the scope of Title III of the CRA." JA6. Examining the statute's "ordinary meaning," the court reasoned that "the phrase 'come into ... possession'" does not extend to the SVRL because "Virginia election officials created the database themselves," while "'[c]oming into possession of something most naturally implies receipt from an external source.'" JA8-9 (quoting *United States v. Bellows*, 834 F. Supp. 3d 113, 123

n.10 (D. Me. 2026)). The district court also observed that the CRA "criminalizes alteration of any [covered] record or paper," which would "render regular list maintenance" under the NVRA and HAVA "illegal activity." JA10. It rejected DOJ's contrary arguments, including its focus on the phrase "all records" in the CRA, holding that DOJ's reading would render the phrase "comes into possession" "surplusage." JA11. The court concluded that "[i]f Congress did intend to say 'all records,' full stop, it had the proper punctuation available." JA11.[8]

This appeal followed.

## SUMMARY OF THE ARGUMENT

1. The district court correctly held that the CRA does not extend to SVRLs. The statute covers only static records—like voter applications—that "come into" the possession of election officials from voters. 52 U.S.C. §20701. Dictionary definitions, common usage, and statutory context all confirm that "come into" possession means receiving something from an outside source. Further, the CRA requires covered records to be retained, preserved, and not altered. That makes sense when applied to static, discrete documents submitted to election officials by voters, but if extended to SVRLs, it would place the CRA in irreconcilable conflict with HAVA and the NVRA, which command election officials to continuously update and

[8] The court did not address the other grounds for dismissal presented by Commissioner Koski and Intervenors. JA13.

alter SVRLs. The SVRL did not "come into" the possession of election officials, nor is it static; it is a dynamic database that is created, maintained, and—under command of federal law—continuously revised by election officials.

2. The district court was likewise correct to reject DOJ's argument that the Federal Rules of Civil Procedure or the CRA insulates DOJ's demand from judicial scrutiny. Quite the contrary—the Supreme Court has made clear in a decision interpreting the same language that appears in the CRA that judicial review of government document demands is necessary to ensure that any investigation will be conducted pursuant to a legitimate purpose, that the underlying statute has been satisfied, and that the court's process is not being abused. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964).

3. This Court may affirm on alternative grounds that the district court did not reach. For example, DOJ failed to comply with the CRA's requirement that its written demand to Virginia state its factual "basis." 52 U.S.C. §20703. DOJ's August 14 letter—which was its only CRA demand—did not contain any factual material about Virginia's list maintenance practices, much less facts that would suggest a violation of federal law. Any attempt to cure that deficiency using other communications, pleadings below, or briefing here is futile because the CRA requires DOJ to state a basis in the demand letter itself. *Id.*

4. This Court may also affirm because DOJ's stated "purpose"—to assess Virginia's compliance with the NVRA and HAVA's list maintenance requirements—is not a proper purpose for a CRA demand. The CRA cannot be repurposed to give DOJ the power to audit States' SVRLs when Congress chose not to give it any such authority in the NVRA or HAVA.

5. Alternatively, the Court may affirm because Virginia protects the sensitive voter data at issue here from disclosure, and there is no indication in the CRA that Congress intended to preempt state privacy laws. DOJ also failed to comply with the notice requirements of the federal Privacy Act and thus is not entitled to unredacted copies of the SVRL.

6. If the Court were to accept DOJ's arguments and reverse the ruling below, DOJ would not be entitled to the relief it seeks—immediate production of the unredacted SVRL. The proper course would be to remand and allow discovery on, among other things, whether DOJ's stated purpose is pretextual.

## STANDARD OF REVIEW

"On review of a Rule 12(b)(6) dismissal, [the Court] consider[s] a case de novo." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). The Court is "entitled

to affirm the [district] court's judgment on alternate grounds, if such grounds are apparent from the record." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002).

## ARGUMENT

### I. The district court correctly held that the CRA does not cover state-created, dynamic records like Virginia's SVRL.

The district court correctly held that state-created, dynamic voter registration lists do not fall within the scope of Title III. SVRLs are records that election officials create, not ones that "come into [their] possession." 52 U.S.C. §20701. And HAVA and the NVRA direct state officials to make constant changes to the lists, which would conflict with the CRA's requirement that documents be preserved unaltered. DOJ's counterarguments have been rejected by every court to consider them to date. *See Hobbs*, 2026 WL 2833713, at *6 (collecting the "growing, unanimous consensus" that SVRLs are not "subject to a Title III demand").

#### A. Virginia's SVRL was created by election officials and therefore did not "come into" their possession.

"Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 702 (4th Cir. 2019) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). "This [C]ourt has long consulted dictionaries of common usage in order to establish the plain meaning of disputed statutory language." *United States v. Fugit*, 703 F.3d 248, 254 (4th Cir. 2012). The CRA requires election officers to "retain and

preserve … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. Only "records" or "papers" that "come into" election officials' possession within the meaning of Section 20701 are subject to production upon a proper demand by the Attorney General. *Id.* §20703.

The CRA does not define what it means for a record to "come into" the possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession with acquiring, obtaining, or receiving something from an outside source. *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire"). This same understanding endures 66 years later. *See, e.g.*, *Receive, Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"). Federal courts have adopted these definitions. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United*

*States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed., 1966, unabridged))).

Common usage confirms this point. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "come into" possession of a cake she baked with those ingredients. *Id.* Such a phrase would be unnatural because it would falsely imply that the baker merely acquired a finished cake from someone else instead of expending time and labor to produce it. Similarly, "[a]n ordinary English speaker would not say" that Virginia came into possession of the SVRL that it "created." *Id.*

Accordingly, because Virginia election officials internally generate and continuously update the SVRL, it does not "come into" their possession and thus is not a record subject to inspection under the CRA. If Congress intended for the CRA to cover dynamic documents created by election officials, it had "obvious alternative" language at its disposal. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014). As the district court noted, Congress could have written the CRA to encompass "all records" that met the statutory criteria, without any qualifier regarding possession, as it did in the NVRA. JA11 (quoting 52 U.S.C. §20507(i)(1)).

Or "Congress could have required the retention and production of all election-related records and papers '*in* the possession of' the state election official." *Bellows*, 834 F. Supp. 3d at 123 n.10 (emphasis added). Indeed, Congress frequently employs the phrase "in the possession of" to convey its desire that a statute sweep broadly. *E.g.*, 30 U.S.C. §1732(b); 6 U.S.C. §1502(a); 18 U.S.C. §§3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. §12(e); 49 U.S.C. §47124a(b)(1). But in the CRA, Congress "chose not to use this broader formulation in Section 20701 and, having done so, the court must give meaning to the words 'come into.'" *United States v. Scanlan*, 838 F. Supp. 3d 150, 156 (D.N.H. 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026). After all, "[c]ourts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018).

Additional textual indicators confirm that Congress used the ordinary meaning of "come into possession." The surrounding text of Section 20701 explains that the relevant "records" are those "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701; *see Yates v. United States*, 574 U.S. 528, 543 (2015) (noting that "accompanying words" are key for interpreting statutory phrases because "a word is known by the company it keeps"). "Each of these terms refers to something that the *voter* submits or does as part of the registration process," rather than something state

officials create themselves. *United States v. Benson*, 819 F. Supp. 3d 753, 768-69 (W.D. Mich. 2026) (emphasis added), *aff'd*, 179 F.4th 470 (6th Cir. 2026). And, as the Sixth Circuit recounted, even the reference to records related to a "payment of poll tax" reveals the narrow category of documents captured in this language. *Benson*, 179 F.4th at 479. When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.* The CRA thus required that officers "retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

### B. Applying the CRA to Virginia's SVRL would require it to be preserved without alteration, but federal law requires constant updates.

The CRA's preservation requirements confirm that it does not apply to Virginia's SVRL. Any record covered by the CRA must be "retain[ed] and preserve[d]," and may not be "alter[ed]." 52 U.S.C. §§20701-20702. If Section 20701 is read to cover Virginia's SVRL, it would "effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit." *Scanlan*, 838 F. Supp. 3d at 157. It is implausible that "Congress was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The CRA's command in Section 20701 that covered records must be preserved and retained is paired with criminal penalties in Section 20702 for those who

willfully "alter" them. 52 U.S.C. §20702. HAVA, in contrast, requires States to establish a dynamic SVRL that "is constantly being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." *United States v. Thomas*, No. 3:26-CV-21, 2026 WL 2070437, at *6 (D. Conn. July 17, 2026); 52 U.S.C. §21083(a)(1). The NVRA imposes similar list-maintenance requirements. *See* 52 U.S.C. §20507(a)(4).

Adopting DOJ's interpretation of the CRA would accordingly create an unavoidable clash with the NVRA and HAVA, placing election officials in the bind of choosing which statute to honor—at the risk of criminal penalty. *See, e.g.*, *United States v. DeMarinis*, No. 1:25-CV-3934, 2026 WL 1780586, at *4-6 (D. Md. June 18, 2026) ("This Court will not read § 20701 to produce such an absurd result."), *appeal docketed*, No. 26-1878 (4th Cir. July 13, 2026). Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Earlier-adopted statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2177 n.8 (2026) (emphasis added) (citation omitted). This Court should join the Sixth Circuit and numerous district

courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

**C. DOJ's interpretation of the CRA should be rejected.**

Nothing in DOJ's brief justifies departing from the overwhelming judicial consensus that the CRA's plain text does not extend to internally generated, dynamic SVRLs.

*First*, DOJ misses the point in arguing that a State's SVRL must be covered by the CRA because it "relat[es]" to voter registration and the phrase "relating to" has a broad scope. Br. 20-21. Under the CRA, a record must not merely "relate to" voter registration—it must *also* "come into" election officials' possession. 52 U.S.C. §20701. The two phrases impose distinct requirements.

*Second*, in positing that an individual can "come into possession" of self-created items, DOJ argues that possession does not turn on "the particular means by which that possession is secured." Br. 18. To advance this theory, DOJ cites several definitions of "acquire," none of which resolve the dispute in its favor. According to DOJ's quotation of Black's Law Dictionary, for example, "to acquire" was to "receive or gain *in whatever manner*[,]" through "the act of getting or obtaining something which may be already in existence, *or may be brought into existence* through means employed to acquire it." Br. 17 (DOJ's emphasis) (quoting *Black's Law Dictionary* 41 (4th ed. 1968)). This definition remains consistent with getting

or obtaining from an external source. When a customer acquires a cake from a bakery, that cake "may already be in existence" (pre-baked), or it "may be brought into existence" (made from scratch); in either scenario, the cake still comes into the customer's possession *from the bakery* rather than being self-generated. Here, Virginia does not acquire its SVRL from an outside entity, and therefore does not "come into possession" of it.

DOJ also claims Congress selected the phrase "come into possession" "because it is broad enough to cover any document obtained by any means—both self-generated and from an outside source—during the officer's tenure." Br. 18. Notably, DOJ's main supporting authority is *DOJ itself*—a memorandum prepared by the Office of Legal Counsel long after DOJ's litigation campaign began that reads like a legal brief attempting to justify DOJ's position, not anything remotely resembling an authoritative or objective source. *See* Br. 18; *see also DeMarinis*, 2026 WL 1780586, at *5 ("This Court will not interpret the CRA contrary to its text simply because an office of the party advancing that interpretation has adopted it.").[9]

*Third*, *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), does not help DOJ. *See* Br. 19. As the Sixth Circuit recognized, *Tax Analysts*

---

[9] DOJ also cites *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *see* Br. 18, but that decision did not interpret "come into possession" or otherwise discuss Congress's drafting intent.

"provides no insight" about "'come into … possession,' as Title III uses it." *Benson*, 179 F.4th at 481. In *Tax Analysts*, there was no dispute that the relevant statutory term ("agency records") would include self-created records; the Court's analysis relied on an agency-recordkeeping statute that defined "record" to include materials "made *or received*" by an agency, 492 U.S. at 145-46 (emphasis added); and the phrase "come into possession" appeared nowhere in that statute.

*Fourth*, in response to the district court's holding that DOJ's reading would render the words "come into" as surplusage, JA11, DOJ contends that Congress "used the phrase '*come* into his possession' rather than '*in* his possession' ... to focus on *how* and *when* the officer gains possession of the records or documents in the first instance." Br. 21. But DOJ's "temporal" reading, Br. 23, is untethered from the CRA's text, which does not contain the additional phrases that DOJ relies upon—i.e., "during her tenure" and "in the course of administering" an election. Br. 23. As actually written, the statute does *nothing* to support a restriction to documents received during an official's service. "If that is the meaning Congress intended," the phrase "come into possession" is "an odd selection of words to convey it," particularly in light of "obvious alternative" language. *Bellows*, 834 F. Supp. 3d at 123 n.10 (citation omitted). "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," which

is the language used in the NVRA. *United States v. Caldwell*, No. 26-CV-2025, 2026 WL 2186515, at *7 (D.N.J. July 29, 2026) (quoting *Benson*, 819 F. Supp. 3d at 768).

DOJ points to other statutes that use the phrase "come into possession," Br. 22-24, but those statutes only undercut DOJ's "temporal" construction: Each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. For example, 8 U.S.C. §1454(a) says that someone who "comes into" possession of a "lost" certificate of naturalization must return it to the Attorney General; that "presupposes receipt from an external source" because it is implausible to read the statute as requiring someone who recovers their own lost certificate to send it to the Attorney General. *Scanlan*, 838 F. Supp. 3d at 159. DOJ's other handpicked statutes also illustrate that "come into" most naturally refers to receiving something from an outside source. *See, e.g.*, 44 U.S.C. §3572 (using phrase "comes into possession" in reference to "information supplied by individuals or organizations to an agency"); 13 U.S.C. §214 (referencing 13 U.S.C. §9, which prohibits disclosure of information "furnished" to the Department of Commerce for the Census); 30 U.S.C. §1732(b) (explaining States and Indian tribes are entitled to have access to royalty information "as soon as practicable after it comes into the possession of the Secretary"); 10 U.S.C. §130c(d) (using phrase "came into possession or under the control of the United States" in reference to information "received by an agency" from a foreign

government). The consensus construction of the CRA among courts sits comfortably among these laws. *See, e.g.*, *Benson*, 179 F.4th at 482.[10]

*Fifth*, DOJ argues that the district court incorrectly concluded that applying the CRA's retain-and-preserve requirement to an SVRL would put it in conflict with the NVRA's and HAVA's requirements that the SVRL be updated regularly. *See* Br. 27-31. DOJ contends that this reading would place all dynamic records "requiring continuous maintenance or updates" beyond the scope of Title III, but DOJ does not explain why that interpretation is wrong, nor does it identify any other dynamic records in the election context that have historically been available to DOJ but would no longer be accessible through a Title III demand. Br. 28-29. DOJ further suggests that "list maintenance keeps the SVRL current" without "alter[ing]" it, as Title III would forbid. Br. 30. But "alter" simply means "to cause to become different in some particular characteristic." *Alter*, *Webster's Third New International Dictionary* 63 (1966). The very point of list maintenance to keep the SVRL "current" is that the list

---

[10] In a footnote, DOJ cites two instances where Congress drafted statutes to reach certain records that were "created or made available for use by, obtained by, or otherwise came into the possession of" an agency. Br. 19 n.4. DOJ argues this shows that Congress has used the phrase "came into the possession" to "encompass both self-generation and receipt from an outside source." *Id.* In fact, it demonstrates that Congress *distinguishes* between those two categories, making clear that a record is covered if it was "created" *or* "obtained" by an agency.

will "become different" every time a voter registers, updates their registration, or is removed.[11]

DOJ also cites *Fischer v. United States*, 603 U.S. 480 (2024), to argue that the term "alter" applies only to actions that impair the document's evidentiary value, *see* Br. 29; but *Fischer* reached that conclusion because the obstruction-of-justice statute the Court there was tasked with construing contains an additional *mens rea* requirement that the CRA does not. *See* 603 U.S. at 487 (applying 18 U.S.C. §1512, which criminalizes altering documents "with the intent to impair the object's integrity or availability for use in an official proceeding"). That said, depending on the issue being investigated, updating an SVRL might well impair its evidentiary value—such as if an ineligible voter previously listed were removed.

"Alter" "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *City and Cnty. of S.F. v. EPA*, 604 U.S. 334, 350 (2025) (citation omitted). Read together, the CRA's requirements that covered records be

---

[11] DOJ cites the Tenth Circuit's decision in *Voter Reference Foundation* to suggest that DOJ's reading of the CRA can be harmonized with these statutes, Br. 29-30, but that is wrong. In holding that a dynamic SVRL is a record under the NVRA, the Tenth Circuit interpreted the NVRA's directive to "*maintain*[]" records subject to disclosure. *Voter Reference Found.*, 160 F.4th at 1085 (quoting 52 U.S.C. §20501(b) (emphasis added)). Its holding hinged on the dictionary definition of "maintain": "to 'carry on' or 'keep up.'" *Id.* (quoting *Maintain*, *Oxford English Dictionary* (2d ed. 1989)). To "carry on" or "keep up" something stands in contrast to the CRA's command to "preserve," "retain," and not "alter" records. 52 U.S.C. §§20701-20702.

retained and preserved, *and* not altered, are all consistent with an obligation to keep records in a static, identical form; it does not make sense to extend that obligation to a dynamic, constantly evolving SVRL. Nor does it make sense to contend that the NVRA and HAVA are a "specific" exception to a "general" prohibition in Title III. Br. 30. Title III is clear that records subject to production are records that cannot be altered, and thus inversely, that records that can be altered are not subject to production.

As a backup, DOJ urges the Court to ignore this statutory collision because an election official is not liable for altering a record covered by the CRA absent a showing of willfulness, Br. 31, but willfulness simply means the "voluntary, intentional violation of a known legal duty," *United States v. Gentner*, 177 F.4th 519, 530 (4th Cir. 2026) (citation omitted). This knowledge requirement cannot possibly change what it means to "alter" a record. And, if this Court held that Virginia's SVRL *is* a record covered by the CRA, election officials who engage in the list maintenance that HAVA and the NVRA demand would necessarily be voluntarily and intentionally altering the SVRL—in direct violation of the CRA.[12]

---

[12] DOJ also asserts that a "majority of judges on the Sixth Circuit have determined that Title III of the CRA can be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another." Br. 28. That is incorrect. Judge Murphy's concurrence in denial of rehearing (which two other judges joined in full and a third joined in part) does not announce a definitive position on this issue; it merely identifies "room for doubt over the panel opinion's

*Sixth*, DOJ argues that regardless of who first created the SVRL, Commissioner Koski subsequently "[came] into [the] possession" of it, making it subject to the CRA. Br. 32. This again misunderstands the nature of the SVRL. Unlike an individual document submitted from a voter to an election official, the SVRL is not an individual record that is transferred from one person to another. Rather, it is an "interactive" and "centralized" database that many persons can simultaneously access and change. 52 U.S.C. §21083(a)(1); *see also Scanlan*, 838 F. Supp. 3d at 159 (describing New Hampshire's SVRL as a "continuously maintained, state-generated compilation of data" that the State "has built, updated, and controlled since its creation."). Indeed, other language in the CRA emphasizes the difference between a dynamic database maintained and updated by multiple people and a static document that one election official passes along to another. 52 U.S.C. §20701 (providing that, if records are appropriately "deposited with" another custodian, then the duty to retain and preserve "devolve[s] upon such custodian").

*Seventh*, DOJ attempts to support its position by stitching together fragments of the CRA's legislative history and historical "[c]ontext." Br. 26-27, 34-36. But the isolated historical fragments DOJ points to cannot override the CRA's plain text: when statutory language is clear, it is improper to "resort to legislative history to

---

interpretation" of Title III. *United States v. Benson*, 187 F.4th 462, 463-69 (6th Cir. 2026) (Murphy, J., concurring in denial of rehearing en banc).

determine what Congress intended its enactments to mean." *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 288 n.15 (4th Cir. 2004). Moreover, DOJ's retelling of the CRA's history and context is wrong. The Commission Report that prompted enactment of the CRA explains why Congress was focused on application materials. The Commission found its investigations thwarted by Jim Crow officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep.* 93, and it determined that comparing such applications to accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137; *see also Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*. DOJ needed *applications* specifically because, "[w]ithout access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race." *United States v. Evans*, No. 25-CV-4403, 2026 WL 2267774, at *9 (D.D.C. Aug. 6, 2026).

Unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Id.* at *10 (emphasis added). Regardless, voter lists (although not SVRLs, with their detailed personal identifying information) were *already* available to DOJ in most States because "voter rolls have long been treated as public records, which

are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why, "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* Congress drafted the CRA to cover records that were *not* available, rather than records treated as public.

Ultimately, DOJ's statutory argument rests on its policy preference about how it would like to be able to enforce voting laws. Br. 33-34. But "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). DOJ's present campaign for States' SVRLs is unprecedented. If Congress thought it necessary for DOJ to audit unredacted SVRLs to assess compliance with the NVRA and HAVA, it would have given DOJ the authority to do so *in the NVRA and HAVA*. *Bellows*, 834 F. Supp. 3d at 125. Instead, HAVA affirms that SVRLs are to be "maintained" and "administered" at "the State level," 52 U.S.C. §21083(a)(1)(A), as does the NVRA, *see id.* §20507(a).

## II. The Court should also affirm because of other flaws in DOJ's claim.

DOJ's demand also fails for a host of independent reasons addressed by the parties below, each of which provides an independent basis to affirm.

### A. DOJ's CRA demand is subject to meaningful judicial review.

The district court properly assessed whether DOJ's demand complied with the CRA's requirements, and under the appropriate process: the Federal Rules of Civil Procedure. *See* JA2 n.3 (citing many other decisions reaching same conclusion). Relying almost entirely on *Lynd*, a Fifth Circuit case from 1962, DOJ argues that it is entitled to a "special statutory proceeding" that leaves no room for "judicial review" of its compliance with the CRA's requirements. Br. 40. This is baseless.

The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts[.]" JA2 n.2 (quoting Fed. R. Civ. P. 1). This case is just such an action. Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—but none involve the CRA. *See* Fed. R. Civ. P. 81(a). As a result, the barrier DOJ faces here is high: the Federal Rules "are the default rules in civil litigation," and while Congress may override that command, courts "do not lightly infer that Congress has done so; and silence on the subject is seldom enough." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023).

Nothing in the CRA supports the exemption that DOJ seeks. By its plain text, the CRA provides that federal district courts "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. §20705 (emphasis added). That language cannot be read to insulate CRA claims from routine

judicial review or displace the Federal Rules. Just two years after *Lynd*, the Supreme Court construed a statute with materially identical language ("appropriate process") and held that, because it "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. DOJ appears to recognize this: Despite suggesting that the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. *See* Br. 13.

*Powell* also recognizes the role of judicial review in actions to enforce government document demands. *Powell* explains that a reviewing court must ensure that the demand is made pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, and that the underlying statute authorizing the demand has been satisfied. *See* 379 U.S. at 58. It underscores that "[i]t is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Id.* That more than authorizes the judicial review that the district court conducted here.

Courts evaluating DOJ's recent CRA demands have consistently held that "[t]he Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1102 (D. Or. 2026), No. 26-1231 (9th Cir. argued May 19, 2026); *see, e.g.*, *Benson*, 179 F.4th at 483 n.2; JA2 n.2 (citing cases). But even in *Lynd*, the Fifth Circuit recognized that

courts must be "open for determination" if there were a "genuine dispute" about whether a "particular paper or record" fell under the CRA. 306 F.2d at 226. This case certainly presents such a dispute.

And unlike here, the Fifth Circuit in *Lynd* had no reason to doubt that DOJ invoked the CRA for a valid purpose and complied with the statute's demand requirements: that court held that the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of … voting rights," *Lynd*, 306 F.2d at 228, and "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration and voting," *id.* at 229 & n.6. *Lynd* therefore never considered any of the issues currently before this Court.

DOJ further suggests judicial review is improper because the CRA contains no "meaningful standard" against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. Br. 40. Not so. By requiring that DOJ state "the basis and the purpose" for the demand and specifying what records fall within its scope, the CRA provides the standard for a court's review. DOJ claims a power to demand records that derives solely from statute, and the Court cannot endorse DOJ acting beyond its power—it must ensure DOJ acts "within the authority of the agency." *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 499 (4th Cir. 2011) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *Okla. Press*

*Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946) (agency investigations must be for "a lawfully authorized purpose"). Moreover, DOJ has "affirmatively embraced the process of ordinary litigation by filing a Complaint and Amended Complaint," JA2 n.2, and whether it likes it or not, is now subject to the ordinary pleading scrutiny of the Federal Rules, *see id.*

Finally, DOJ focuses much of its opening brief on the issue of whether a CRA demand is an administrative subpoena. *See* Br. 42-48. NAACP Intervenors have never argued that it is. What matters for this Court's purposes is that a CRA demand is a government document demand, which is subject to meaningful judicial review under *Powell* and must satisfy the requirements of the CRA itself—including, most notably, the requirement to provide an adequate "statement of the basis and the purpose therefor." 52 U.S.C. §20703. Whether or not a CRA demand is an administrative subpoena, DOJ's failure to satisfy these requirements required the dismissal of its action here.

**B. DOJ did not comply with the CRA's requirement that it issue a demand that states its basis.**

The CRA directs the Attorney General to make a "demand in writing," and specifies that "[*t*]*his demand* shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. §20703 (emphases added). Requiring DOJ to articulate a basis in the demand itself for why it seeks the requested information is an important check against bad-faith investigations. *See CFPB v. Accrediting Council for Indep. Colls.*

*& Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017) (quashing civil investigative demand that failed to "adequately state 'the specific conduct under investigation'" (citation omitted)). Because DOJ failed to state a basis in its August 14 demand letter, it did not comply with the CRA, and this Court may affirm the district court's holding on the alternative basis that DOJ's demand letter was facially defective.

A "basis" under the CRA means "a factual basis for investigating a violation of a federal statute." *Oregon*, 828 F. Supp. 3d at 1104; *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026) (stating the "basis" requires "specific, articulable facts pointing to the violation of federal law"), No. 26-1232 (9th Cir. argued May 19, 2026); *United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026) (collecting cases). That is consistent with dictionary definitions. *See, e.g.*, *Basis*, *Black's Law Dictionary* (4th ed. 1968) (including definitions for "basis" such as the "groundwork," "support," or "foundation" of something). DOJ's attempts to reframe the inquiry as whether it provided Virginia with "notice" ignore the statutory text. Br. 50. The CRA does not tell DOJ to provide "notice"; it orders that DOJ "shall" include "the basis" for its demand. 52 U.S.C. §20703. "The use of the word 'shall' in a statute 'creates an obligation impervious to judicial discretion.'" *Benson*, 179 F.4th at 483 (quoting *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024)).

Under that standard, DOJ's August 14, 2025 demand letter was facially inadequate. The letter is devoid of any factual content, much less any basis for DOJ's supposed investigation into Virginia's list maintenance practices. *See generally* JA56-58. And while DOJ did state a purpose in its letter—"ascertain[ing] Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," JA57—it failed to advance any factual basis for its investigation into Virginia's list maintenance activities. Stuck with a facially deficient demand, DOJ makes several attempts to evade the CRA's requirements. All are meritless.

*First*, DOJ tries to smuggle the contents of a separate communication—its July 15 letter—into its CRA demand, insisting the Court consider the "two letters ... individually and together." Br. 48. But DOJ's July 15 letter does not mention the CRA at all, JA52-54, so it cannot constitute DOJ's "demand in writing" pursuant to the CRA. *See United States v. Galvin*, 830 F. Supp. 3d 122, 128 (D. Mass. 2026). DOJ cites no authority for its attempt to string together multiple documents to provide its basis, nor can it. Congress was unequivocal: "*This* demand"—*i.e.*, the written demand required under the CRA—"shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. §20703 (emphases added). "Congress's decision to use the indefinite article 'a' ... suggests that the government must issue a *single* statutorily compliant document." *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) (emphasis added). In *Niz-Chavez*, the Supreme Court was clear that similar statutory

instructions require the government to provide "'a' single document containing the required information, not a mishmash of pieces with some assembly required." *Id.* at 161. DOJ's failure to provide the required information in a single written demand likewise violates the plain terms of the CRA. *See id.* at 172.

*Second*, even if the Court were to ignore the statute's text and consider the letters together, the July 15 letter did not articulate any factual basis to suspect Virginia may have violated federal law. The only law that the letter invokes is the NVRA, which requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" from the SVRL "by reason of—(A) the death of the registrant; or (B) a change in the residence of the registrant," pursuant to proper safeguards. 52 U.S.C. §20507(a)(4). But the July 15 letter says nothing to suggest unreasonable efforts to remove deceased voters from the SVRL, and it asserts that Virginia's rate of removing registrants for moving out of the Commonwealth "was twice as high as the national average." JA53.

*Third*, DOJ now argues that its August 14 letter stated a "legal basis" for its demand. Br. 48-49. This argument is forfeited because DOJ did not make it below. *See GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 270 n.2 (4th Cir. 2025). Regardless, "[r]eading 'basis' in the way [DOJ] suggests collapses its meaning with that of 'purpose.'" *Oregon*, 828 F. Supp. 3d at 1103. "In interpreting a statute, we should strive to give effect to every word that Congress has used to avoid surplusage."

*United States v. Umeti*, 167 F.4th 687, 699 (4th Cir. 2026) (quoting *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011)). As other courts have correctly determined, "the basis" and "the purpose" the CRA requires are "conceptually distinct." *Galvin*, 830 F. Supp. 3d at 128. While "basis" means "foundation" or "groundwork," *supra* 36, "purpose" means "an end, intention, or aim, object, plan, project." *Purpose*, *Black's Law Dictionary* (4th ed. 1968).

History confirms the plain text: demands made shortly after the passage of the CRA reveal that DOJ originally understood the CRA to require it to state its factual basis. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6 ("This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (similar); *see also Galvin*, 830 F. Supp. 3d at 128 (concluding that requiring DOJ to state a factual basis "comports with the construction given Title III by the Justice Department and federal courts in the early months and years following the statute's enactment"). DOJ cannot dodge its statutory obligation to provide a basis by pointing at its purpose. The two are distinct requirements, and DOJ's demand letter clearly lacks a basis.

### C. DOJ's claimed purpose of investigating Virginia's list maintenance program is not a proper purpose for a CRA demand.

A CRA demand must also state "the purpose therefor." 52 U.S.C. §20703. The statutory term "purpose" must be read in the context of the CRA—a law designed to enhance DOJ's enforcement powers for the protection of civil rights. *See Oregon*, 828 F. Supp. 3d at 1105 (holding that "[t]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights"). Thus, a proper purpose under the CRA must relate to protecting individual voting rights. DOJ's only stated purpose of auditing Virginia's voter list maintenance is improper, as courts have held in rejecting DOJ's parallel demands.[13]

Notwithstanding these rulings, DOJ maintains that there is "no such limitation on the scope of the basis or purpose." Br. 52. But "[i]f any purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 828

[13] *See United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877, at *5-6 (C.D. Ill. July 31, 2026); *United States v. Warner*, No. 2:26-CV-156, 2026 WL 2018877, at *6-7 (S.D.W. Va. July 13, 2026); *Bellows*, 834 F. Supp. 3d at 123-27, *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. Amore*, 831 F. Supp. 3d 149, 157 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 9, 2026); *Oregon*, 828 F. Supp. 3d at 1108-09; *Weber*, 816 F. Supp. 3d at 1183-84; *see also United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-CV-1338, 2026 WL 1999921, at *8 (N.D.N.Y. July 10, 2026) (DOJ's purported purpose "lacks any relation to the purposes for which Title III was enacted"), *appeal docketed*, No. 26-2060 (2d Cir. July 24, 2026).

F. Supp. 3d at 1104. In other words, DOJ once again has a surplusage problem, and this Court should not read "Title III so broadly as to render an express statutory obligation void of any authoritative meaning." *Warner*, 2026 WL 2018877, at *6; *see also United States v. Young*, 989 F.3d 253, 259 (4th Cir. 2021) (rejecting interpretation that would render statutory term surplusage).

DOJ's blinkered read of the CRA's purpose requirement is simply not how statutory interpretation works. "Textualists—like all those who use language to communicate—do not interpret words in a vacuum." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 301 (2026) (Barrett, J., concurring). Just as a parent's instruction to "[m]ake sure the kids have fun" does not mean a babysitter may take the kids on a multi-day jaunt to a rollercoaster park, *Biden v. Nebraska*, 600 U.S. 477, 513 (2023) (Barrett, J., concurring), the CRA's instruction that DOJ state the "purpose" for its demand does not give it carte blanche to invoke the CRA for any purpose it desires.

The proper purposes for a CRA demand can be discerned from "look[ing] to Title III's text together with the legislative backdrop against which Congress enacted the statute." *Warner*, 2026 WL 2018877, at *6. The CRA is concerned with individuals' ability to register to vote and then cast a vote freely. Its focus on "act[s] requisite to voting," 52 U.S.C. §§10101(a)(2)(B), 20701, demonstrates that its inspection provision is also rooted in an *individual's* right to vote. That unmistakable textual cue aligns with the CRA's history, which, as contemporary courts observed,

"leaves no doubt but that [the CRA] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. at 853 . And the "purpose of [T]itle III" is to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Hearings* at 700 (statement of Rep. McCulloch). This Court should reject DOJ's attempt to convert the CRA, enacted to *protect* individuals' right to vote, into a tool to further its efforts to *remove* voters from States' voter rolls.

In a last-ditch pivot, DOJ argues for the first time on appeal that its purpose in monitoring Virginia's NVRA and HAVA compliance in fact relates to voting rights. Br. 53-54. This effort fails, as such a purpose is not stated in the August 14 letter or DOJ's briefing in the district court. And even if DOJ had made this assertion earlier, it cannot use the specter of supposedly "fraudulent voting" to transform an NVRA and HAVA list-maintenance investigation into a CRA civil rights investigation. Br. 54. The authority DOJ cites makes clear that list-maintenance issues such as "failures to purge voters who have moved away or have died" do not "bear any particular importance" to a CRA inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962). When the federal government "claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). And here, the "[b]ackground legal conventions and constitutional structure [that]

inform the most natural reading of a statute," *Learning Res.*, 607 U.S. at 301 (Barrett, J., concurring), confirm that "whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them." *Bellows*, 834 F. Supp. 3d at 124.

**D. The CRA does not preempt Virginia's privacy protections.**

Even if the CRA permits DOJ to inspect Virginia's SVRL, Virginia law protects sensitive voter information from disclosure, and the CRA does not preempt those protections. *See* Va. Code Ann. §24.2-444(C); *id.* §24.2-405(C); *Raffensperger*, 2026 WL 3002013, at *8. The information Virginia protects includes "an individual's social security number, or any part thereof," and "the day and month of birth of an individual," Va. Code Ann. §24.2-444(C), precisely what DOJ demands, *see* JA44.[14]

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). As the party arguing for preemption, DOJ must "bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono*

---

[14] DOJ relied below, though not here, on an unrelated portion of Virginia law that provides limited exceptions for disclosure of social security numbers pursuant to Freedom of Information Act requests. *See* Va. Code Ann. §2.2-3815. But that exception is explicitly cabined to "[t]he provisions of [§2.2-3815]," and does not apply to the voter protections contained elsewhere in Virginia law. *Id.* §2.2-3815(B).

*v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 812-14 (1997) (citation omitted). It has entirely failed to do so.

While Congress "*can* override" state election protections, Br. 59 (emphasis added), nothing in the CRA evinces a purpose to preempt common-sense voter privacy laws like Virginia's. The statute does not speak to the issue at all. And in holding that the NVRA's inspection provision requires disclosure of voter registration records, this Court has reiterated "that disclosed voter applications [may] be redacted to omit applicants' social security numbers," because such voter information "qualifie[s] as 'uniquely sensitive information.'" *Pub. Int. Legal Found., Inc.*, 996 F.3d at 265 (quoting *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d at 333-35). Similarly, nothing in the CRA's text prohibits such redactions.

DOJ attempts to identify a preemptive conflict in the CRA by citing 52 U.S.C. §20704, which provides that DOJ may not share records obtained under the CRA except to Congress, other government agencies, or in a judicial proceeding. *See* Br. 60. But Section 304 exists to prevent *DOJ* from disclosing sensitive information; it does not speak to whether *States* may enact their own protections. Nor does it conflict with Virginia law. Both federal and state "privacy protections can coexist because the latter does not obstruct the former," *Weber*, 816 F. Supp. 3d at 1189, and they provide additional safeguards protecting highly sensitive information.

DOJ's reliance on the text and history of the CRA, Br. 60, is belied by its chief authority, *Lynd*, which recognizes that the CRA was intended only to reach "public records which ought ordinarily to be open to legitimate reasonable inspection," not "confidential, private papers and effects." 306 F.2d at 231; *see also Raffensperger*, 2026 WL 3002013, at *7 (citing same). Because there is "no explicit manifestation of Congress's intent to preempt states' voter privacy laws," *id.*, "the State's broad constitutional authority over ... voters' privacy rights," Br. 59, is not displaced. The CRA cannot require Virginia "to disclose specific types of information [it is] prohibited from disclosing under" state law. *Oregon*, 828 F. Supp. 3d at 1108.

### E. DOJ has not complied with the Privacy Act.

The record below provides additional grounds to affirm the district court's ruling: the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F. Supp. 3d at 1192-94; *cf. Willner v. Dimon*, 849 F.3d 93, 103 (4th Cir. 2017).[15] The Privacy Act protects against governmental use and retention of identifiable

[15] This claim should not be confused with the one the Supreme Court expressed reservations about in separate litigation. In *Department of Homeland Security v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026), the Court stayed a judgment that had blocked the Department of Homeland Security's (DHS) modified Systematic Alien Verification for Entitlements (SAVE) program, which facilitates bulk comparison of voter data with federal citizenship records. The Supreme Court did not resolve whether DHS complied with the Privacy Act. Instead, it concluded on an interim posture that an immigration statute allowing information-sharing with *DHS*—which would not apply to *DOJ's* collection of Virginia's voter file—likely authorized the modified SAVE program. *Id.* at *2-3.

personal information by requiring agencies to comply with procedural safeguards. Because DOJ has not done so, it may not obtain the data that it demands. This deficiency warranted dismissal—and now, affirmance—because it remains plain from "the face of the complaint." *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850 (4th Cir. 2016).

The Privacy Act governs any agency that "maintains" a "system of records." 5 U.S.C. §552a(e). A "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* §552a(a)(5). The term "maintain" is defined to include "maintain, collect, use, or disseminate." *Id.* §552a(a)(3). DOJ does not contest that Virginia's SVRL—which contains the names of all registered voters as well as their voter registration identifiers and other identifying information—qualifies as a "system of records" under the Privacy Act. *Accord Schwier v. Cox*, 412 F. Supp. 2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). Accordingly, for DOJ to "collect," "use," or "maintain" Virginia's SVRL, it must first comply with obligations imposed by the Act. *See* 5 U.S.C. §552a(e); *Weber*, 816 F. Supp. 3d at 1193.

One such obligation is that, before an agency may "establish[] or revis[e]" a "system of records," it must "publish in the Federal Register ... a notice of the

existence and character of the system of records." 5 U.S.C. §552a(e)(4). The System of Records Notice or "SORN" must include a defined set of information about the records stored in the system, including the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. *Id.* §552a(e).

DOJ does not contest that it was required to issue a compliant SORN before engaging in activity covered by the Act. Br. 62; *LULAC v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 115-16 (D.D.C. 2026), *appeal docketed*, No. 26-5476 (D.C. Cir. July 2, 2026). But to demonstrate compliance, DOJ merely points to a preexisting SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." Br. 62. This SORN is deficient several times over.

*First*, it does not disclose what DOJ intends to do with the data—indeed, it does not even *mention* the NVRA, HAVA, or the CRA, which DOJ has identified in connection with its data collection effort. *See, e.g.*, Br. 1, 5-6, 8-9. DOJ notes that the SORN refers to the Civil Rights Division's website, which in turn mentions the statutes, *see* Br. 63 n.11, but the Privacy Act requires information in the SORN to be "publish[ed] in the Federal Register," 5 U.S.C. §552a(e)(4)—not on an agency's webpage. Moreover, the Division's website merely lists the statutes enforced by the

Voting Section; it does not disclose the intended "routine use[s]" of the mass data collection DOJ seeks, as required by the Privacy Act. 5 U.S.C. §552a(e)(4)(D).

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists this language covers its demand because every Virginia registered voter is simultaneously a "subject" and "victim" in its "investigation into ... voter fraud." Br. 63-64. Virginia voters would be aghast to learn that DOJ views each and every one of them as a "subject"—a designation serious enough that it would normally trigger a well-advised recipient to seek criminal defense counsel. *See id.* at 63 (DOJ recognizing that a "subject" is a person whose "conduct" is under "investigation"). And it is similarly implausible to call every voter a "victim" in an investigation purportedly about the sufficiency of the State's voter roll maintenance.

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. at 47611. Although this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's full, unredacted voter list.

In sum, the SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F. Supp. 3d at 1193-94; *see also* Privacy Act of 1974, Pub. L. No. 93-579, § 2(b)(1), 88 Stat. 1896, 1896 (Congress enacted the Act to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated" by federal agencies). If DOJ could rely on a preexisting SORN that says nothing about voter registration databases to collect voter data, one of the Privacy Act's central purposes would be defeated entirely.[16]

The failure to comply with the Privacy Act requires dismissal because courts may not "command[] unlawful conduct." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79-80 (1982) (declining to "command[] unlawful conduct"); *accord Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193 (1978) (federal courts cannot grant relief that would violate specific commands of Congress); *see also South Carolina v. United States*, 243 F. Supp. 3d 673, 696 (D.S.C. 2017) (order "could not compel the agency to take an unlawful action"), *aff'd*, 907 F.3d 742 (4th Cir. 2018). And although DOJ cites *United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983), for the proposition that it need not comply with the Privacy Act—thus inviting this Court to order a violation

---

[16] The "law enforcement" exception DOJ references means only that DOJ is not *categorically* barred from collecting First Amendment information. *See* 5 U.S.C. §552a(e)(7). There is no law enforcement exception to the Act's SORN requirement. *Id.* §552a(e)(4).

of federal law—that decades-old and out-of-circuit case is distinguishable. *McAnlis* did not involve a SORN deficiency but a separate notice provision of the Privacy Act, 5 U.S.C. §552a(e)(3), and the court there concluded that the individual at issue "suffered no prejudice in failing to receive a Privacy Act notice," 721 F.2d at 337. By contrast, millions of Virginians, including Intervenors' members, would be severely prejudiced if their sensitive personal data is disclosed.

## III. If the Court reverses, it should remand for additional proceedings.

Even if the Court were to reverse, it should reject DOJ's audacious request to "remand with instructions to order Commissioner Koski to immediately produce the requested unredacted SVRL" and to immediately issue its mandate. Br. 64. Rather, the appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking Virginia's SVRL is pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). Multiple federal courts have expressed doubt about DOJ's stated purpose for seeking SVRLs. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F. Supp. 3d at 1107 (similar). Further factfinding will be necessary to determine whether DOJ's stated purpose for its demand is its true purpose.

## CONCLUSION

The Court should affirm.

October 8, 2026

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
Jacob D. Shelly
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
Tel.: (202) 948-1135

Walker R. McKusick
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Ste. 2100
Seattle, WA 98101
Tel.: (202) 948-1135

*Counsel for Intervenors-Defendants-Appellees National Association for the Advancement of Colored People and NAACP Virginia State Conference*

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors-Defendants-Appellees National Association for the Advancement of Colored People and NAACP Virginia State Conference respectfully submit that oral argument is appropriate because this case presents important issues of first impression in this Circuit.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,388 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

October 8, 2026

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

## TEXT OF RELEVANT STATUTORY PROVISIONS

### The Civil Rights Act of 1960

### 52 U.S.C. § 20701 – Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

### 52 U.S.C. § 20702 – Theft, destruction, concealment, mutilation, or alteration of records or papers; penalties.

Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

### 52 U.S.C. § 20703 –Demand for records or papers by Attorney General or representative; statement of basis and purpose.

Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

## The National Voter Registration Act

### 52 U.S.C. § 20507 – Requirements with respect to administration of voter registration.

**(a) In general** — In the administration of voter registration for elections for Federal office, each State shall—

(1) ensure that any eligible applicant is registered to vote in an election—

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except—

(A) at the request of the registrant;

(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by

reason of—

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) (inform applicants under sections 20504, 20505, and 20506 of this title of—

(A) voter eligibility requirements; and

(B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

**(b) Confirmation of voter registration** — Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.]; and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c) Voter removal programs** —

(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses

may have changed; and

(B) if it appears from information provided by the Postal Service that—

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2) (A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

(B) Subparagraph (A) shall not be construed to preclude—

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

(ii) correction of registration records pursuant to this chapter.

**(d) Removal of names from voting rolls** —

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(B) (i) has failed to respond to a notice described in paragraph (2); and

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an

election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

[ . . . ]

**(i) Public disclosure of voter registration activities** —

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of

the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

[ . . . ]

**52 U.S.C. § 20510 – Civil enforcement and private right of action.**

**(a) Attorney General** — The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.

**(b) Private right of action**

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

[ . . . ]

**<u>The Help America Vote Act</u>**

**52 U.S.C. § 21083 – Computerized statewide voter registration list requirements.**

**(a) Computerized statewide voter registration list requirements —**

(1) Implementation

(A) In general — Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement,

in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list"), and includes the following:

(i) The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.

(ii) The computerized list contains the name and registration information of every legally registered voter in the State.

(iii) Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.

(iv) The computerized list shall be coordinated with other agency databases within the State.

(v) Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

(vi) All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

(vii) The chief State election official shall provide such support as may be required so that local election officials are able to enter information as described in clause (vi).

(viii) The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State.

(B) Exception — The requirement under subparagraph (A) shall not apply to a State in which, under a State law in effect continuously on and after October 29, 2002, there is no voter registration requirement for individuals in the State with respect to elections for Federal office.

(2) Computerized list maintenance

(A) In general — The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

(i) If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 (42 U.S.C. § 1973gg et seq.) [now 52 U.S.C. § 20501 et seq.], including subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act (42 U.S.C. § 1973gg–6) [now 52 U.S.C. § 20507].

(ii) For purposes of removing names of ineligible voters from the official list of eligible voters—

(I) under section 8(a)(3)(B) of such Act (42 U.S.C. 1973gg–6(a)(3)(B)) [now 52 U.S.C. 20507(a)(3)(B)], the State shall coordinate the computerized list with State agency records on felony status; and

(II) by reason of the death of the registrant under section 8(a)(4)(A) of such Act (42 U.S.C. 1973gg–6(a)(4)(A)) [now 52 U.S.C. 20507(a)(4)(A)], the State shall coordinate the computerized list with State agency records on death.

(iii) Notwithstanding the preceding provisions of this subparagraph, if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. § 1973gg–2(b)) [now 52 U.S.C. § 20503(b)], that State shall remove the names of ineligible voters from the computerized list in accordance with State law.

(B) Conduct — The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that—

(i) the name of each registered voter appears in the computerized list;

(ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and

(iii) duplicate names are eliminated from the computerized list.

(3) Technological security of computerized list — The appropriate State or local official shall provide adequate technological security measures to prevent the unauthorized access to the computerized list established under this section.

(4) Minimum standard for accuracy of State voter registration records — The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:

(A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.], registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

(B) Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.

[ . . . ]

**52 U.S.C. § 21111 – Actions by the Attorney General for declaratory and injunctive relief.**

The Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title.

## <u>The Privacy Act</u>

**5 U.S.C. § 552a – Records maintained on individuals.**

**(a) Definitions.** — For purposes of this section—

(1) the term "agency" means agency as defined in section 552(e)(1) of this title;

(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term "maintain" includes maintain, collect, use, or disseminate;

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

(6) the term "statistical record" means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;

(7) the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

[ . . .]

**(e) Agency Requirements.** — Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of

the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance,

timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

**(f) Agency Rules.** — In order to carry out the provisions of this section, each agency

that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including special procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.