**No. 26-2002**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STEVEN KOSKI, in his official capacity as Commissioner of the Virginia Department of Elections,

*Defendant-Appellee*,

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; NAACP VIRGINIA STATE CONFERENCE; COMMON CAUSE; KATHERINE ELLENA,

*Defendants-Intervenors-Appellees*

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 26 Civ. 0042 (Young, J.)

---

**BRIEF OF INTERVENOR-DEFENDANTS-APPELLEES COMMON CAUSE AND KATHERINE ELLENA**

---

PATRICIA YAN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

ARI J. SAVITZKY
DAVIN ROSBOROUGH
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Counsel for Common Cause and Katherine Ellena*

## DISCLOSURE STATEMENT

Defendant-Appellee Common Cause states pursuant to Federal Rule of Appellate Procedure 26.1 that they do not have any parent corporation and no publicly held corporation owns 10% or more of their stock.

Defendant-Appellee Katherine Ellena states pursuant to Federal Rule of Appellate Procedure 26.1 that she is a natural person thus does not have any parent corporation and no publicly held corporation owns any stock.

# TABLE OF CONTENTS


DISCLOSURE STATEMENT .......... 2

TABLE OF CONTENTS .......... 3

TABLE OF AUTHORITIES .......... 5

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

A. Statutory Background: Title III of the Civil Rights Act of 1960 .......... 4

B. Factual Background .......... 6

C. Procedural Background .......... 15

SUMMARY OF ARGUMENT .......... 17

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 19

I. THE SVRL IS OUTSIDE THE SCOPE OF TITLE III. .......... 19

A. The SVRL Did Not "Come Into [the] Possession" of Virginia Election Officials. .......... 19

B. DOJ's Contrary Arguments Lack Merit. .......... 24

II. DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS .......... 32

A. The Federal Rules Apply. .......... 33

B. DOJ Failed to Provide "a Statement of the Basis and the Purpose" for Its Demand. .......... 39

III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT. ............................................. 56

CONCLUSION ............................................................................. 61

# TABLE OF AUTHORITIES

## Cases

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962)....5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....19

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999)....60

*Corner Post, Inc. v. Board of Governors of the Federal Reserves System*,
603 U.S. 799 (2024)....41

*Department of Commerce v. New York*,
588 U.S. 752 (2019)....56

*Donaldson v. United States*,
400 U.S. 517 (1971)....36

*Duncan v. Walker*,
533 U.S. 167 (2001)....43

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993)....57

*Honeycutt v. United States*,
581 U.S. 443 (2017)....20

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962)....6

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)....6

*Loughrin v. United States*,
573 U.S. 351 (2014)....29

*Megaro v. McCollum*,
66 F.4th 151(4th Cir. 2023) .......... 19

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......... 41, 56

*Pharmaceutical Coalition for Patient Access v. United States*,
126 F. 4th 947(4th Cir. 2025). .......... 23

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .......... 28, 58, 59

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) .......... 48, 52, 53

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 58, 59

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) .......... 58

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020) .......... 18

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990) .......... 60

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 40

*U.S. v. Mississippi*,
380 U.S. 128 (1965) .......... 22

*United States v. Adams*,
No. 26-cv-00019, 2026 WL 2123871
(E.D. Ky. July 23, 2026) .......... 16, 19, 33

*United States v. Aguilar*,
No. 25-cv-00728, 2026 WL 2364502
(D. Nev. Aug. 14, 2026) .......... 15, 19, 25, 43

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ............................................ passim

*United States v. Bellows*,
834 F. Supp. 3d 113 ..................................................... 15, 19, 33, 50, 53

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .................................................... passim

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026)............................. 15, 19, 23, 29

*United States v. Board of Elections of New York*,
No. 25-cv-1338, 2026 WL 1999921
(N.D.N.Y. July 10, 2026) .................................................. 16, 19, 25, 33

*United States v. Caldwell*,
No. 26-cv-2025, 2026 WL 2186515
(D.N.J. July 29, 2026)........................................................... 16, 19, 33

*United States v. Cartwright*,
230 F. Supp. 873 (M.D. Ala. 1964) ......................................................6

*United States v. DeMarinis*,
No. SAG-25-3934, 2026 WL 1780586
(D. Md. June 18, 2026) ......................................................... 15, 19, 33

*United States v. Evans*,
No. cv 25-4403, 2026 WL 2267774
(D.D.C. Aug. 6, 2026)...................................................... 15, 19, 26, 28

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) .................................. 15, 19, 23, 33

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026)....................................... 15, 40, 42

*United States v. Griswold*,
No. 25-cv-3967, 2026 WL 2235374
(D. Colo. Aug. 3, 2026)............................................................. passim

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877
(C.D. Ill. July 31, 2026) ............................................................ passim

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964)............................................................4

*United States v. Oliver*,
No. 25-cv-01193, 2026 WL 2031479
(D.N.M. July 14, 2026) ................................................... 16, 33, 46, 55

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026)...............................................4, 15

*United States v. Powell*,
379 U.S. 48 (1964) .........................................................................34, 35

*United States v. Scanlan*,
No. 25-cv-371, 2026 WL 1864054
(D.N.H. June 29, 2026)........................................................... passim

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026) ......................................... passim

*United States v. Simms*,
914 F.3d 229 (4th Cir. 2019)............................................................25

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778
(D. Minn. Aug. 17, 2026) ....................................................... 15, 19, 28

*United States v. Smith*,
395 F.3d 516 (4th Cir. 2005)............................................................19

*United States v. Thomas*,
No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026) ............ 16, 19

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877 (D.W.V. July 13, 2026)........... passim

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... passim

*United States v. Wisconsin Elections Commission*,
833 F. Supp. 3d 949 (W.D. Wis. 2026).......... 15, 19, 29

*Zak v. Chelsea Therapeutics International, Ltd.*,
780 F.3d 597 (4th Cir. 2015).......... 19

**Statutory and Constitutional Authorities**

5 U.S.C. § 552 .......... 57

5 U.S.C. § 552a .......... 57, 59, 60

8 U.S.C. § 1454 .......... 29

13 U.S.C. § 214 .......... 21

18 U.S.C. § 1703 .......... 21

18 U.S.C. § 654 .......... 21

26 U.S.C. § 7604 .......... 34

28 U.S.C. § 1291 .......... 3

28 U.S.C. §1331 .......... 3

28 U.S.C. §1343 .......... 3

30 U.S.C. §1732(b).......... 29

44 U.S.C. § 3501 .......... 58

50 U.S.C. § 217 .......... 21

52 U.S.C. § 20501 .......... 7

52 U.S.C. § 20507 .......... passim

52 U.S.C. § 20701 .......... passim

52 U.S.C. § 20702 .......... 23

52 U.S.C. § 20703 ........ passim

52 U.S.C. § 20705 ........ 5, 34

52 U.S.C. § 20901 ........ 7

52 U.S.C. § 20922 ........ 7

52 U.S.C. § 21083 ........ 53

52 U.S.C. § 21085 ........ 53

U.S. Constitution Article I, § 4 ........ 3

**Other Authorities**

106 Cong. Rec. H5,326 (daily ed. March 11, 1960 ........ 5

106 Cong. Rec. S6,959 (daily ed. March 30, 1960) ........ 35

*Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis ........ 42

Brian Landsberg, *Free at Last to Vote* (2007) ........ 31

*CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*, Citizens for Responsibility and Ethics in Washington (published Dec. 19, 2025) https://www.citizensforethics.org/legal-action/lawsuits/crew-sues-doj-for-failing-to-produce-records-on-voter-data-collection/ ........ 14, 15

David Gilbert, *The DOJ Misled a Judge About How It's Using Voter Roll Data*, WIRED (Apr. 6, 2026), https://perma.cc/KX7Z-ARGB; David Gilbert, *ICE Plans to Pay $5 Million to Create National Voting Database*, WIRED (Sept. 2, 2026), https://perma.cc/J8RU-VEMM ........ 10

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ........ 9

Executive Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) .......... 13

Emily Bazelon & Rachel Poser,
*The Unraveling of the Justice Department*, N.Y. TIMES, Nov. 16, 2025,
https://perma.cc/L39A-S5VZ ........................................................ 11

Jonathan Shorman,
*DOJ is Sharing State Voter Roll Lists with Homeland Security*,
STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F .................. 10

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025,
https://perma.cc/6P7X-NZXL ........................................................ 9

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice (updated August 28, 2026),
https://perma.cc/DFJ2-ERTE. ................................................ 8, 12

Letter to Secretary Markwayne Mullin from Senator Alex Padilla
(Sept. 13, 2026), https://perma.cc/2LAD-25KV .................................. 13

Memorandum Opinion of Office of Legal Counsel (May 12, 2026),
https://www.justice.gov/olc/media/1440346/dl .................................. 14

Miles Parks & Jude Joffe Block,
*Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8. .................. 9

Note, *Federal Protection of Negro Voting Rights*,
51 Virginia L. Rev. 1051 (1965) ................................................... 30

Notice of Corrections to the Record,
*American Federation of State, County and Municipal. Employees., AFL-CIO v. Social Secretary Administration*,
No. 25-cv-596, (D. Md. Jan. 16, 2026), Dkt. No. 197 ........................... 11

Reid Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://perma.cc/E75W-SRZD .... 13

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026, https://perma.cc/T66C-RYRC ........................................................ 10

The Federalist No. 60
(Alexander Hamilton) ........................................................................ 3

U.S. Commission on Civil Rights,
*Report of the U.S. Commission on Civil Rights 1959* (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf ................... 22

U.S. Election Assistance Commission,
*Election Administration and Voting Survey 2024 Comprehensive Report* ........................................................................ 7,47,52

**Rules**

Fed. R. Civ. P. 1 ........................................................................ 35

Fed. R. Civ. P. 12(b)(6) ........................................................................ 19

Fed. R. Civ. P. 16(b) ........................................................................ 38

Fed. R. Civ. P. 56 ........................................................................ 38

Fed. R. Civ. P. 81 ........................................................................ 35, 36

# INTRODUCTION

The United States, through the Civil Rights Division of its Department of Justice (DOJ), is attempting to seize millions of citizens' sensitive voter data over the objection of their own state governments. A unanimous array of twenty-seven different federal courts has held those efforts unlawful because the Civil Rights Act of 1960 (CRA) does not authorize the Administration to seize private, sensitive voter data or conduct baseless fishing expeditions into state voter rolls. This Court should join the resounding chorus.

Beginning last Fall, DOJ began demanding that states turn over complete and unredacted copies of their statewide voter registration lists (SVRLs), which contain the sensitive information of every voter in the state, such as driver's license numbers and partial social security numbers.DOJ claims that Title III of the CRA, 52 U.S.C. § 20701 *et seq.*, a 1960s voting rights statute passed to remedy Black voter disenfranchisement in the Jim Crow South, entitles the federal government to seize the personal identifying information of millions of Virginia voters today. It does not. This Court can affirm the district court's rejection of the CRA claim on multiple grounds.

*First*, Virginia's SVRL does not fall within the "records and papers" contemplated by the CRA. The CRA covers only records that have "come into [the] possession" of state election officials, like the voter registration applications submitted by Black voters that motivated the statute's passage. 52 U.S.C. § 20701. But the SVRL was *created by* Virginia in the first place.

*Second*, DOJ failed to provide the written "statement of the basis and the purpose" for its demand that Title III expressly requires. 52 U.S.C. § 20703. DOJ never provided any factual "basis" whatsoever in its CRA demand letter. And DOJ's supposed "purpose" is also unsound and an obvious pretext for interfering with elections and creating an unauthorized national voter database.

*Third*, the relief DOJ seeks—forced disclosure of millions of Virginians' sensitive, protected data—would impermissibly burden voting and privacy rights, threatening to chill political participation and activity. Disclosure of the unredacted SVRL would be unlawful even if the CRA otherwise authorized it.

The Framers vested states, not the federal executive, with responsibility for managing most aspects of federal elections to protect

our democracy from "tyrants." The Federalist No. 60 (Alexander Hamilton); *see* U.S. Const. art. I, § 4, cl. 1. This Administration's unprecedented and baseless intrusion into the machinery of our elections must be rejected. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether a state's SVRL, which is a database created by a state's chief election official, is a "record[] . . . which come[s] into [their] possession" within the meaning of Title III, 52 U.S.C. § 20701.
2. Whether DOJ can obtain a covered record under Title III in the absence of a "demand in writing by the Attorney General or his representative . . . contain[ing] a statement of the basis . . . therefor." 52 U.S.C. § 20703.
3. Whether DOJ can obtain a covered record under Title III where its written "statement of the basis and the purpose therefor," 52 U.S.C. § 20703, is invalid or pretextual.

4. Whether the redaction of sensitive personal information from the Virginia SVRL would be required to avoid a constitutional violation or a violation of federal privacy law.

## STATEMENT OF THE CASE

### A. Statutory Background: Title III of the Civil Rights Act of 1960

Congress enacted Title III to stop Jim Crow states from denying Black citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956 at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt in nearly a century to enforce the Reconstruction Amendments' voting guarantees. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). With Title III, Congress sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that elections officials retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney

General . . . be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

While Congress wanted DOJ to investigate constitutional violations, some, including Florida Congressman William Cramer, were concerned Title III powers would be used for "fishing expedition[s]." 106 Cong. Rec. H5,326 (daily ed. March 11, 1960. To address these concerns, Congress adopted Representative Cramer's amendment to Title III, which added a requirement that a records demand include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. H5,326 (daily ed. March 11, 1960. Congress anticipated judicial review over such statements of basis and purpose, specifying that "[t]he United States district court for the district in which a demand is made pursuant to [S]ection 20703 of this title, . . . shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

DOJ initially used Title III as intended, to investigate jurisdictions that had denied voter registration to Black Americans. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 586–89 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (investigation of registration records showing discriminatory

practices led to less than 10% Black registration rate); *see also United States v. Cartwright*, 230 F. Supp. 873, 875 (M.D. Ala. 1964) (investigation revealed registrars engaged in racially discriminatory practices resulting in 7.5% Black registration). In conducting those investigations, DOJ followed the law by setting forth in writing "the basis and the purpose" for its demands—that is, the factual basis for why it suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

This robust use of Title III was short lived. In 1965, Congress passed the Voting Rights Act, which established broad new voter protections and led to the enfranchisement of millions of Black citizens. Judicial assessment of Title III thus has largely been silent since 1965.

### B. Factual Background

#### *1. DOJ Seeks Virginians' Sensitive Voter Data*

Sixty years later, on July 15, 2025, DOJ sent a letter to Susan Beals, Virginia's then-Commissioner of the Department of Elections, demanding, pursuant to the National Voter Registration Act (NVRA),

52 U.S.C. § 20501 *et seq.*, an electronic copy of Virginia's entire SVRL. JA52–54.

The July 15 letter did not mention the CRA. JA52–54. It did not claim any deficiencies in Virginia's voter list maintenance practices or inconsistencies with the NVRA or the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq*. *Id*. In addition to requesting the SVRL, the July 15 letter propounded six questions regarding Virginia's responses to the Election Administration and Voting Survey 2024 Comprehensive Report (2024 EAVS Report). JA53. The 2024 EAVS Report is a biennial report published by the U.S. Election Assistance Commission (EAC),[1] which broadly reports survey data about federal elections management from all fifty states and U.S. territories, providing an overview of America's decentralized electoral system.[2]

On August 14, DOJ sent another letter again demanding the full electronic voter file, with "*all fields*, including the registrant's full name,

---

[1] The EAC was established by HAVA to be an independent federal agency charged with, among other functions, serving as a national clearinghouse for the compilation of information and review of procedures regarding the administration of federal elections. *See* 52 U.S.C. § 20922.

[2] *See U.*S Election Assistance Comm'n*, Election Administration and Voting Survey 2024 Comprehensive Report* i-ii (2025), https://perma.cc/9M99-STAY.

date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number" included. JA56–58. DOJ's August 14 letter for the first time cited Title III as authority for its request. *Id.* It stated that "[t]he purpose of this request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," but did not reference any potential compliance deficiencies with respect to those statutes' voter list maintenance requirements or any other factual basis for the request. JA57.

Virginia did not produce the unredacted SVRL, and DOJ eventually filed a single-count federal civil action under the CRA, JA37–46—one of thirty-one nearly identical actions DOJ has initiated across the country—seeking to compel production of Virginians' sensitive data.[3] The Complaint did not allege any violations of the NVRA or HAVA.

---

[3] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated August 28, 2026), https://perma.cc/DFJ2-ERTE.

### 2. *The Administration Seeks to Build an Illegal National Voter Database and to Use It to Disenfranchise Voters.*

DOJ's requests for private, sensitive voter data appear to be in connection with novel efforts to construct a national voter database for use in challenging voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[4] Within months of the Administration's taking office, DOJ officials asked staffers from the new Department of Governmental Efficiency (DOGE) to identify supposed noncitizens on state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote, including and especially naturalized citizens.[5] DOJ has also been coordinating in these unprecedented efforts with the federal Department of Homeland Security

---

[4] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html

[5] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

(DHS), according to reported statements from both agencies and DOJ's admissions in open court.[6] DOJ has acknowledged it has begun pooling the voter data it obtains, and DHS has meanwhile recently offered $5 million to a private contractor to build a national voter database.[7]

Around the time that DOJ first began filing these lawsuits, one article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in these cases regarding the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons.

---

[6] *See* JA127–128, 142–143 (Mar. 26, 2026 Hr'g Tr. at 50:21–23, 65:1–66:18, *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025) (admitting planned provision of voter data to DHS)); *see also, e.g.*, Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS, Mar. 26, 2026, https://perma.cc/T66C-RYRC; Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://perma.cc/8HCR-S45F.

[7] David Gilbert, *The DOJ Misled a Judge About How It's Using Voter Roll Data*, WIRED (Apr. 6, 2026), https://perma.cc/KX7Z-ARGB; David Gilbert, *ICE Plans to Pay $5 Million to Create National Voting Database*, WIRED (Sept. 2, 2026), https://perma.cc/J8RU-VEMM .

> That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES, Nov. 16, 2025, https://perma.cc/L39A-S5VZ.

Administration officials have also been working with outside "election integrity" advocates, apparently mishandling sensitive personal data in the process. For example, as detailed in a court filing on behalf of the SSA:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group.

Notice at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596, (D. Md. Jan. 16, 2026), Dkt. No. 197.The filing, which does not specify the terms of the "Voter Data Agreement" or the activities DOGE actors or others undertook pursuant to it, also indicates that, around the same period, DOGE shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6

Additional government documents suggest that the Administration plans to use voters' sensitive personal data to assert control over voting eligibility in the states. In particular, DOJ has asked states to execute a memorandum of understanding (MOU) in connection with its requests for states' voter data. *See* JA68–76.[8] The MOU purports to vest DOJ with substantial new authority to compel states to remove people from the voter rolls, depriving them of the franchise. JA69, 72. Specifically, under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and compel states to "remov[e]" these voters "within forty-five (45) days." JA72. These removals are purportedly required by the MOU despite the protections of the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within 90 days of an election, 52 U.S.C. § 20507. The MOU would thereby turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters.

In parallel, DHS has launched an "Unlawful Voter Initiative," tasking hundreds of employees with investigating voters by gathering

---

[8] In addition to the executed copy of the MOU included in the Joint Appendix, see Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.1.

voter information from state government sources using identifying information held by DHS and, if necessary, falsely attesting that they are the voter or are authorized to access the voter's information.[9]

The actions of the President and other officials also highlight the Administration's impermissible aims. For example, earlier this year, President Trump announced his desire to "take over the voting" and "nationalize" elections in certain states. Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://perma.cc/E75W-SRZD. The next month, the President issued an executive order, in part directing DHS, in coordination with SSA, to compile lists of citizens eligible to vote in each state, *see* EO No. 14,399 § 2(a), 91 Fed. Reg. 17,125 (Mar. 31, 2026).

Additional recent statements and disclosures have confirmed that DOJ plans to use Virginians' data in collaboration with DHS, rather than for any purpose related to list maintenance under HAVA. For example, in a May 2026 memorandum from its Office of Legal Counsel, DOJ explained that its efforts to seek statewide voter lists come "[i]n response

---

[9] *See* Letter to Sec'y Markwayne Mullin from Sen. Alex Padilla (Sept. 13, 2026), https://perma.cc/2LAD-25KV.

to the President's order to identify those who may be voting illegally," and that DOJ plans "to share the lists with Homeland Security Investigations . . . or another unit within DHS." *See* Mem. Op. of O.L.C. (May 12, 2026), https://www.justice.gov/olc/media/1440346/dl (OLC Memo) at 1. Notably, DHS plays no role in enforcing HAVA or the NVRA.

Internal documents recently produced by DOJ in response to FOIA requests document that DOJ entered into an agreement with DHS in July 2025 to run state voter lists through the Systemic Alien Verification for Entitlements (SAVE) program and planned to pressure states to do the same.[10] The documents also indicate that DOJ contemplated using voter data for criminal enforcement, noting "Crim Section may have some uses for the data . . . once we get results from SAVE."[11]

These are not the purposes that DOJ disclosed to Virginia or has advanced in this litigation. But the FOIA documents make clear that DOJ's silence on these planned uses was deliberate: DOJ's internal view

---

[10] *See CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*, Citizens for Resp. & Ethics in Wash. (published Dec. 19, 2025) https://perma.cc/2BB3-WMN2 (last accessed Aug. 20, 2026); *id.*, Apr. 14, 2026, Records: Part 1, CREW v. DOJ-CRT-00752, 00828, https://perma.cc/CQU6-68RR.

[11] *Id.*, Apr. 14, 2026, Records, Part 2, CREW v. DOJ-CRT-001182, https://perma.cc/T9B9-XJQW.

was that it had no obligation "to give the states information about what we are going to do with the data," and remarkably, that "[n]o judge will have authority to limit us beyond a promise of Federal law compliance."[12]

### C. Procedural Background

DOJ has now filed more than thirty lawsuits seeking to obtain state SVRLs pursuant to Title III. Every court that has passed upon the validity of these actions—now twenty-seven in all, including the Sixth Circuit—has held that DOJ's demand is unenforceable.[13]

---

[12] *Id.* at CREW v. DOJ-CRT-001163.

[13] *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026); *United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949 (W.D. Wis. 2026); *United States v. Bellows*, 834 F. Supp. 3d 113 (D. Me. 2026); *United States v. Fontes*, 832 F. Supp. 3d 944 (D. Ariz. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *Oregon*, 828 F. Supp. 3d 1092; *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Hobbs*, No. 25-cv-6078, 2026 WL 2833713 (W.D. Wa. Sept. 22, 2026); *United States v. Hanzas*, No. 25-cv-00903, 2026 WL 2754349 (D. Vt. Sept. 17, 2026); *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 25-cv-00728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *United States v. Evans*, No. cv 25-4403, 2026 WL 2267774, at *1 (D.D.C. Aug. 6, 2026); *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. 26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 26-cv-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v.*

The district court here is one of them. JA1–13. Following full briefing on DOJ's motion to compel, JA47–48, and Rule 12 motions from Commissioner Beals' successor Defendant Steven Koski, Intervenor-Defendants Common Cause and Katherine Ellena, and Intervenor-Defendants the NAACP and the Virginia State Conference of the NAACP, the district court held that "Virginia's SVRL is not a record subject to production under Title III of the CRA" because the SVRL is a record that is created by state officials and not one that "come[s] into [their] possession" within the meaning of the statute. JA8 (citing 52 U.S.C. § 20701). The district court explained that, "Commissioner Koski did not acquire, obtain, or receive Virginia's SVRL. Rather—and as mandated by the HAVA—Virginia election officials created the database

*Thomas*, No. 26-cv-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Oliver*, No. 25-cv-01193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877 (S.D.W.Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. DeMarinis*, No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *see also* Order, *United States v. Raffensperger*, No. 26-cv-485, Dkt. No. 146 (N.D. Ga. Sept. 30, 2026); *United States v. Koski*, JA1–13.

themselves." JA9 (citations omitted). The court did not reach any of the other arguments in favor of dismissal.

This timely appeal followed. JA192–193.

## SUMMARY OF ARGUMENT

The CRA claim here is legally deficient many times over, and there are multiple independent bases on which to affirm.

*First*, Title III does not reach the records DOJ seeks. Title III covers only documents that "come into [the] possession" of election officials. 52 U.S.C. § 20701. The SVRL is a record Commissioner Koski's office *created*, not one obtained from some external source, and thus did not "come into his possession" as a matter of plain text. This reading interprets Title III harmoniously with the NVRA and HAVA, which requires states to create and maintain their own SVRLs.

*Second*, the United States has neither pleaded nor provided a valid "statement of the basis and the purpose" for its demand for Virginia's unredacted SVRL, as Title III requires. 52 U.S.C. § 20703. The August 14 letter in which DOJ invoked the CRA and demanded the SVRL pursuant to it contained no factual basis for its demand. DOJ's attempt to backfill a factual basis for its demand for the first time on appeal, by

citing to the July 15 letter's reference to Virginia's 2024 EAVS survey responses, is both waived and in any event meritless. And DOJ also failed to plead or provide a valid "purpose," an independent ground to affirm. The generalized purpose DOJ pointed to (namely, ascertaining Virginia's compliance with the NVRA and HAVA) does not match the records demanded; a single point-in-time SVRL provides no insight into Virginia's list maintenance process or procedures. And even if this supposed purpose were otherwise valid, it is invalidated here because judicially noticeable materials demonstrate that it is pretextual.

*Finally*, the relief sought—disclosure of the SVRL without redactions to protect the privacy of millions of Virginia voters—cannot be granted without trammeling constitutional and privacy rights, and thus cannot be granted at all. That is another basis for affirmance.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss de novo." *E.g.*, *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). The Court "may affirm on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

Dismissal is proper if, accepting all well-pleaded factual allegations as true, the complaint does not plausibly "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a Rule 12(b)(6) motion, courts may consider "documents attached to the complaint as exhibits" and may also "take judicial notice of matters of public record." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *see also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

## ARGUMENT

### I. THE SVRL IS OUTSIDE THE SCOPE OF TITLE III.

#### A. The SVRL Did Not "Come Into [the] Possession" of Virginia Election Officials.

This Court can affirm because the SVRL is not covered by Title III in the first place, as nineteen courts have held.[14]

[14] *See Benson*, 179 F.4th at 480–81; *Schmidt*, 835 F. Supp. 3d at 699; *Bellows*, 834 F. Supp. 3d at 123; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 953–955; *Fontes*, 832 F. Supp. 3d at 954; *Benson*, 819 F. Supp. 3d at 770; *Hanzas*, 2026 WL 2754349, at *4–5; *Simon*, 2026 WL 2389778, at *11; *Aguilar*, 2026 WL 2364502, at *5; *Evans*, 2026 WL 2267774, at *5, *11; *Griswold*, 2026 WL 2235374, at *4–5; *Matthews*, 2026 WL 2212877, at *3–4; *Caldwell*, 2026 WL 2186515, at *6–8; *Adams*, 2026 WL 2123871, at *4–5; *Thomas*, 2026 WL 2070437, at *7; *Koski*, JA6–10; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *DeMarinis*, 2026 WL 1780586, at *5.

Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The statute then obligates officials to turn over "[a]ny record or paper required by [S]ection 20701 . . . to be retained and preserved," *id.* § 20703. While "all records and papers . . . relating to any application, registration, . . . or other act requisite to voting" is indeed broad language, *see* U.S. Br. 20–21, Title III also provides an immediate textual limitation to those otherwise wide parameters: Only those records or papers that have "come into [the official's] possession" must be retained and provided in response to a valid Title III demand. 52 U.S.C. § 20701.

The SVRL falls outside the bounds of that text. The phrase "come into . . . possession" in the CRA refers to records that elections officials "'*acquire,' 'obtain,' or 'receive*,'" rather than those they *create*. *United States v. Benson*, 179 F.4th 470, 480 (6th Cir. 2026) (collecting and quoting contemporaneous dictionary definitions)); *see also Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or

acquire" and "to come into possession of" in interpreting terms of the Comprehensive Forfeiture Act) (internal quotation marks omitted). Indeed, Congress regularly uses the phrase "comes into possession" to refer to something that the subject obtains or acquires, rather than creates. *See, e.g.*, 13 U.S.C. § 214 (prohibiting census staff from disclosing "any information . . . which comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of money or property that "comes into [one's] possession"); 18 U.S.C. § 1703(a) (prohibiting postal employees from destroying mails that "come into [their] possession"); 50 U.S.C. § 217 (requiring servicemembers to report whenever abandoned property "comes into [their] possession"); *see also United States v. Scanlan*, No. 25-cv-371, 2026 WL 1864054, at *11 (D.N.H. June 29, 2026) ("Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source").

The SVRL is a continuously updated document created by state officials, not a record that "come[s] into [their] possession," and is thus outside of the CRA's reach.

This reading is consistent with Title III's aims. The statute was part of an effort to force Southern registrars to accept voter registration forms

submitted by Black voters, rather than rejecting and then destroying them. *See, e.g.*, U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1959* at 93 (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf ("1959 USCCR Report") ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); H.R. Rep. 86-956 at 7 (describing viewing rejected registration materials as "an essential step in the process of enforcing and protecting the right to vote"). *United States v. Mississippi*, a disconnected snippet of which DOJ repeatedly cites, is crystal clear on this point: Mississippi had repealed a prior law requiring retention of voter registration forms, such that "registrars no longer need[ed] keep any record made in connection with" voter registration applications, and state actors thereafter began "to destroy these records." *See* 380 U.S. 128, 134 (1965) (selectively quoted at U.S. Br. 15, 19). DOJ sued, alleging among other things a "direct violation of Title III . . ., which requires that records of voting registration be kept." *Id.*

Title III at its heart is a retention provision to prevent the destruction of materials submitted by would-be voters so that federal

enforcers can determine whether they were being denied registration on the basis of race. As the district court held, these aims are reflected not just in the statute's "comes into possession" language, but in Title III's subsequent language specifying that the records and papers at issue are those "relating to any application, registration, payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701—all of which "'refer[] to something that the voter submits or does as part of the registration process' and thus refers to 'records that election officials receive, rather than create.'" *United States v. Fontes*, 832 F. Supp. 3d 944, 950 (D. Ariz. 2026) (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 769 (W.D. Mich. 2026)); *accord* JA10; *see also generally Pharm. Coalition for Patient Access v. United States*, 126 F. 4th 947, 959 (4th Cir. 2025).

Reading Title III this way also harmonizes it with HAVA and the NVRA and avoids bizarre results that Congress could not have intended. Under the CRA, it is a criminal violation for anyone to "willfully steal[], destroy[], conceal[], mutilate[], or alter[] any record or paper required by [Title III] to be retained and preserved." 52 U.S.C. § 20702. Yet the NVRA and HAVA affirmatively "*require* [state] election officials to alter the [SVRL] routinely as part of their 'reasonable effort[s]' to ensure

accuracy." *Benson*, 179 F.4th at 479 (citing 52 U.S.C. § 20507(a)(4)). The SVRL thus cannot be "preserved" because the NVRA and HAVA require it to be *altered* on a constant basis. Subjecting the SVRL to Title III "would place Title III on a collision course with the NVRA and HAVA," an unharmonious result. *Benson*, 179 F.4th at 480; *accord* JA10.[15]

### B. DOJ's Contrary Arguments Lack Merit.

DOJ cannot evade the plain meaning of the text Congress chose.

Regarding text, DOJ mainly argues that Title III's specification of records that "come into [an election official's] possession" includes *any* records that the official might possess, including those that the official or their office creates in the first place. U.S. Br. 16–19.[16] But that reading

[15] DOJ suggests that conducting list maintenance constitutes "retaining and preserving" the SVRL. U.S. Br. 29–30. But adding or deleting information or entire records from the SVRL is not "preservation." And these changes are willful and intentional, *contra* U.S. Br. 31, as election officials are required to complete them by federal law. DOJ complains that this reasoning, if accepted, "would place all dynamic documents, not just the SVRL, beyond the reach of Title III." U.S. Br. 28. But DOJ identifies no other dynamic documents like the SVRL that might be at issue (and does not explain why those unnamed documents should be subject to Title III, either).

[16] The Court should ignore DOJ's citation (U.S. Br. 18) to the non-binding, self-serving OLC Memo issued by DOJ's own lawyers. The memo was "not contemporaneous with the passage of Title III" and was rather issued after DOJ began losing in its recent brood of Title III cases; it also does not "adhere[] to some earlier Executive Branch

would improperly read language out of the statute, replacing "all records and papers *which come into [their] possession*" with "all records and papers which *they possess*." DOJ's reading would violate the "well-established rule" against constructions "that render[] part of the statute superfluous." *E.g.*, *United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019). Indeed, DOJ's argument, that "[t]he defining feature of the phrase 'come into possession' … is the resulting possession—not the particular means by which that possession is secured," U.S. Br. 18, is just a fancy way of asking the Court to focus on the word "possession" and pretend the words "come into" do not exist.

DOJ's reading would upend normal rules of usage and plain common sense, too. In DOJ's telling, "[w]hen Commissioner Koski or his agents … aggregate individual voter records into an SVRL, they get or acquire a new document (the SVRL) and retain it within their control—thus coming into possession of the SVRL." U.S. Br. 21. Is DOJ is saying that each and every time Virginia election officials update the SVRL, as they constantly do in compliance with federal law, they "come into

---

interpretations of Title III," and "conflicts with the plain language of Title III." *Benson*, 179 F. 4th at 482; *see also Aguilar*, 2026 WL 2364502, at *5; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *10.

possession" of a *new* SVRL? Or that Virginia officials have been continuously "coming into possession" of the same SVRL ever since they first created it? Neither one is normal English usage. "An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Or as another court explained: "[O]ne might say, for example, that the Mona Lisa 'came into the possession' of the Louvre around 1797; one would not say that the painting 'came into the possession' of Leonardo da Vinci when he completed it around 1517." *United States v. Evans*, No. cv 25-4403, 2026 WL 2267774, at *6 (D.D.C. Aug. 6, 2026).

This Court could affirm based on text alone, but if it considers them, DOJ's other arguments do not move the needle.

*First*, DOJ invokes *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), for the proposition that "the phrase 'come into … possession' is broad enough to cover internally generated documents." U.S. Br. 19–20. *Tax Analysts* does not say that. In *Tax Analysts*, the Court interpreted the meaning of the term "agency records" in the Freedom of Information Act (FOIA) and concluded that this term

included *both* records obtained by the agency as well as those generated internally. 492 U.S. at 145–146. The case did not analyze the term "come into possession" at all. It only used the phrase in describing how a record that "come[s] into the agency's possession in the legitimate conduct of its official duties" is in the agency's "control" and is therefore an "agency record" for FOIA purposes. *Id.* Indeed, the entire premise of the dispute in *Tax Analysts* was that records that "come into the agency's possession" (i.e., that are obtained from an external source) are only *one* distinct subset of agency records, while those created by the agency are another.

Here, unlike in the FOIA context, the CRA does not use a general term like "agency records" that encompasses both records that come from third parties and records that are generated internally; rather, it expressly covers *only* those that "come into [the officials'] possession." 52 U.S.C. § 20701.[17] That difference is dispositive.

---

[17] The NVRA, unlike Title III, does use such broader language in its public disclosure provisions, requiring retention and disclosure of "*all records* concerning the implementation of programs and activities conducted for the purpose of" list maintenance. 52 U.S.C. § 20507(i)(1) (emphasis added). The NVRA's disclosure provisions thus *do* cover the SVRL, but they come subject to important safeguards for voters' protected personal information. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012); *see also infra* 58–59.

*Second*, DOJ suggests that Congress specified "records and papers which come into [election officials'] possession" in Title III to make a "temporal" distinction and thereby "cabin[] an election official's liability to documents she received during her tenure." U.S. Br. 21–24 (citation omitted). That is wrong on multiple levels.

To start, the text "says nothing about when or how [an election official] acquires the records and papers." *E.g.*, *Evans*, 2026 WL 2267774, at *7; *Simon*, 2026 WL 2389778, at *10–11. Rather, as the district court noted, Title III "already has an explicit temporal component—a period of twenty-two months from the date of certain enumerated elections—so there is no reason to believe 'come into possession' is imbued with a hidden meaning about additional time restraints." JA10; *see also United States v. Wis. Elections Comm'n*, 833 F. Supp. 3d 949, 954 (W.D. Wis. 2026) (noting Title III's temporal requirement "runs from the date of the election, not the date that the records came into election officers' possession.").[18]

[18] By contrast, 30 U.S.C. 1732(b), on which DOJ mistakenly relies (U.S. Br. 22), *does* contain explicit language making the "coming into possession" of something a temporal trigger, providing that certain "information shall be made available [to the public] not later than 30

DOJ points to 8 U.S.C. § 1454(a) as an exemplar of this supposed "temporal" use of the phrase "come into possession," but that statute further disproves its point. *See* U.S. Br. 23-34. Section 1454(a), which concerns a lost certificate of naturalization, refers to the person "who shall have, or may come into possession of it. . . ." 8 U.S.C. § 1454(a). Section 1454(a) thus "draws an explicit distinction between possessing something and having something come into one's possession." *Benson*, 819 F. Supp. 3d at 768; *accord Loughrin v. United States*, 573 U.S. 351, 357–58 (2014) (categories separated by "or" should "be given separate meanings").[19]

And, stepping back: Why would Congress have wanted to "cabin[] an election official's liability to documents she received during her tenure" (U.S. Br. 23–24) in the first place? If Title III actually worked in the way DOJ suggests, a Jim Crow county could have evaded Title III's

days after such information comes into the possession of the Secretary." Title III is not drafted that way.

[19] Further, because certificates of naturalization are created by the government, "neither the applicant nor any third party who subsequently acquires it has created it." *Scanlan*, 2026 WL 1864054, at *5. The statute thus cannot support the notion that creating a document is equivalent to coming into possession of it.

requirements by firing its registrar and having a new registrar destroy all the materials submitted to their predecessor.

*Third*, DOJ offers various purpose-based arguments that, even if they could overcome text, misread history.

DOJ claims that Title III must cover "at least some government-generated records" in order to reach supposed "indices" created by Jim Crow registrars to track which White voters had "vouched" for a new registrant. U.S. Br. 25–27, 34–35 (citing *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting)). The fatal problem with this point is that there is no evidence that these voucher lists actually existed. To be sure, some Jim Crow jurisdictions employed unequally-enforced requirements that a voter who was already registered (*i.e.*, a White person) appear in person and orally testify to vouch for any new registrant. *See* 1959 USCCR Report at 76, 90, 93–94 (describing use of voucher qualification in two counties); *see also* U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights 1961* at 52–53 (1961), https://www.usccr.gov/files/historical/1961/61-001.pdf (describing another county); Note, *Federal Protection of Negro Voting Rights*, 51 Virginia L. Rev. 1051, 1077–78, 1097–99 (1965); Brian Landsberg, *Free*

*at Last to Vote* 44, 49, 58, 64, 66–69, 112, 168–69 (2007). But neither DOJ nor the Sixth Circuit dissental on which DOJ relies cites any evidence that physical lists of voters who vouched for registrants actually existed, let alone that they were considered important by the framers of Title III.[20]

The aim of Title III was not to reach supposed voucher indices, or other publicly available documents, but the actual voter registration applications of Black would-be registrants, which Jim Crow registrars were rejecting and destroying. H.R. Rep. 86-956 at 7. Congress identified these as the "essential" evidence needed to show that Black citizens were being denied the right to register to vote. *Id.* That evidence could then support the initiation of formal litigation and the discovery process, which could reach purely internal materials if necessary.

---

[20] Officials in one Alabama county apparently made notations on a set of individual index cards corresponding to county voters indicating when the voters had vouched for new registrants. 1959 USCCR Report at 90, 93–94. This appears to be the source for the reference to "indices" of vouchers. *See Benson*, 179 F.4th at 486 (Nalbandian, J., dissenting). It is not clear that these index cards were purely internal documents. But even if they were, maintaining such written notes appears to have been the practice of that particular county; voucher rules were local practices and not mandated by state law. *See, e.g.*, *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965).

*Finally*, DOJ argues in the alternative (at U.S. Br. 31-33) that the SVRL came into Commissioner Koski's possession when he received it from his predecessor-in-office Commissioner Beals, or else from other staff in his office. This makes no sense. If the statute worked that way, Title III would be subject to random holes in coverage depending on how a given elections office happens to organize its operations and divide responsibility for creating and maintaining records. Congress defined "officer of elections" broadly to avoid such lacunae. *See.* 52 U.S.C. § 20706. Title III reaches all manner of voting-related records or papers obtained from some external source, such as the voter registration applications and forms that the statute aimed to preserve for federal review. Because Virginia's SVRL falls outside of that specified universe, the Court must affirm.

## II. DOJ DID NOT COMPLY WITH THE CRA'S "BASIS" AND "PURPOSE" REQUIREMENTS.

Even if the SVRL was covered under Title III—and it is not—DOJ failed to comply with Title III's requirement to set forth a "demand in writing" that "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. That failure provides multiple additional bases to affirm.

### A. The Federal Rules Apply.

DOJ claims that enforcing a Title III demand constitutes "a special statutory proceeding," such that the Federal Rules do not apply, and courts may conduct no "post hoc scrutiny" into DOJ's compliance with Title III's "basis and purpose" requirements. U.S. Br. 38, 40. This is wrong, as over a dozen courts have now held.[21]

To begin with the text, Title III provides: "The United States District Court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The process that is "appropriate," where DOJ has filed a civil action, is the Federal Rules of Civil Procedure.

[21] *See Benson*, 179 F.4th at 483 n.2; *Bellows*, 834 F. Supp. 3d at 122; *Fontes*, 832 F. Supp. 3d at 947 & n.1; *Amore*, 831 F. Supp. 3d at 155; *Oregon*, 828 F. Supp. 3d at 1102–03; *Weber*, 816 F. Supp. 3d at 1182; *Griswold*, 2026 WL 2235374, at *3; *Matthews*, 2026 WL 2212877, at *2; *Caldwell*, 2026 WL 2186515, at *5; *Adams*, 2026 WL 2123871, at *3–4; *Oliver*, 2026 WL 2031479, at *7; *Warner*, 2026 WL 2018877, at *2; *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *6–7; *Scanlan*, 2026 WL 1864054, at *1 n.2; *DeMarinis*, 2026 WL 1780586, at *3; *see also* JA1 n.2.

Binding precedent so holds. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court held that proceedings to enforce a federal records statute—one whose jurisdictional provision is materially identical to the CRA, with the same "by appropriate process" language—are governed by the Federal Rules, *id*. at 52, 57–58 & n.18 (citing 26 U.S.C. § 7604(a)). *Compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of [records]" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper" (emphasis added)).

The *Powell* Court was clear: Because the jurisdictional provision of the records statute there provided that requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 57–58 & n.18. Where the federal government demands the

production of documents in those circumstances, the demand may be contested as the Rules allow, on "any appropriate ground." *Id.* at 58.

The Federal Rules themselves are in accord. They "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Rules contain limited and narrow carveouts to their own application, none of which include a Title III claim. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that the Rules "apply to proceedings to compel testimony or the production of documents"). Here, DOJ filed a federal civil action seeking to compel production of documents; it cannot avoid the implications of its own decisions.

The legislative history of Title III is also consistent. As Senator Hruska explained: "[Section 305] is merely a restatement of court powers which now exist. . . . A formal court application, and any order which might flow from the court, would still remain unimpaired and without diminution." 106 Cong. Rec. S6,959 (daily ed. March 30, 1960). The CRA's "appropriate process" language was meant to confirm courts' unimpaired judicial oversight—not stymie it.

Applying the Rules here is consistent with the independent judicial function that they are designed to serve. Whatever the context, it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements, and whether evidence sought through the judicial process is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971) (citing Fed. R. Civ. P. 81). This independent judicial obligation is critically important today.

DOJ never supports its contrary assertion that this civil action is actually a "special statutory proceeding" that exists outside of the Federal Rules, whereby "the sufficiency of the Attorney General's statement" of basis and purpose cannot be questioned. U.S. Br. 38, 40. It points to no statutory text that so provides—because none exists. Rather, DOJ's conception of this "special" process is based solely on the Fifth Circuit's 1962 opinion in *Lynd*, 306 F.2d 222. *See* U.S. Br. 39–40. But that non-binding decision was issued before *Powell* and addressed wholly dissimilar circumstances.

*Lynd* was a response to the situation that prevailed in the Jim Crow states in the early 1960s, where counties refused to process the

registrations of Black voters and stymied every effort to enforce federal law. The Fifth Circuit described this recalcitrance: By the time *Lynd* was decided, the registrar defendants there had spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Lynd*, 306 F.2d at 227. This was all despite the fact that "the factual foundation for" the Title III requests was utterly self-evident—massive racial disparities in registration that evidenced discriminatory refusal to register Black voters—and DOJ had in fact clearly stated the factual basis and purpose of its requests. *See id*. at 226–28 & n.6.[22] Against that backdrop, the Fifth Circuit emphasized that, after months of dilatory action, a new round of plenary "judicial review or ascertainment" of facts was not warranted. *See id*. at 226–28.

Moreover, *Lynd* was decided before sensitive personal identifying information such as Social Security or driver's license numbers was part

[22] *See also infra* 41, 49

of a person's voter registration record, and before federal laws like the Privacy Act were passed to protect and constrain access to personal information. *Lynd* and contemporaneous cases required production of *public* records; as the court explained: "[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Id.* at 231. And even in that very different context, federal courts applying Title III recognized there would be "exception[s]" to "[t]he right of free examination of official records" due to improper purpose. *In re Coleman*, 208 F. Supp. at 201.

*Lynd* is thus inapposite, and in any event, DOJ goes far beyond *Lynd* now. It did not seek expedited summary judgment following months of litigation over a facially valid Title III demand—something that the Federal Rules would allow under appropriate circumstances, *see* Fed. R. Civ. P. 16(b), 56. It instead argues that Title III prevents federal courts from *any* inquiry into whether a DOJ demand for millions of voters' personal identifying information is legally valid, even where DOJ has invoked the court's jurisdiction by filing a civil action. No wonder so many courts have rejected this claim: Title III's text, binding cases like *Powell*,

the Rules, and basic notions of judicial independence are all to the contrary.

### B. DOJ Failed to Provide "a Statement of the Basis and the Purpose" for Its Demand.

Whatever form of inquiry applies, Title III's requirements must be met; otherwise DOJ's demand is fatally flawed and unenforceable. That is the case here.

#### *1. Title III requires DOJ to articulate the basis and the purpose of its demand.*

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from being used to conduct baseless "fishing expedition[s]" and to ensure notice to election officials of the nature of the federal inquiry. *See* 106 Cong. Rec. H5,326.

There are at least three notable aspects of Title III's text with respect to the "basis" and "purpose" requirements. First, Title III's use of the words "*shall* contain" demonstrates that "the requirement that the Attorney General state 'the basis'" and "the purpose" "is mandatory, not a mere formality with which the federal government or this Court is free to dispense." *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass.

2026); *see also, e.g.*, *Benson*, 179 F.4th at 483; *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877, at *5 (S.D.W.Va. July 13, 2026). Such mandatory commands are "impervious to judicial discretion." *E.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024).

Second, the requisite statement containing "the basis and the purpose" must be made "in writing," meaning that the basis and the purpose "must be made express." *Galvin*, 830 F. Supp. 3d at 128. In this way, "[t]he statute . . . directs the Court to the Attorney General's written demand—rather than the United States's subsequent court filings." *Id.*

Third, the statute's language, providing that the demand "contain a statement of *the* basis <u>and</u> *the* purpose therefor," confirms that "basis" and "purpose" are two independent, "conceptually distinct" requirements, both of which must be satisfied by the written demand. *Galvin*, 830 F. Supp. 3d at 128 (emphasis added); *see* 52 U.S.C. § 20703; *see also Benson*, 179 F.4th at 483; *Scanlan*, 2026 WL 1864054, at *6. Moreover, by twice using the definite article, the statute requires not just *a* conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S.

155, 165–66 (2021) (use of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

The "basis" is the factual grounds for why the Attorney General believes there may be a violation of voters' rights in the first place, whereas the "purpose" explains how the requested records would help the Attorney General determine if there is, in fact, a violation. *Lynd* illustrates how the statute is supposed to work. In *Lynd*, the Attorney General's stated basis was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." 306 F.2d at 229 n.6. The stated purpose was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred," i.e., to investigate and establish a discriminatory "pattern or practice" in the jurisdiction's voting registration processes. *Id.*; *see also id.* at 228 n.4. DOJ sent a single writing containing these statements to satisfy the statute's requirements. *Id.*

Here, the United States's failure to provide *either* the basis *or* the sufficient purpose for its request for Virginia's unredacted SVRL invalidates its CRA claim. This Court can affirm based on either of these fatal defects of statutory compliance.

### ***2. The United States failed to state the basis for its CRA demand.***

The "basis" for a CRA demand is a statement of why the United States believes there may be some relevant violation of law—the facts on which the demand is "based." *Lynd*, 306 F.2d at 229 n.6; *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis (last visited Aug. 17, 2026) ("something on which something else is established or based"). Courts have consistently held that "the 'basis' contemplated by Title III is a factual, not legal basis." *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, *United States v. Amore*, 831 F. Supp. 3d 149, 156 (D.R.I. 2026); *Galvin*, 830 F. Supp. 3d at 127 (noting dictionary definitions for "basis" include the "foundation" or "'chief supporting factor' 'for' the demand" (citation omitted)); *Oregon*, 828 F. Supp. 3d at 1103; *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026); *United States v. Hanzas*, No. 25-cv-00903, 2026 WL 2754349, *5 (D. Vt. Sept. 17, 2026); *United States v. Aguilar*, No. 25-cv-00728, 2026 WL

2364502, at *5 (D. Nev. Aug. 14, 2026); *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026); *Scanlan*, 2026 WL 1864054, at *7 (noting this textual "reading also accords with the Attorney General's own historical practice under Title III. . .").

DOJ suggests that stating the "*legal* basis" for the demand is sufficient, U.S. Br. 49, but that is indefensible. Merely referring to Title III cannot be sufficient, because *every* Title III request is, by definition, legally based on Title III. If DOJ could tautologically cite Title III as "the basis" for its request under Title III, the statutory obligation to provide "a statement of the basis" for the request in writing, 52 U.S.C. § 20703, would be rendered "wholly superfluous," *e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001), and the statutory aim of giving election officials proper notice would be disserved.

As for a factual basis, DOJ's demand letter simply did not contain one. DOJ invoked the CRA and demanded the SVRL pursuant to the Title III in its August 14 Letter. JA56–58. And the August 14 Letter contains literally nothing that could be characterized as a factual basis for the demand. *Id.* Rather, the letter claims that various statutes including the CRA entitle DOJ to the SVRL, and then states "[p]ursuant to the

foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Virginia's complete and current VRL." JA57. It states "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* It never sets forth a factual basis.

Even now, DOJ does not attempt to claim that the August 14 letter—the only place where it made a CRA demand—contained a factual basis for its CRA demand. The total omission of any factual basis for the demand is fatal, as numerous courts have concluded. *E.g.*, *Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1103; *Weber*, 816 F. Supp. 3d at 1184; *Warner*, 2026 WL 2018877, at *5; *see also, e.g.*, *Matthews*, 2026 WL 2212877, at *5; *Scanlan*, 2026 WL 1864054, at *7.

To evade this conclusion here, DOJ for the first time on appeal relies on the July 15 letter, which nowhere mentions the CRA, claiming that the factual basis for its CRA demand may nevertheless be found there and that the two letters should be "discussed and viewed as one." U.S. Br. 37. More specifically, DOJ points to the July 15 letter's references to Virginia's responses on the 2024 EAVS survey as supplying

the requisite factual basis. U.S. Br. 48–51. This argument fails for several reasons.

*First*, it is waived. DOJ included no allegations in its Complaint that the EAVS responses discussed in the July 15 letter were actually its "basis" for the CRA demand, and made no such arguments before the district court in its opposition to the motions to dismiss. Instead, DOJ argued below that the provision of a *legal* basis for the demand (*i.e.*, citing the CRA) was enough, *see* U.S. Opp. to MTDs at 10, D.Ct.Dkt. No. 58 ("[T]he basis for the demand was Title III of the CRA, the NVRA and HAVA,"). Having completely failed to identify, plead, or argue a factual basis before the district court, DOJ may not do so now for the first time on appeal. *E.g.*, *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

*Second*, the July 15 letter itself is not a "demand in writing" for purposes of the CRA. 52 U.S.C. § 20703. As a matter of statutory text, a CRA demand must take the form of a "demand in writing that "shall contain a statement of the basis and the purpose therefor." *Id.* In other words, the CRA requires a single written demand that "must contain *both*" a statement of the basis along with the purpose. *Benson*, 179 F.4th at 483 (emphasis added). Here, neither letter does that. The July 15

letter, which discusses Virginia's responses to the 2024 EAVS survey, does not mention the CRA at all. JA52–54. The August 14 letter, which does mention the CRA and which DOJ identified in its Complaint as propounding its written CRA demand, purports to state a "purpose" for the demand but includes no statement of any factual basis whatsoever. JA56–58; *see also* JA43 ¶ 25. The two letters cannot be combined after the fact to create a valid demand under the CRA. *See Benson*, 179 F.4th at 483 (noting none of the three letters sent to Michigan officials contained "both a statement of the basis along with the purpose"); *accord Oregon*, 828 F. Supp. 3d at 1104; *United States v. Griswold*, No. 25-cv-3967, 2026 WL 2235374, at *4 (D. Colo. Aug. 3, 2026); *United States v. Oliver*, No. 25-cv-01193, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026).

*Third*, even if the July 15 letter could be considered as part of the relevant CRA demand, that would not salvage DOJ's position, because that letter still contains no statement of the basis for the demand. DOJ claims that the July 15 letter refers to "irregularities" or "anomalies in Virginia's voter registration data" and expressed "concern over the sufficiency" of Virginia's maintenance efforts. U.S. Br. 7, 48. But the July 15 letter does not describe or refer to any "anomalies" or "concerns." *See*

JA52–54. Rather, the letter asks six focused questions about the responses Virginia reported on certain questions in the 2024 EAVS survey, for example noting that Virginia had reported a higher-than-average rate of duplicate registrations in its SVRL and asking for further information about Virginia's practices for removing duplicate registrations. JA53.

Such questions are not a basis for DOJ's sweeping SVRL demand. The July 15 letter never suggests any reason to think that Virginia's list maintenance procedures might not comply with the NVRA or HAVA. *See* JA52–54. It points out a few EAVS-reported categories of data like duplicate registrations or overall registration rates for which Virginia reported statistics that are somewhat different than other states. But as the 2024 EAVS Report itself acknowledges, such differences are to be expected between the states, and even within states. *See* 2024 EAVS Report, *supra* n.2 at 2 ("Broad legal and procedural authority [over elections] rests with the states . . . . As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing"). The July 15 Letter never explains how the survey responses DOJ

inquired about are even *potentially* indicative of any improper practice under the NVRA or HAVA or otherwise inconsistent with the "reasonable effort" at list maintenance that those statutes require. *Cf. Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing statutorily-required "reasonable effort" for purposes of NVRA and HAVA as "a serious attempt" which "need not be perfect, or even optimal"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026).

Notably, multiple federal courts have held that similar attempts to retroactively claim 2024 EAVS responses as the "basis" for a sweeping demand for the state's SVRL were insufficient. *See* DOJ Letter, *United States v. Weber*, No. 25-cv-9149 (C.D. Cal. Dec. 1, 2025), Dkt. No. 87-3 at 2 (claiming California's reported removal percentage for dead voters "was well below the national average"); DOJ Letter, *United States v. Schmidt*, No. 25-cv-1481 (W.D. Pa. Jan. 12, 2026), Dkt. No. 103-3 at 2 (claiming Pennsylvania's reported percentage of duplicates was "nearly three times below the nationwide average").

DOJ appears to acknowledge that one function of the CRA's "basis" requirement is to provide "notice" to election officials, U.S. Br. 50–51. But it never explains how DOJ's technical questions about Virginia's 2024

EAVS survey submission in the July 15 letter could have provided even a hint of notice that there might be some federal concern over Massachusetts's voter removal practices under the NVRA or HAVA—let alone that such concern was the basis for DOJ's later CRA demand for the state's SVRL.[23]

The CRA is not a game. The statute was designed to give DOJ significant power to investigate real violations of voting rights, but includes key safeguards to prevent pure fishing expeditions. DOJ need not use "magic words" or prematurely "prove a legal violation" to satisfy the statutory basis requirement. U.S. Br. 47–48 But it does need to provide the target jurisdiction with a clear written demand that sets forth "the basis and the purpose" therefor. That is what DOJ did in the early 1960s cases like *Lynd*. *E.g.*, 306 F.2d at 229 n.6 (demand was "based on information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made; *accord*

[23] Notably, DOJ never pleads or argues that it did not get answers to its various questions. To the contrary, it alleges that, after its July and August letters, there were "months" of further "discussions" with then-Commissioner Beals' office. JA43.

*Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (same demand) (cited at U.S. Br. 41). But DOJ failed to do that here.

### *3. DOJ failed to state a valid purpose for its CRA demand.*

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a legal violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. Title III requires an "assessment of the sufficiency of . . . the purpose asserted," *United States v. Bellows*, 834 F. Supp. 3d 113, 124 (D. Me. 2026); otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

Here, DOJ's August 14 letter invoking the CRA stated that "[t]he purpose of the request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." JA57. At least eight courts have held that this purported purpose did not satisfy Title III. *See United States v. Schmidt*, 835 F. Supp. 3d 697, 699–700 (W.D. Pa. 2026); *Bellows*, 834 F. Supp. 3d at 123–27; *Amore*, 831 F. Supp. 3d at 157–58; *Oregon*, 828 F. Supp. 3d at 1104–05; *Weber*, 816 F. Supp. 3d at 1183–84; *Griswold*, 2026 WL 2235374, at *4; *Matthews*, 2026 WL

2212877, at *5–6; *Warner*, 2026 WL 2018877, at *6–8. Here too, for multiple reasons, DOJ's stated purpose is invalid.

*First*, DOJ's stated purpose is outside the scope of Title III. The CRA and Title III were not designed "to investigate list maintenance procedures" but rather "violations of individuals' voting rights." *Oregon*, 828 F. Supp. 3d at 1105; *see also Amore*, 831 F. Supp. 3d at 157–58; *Weber*, 816 F. Supp. 3d at 1183; *Matthews*, 2026 WL 2212877, at *5. Its purpose was to "help end voting discrimination." *Benson*, 179 F.4th at 474. Accordingly, the purpose of a Title III demand must involve "an investigation into potential violations of an individual's right to vote." *Warner*, 2026 WL 2018877, at *7. To be sure, it is theoretically possible for list maintenance procedures to implicate individuals' right to vote—for example, in the case of their improper removal in violation of the NVRA, *see, e.g.*, 52 U.S.C. § 20507(d). But the generic statement in DOJ's August 14 letter does not indicate any such purpose.

*Second*, DOJ's stated purpose does not comport with the records it demands. Neither the August 14 letter nor the Complaint articulate how the unredacted SVRL, which is a static snapshot of Virginia's voter file,

is relevant to ascertaining Virginia's compliance with the NVRA or HAVA. JA41–44, 56–58. In fact, it is not.

Both the NVRA and HAVA make clear that voter list maintenance is the responsibility of the states. The NVRA requires states to "conduct a general program that makes a reasonable effort" to remove ineligible voters from the official lists of eligible voters. 52 U.S.C. § 20507(a)(4)(A)–(B). Perfect or error-free voter rolls are not the standard, nor are they feasible in practice. *See, e.g.*, 2024 EAVS Report at 150 (noting it is "inevitable that voter lists will contain some number of voter records for individuals who are no longer eligible to vote"); *see also, e.g.*, *Benson*, 136 F.4th at 624–26 (discussing "reasonable effort" requirement). Indeed, the NVRA explicitly *prohibits* removal of some potentially ineligible registrants until steps are taken to provide notice and ensure they are not removed prematurely or unfairly. 52 U.S.C. § 20507(d); *see also* 2024 EAVS Report at 150 (noting that "registration removal can take up to two federal general election cycles to complete for some registration records"). The NVRA thus mandates that state SVRLs include some voters who may no longer qualified to vote.

Meanwhile, HAVA, which requires the collection and use of personal identifying information and numerical identifiers in the state's SVRL, makes clear that it is *states*—not the federal government—who are principally tasked with "perform[ing] list maintenance." 52 U.S.C. § 21083(a)(2)(A). That statute expressly provides that "[t]he specific choices on the methods of complying with" such requirements "shall be left to the discretion of the State." *Id.* § 21085.

Accordingly, it is a state's *overall procedures* for voter list maintenance and how they are carried out that establish its compliance with the NVRA and HAVA, *see* 52 U.S.C. §§ 20507(a)(4), (c)(1), 21083(a)(2)(A), 21085; *see also Benson*, 136 F.4th at 624–26; *Oregon*, 828 F. Supp. 3d at 1097; *Matthews*, 2026 WL 2212877, at *1; *Bellows*, 834 F. Supp. 3d at 120–21. A snapshot of the unredacted voter file from one particular moment in time does not provide information relevant to determine if the state is making a "reasonable effort" to remove ineligible voters or is otherwise in compliance with the NVRA or HAVA. And the sensitive personal identifiers like driver's license numbers and partial Social Security numbers contained in such unredacted files are especially unnecessary for such an inquiry.

DOJ does not offer even a rudimentary explanation of how it would use the SVRL for its stated purpose. It argues that the SVRL will allow it to assess whether there are "possible violations of federal statutes," but never identifies what statutes might be violated or how the SVRL could be used to make that assessment. U.S. Br. 53–54. DOJ also baselessly references "fraudulent voting," again with no attempt to describe what this means, or how it relates to Virginia's SVRL. *Id.* DOJ's failure to articulate a valid purpose is independently fatal to its Title III claim.

*Third*, DOJ's stated purpose is also contradicted by judicially noticeable information and admissions confirming that it seeks to use voters' sensitive data for purposes other than those stated in the CRA demand including to violate the NVRA and HAVA.

DOJ intends to use whatever voter data it can get its hands on to work with DHS to build a national voter list that can and will be used for immigration-related enforcement. *See supra* 9–15 & nn.4–12. The statements and documents in the public record suggest the Administration's underlying intentions: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen

voting; and as a tool for immigration enforcement." *Schmidt*, 835 F. Supp. 3d at 699–700; *see also Oregon*, 828 F. Supp. 3d at 1106, 1108; *Weber*, 816 F. Supp. 3d at 1184; *Oliver*, 2026 WL 2031479, at *6 n.15. Yet creating a national voter list and conducting immigration enforcement are nowhere mentioned in DOJ's written CRA demand. JA56–58.

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* JA68–76. Far from supporting any purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," App.79, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. *See generally* 52 U.S.C. § 20507. The MOU suggests that DOJ's purpose is not ascertaining compliance with the NVRA and HAVA, but

defying those statutes to unlawfully centralize control over state voter rolls in the hands of the federal executive.

These are not "mere allegations." U.S. Br. 57. The Court need not ignore public, judicially-noticeable admissions and government documents and statements demonstrating DOJ's failure to set forth the actual purpose for its demand. *See supra* 9–15 & nn.4–12. It is not "required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019), or to "accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord Schmidt*, 835 F. Supp. 3d at 699–700; *Oregon*, 828 F. Supp. 3d at 1106–08; *Warner*, 2026 WL 2018877, at *8 n.9. DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703; *see Niz-Chavez*, 593 U.S. at 165–66. The pleadings and public record show that it did not. The Court can affirm on that basis as well.

## III. THE CRA DOES NOT REQUIRE DISCLOSURE OF PRIVATE, SENSITIVE VOTER INFORMATION TO THE FEDERAL GOVERNMENT.

Even if DOJ had provided the basis and the purpose for its demand for records—which it did not—certain personal voter information would

need to be redacted. Constitutional and privacy concerns prohibit disclosure of the sensitive information DOJ seeks.

Requiring voters to disclose unique identifiers like driver's license numbers to the federal executive as "a condition of [the] right to vote . . . creates an intolerable burden on that right." *See Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993). Voters would be discouraged from registering and exercising their right to vote if the sensitive information they submitted for registration could be seized by the federal executive without an opportunity to object. And this risk of chilling voters' rights is especially serious here where Administration actors have already shared Americans' sensitive personal information with anti-voter "election integrity" groups and uploaded such information to unsecured, non-government servers contrary to agency security protocols. *See supra* 11.

In *Lynd*, the Fifth Circuit noted that "of great importance" to its reasoning was that it was "not discussing confidential, private papers and effects," only public records. 306 F.2d at 231. But here, DOJ seeks sensitive private information like Social Security information. Federal laws enacted since *Lynd* was decided acknowledge the sensitivity of such

personal data. *See, e.g.*, 5 U.S.C. § 552(b)(6) (exempting private records from FOIA disclosure); 5 U.S.C. § 552a(b) (establishing protections for personal information held by the federal government); 44 U.S.C. § 3501 note (purpose of law is to "ensure sufficient protections for the privacy of personal information . . . ."). And today, unlike when *Lynd* was decided, there are new threats to this sensitive information: Voter data can be electronically transferred, compounded, hacked, or run through dubious, DOGE-run AI programs.

Courts' treatment of requests for state voter rolls under the NVRA is instructive here. The 1993 NVRA includes a records provision allowing for disclosure of records specifically related to list maintenance. *See* 52 U.S.C. § 20507(i)(1). And, as this Court and others have recognized, redaction of voters' sensitive personal data is permitted in NVRA cases and may even be affirmatively required to protect the right to vote and voter privacy. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021); *see also, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). Like the

NVRA, Title III must be interpreted to avoid burdening constitutional rights. *See Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56.

Interpreting Title III consistent with the later-enacted NVRA in this regard, to allow and even require redactions, makes sense. Both statutes use the same "all records" language. *Compare* 52 U.S.C. § 20507(i) *with* 52 U.S.C. § 20701. And both statutes are otherwise silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* 52 U.S.C. § 20507(i)(1).

DOJ argues that the NVRA's disclosure provisions are available to all, whereas the CRA applies only to the federal government. U.S. Br. 60–61. But invasions of privacy by the federal government are no less chilling than those wrought by private actors—indeed, some would find federal intrusions *more* problematic. Moreover, the limited CRA case law from around the time of the statute's passage expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230; *accord In re Coleman*, 208 F. Supp. at 200, recognizing that, even in the CRA context, courts can and must protect sensitive voter information. *See, e.g.*, *Long*, 682 F.3d at 339; *accord Bellows*, 92 F.4th at 56.

And in addition to these federal constitutional constraints, DOJ's efforts also run afoul of the Privacy Act, a federal statute that requires it to publish a System of Records Notice (SORN) detailing the use and storage of the SVRLs before collecting them, 5 U.S.C. § 552a(e)(4), and which bans the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," such as the right to vote, *id.* § 552a(e)(7); *see Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69, 75–76 (1990).

DOJ's response is that it may bypass these constraints by relying on old, outdated SORNs from many years ago, and an "authorized law enforcement activity" exception to the ban on First Amendment Rights databases. U.S. Br. 62–64. The breathtaking reasoning behind this position is that, in DOJ's view, *every registered voter in America is a subject of a federal criminal investigation into voter fraud* and also somehow simultaneously a victim of the fraud being investigated. *See* U.S. Br. 63–64 ("Persons who appear in [an SVRL] are '[s]ubjects of investigations,' 68 Fed. Reg. at 47,611," and also "potential 'victims' of NVRA and HAVA noncompliance, 68 Fed. Reg. at 47,611."). That DOJ

needs to characterize every registered voter in the country as a subject and/or victim of a criminal investigation to get around the requirement to publish a new SORN is telling. Under DOJ's interpretation, it can compile and maintain a nationwide voter database that has never been authorized by Congress as part of its "routine" enforcement of the NVRA, HAVA, and the CRA. *See* U.S. Br. 63. This would render the Privacy Act's protections meaningless.

Even if DOJ had properly pleaded some entitlement to Virginia's SVRL under Title III, voters' sensitive personal information would need to be protected. Because DOJ demands only the unredacted SVRL, which cannot be disclosed without violating the Constitution and the Privacy Act, its demand is defective. The Court can affirm on that basis as well.

## CONCLUSION

The decision below should be affirmed.

Dated: October 8, 2026 Respectfully submitted,

*/s/ Ari Savitzky*

PATRICIA YAN
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

ARI J. SAVITZKY
DAVIN ROSBOROUGH
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Counsel for Defendants-Appellees Common Cause and Katherine Ellena*

**CERTIFICATE OF COMPLIANCE**

I certify this motion complies with the length limits set forth in Fed. R. App. P. 27(d)(2) because this brief contains 12,947 words excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: October 8, 2026

*/s/ Ari Savitzky*
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause and Katherine Ellena*

# CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2026, I electronically filed the foregoing brief by using the ECF system.

I certify that the participants in the case are registered ECF users and that service will be accomplished by the ECF system.

Dated: October 8, 2026

*/s/ Ari Savitzky*
Ari Savitzky

*Counsel for Defendants-Appellees Common Cause and Katherine Ellena*